UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LIMA LS PLC,<br><br>Plaintiff,<br><br>v.<br><br>PHL VARIABLE INSURANCE COMPANY, a Connecticut corporation; PHOENIX LIFE INSURANCE COMPANY, a New York corporation; THE PHOENIX COMPANIES, INC., a Connecticut corporation; JAMES D. WEHR, an individual; PHILIP K. POLKINGHORN, an individual; EDWARD W. CASSIDY, an individual; and DONA D. YOUNG, an individual, and DOES 1-20, inclusive,<br><br>Defendants. | No. _____<br><br>**COMPLAINT FOR:**<br><br>**(1) VIOLATIONS OF CONNECTICUT ANTITRUST ACT, CONN. GEN. STAT. §§ 35-24, ET SEQ.;**<br><br>**(2) VIOLATIONS OF CONNECTICUT ANTITRUST ACT, CONN. GEN. STAT. §§ 35-24, ET SEQ.;**<br><br>**(3) VIOLATIONS OF CONNECTICUT UNFAIR TRADE PRACTICES ACT, CONN. GEN. STAT. §§ 42-110A, ET SEQ.;**<br><br>**(4) VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1962(C) AND (D); AND**<br><br>**(5) FRAUD**<br><br><br><br>**JURY TRIAL DEMANDED**<br><br>AUGUST 2, 2012 |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................. 1

II.     GENERAL BACKGROUND ................................................. 4

III.    JURISDICTION AND VENUE ............................................ 10

IV.     THE PARTIES .................................................................. 10

V.      LIFE INSURANCE ........................................................... 13

VI.     THE SECONDARY MARKET FOR LIFE INSURANCE ........... 15

VII.    PHOENIX ....................................................................... 17

    A.   Phoenix's Struggles After Its Demutualization in 2001 .................... 17

    B.   Phoenix's Use of the Secondary Market to Increase Sales in the Primary Market ................................................................. 19

    C.   Phoenix's Massive Losses As a Result of the 2008 Financial Crisis ................ 29

VIII.   DEFENDANTS' UNLAWFUL STRATEGY TO SHED BILLIONS OF DOLLARS OF FUTURE LIABILITIES ................................ 31

IX.     PHOENIX'S ANTICOMPETITIVE STRATEGY AND CONDUCT .......... 33

    A.   PHL Has Improperly Refused or Delayed the Processing of Policy Transfers ................................................................. 38

    B.   Phoenix Refuses to Tell Policyholders Whether It Will Honor Their Policies ................................................................. 39

    C.   Phoenix Has Improperly Attempted to Raise the COI Rates on Its Policies ....... 41

    D.   Phoenix Has Issued False and Misleading Policy Illustrations .......... 46

    E.   Phoenix Has Regularly Denied Claims for Death Benefits on Baseless and Pretextual Grounds ................................... 47

    F.   Phoenix Refuses to Return the Premiums It Has Collected When Seeking to Rescind or Void Its Own Policies ............ 50

X.      THE SUCCESS OF PHOENIX'S ANTICOMPETITIVE CAMPAIGN ........ 54

XI.     PHOENIX'S ANTICOMPETITIVE PURPOSE AND INTENT ............... 56

XII.    THE RELEVANT MARKETS ............................................. 57

    A.   Relevant Product Market ............................................. 57

    B.   Relevant Geographic Markets ....................................... 60

XIII.   THE SECONDARY MARKET FOR PHOENIX POLICIES ........... 60

XIV.    PHOENIX'S MARKET POWER IN THE SECONDARY MARKET ......... 64

    A.   The Secondary Market Features Substantial Entry and Expansion Barriers ....... 65

# TABLE OF CONTENTS
(continued)

**Page**

XV.     THE EFFECT OF PHOENIX'S CONDUCT ON TRADE OR COMMERCE .............. 67

XVI.    INJURY-IN-FACT AND DAMAGES ........................................................................ 67

XVII.   ANTITRUST INJURY AND STANDING ................................................................ 68

XVIII.  THE INDIVIDUAL DEFENDANTS' PATTERN OF RACKETEERING .................. 69

        A.      Premium Notices ........................................................................................ 72

        B.      Annual Statements ...................................................................................... 74

        C.      Verifications of Coverage ........................................................................... 76

        D.      Policy Illustrations ..................................................................................... 78

        E.      COI Letters .................................................................................................. 79

XIX.    CLAIMS FOR RELIEF ........................................................................................... 83

        A.      FIRST CAUSE OF ACTION (ACTUAL MONOPOLIZATION) .................... 83

        B.      SECOND CAUSE OF ACTION (ATTEMPTED MONOPOLIZATION) ......... 84

        C.      THIRD CAUSE OF ACTION (UNFAIR TRADE PRACTICES) .................... 85

        D.      FOURTH CAUSE OF ACTION (VIOLATIONS OF RICO) ........................... 87

        D.      FIFTH CAUSE OF ACTION (FRAUD AND CONSPIRACY TO
                DEFRAUD) ................................................................................................... 90

XX.     PRAYER FOR RELIEF ........................................................................................... 92

        A.      On the First Cause of Action ...................................................................... 92

        B.      On the Second Cause of Action .................................................................. 93

        C.      On the Third Cause of Action ..................................................................... 93

        D.      On the Fourth Cause of Action ................................................................... 94

        E.      On the Fifth Cause of Action ...................................................................... 94

XXI.    DEMAND FOR JURY TRIAL ................................................................................. 95

## COMPLAINT

For its Complaint against Defendants PHL Variable Insurance Company ("PHL"), Phoenix Life Insurance Company ("PLIC"), and The Phoenix Companies, Inc. ("PNX") (collectively, "Phoenix" or the "Company"), and certain of their current and former officers, James D. Wehr, Philip K. Polkinghorn, Edward W. Cassidy, and Dona D. Young (collectively, the "Individual Defendants" and together with Phoenix and Does 1 through 20, "Defendants"), Plaintiff Lima LS plc ("Plaintiff" or "Lima") hereby alleges as follows:

## I.  INTRODUCTION

1.      This lawsuit revolves around a failing life insurance company and management's desperate and illegal attempts to keep the Company afloat so they can continue to pay themselves millions of dollars each year.  Meanwhile, the Company is secretly trying to purge billions of dollars of future liabilities by causing policyholders to lapse or surrender their policies, refusing to pay death benefits when policies mature, and canceling its own policies while keeping the premiums.

2.      Between roughly 2003 and 2009, Phoenix made hundreds of millions of dollars selling billions of dollars in life insurance policies that were later sold to investors on the secondary market for life insurance.  In addition to lining their own pockets, Phoenix's management took the premiums generated from these sales and sunk them in high-risk investments.  They also planned to take these revenues and *buy* life insurance policies on the secondary market, which would increase demand for Phoenix policies in the primary market and hedge against the mortality risks from the Company's new sales of life insurance. Management's strategy was straightforward:  (a) use the demand for life insurance policies in a burgeoning secondary market to generate premium revenue from new sales of life insurance in

the primary market, (b) turn a huge profit on those premiums by earning spreads on high-risk investments, and (c) offset the Company's mortality exposure by buying policies in the secondary market.

3.     That seemingly flawless plan crumbled when the national financial crisis struck in 2008, causing Phoenix to incur over a billion dollars of losses on its investment portfolio and to reveal the following in its 2008 annual report filed with the Securities and Exchange Commission:

> The value of our investment portfolio has declined which has resulted in, and may continue to result in, higher realized and/or unrealized losses.  For example, in 2008 **the value of our general account investments decreased by $1.3 billion**, before offsets, due to net unrealized losses on investments.  A widening of credit spreads, such as the market has experienced recently, increases the net unrealized loss position of our investment portfolio and may ultimately result in increased realized losses.  The value of our investment portfolio can also be affected by illiquidity and by changes in assumptions or inputs we use in estimating fair value.  Further, **certain types of securities in our investment portfolio, such as asset-backed securities supported by residential and commercial mortgages, have been disproportionately affected**.  Continued adverse capital market conditions could result in further realized and/or unrealized losses.  (Emphasis added).

4.     Within a matter of months, Phoenix's stock price plunged from $13.98 per share to $0.29 per share, as the Company lost nearly **a billion and a half dollars** in shareholder equity, suffered several credit rating agency downgrades that crippled the Company's ability to sell new life insurance, and lost two of its main distributors who stopped selling Phoenix policies due to concerns about the Company's reputation and ability to pay future claims.

5.     Since then, Phoenix and its management have been trying to recoup the Company's massive losses by eradicating the liabilities associated with billions of dollars in policies that the Company sold between approximately 2003 and 2009 – most of which are now owned by investors who purchased them on the secondary market.  Since as early as 2009, Phoenix has been engaged in a subversive scheme to create uncertainty about whether it will

honor the terms of its own policies, forcing policyholders like Plaintiff to have to decide whether to (a) forfeit their investments by lapsing or surrendering their policies back to Phoenix, and let Phoenix keep all or most of the premiums while it never has to pay the death benefits, or (b) continue paying premiums to Phoenix, even though Phoenix might never honor their policies but will nevertheless keep their premiums. All the while, Phoenix continues to induce policyholders to continue paying premiums to Phoenix by affirmatively representing to them in policy statements and correspondence that their policies are "in force" and "active." But after collecting premiums for years, Phoenix then tries to keep their premiums and void their policies or refuse to pay the death benefits when they come due.

6. Plaintiff brings this action against Defendants based on their anticompetitive and exclusionary attempts to destroy competition and attain or maintain a monopsony in the secondary market for life insurance policies issued by Phoenix.[1] To accomplish their unlawful scheme, Defendants have used Phoenix's unique position as the issuer of Phoenix policies to erect strategic barriers that have excluded other buyers or potential buyers from this market. As virtually the only buyer left in the market, Phoenix is now able to set market prices at nothing or next to nothing. Defendants' conduct has not only injured market participants, it has undermined the integrity of Phoenix's own life insurance contracts to the detriment of consumers, Phoenix's policyholders, potential buyers of Phoenix policies, and competition in the secondary market.

7. Furthermore, in connection with Defendants' overall strategy to attain or maintain a monopsony on the secondary market for Phoenix policies, the Individual Defendants have conducted the affairs of Phoenix through a pattern of racketeering activity that has entailed fraudulently inducing Plaintiff and other policyholders to continue paying premiums to Phoenix

---

[1] A monopsony is a monopoly on the buyer side of a market and exists where a buyer dominates a market and has the power to drive prices below competitive levels. A monopsony is sometimes referred to as a buyer's monopoly.

while the Individual Defendants have no intention of allowing Phoenix to honor the terms of its own policies. They will, instead, attempt to force policyholders to lapse or surrender their policies, or else try to rescind their policies or deny the death benefits when the policies mature. If their plan is successful, Phoenix will, over time, end up paying only a very small percentage of the death benefits on the policies it issued.

## II.  GENERAL BACKGROUND

8.     Until relatively recently, consumers who wanted to sell their life insurance policies were limited to one potential purchaser – the company that issued the policy. A person who owned a life insurance policy but no longer needed or wanted it had two economically inefficient options: (i) let the policy lapse and receive *nothing* in return for the cancellation of the policy; or (ii) surrender the policy back to the insurance company that issued it in exchange for a cash surrender value that was typically *a nominal amount*. Lapsing or surrendering a policy is, in effect, selling the policy back to the insurance company that issued it. That "sale" almost always results in a loss to the consumer and a windfall for the insurance company, which keeps most, if not all, of the premiums paid to date and never has to pay any death benefits to the policyholder.

9.     Over roughly the past decade, the emergence of a robust secondary market for life insurance has eliminated this market deficiency by providing consumers with a third, often superior option: they can sell (or "settle") their policies to a buyer other than the insurance company.[2] That buyer, often a bank, insurance company, investment fund, pension fund, or other institutional investor that is seeking investments uncorrelated to the traditional equity and

---

[2] As the United States Government Accountability Office observed in its July 2010 Report to the Special Senate Committee on Aging (the "GAO Report"):  "A policy owner with unneeded life insurance can surrender the policy to the insurer for its cash surrender value.  Or, the owner may receive more by selling the policy to a third-party investor through a life settlement."

debt capital markets, may offer the consumer as much as, or even more than, **ten times** the cash surrender value offered by the insurance company that issued the policy. The investor that purchases the policy continues to pay premiums and will receive the death benefit when the policy matures, yielding a gain or loss on the investment that is equal to the difference between (i) the death benefit and (ii) the purchase price plus the additional premiums paid. The investor may also sell or resell the policy to another investor on the secondary market. The secondary market has benefited consumers by providing a liquid market where they can sell their policies for fair value, as opposed to just lapsing or surrendering their policies to the insurance company that issued them and receiving nothing or very little in return.

10.     It is also no secret that insurance companies, including Phoenix, initially helped to create the secondary market for life insurance because it allowed them to sell significantly larger amounts of insurance. Consumers who would not otherwise do so bought life insurance knowing they could later sell their policies for fair market value if they did not need or want to keep their policies, and many consumers began purchasing life insurance with the knowledge they might one day be able to sell their policies for a profit. In other words, the existence of a robust secondary market drove up the demand for life insurance in the primary market. Phoenix, therefore, not only embraced the secondary market, Phoenix helped create it.

11.     Over the span of just a few years, Phoenix sold billions of dollars in policies that it knew would be resold on the secondary market. Upon information and belief, while Defendant Young was the President, Chief Executive Officer, and Chairman of the Board of PNX[3], Defendant Polkinghorn, the Executive Vice President of Business Development of PNX, directed Phoenix's product development teams to design policies that would be ideal for

---

[3] Defendant Young was the President of PNX from 2000 to April 15, 2009 and the Chief Executive Officer and Chairman of the Board from April 1, 2003 to April 15, 2009. She also remained as a consultant for PNX from April 15, 2009 to April 15, 2010.

investors in the secondary market.  Polkinghorn and Defendant Cassidy, who joined Phoenix in 2006, actively encouraged Phoenix's sales force to seek out business through agents who had relationships with investors on the secondary market.  To facilitate the sales of policies with the highest possible death benefits (so that Phoenix could receive the large amounts of premiums associated with such high-dollar policies), Phoenix adopted a sales strategy that involved relaxing or disregarding its normal underwriting standards and encouraging consumers to overstate their net worth and income.  At Defendant Polkinghorn's and Cassidy's direction, Phoenix did not require policy applicants to provide documentary support for their stated net worth and income, and Phoenix intentionally ignored glaring inconsistencies and other red flags in policy applications, because Phoenix cared only about receiving the premium payments. Phoenix did not care about whether the insureds needed or could afford the policies because Phoenix knew these policies would later be sold to investors in the secondary market.

12.     As a result of Phoenix's sales and marketing practices, PHL increased its annual revenues from life insurance premiums *by over 350%*, from $125 million in 2003 to $445 million in 2007.  Most, if not all, of these additional premiums came from Phoenix's sales of universal life insurance, the most common type of life insurance purchased by investors in the secondary market.  Phoenix's management used these sales as a basis for lining their own pockets with multimillion dollar executive compensation packages.

13.     Toward the end of 2008, however, Phoenix sustained massive losses on its risky investment portfolio, which, at the direction of the Chief Investment Officer at the time, Defendant Wehr, was comprised of hundreds of millions of dollars in subprime and Alt-A residential mortgage-backed securities.  Phoenix's main distributors, State Farm Mutual Automobile Insurance Company ("State Farm") and National Life Group, publicly announced

that they would no longer sell Phoenix products.  Compounding Phoenix's problems, several

rating agencies downgraded Phoenix's financial ratings and future outlook, signaling that

Phoenix might not be able to meet its obligations to pay claims in the future and crippling its

ability to sell new life insurance policies in the primary market.

14.     Phoenix was left unable to compete in the primary market for life insurance due to

rating agency downgrades and the loss of key distribution channels – and unable to compete in

the secondary market for life insurance due to limited capital and liquidity.  Faced with this

market reality, Defendants, upon information and belief, made a calculated decision:  Phoenix

would scale back its sales of life insurance in the primary market and try to recapture its previous

monopsony (and become the sole buyer of its policies) in the secondary market by engaging in a

series of anticompetitive and exclusionary acts designed to prevent or discourage the sales of its

policies to third parties and create uncertainty as to whether Phoenix would perform under its

own policies, so that no one other than Phoenix could or would buy a Phoenix policy on the

secondary market.  By thereby eliminating competition in the secondary market for its policies,

Phoenix would leave policyholders who wanted to sell their policies with no choice but to lapse

or surrender them back to Phoenix.

15.     Defendants thus devised, and have executed, a carefully-conceived strategy that

includes, *inter alia*: (a) refusing to pay death benefits when policies mature; (b) refusing to

record the transfers of ownership of its policies; (c) refusing to tell policyholders whether it

would honor its policies; (d) forcing secondary market purchasers to incur substantial and

unnecessary litigation costs and delays before obtaining the benefits of their policies;

(e) resurrecting policy liens that Phoenix itself had released years earlier to avoid or delay paying

death benefits; (f) seeking to rescind its policies on the ground that the policies were void from

the very beginning, while attempting to keep the premiums it has collected over the years;
(g) improperly raising cost of insurance (or "COI") charges (*i.e.*, the portion of the premium
payment attributable to providing insurance, as opposed to other expenses and fees) on its
policies, including singling out for such increases policies that were purchased by Phoenix's
competitors on the secondary market; (h) attempting to rescind policies even after improperly
raising COI charges on those same policies; (i) issuing false and misleading illustrations that
inflate a policy's future charges to make the policy appear less valuable to policyholders and
secondary market purchasers; and (j) singling out secondary market purchasers of Phoenix
policies for other discriminatory treatment.

16.     As a result of Defendants' anticompetitive and exclusionary conduct, there are
very few, if any, buyers who remain willing to purchase Phoenix life insurance policies on the
secondary market.  Defendants' anticompetitive and exclusionary conduct, and the resulting
uncertainty it has created, has destroyed the value of Phoenix policies and robbed policyholders
of the once-precious ability to sell their policies in a competitive market.  The few buyers who do
remain will only buy Phoenix policies at severe discounts and at prices that are far below the
actual value of the policies in the absence of Defendants' anticompetitive and exclusionary
conduct.  That conduct has left Phoenix as a monopsonist or virtual monopsonist in the
secondary market for its policies.

17.     In furtherance of this anticompetitive and exclusionary scheme, the Individual
Defendants have also used Phoenix as an unlawful enterprise through which they have
fraudulently induced Plaintiff and other policyholders to pay premiums to Phoenix, while
Phoenix, at the direction of the Individual Defendants, has no intention of ever honoring their
policies.  Instead, as Phoenix continues to collect premiums, the Individual Defendants have

directed Phoenix to engage in actions designed to force Phoenix's policyholders to eventually lapse or surrender their policies before they ever mature.  For example, the Individual Defendants have directed Phoenix to issue notices to policyholders advising them that Phoenix is raising their COI rates.  These rate increases were specifically designed to "shock" policyholders into immediately lapsing or surrendering their policies, and many policyholders did, in fact, lapse or surrender their policies.  But even if some policyholders do not lapse or surrender their policies as a result of the cost of insurance increases, the Individual Defendants have no intention of permitting Phoenix to honor the terms of its policies.  Their plan is instead to continue collecting premiums while trying to force future lapses and surrenders.  If a policyholder does not lapse or surrender his or her policy, Phoenix will then deny the death benefits when a claim is made and take the position that the policy was void *ab initio* because it was purchased with the thought of potentially selling it to an investor (as many of Phoenix's policies were).

18.     As a result of Phoenix's anticompetitive strategy and the Individual Defendants' fraudulent scheme, Phoenix's policyholders (including consumers who purchased their policies directly from Phoenix and investors who purchased policies from consumers or other investors on the secondary market) face a sinister dilemma: either (a) continue to pay premiums to Phoenix solely to protect their investments and hope that Phoenix will ultimately honor their policies, or else (b) forfeit all or nearly all of their investments by selling their policies back to Phoenix for nothing or next to nothing.  In either case, Phoenix and the Individual Defendants who devised and have invested in their unlawful and fraudulent enterprise will make a huge profit.

19.     This Complaint is filed, and this action is instituted, to recover the damages caused by Defendants' past and continuing violations of law, as further detailed below.

### III.  JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the Complaint alleges claims for relief arising under federal law, specifically the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).

21.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the action involves parties of diverse citizenship, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

22.     This Court has personal jurisdiction over the Defendants because they are found in this judicial district and because they conduct and transact business in this district.

23.     Venue is proper pursuant to 28 U.S.C. §§ 1391(a)(1), (a)(2), and 1391(b) and 18 U.S.C. § 1965(a) because one or more Defendants resides or reside in this judicial district, and a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district, and one or more Defendants transacts their affairs in this district.

### IV.  THE PARTIES

24.     Plaintiff Lima LS plc is a company incorporated in England and Wales with limited liability, with its principal place of business and nerve center in London, England.

25.     Lima is a participant and investor in the secondary market for Phoenix life insurance policies.  As of July 30, 2012, Lima holds the interest in 197 Phoenix policies currently in force (the "In Force Policies").  These policies were issued between 2003 and 2009 and total $1.15 billion dollars in face amount.  Phoenix has collected approximately $137.4 million in premiums on the In Force Policies, and Lima continues to pay Phoenix approximately $3.4 million each month in premiums on these policies.  As of July 30, 2012, Lima has lapsed or surrendered (*i.e.*, sold to Phoenix) a total of 52 policies and received $0 in return for those

polices (the "Lapsed Policies"). The Lapsed Policies had a total face amount of $229 million. Phoenix received a total of $16.6 million in premiums on the Lapsed Policies before they were lapsed. The In Force Policies and the Lapsed Policies are referred to herein, collectively, as the "Lima Policies" or the "Policies." A list of the In Force Policies is set forth on Appendix A to the Complaint. A list of the Lapsed Policies is set forth on Appendix B to the Complaint.

26.     Lima acquired the interests in the Policies in December 2010 through its acquisition of five limited liability companies that held the interests in the Policies. After the acquisition, four of the five limited liability companies were merged into one of the companies, Estate Planning, LLC, which was then converted to a limited partnership and renamed Lima Acquisition LP ("Lima LP"). Lima is the general partner of Lima LP. The Policies are held, or were held (in the case of the Lapsed Policies), by U.S. Bank National Association ("U.S. Bank"), as securities intermediary for Lima LP. At the time of the acquisition, Lima had no knowledge of Defendants' fraudulent and unlawful scheme as described herein.

27.     Lima from time to time resells, or attempts to resell, Phoenix policies to other investors in the secondary market, primarily in the United States. Lima may also be forced to lapse or surrender Phoenix policies (*i.e.*, sell policies back to Phoenix) in the future as a result of Defendants' unlawful conduct as described herein.

28.     Upon information and belief, Defendant PNX is a Connecticut corporation with its principal place of business and nerve center located in Hartford, Connecticut. PNX is the parent company of Defendants PLIC and PHL. PNX's officers and directors overlap with the officers and directors of Defendants PHL and PLIC.

29.     Upon information and belief, Defendant PLIC is a New York corporation with its principal place of business and nerve center located in Hartford, Connecticut. PLIC issues life

insurance policies, including policies owned by Lima.  PLIC is the indirect parent of Defendant PHL.

30.     Upon information and belief, Defendant PHL is a Connecticut corporation with its principal place of business and nerve center located in Hartford, Connecticut.  PHL issues life insurance policies, including policies owned by Lima.

31.     Defendant James D. Wehr is the President and Chief Executive Officer of PNX and, upon information and belief, resides in the State of Connecticut.

32.     Defendant Philip K. Polkinghorn is the Executive Vice President of Business Development of PNX and the President of PNX's Life and Annuity Business Segment, and upon information and belief, resides in the State of Connecticut.

33.     Defendant Edward W. Cassidy is the Executive Vice President of Distribution of PNX and, upon information and belief, resides in the State of Connecticut.

34.     Defendant Dona D. Young was the President of PNX from 2000 to April 15, 2009; the Chief Executive Officer and Chairman of the Board of PNX from 2003 to April 15, 2009; and a consultant to PNX until at least April 15, 2010, and, upon information and belief, resides in the State of West Virginia.

35.     The true names and capacities, whether individual, corporate, associate, or otherwise of Defendants Does 1-20, inclusive, are unknown to Plaintiff at this time.  Each of these unknown Defendants is responsible in some manner for the conduct and events described herein and proximately caused injuries and damage to Plaintiff as alleged herein.  Plaintiff therefore sues said Defendants by such fictitious names and reserves the right to move for leave to amend this complaint when the true name of each such Defendant is ascertained.  Defendants

sued herein as Does 1-20 may include current and former officers and directors of Phoenix who directed, participated in, or authorized the unlawful conduct described herein.

## V.  LIFE INSURANCE

36.     Life insurance is a multi-billion dollar industry in the United States.

37.     Life insurance policies are issued by insurance companies.  No other entities are authorized to provide life insurance.  A potential insured will apply for life insurance, either directly to a life insurance company or through a licensed and authorized insurance agent.

38.     Over the last few decades, insurance companies have transformed life insurance from a simple mechanism traditionally used to protect against the risk of death into an investment that consumers use for tax-deferred growth, to avoid potential estate tax liability, and even for short-term financial gain.  This transformation has occurred as insurers have designed new forms of life insurance, including universal and variable life insurance, which emphasize the investment features of life insurance.  Unlike traditional term life insurance (which provides life insurance for an agreed-upon period of time at fixed premiums) and whole life insurance (which provides a death benefit coverage over the insured's lifetime, in most cases for a level premium that is higher than the premium for comparable term insurance), universal life insurance gives policyholders the choice to pay solely for "pure insurance" or to pay more into a policy account as an investment.  Universal life insurance policies are often described as combining a term life insurance policy (the "pure insurance" component) with a traditional savings account (the "investment" component).  Owners can pay premiums in any amount and at any time as long as enough money is paid to cover the cost of the "pure insurance" protection.

39.     Before a policy is issued, a prospective insured must be underwritten by the insurance company.  Underwriting standards may vary from insurer to insurer, but typically the

prospective insured will have to fill out a lengthy application and undergo a comprehensive medical examination to determine that she or he is healthy enough to be insured.  The insurance company can also request other information material to its decision whether to issue a policy, what type of policy it will issue, and how much insurance it will issue.

40.     Once a policy is issued, the insured is responsible for paying premiums to keep the policy in effect.  Sometimes, life insurance policies are purchased by insureds themselves or trusts created to hold the policies, and sometimes they are purchased for insureds by or with the assistance of others, such as the insureds' employers.  At other times, insureds purchase policies with financing provided by a bank or other third party.

41.     Insurance companies are permitted by state insurance law to charge insureds different premiums only for certain recognized and actuarially relevant and valid reasons.  For example, older individuals may be charged higher premiums than younger individuals because their life expectancies are shorter.  Smokers may be charged higher premiums than non-smokers because their risk of an earlier death is higher.  However, insurers generally may not discriminate by charging different rates for people with similar life expectancies.

42.     If an insured dies while a policy is in force, the insurance company is responsible for paying the death benefit to the designated beneficiary or beneficiaries.

43.     Generally, the death benefit that is paid to the beneficiary is not included as income to the beneficiary for U.S. tax purposes.

44.     Most state insurance laws require that every policy include a provision known as a "contestability clause," which states that the insurer cannot contest the policy after two years from the date it is issued.  Contestability clauses were introduced over a century ago, after years of carrier abuse, to prevent carriers from trying to revisit their decision to issue a policy after

they received years of premiums and at last received a claim for the death benefit.  Contestability clauses give "assurances to persons . . . that neither they nor their families, after the lapse of a given time, will be harassed with lawsuits when the evidence of the original transaction shall have become dim, or difficult of obtention, or when, perhaps, the lips of him who best knew the facts are sealed by death."  *Kansas City Mut. Life Ins. Co. v. Whitehead*, 123 Ky. 21, 27 (1906). Because an insurer cannot contest a policy after the contestability period, a life insurance policy becomes more valuable upon the expiration of the contestability period.

45.     The value of a life insurance policy also generally increases over time because premiums have already been paid on the policy, and the risk of death has generally increased as the insured has aged.

## VI.  THE SECONDARY MARKET FOR LIFE INSURANCE

46.     Life insurance policies are transferrable or assignable, like other assets.  Over a century ago, the United States Supreme Court, in *Grigsby v. Russell*, 222 U.S. 149 (1911), held that a life insurance policy is private property that should be freely assignable at the will of the owner.  In so holding, Justice Holmes observed that "life insurance has become in our days one of the best recognized forms of investment and self-compelled saving.  So far as reasonable safety permits, it is desirable to give to life policies the ordinary characteristics of property."  *Id.* at 155-56.

47.     Despite the principles of transferability and assignability, until relatively recently, owners had the right to sell their policies, but few buyers were available.  Life insurance companies themselves were the only significant buyers of their own policies.  With few, if any, exceptions, life insurance companies would buy back only their own policies; they did not buy each other's policies.

48.     An insured who no longer wanted to keep his policy or pay its associated premiums had essentially two choices: (i) let the policy lapse and receive nothing in return for the cancellation of the policy, or (ii) surrender the policy back to the insurance company that issued it in exchange for a cash surrender value that was often a nominal amount.

49.     Insurance companies relished this arrangement.  For either zero cash outlay or a nominal payment, they could avoid paying the death benefits associated with policies while keeping almost all of the premiums that had already been paid.  Because there was no meaningful competition in any secondary market for their policies, insurance companies were able to reap a huge windfall when they were released of this liability.

50.     During the AIDS crisis of the 1980s, a nascent secondary market for life insurance policies emerged in the form of viatical settlements.  Through viatical settlements, third parties bought life insurance policies for more than their cash surrender value, allowing AIDS patients to access a portion of their life insurance benefits to pay for medicine and other health care costs.  Activity on this early secondary market, however, was limited to AIDS patients and others who were terminally ill, and it rarely involved the resale of policies by one investor to another.

51.     Within the past decade, the viatical settlements market has developed into a more diverse and complex secondary market that is not limited to AIDS patients or the terminally ill. By developing substantial know-how (including knowledge of how to value and price insurance policies and the utilization of sophisticated software to track and optimize premium payments), investors such as global insurance companies, multi-national banks, investment funds, pension funds, and other major financial institutions began to purchase and resell life insurance policies in this secondary market.

52.     This secondary market has created competition for insurance companies that had previously reaped a windfall from lapses and surrenders.  Consumers who no longer wanted to keep their policies could instead, as the GAO Report observed, "receive more by selling [their] [policies] to a third-party investor."  Competition created by the availability of secondary market purchasers has thus allowed consumers to realize the true value of their policies.

## VII.  PHOENIX

### A.     Phoenix's Struggles After Its Demutualization in 2001

53.     Phoenix is a life insurance company that has been in existence since approximately 1850.  According to its public filings, Phoenix's core business has been designing and marketing life insurance products "with a particular focus on the high-net-worth and affluent market."  Upon information and belief, Phoenix targeted this niche market because, as a smaller and lesser-known insurance company, it was unable to compete with larger insurance companies in the broader market.

54.     In 2001, Phoenix's predecessor, Phoenix Home Life Mutual Insurance Company, converted from a mutual insurance company owned by its policyholders to a stock insurance company, and was renamed The Phoenix Companies, Inc.  The Phoenix Companies, Inc. went public on or about June 25, 2001.  The President of the Company when it went public was Defendant Young.

55.     Since Phoenix's demutualization in 2001 through 2004, the Company struggled through numerous financial rating downgrades as a result of what one of its largest shareholders later described as "inefficient capital allocation" and "excessive cost and overhead structure."  In addition, Phoenix's diversions into other business segments, including an asset management business through its subsidiary, Phoenix Investment Partners, Ltd. ("PXP"), were a massive

financial drag on the company.  In 2003, PXP managed approximately $59.2 billion in assets, which by the end of 2004 had dropped in value by nearly $20 billion as the Company's repeatedly poor investment decisions resulted in huge losses to its investors.  By 2004, Phoenix's venture capital forays had also proved to be a huge failure.  As A.M. Best Company, Inc. reported in 2003, "[Phoenix's] capital position has been constrained in the last two years by significant capital losses on its venture capital portfolio, credit write downs and losses on its equity investment in Aberdeen, a Scottish investment management company."

56.    Phoenix's stock hit a low in 2003 of $6.55 per share, down more than 60% since going public, while shares of many other life insurance companies that had gone public during the same time period had increased significantly, some nearly doubling, as illustrated below:



**B.** **Phoenix's Use of the Secondary Market to Increase Sales in the Primary Market**

57.     It was during this time period that Defendant Young also took on the positions of the Chief Executive Officer and Chairman of the Board of PNX.  It was also at this time that the secondary market for life insurance began to emerge, and the emergence of that market was a huge boon to Phoenix.  Not only were consumers more willing to buy life insurance knowing they had better options if they ultimately elected not to keep their policies, but many wealthy individuals began buying life insurance to avoid potential estate tax liabilities, as well as investing in life insurance knowing they could sell their policies in the future.  Indeed, as early as 2005, the life insurance industry acknowledged that the growth of the secondary market had driven an increased demand for policies with large death benefits in the primary market.

58.     As an insurance company that targeted the market of high net worth individuals, Phoenix was fully aware of the desire of many of its customers to invest in life insurance with the knowledge that they might sell their policies in the future.  Indeed, Phoenix relied upon the existence of the secondary market to drive the primary market toward policies with high death benefits because Phoenix knew investors wanted high-face-value policies, and such policies carried with them high premium payment streams.

59.     For example, to increase its sales of high-face-value policies, Phoenix was fast to endorse the use of non-recourse premium financing, and many of the policies that Phoenix issued were purchased with such financing.  Under these arrangements, a lender would loan an insured funds to pay premiums for a policy, and the policy would be pledged to secure the loan.  When the loan matured, usually after two years, the insured could pay off the loan, surrender the collateral (the policy) to the lender, or sell the policy and pay off the loan.  Non-recourse

premium financing made it easier for consumers to buy high-face-value policies, which in turn helped Phoenix sell more policies and receive significantly more premium revenue.

60.     Thus, in Phoenix's 2005 Form 10-K filed with the Securities and Exchange Commission, Phoenix reported in March 2006, "We experienced a significant increase in large estate and business planning cases, some of which involved the use of non-recourse premium financing."  This "significant increase" was no coincidence; it occurred because Phoenix actively encouraged its sales force to sell policies using non-recourse premium financing, and Phoenix designed policies to be attractive to this market.

61.     In 2009, two investment companies that purchased several Phoenix policies on the secondary market filed actions against Phoenix alleging, among other things, that Phoenix fraudulently induced them and "a class of third party investors" to purchase Phoenix policies on the secondary market when, in fact, Phoenix planned to claim their policies were void and keep their premium payments.  In those actions, which were later consolidated (the "*Fenton* Action"), one of Phoenix's wealth management consultants, Ed Humphrey, testified to the following during his deposition:

> **Q.     After you started engaging in Non-Recourse Premium Financing Transactions for Phoenix, did Phoenix actively encourage its sales force to engage in these transactions, Non-Recourse Premium Financing transactions?**
>
> A.     **Yes.**
>
> **Q.     Can you tell us the names of any particular individuals that you dealt with at Phoenix that actually encouraged the sales force to put Non-Recourse Premium Finance on the books of Phoenix?**
>
> **A.     As far as my direct report, Kevin Lawler, was actively pursuing that business, and put together a user guide in 2005, a Non-Recourse user guide, which would help us find, you know, different kinds of – basically Kevin came to the wholesalers within the region in 2005 and asked us for all of the information on the Non-Recourse plans our brokers were using.  From that information, he put together a user guide which gave information on all different types of plans, what was available, and also what other companies were doing.  That was presented to us**

**at our regional meeting.  The other person who asked for Non-Recourse was Bob Primmer, an executive, who was the head of the Life Insurance Department at the time.**

**I went to a meeting in Newport, Rhode Island, near the end of September '05.  It was a rookie cabinet meeting for new wholesalers.  I started to get a good flow of the business, so I asked Bob at that meeting, knowing that there really wasn't much information on this, and how much Non-Recourse we should produce and his view on that.  He told me the more the merrier, as far as Non-Recourse cases.**

**Q.      When did Mr. Primmer say – he actually used the phrase "the more the merrier" when it came to putting Non-Recourse Premium Finance on the books of Phoenix?**

**A.      Yes, he did.**

**Q.      When did he say this?**

**A.      That was the end of September of 2005.**

62.      Phoenix attempted to "seal" Humphrey's transcript in the *Fenton* Action, claiming it was confidential, but the judge rejected Phoenix's request, and the transcript was made available to the public sometime in 2011.

63.      Also around late 2005, the head of Phoenix's Life and Annuity Business Segment, Defendant Polkinghorn, held a conference call in which he read from a script advising Phoenix's sales force that Phoenix would accept sales of policies using non-recourse premium financing.

64.      Phoenix also knew that the policies it issued using non-recourse premium financing were likely to be sold to investors on the secondary market.  As Humphrey testified:

**Q.      When you said before that one of the earmarks of the Non-Recourse Premium Finance business was Single Life policies, was there a reason why it would be Single Life in a Non-Recourse Premium Finance transaction, if you know?**

**A.      The flip side of Non-Recourse Premium Financing was the settlement business.  These policies were basically destined to settle, and the settlement business worked in Single Life policies.  The majority of the business, the settlement business, was driven from Single Life policies.**

\*\*\*

**Q.      So your understanding was that these Non-Recourse Premium Finance transactions were destined to be sold to a third-party investor and that the Single Life policy was a vehicle to do them?**

**Phoenix's counsel:  Objection.  Mischaracterizes testimony.**

**Q.      Is that correct?**

**A.      Yes.**

65.      In 2006, Defendant Cassidy joined Phoenix as PNX's Executive Vice President of Distribution.  Cassidy adopted a sales strategy that involved the use of a wide network of broker general agents and their subagents who had direct relationships with investors on the secondary market.  Through these relationships, Phoenix's agents would procure policies for insureds who were interested in potentially selling their policies to investors on the secondary market.  One of Phoenix's underwriters during this time period has confirmed that Phoenix "green-lighted" agents to write premium-financed policies.  Many of these agents have acknowledged that Phoenix encouraged and incentivized them to sell policies that would likely later be sold to investors.

66.      A senior underwriter who worked at Phoenix in 2008 stated that, during his training, he was told that Phoenix accepted premium financing.  He said the Company was not opposed to issuing policies that it knew would be sold to investors on the secondary market (so-called "investor-originated" or "stranger-originated" life insurance or "IOLI" or "STOLI") and maintained a list of broker general agents, brokers, and agents that were approved to write what Phoenix now calls STOLI policies.  Another underwriter has stated that the Company had a special underwriting group that was assigned to review and underwrite STOLI policies.

67.      Phoenix's management, including Defendants Polkinghorn and Cassidy, not only encouraged Phoenix's sales force to procure such policies, they virtually *required* them to do so. Among other things, Phoenix's management imposed sales quotas that could only be met by

procuring the type of high-face-value universal life insurance policies that were being sought by investors in the secondary market.  For example, Ed Humphrey went from having no sales quota in 2004 to being required to write $2 million in premiums in 2005, to $7.5 million in 2006, and then *$20 million in 2007* (which would have required him to procure around *half a billion dollars* in life insurance death benefits in a single year).  When Humphrey was asked at his deposition what percentage of his business came from the sale of policies that were likely to be sold on the secondary market, Humphrey responded, "95 percent."

68.     Phoenix's top executives were well aware of Humphrey's business, and rewarded him richly for it.  In 2006 alone, Humphrey made $1.8 million (compared to $75,000 two years earlier, before he began soliciting policies destined for the secondary market), and his immediate supervisor, Kevin Lawler, also made over a million dollars that year.  Based on the sales of wealth management consultants like Humphrey, Defendant Young made nearly $4.5 million in 2006 (more than double what she earned two years earlier).

69.     Publicly, however, Phoenix maintained a different position.  Within months of the conference call advising its sales force that Phoenix would accept non-recourse premium-financed policies and Phoenix's distribution to its sales force of the "user guide" on how to sell such policies, Phoenix turned around and told the public and its shareholders, in the same 2005 Form 10-K referenced above, "In the first quarter of 2006 we affirmed our position that we will not accept sales of policies that employ this type of premium financing . . . ."

70.     Another member of Phoenix's internal sales force, Max Labar, testified about Phoenix's attitude toward issuing life insurance policies that would later be sold to investors on the secondary market.  According to Labar, his manager, Doug Koch "definitely encouraged that type of business privately."  As Labar testified in the *Fenton* Action:

**Q.**     In other words, as I understand what you're saying is, is public policy that's communicated to the outside worldwide, saying, "We don't want this investor-owned life insurance," but privately you're being told by Mr. Koch that the company actually wants this kind of business; is that right?

**Phoenix's counsel:  Object; mischaracterizes the testimony.**

**Q.**     Is that a correct statement?

**A.**     I would say that's a correct statement. . . .

71.     Labar further testified that while Defendant Young represented to Phoenix's shareholders that Phoenix was not selling STOLI or IOLI, "privately it was a different matter," as employees were being told to "bring it on" and "crank it out."  Employees who refused to participate in this business would either "fail," "leave," or "be fired."  Labar also estimated that 80% of Phoenix's life insurance sales during this time period were what Phoenix now calls STOLI or IOLI.

72.     The sales and marketing strategy adopted by Phoenix also involved a conscious decision to relax and disregard Phoenix's traditional underwriting standards and requirements. Among other things, Phoenix's underwriters and sales agents have said that the Company would grant "exceptions" to its normal underwriting guidelines to issue policies that would not otherwise be issued.  These "exceptions" included instances where it was apparent that the policy application contained false information about the insured's net worth and income.  This lax underwriting went hand-in-hand with Phoenix's aggressive sales approach in the lucrative market of selling life insurance to seniors, because an insurer that performs proper underwriting will likely reject a high percentage of applications and sacrifice short-term profits for long-term stability.  Phoenix, however, had no interest in such an approach, as it cared only about generating premium revenue so that it could boost its short-term profits, improve its financial ratings, and enrich its executives.

73.      Accordingly, like mortgage lenders that issued loans to applicants who provided

no documentary support for their income, Phoenix became a "no doc" insurer that issued huge,

multi-million dollar policies without asking applicants for a single piece of documentary support.

As Humphrey has testified:

> **Q.      What was requested document-wise by Phoenix, and I am just asking, is it correct that no documentation was requested by Phoenix to support the financial information in the application?**
>
> **Phoenix's counsel:  Objection.  Asked and answered.  Mischaracterizes testimony.**
>
> **Q.      Is that correct?**
>
> **A.      Yes.**

74.      Labar corroborated Humphrey's testimony, and he also warned state regulators

that Phoenix's underwriting practices would cost the Company in the long run:

> **Q.      Well, did you have any understanding whether or not Phoenix had any – cared whether or not those figures were accurate?**
>
> **A.      They never verified it.  They never questioned it, not that I ever saw from anyone, from talking to other, you know, [wealth management consultants] from business that I saw.**
>
> **\* \* \***
>
> **Q.      What I'm trying to ask you is this:  Your understanding from working at Phoenix as a [wealth management consultant] is there really was not much verification of anything except a signature?**
>
> **A.      I never heard of it or saw it and there was never a process that was put in place that said that they verify all that.**
>
> **\* \* \***
>
> **Q.      Did Phoenix care if their net worth figure [in their policy applications] was accurate?**
>
> **A.      In my opinion, no.**
>
> **Phoenix's counsel:  Objection.  Asked and answered.  Mischaracterizes testimony.**

**Q.      And that is based upon your personal knowledge of the procedures at Phoenix?**

**A.      Yes.**

**Q.      And as a [wealth management consultant] at Phoenix and the procedures that you knew about at Phoenix, did Phoenix care about the accuracy of the income figures in the applications?**

**A.      In my opinion, no.**

75.      Consequently, from 2003 to 2007, PHL alone (the primary insurance-issuing subsidiary) increased its annual revenue from life insurance premiums *more than 350%*, from $125 million in 2003 to $445 million in 2007.  During that same timeframe, the parent company's stock, PNX, nearly tripled, climbing from a low in 2003 of $6.55 per share to a high in 2007 of $16.05 per share.  By the end of 2006, Phoenix's internal sales force was writing nearly *1,000% more* life insurance compared to what they were writing just one year earlier, and, upon information and belief, some members of their outside sales force increased their production by an even greater percentage.  Indeed, one of Phoenix's outside sales agents described this period at Phoenix as the "wild, wild west," and one of Phoenix's Regional Managing Directors referred to Phoenix at the time as the "King of STOLI" (a moniker attributable to the sales strategy adopted by Defendants Polkinghorn and Cassidy).

76.      Obviously, Phoenix and Defendants Young, Polkinghorn, and Cassidy had no reservations about selling life insurance policies they knew were destined for the secondary market.  They used the secondary market to grow the Company's sales, and through their efforts, in 2006 and 2007, Phoenix issued billions of dollars more in life insurance than it had ever issued before or ever would issue during any other two-year period in its history.

77.      During an investor call in the third quarter of 2006, Defendant Young declared that Phoenix had already met its "target of double-digit life sales growth for this year" and that

the Company's "sales were driven primarily by universal life."  Defendant Young, however, tried to obscure the precise nature of the Company's business by attributing its unprecedented growth in sales to "strong underwriting expertise especially for large policies, a complete and competitive core product portfolio, and innovative products and programs."  Ignoring the obvious impact that the secondary market had on Phoenix's sales in the primary market, and never once mentioning developments in the premium financing business that helped spur Phoenix's growth, Defendant Young instead attributed the Company's positive outlook to, of all things, a new program that provided discounts for insureds who maintained a target Body Mass Index.  When an analyst questioned her about this Body Mass Index program, Young defensively replied, "This was introduced in the third quarter, so I don't want you to conclude that the BMI impacted the third quarter sales."  Young never said specifically what contributed to Phoenix's huge sales in the first three quarters of 2006, but she knew exactly what allowed Phoenix to achieve ***double-digit sales growth in just three quarters*** – demand for Phoenix policies ***in the secondary market***.

78.    These sales, however, were not enough for Phoenix.  At the direction of Defendant Wehr, PNX's Chief Investment Officer at the time, Phoenix took these revenues and sunk them in a variety of high-risk investments, including hundreds of millions of dollars in subprime and Alt-A mortgage-backed securities and other asset-backed securities, which caused AM Best to observe that "the company maintain[ed] higher than industry average exposure to commercial mortgage-backed securities, Alt-A residential mortgage-backed securities and below investment grade bonds as a result of its investment strategy."  While Phoenix's management was making these reckless bets with policyholder funds, those same executives were awarding themselves outlandish compensation packages – more than ten times as much as the average

executive in the industry, based on total compensation relative to the company's market capitalization.  For example, between 2003 and 2008, Defendant Young received approximately $25 million in executive compensation, which was far more than the top executives of many larger and more successful insurance companies.

79.     Phoenix also planned to participate directly in the secondary market on the buy side.  In 2007, Defendant Young commissioned a team to form a life settlement division to partner with four of Phoenix's broker general agents that sold Phoenix policies in the primary market.  These agencies – Advance Planning Services, American Brokerage Services, Ash Brokerage, and Madison Brokerage – would, in addition to procuring policies for Phoenix in the primary market, at the same time broker sales of policies to Phoenix *in the secondary market*.

80.     On April 1, 2008, Phoenix announced the launch of its life settlement subsidiary, Phoenix Life Solutions, Inc.  As Phoenix stated in its marketing materials, Phoenix considered this business a "natural hedge for [its] core business" and an opportunity to "partner" with investors, investment banks, and other distributors of life insurance products, which were the types of institutions buying Phoenix policies on the secondary market.  In a statement announcing the launch of Phoenix Life Solutions, Inc., Defendant Polkinghorn declared, "It's time for the life insurance industry to step forward and recognize that life settlements can offer consumers numerous advantages, including increased flexibility with their personal assets . . . ." Polkinghorn continued, "Phoenix Life Solutions leverages Phoenix's knowledge of the high-net-worth and affluent markets, our expertise in mortality and risk management, and our ability to be a partner of choice with firms that want to be involved in a new equation for the life settlement business."

81.     Phoenix's awareness of the secondary market and its desire to compete to buy policies in the secondary market for Phoenix policies is further reflected in the language of its own policies.  In late 2007 or early 2008, Phoenix began including a provision in its universal life insurance policies that stated to policyholders:

> If, however, you are offered consideration by a third party to transfer ownership of your policy or any interest in your policy including a collateral or absolute assignment to such third party, no transfer of ownership shall take effect unless we or one of our affiliated companies first have the right to also offer consideration for your policy.  We will require information satisfactory to us that is necessary for us to determine the amount of such consideration we will offer for your policy.

82.     Former wealth management consultant Ed Humphrey explained the purpose of this language as follows:  "What they are basically talking about here is the right to bid on a settlement policy, in layman's terms.  Because they are talking about a right to offer consideration for assignment of a policy.  Basically what is known from this in the industry, is that Phoenix knew that there was going to be a large settlement business market and [Phoenix] was forming a subsidiary settlement company, and was going to, you know, obviously, want the right to bid on their contracts before it went out to a third party."

83.     Phoenix's plan was simple.  Phoenix used the demand for policies in the secondary market to drive up sales in the primary market, and with the revenue generated from these sales, and the hoped-for profits from Defendant Wehr's risky investment strategy, Phoenix would then compete to buy policies on the secondary market through its life settlement division.  This life settlement division would then operate as a "hedge" against the mortality risks Phoenix took on with the billions of dollars of policies it sold in the primary market.

**C.     Phoenix's Massive Losses As a Result of the 2008 Financial Crisis**

84.     Unfortunately for Phoenix, "the wild, wild west" came to a screeching halt in 2008 when the financial crisis hit its peak.  In the span of just a few months, PNX's stock

plummeted from $13.98 per share on September 19, 2008 to an all-time low of $0.29 per share on March 6, 2009.  PNX's public filings reflected a loss in shareholder equity from $2.279 billion in 2007 to $865 million in 2008, including a loss of nearly $5 billion in assets on its balance sheet during that period.  The individuals primarily responsible for these huge losses were Phoenix's top executives, including Defendant Young, the President and Chief Executive Officer, and Defendant Wehr, the Chief Investment Officer and the former Senior Managing Director and Portfolio Manager of PXP, Phoenix's failed asset management business.

85.     On March 3 and March 4, 2009, Phoenix's two largest distributors, State Farm and National Life Group, publicly announced they would no longer sell Phoenix products.

86.     One month later, Defendant Young abruptly resigned.  Despite the Company's collapse, Dona Young was the only executive officer who was replaced, and she retired with some $15 million in pension benefits.  The person chosen to replace her was Defendant Wehr, the same individual responsible for the Company's hundreds of millions of dollars in losses and its failed asset management segment, PXP.

87.     Three months later, in July 2009, AM Best downgraded Phoenix's credit rating, citing the Company's "below average operating returns, recently declining life and annuity sales, and a diminished business profile following the loss of two of its most significant distribution relationships."  The report further observed that "the company is operating in a significant unrealized loss position within its general account investment portfolio, where it maintains an above-average exposure to below investment grade bonds."

88.     AM Best went on to comment, "Phoenix will also be challenged to grow statutory life and annuity premium following the announcement that its top two distributors – State Farm and National Life Group – have suspended sales of Phoenix's life and annuity products."

Throughout Phoenix's financial difficulties, the Company's executives continued to compensate themselves at the same rates as during its peak periods and still well above the levels of many larger (and more profitable) insurance companies, causing one of its institutional shareholders to comment in 2008:

> We believe it is clear that the Board of Directors has failed to exercise effective and responsible oversight on [shareholders'] behalf. Instead, shareholders have been left with losses, policyholders have been left with downgraded ratings for their policies and management has been enriched.

## VIII.  DEFENDANTS' UNLAWFUL STRATEGY TO SHED BILLIONS OF DOLLARS OF FUTURE LIABILITIES

89.      As a result of the developments described above, Phoenix, by the end of 2008 or early 2009, found itself virtually unable to write new life insurance business.  The credit crisis also left Phoenix with little or no liquidity and thus no capital to fund its previously-planned life settlement division, whose plug was pulled in 2008.  The Company, however, was still faced with having to meet its contractual obligations on the billions of dollars in life insurance it had issued over the past several years – policies that were now largely owned by the investors that had purchased them on the secondary market.  Phoenix's reinsurers also began questioning the Company's underwriting practices and its concentration of high death benefit policies, which ran contrary to the industry norm of issuing higher volumes of lower death benefit policies to generate a greater distribution of risk.

90.      As one former high-level executive described the situation, Phoenix found itself "in way over its head" with policies now largely owned by investors.  That same executive indicated that since 2008 or early 2009, the Company has been run by an "Insiders' Circle" that has been closing ranks, burying information, and working to prevent information from leaking

because "they have some exposure."  This "Insiders' Circle," upon information and belief, has consisted of at least the following individuals:

- Defendant Wehr, the former Chief Investment Officer who replaced Defendant Young as the President and Chief Executive Officer of PNX in 2009;

- Defendant Polkinghorn, the President and Chief Executive Officer of PHL and the Executive Vice President of PNX's Life and Annuity Division;

- Defendant Cassidy, the Executive Vice President of Distribution of PNX;

- Defendant Young, the former President, Chief Executive Officer, and Chairman of the Board of PNX, who continued as a consultant to Phoenix until at least April 2010;

- Peter A. Hofmann, the Senior Executive Vice President and Chief Financial Officer of PNX since 2008;

- Christopher M. Wilkos, who became the Executive Vice President and Chief Investment Officer of PNX in 2009; and

- John T. Mulrain, a member of Phoenix's legal department since 1992 and who became the Senior Vice President, Secretary, and General Counsel of PNX in 2009.

91.     In response to Phoenix's precarious financial position, upon information and belief, the Insiders' Circle orchestrated a plan designed to eliminate the liabilities associated with billions of dollars in policies that Phoenix had so aggressively sold and were now largely owned by investors that had purchased them on the secondary market.  The Insiders' Circle knew that Phoenix could no longer compete in the primary market for life insurance because of rating downgrades and the loss of its key distribution channels.  Nor could Phoenix compete in the secondary market for life insurance policies generally, because it lacked the capital and liquidity to do so.  The Insiders' Circle therefore decided to focus Phoenix's efforts on the secondary

market *for Phoenix policies*, where Phoenix policies were being bought and sold among investors.

92.     Defendants thus devised a strategy to engage in a pattern of anticompetitive and exclusionary conduct designed to restore Phoenix's previous position as a monopsonist buyer on the secondary market for Phoenix policies.  Defendants then launched an aggressive multi-faceted campaign to attack and undermine Phoenix's own policies by, among other things, increasing the costs of the policies, refusing to honor or record transfers of ownership of them, and creating uncertainty about them, so that no one – other than Phoenix – will buy a Phoenix policy on the secondary market.  By attacking and undermining its own policies, Phoenix has also made the policies undesirable to its own policyholders, who must continue to pay premiums to Phoenix without knowing whether Phoenix will ultimately honor the policies.  Defendant Wehr tacitly acknowledged this unlawful strategy by stating that Phoenix policies owned by investors are "worthless" because Phoenix is able to "manage its liabilities" with respect to such policies.

93.     In other words, if Defendants' strategy were to succeed, policyholders would no longer want to keep their Phoenix policies, and Phoenix would be the only buyer willing to purchase them.  Phoenix's policyholders would thus have no choice but to lapse or surrender their policies back to Phoenix, allowing Phoenix to keep all or most of the premiums while shedding the future liabilities associated with those policies.

### IX.  PHOENIX'S ANTICOMPETITIVE STRATEGY AND CONDUCT

94.     Defendants have engaged in a variety of tactics to maintain or attain a monopsony for Phoenix, and these various tactics form part of a single, overall monopsonization scheme.

Each tactic cannot be weighed and understood in isolation, but must be evaluated as part of Defendants' overall exclusionary and anticompetitive strategy and objectives.

95.     Phoenix, as the counterparty to its own policies, is in a unique position to control the value of its policies on the secondary market.  For example, Phoenix must pay the death benefit under a policy; Phoenix generally must record an assignment of the policy if it is to be sold on the secondary market; only Phoenix can issue an annual statement or verification of coverage[4] under a policy; and Phoenix has the power to determine the cost of insurance (or COI) that holders of its policies must pay.

96.     Phoenix has abused this unique control in a variety of ways described below. This anticompetitive conduct and the resulting uncertainty have driven secondary market purchasers out of the market while forcing secondary market sellers (its own policyholders) to have to decide whether to (a) continue to pay premiums to Phoenix with no assurances that Phoenix will honor its obligations or (b) sell their policies back to the monopsonist Phoenix for nothing or next to nothing and allow Phoenix to reap a windfall by never having to pay the death benefits.

97.     The effects of Defendants' anticompetitive and exclusionary scheme are evident. Today, many potential buyers of life insurance policies expressly refuse to purchase Phoenix policies.  Even in the rare situations where secondary market buyers have expressed interest in Phoenix policies, they have offered hugely discounted prices because of Phoenix's anticompetitive and exclusionary conduct and the uncertainty it has created.

98.     Defendants' anticompetitive and exclusionary conduct was not clear to or foreseeable by policy buyers at the time they purchased Phoenix policies because their actions

---

[4] A verification of coverage typically represents to a policyholder that the policy is valid and in force.  Verifications of coverage may state, among other things, the current death benefit, policy value, and cash surrender value for the policy.

reflected a fundamental change in Phoenix's approach to the secondary market, and they were part of Defendants' secret attempt to maintain or attain a monopsony in the secondary market for Phoenix policies. Defendants' anticompetitive actions have included, but are not limited to:

a. Refusing to record the transfer of ownership of policies to prevent the secondary market sales of policies to buyers other than Phoenix;

b. Refusing to tell policyholders whether Phoenix will honor its own policies;

c. Improperly raising COI rates for unauthorized purposes, including specifically targeting policies that were purchased by its competitors in the secondary market for its policies (and thus reducing, or eliminating, the profitability of buying and selling policies in the secondary market);

d. Raising the COI rates on policies that Phoenix later contends are void policies;

e. Issuing false and misleading policy illustrations that reflect higher future COI charges to cause policyholders to misprice their policies and/or cause them to make sub-optimal decisions about their policies, including lapsing or surrendering them to Phoenix;

f. Reneging on verifications of coverage that it issued confirming that it has released prior liens on the policies;

g. Telling policyholders they cannot rely on Phoenix's own written statements because Phoenix does not represent them to be true;

h. Denying death benefit claims on the ground that its policies are invalid when there is no factual basis for doing so;

i. Delaying and refusing to pay death benefits for a variety of pretextual and bad faith reasons; and

j.      Refusing to return the premiums it has collected when seeking to rescind or void

its own policies, thus attempting to retain a huge windfall, penalize innocent third-

party purchasers, and force policyholders to incur costs to recover the premiums

they paid.

99.      Defendants' strategy has also entailed using litigation as an anticompetitive

device and for improper purposes.  Since sometime in 2008, Phoenix has indiscriminately

initiated dozens of lawsuits, without regard to the facts or law.  In many of these lawsuits,

Phoenix is seeking to void policies (and keep the premiums) on the ground that the insured

purchased the policy with the thought of perhaps one day selling it.  In other words, Phoenix is

attacking the very practice it embraced several years earlier to drive up its sales in the primary

market.  Furthermore, to discourage and deter investors from buying Phoenix policies from

others in the secondary market, Phoenix is now filing fraud claims against current policyholders

who did not participate in any way in the origination of their policies but simply purchased them

on the secondary market.  In addition to commencing litigation, Phoenix has also forced

policyholders to sue Phoenix to, among other things, collect death benefits, force Phoenix to

record policy transfers, and prevent Phoenix from improperly raising COI rates.  This litigation

increases the ultimate cost of purchasing a Phoenix policy on the secondary market and thus

drives competitors out of the market for Phoenix policies.

100.      As of the date of this Complaint, Phoenix is now a party to approximately 86

lawsuits involving around *$3.6 billion* in Phoenix policies now owned by investors that

purchased their policies on the secondary market.  This amounts to approximately 17% of the

$21.6 billion total in outstanding death benefits for all PHL policies and, upon information and

belief, over 33% of the total face amount of PHL policies currently owned by investors –

investors that include foreign and national banks, pension funds, endowments, investment funds, other insurance companies, and various other public and private entities.

101.   Included among these many lawsuits involving Phoenix are: (a) a federal RICO mail and wire fraud action filed against Phoenix by an investment fund that owns over $450 million in Phoenix policies and whose investors include the California Public Employees' Retirement System (CalPERS), (b) the *Fenton* Action, involving approximately $300 million in investor-owned policies, alleging fraud and related claims against Phoenix, (c) four COI lawsuits described in paragraph 128 below, and (d) over 60 lawsuits in which Phoenix is seeking to void or rescind over $360 million in investor-owned policies while keeping the premiums.

102.   Upon information and belief, the number of lawsuits involving Phoenix is dozens more than any other insurer is involved in, is increasing at an alarming rate, and already represents more than 50% of all similar lawsuits involving ***seven other like insurers combined***[5], including many significantly larger insurance companies.  Phoenix commences litigation without regard for the merits of the case, because it knows that the mere uncertainty and risk of incurring the costs and delays associated with litigating against Phoenix are sufficient to drive away potential buyers of Phoenix policies on the secondary market.  Thus, whether Phoenix has initiated litigation or forced policyholders to initiate litigation against it, Phoenix has taken baseless positions to avoid or delay paying death benefits, resist policy transfers or assignments, and require policyholders to continue paying unlawful and excessive COI rates.  Phoenix has advanced its positions, not out of a good faith desire to test their legality, but as a sham to interfere with secondary market competition generally.

---

[5] Those other insurers are American General, AXA, John Hancock, Lincoln National, New York Life, Northwestern, and TransAmerica.

103.     Moreover, despite the volume and magnitude of litigation that Phoenix has commenced or prompted in the last three years, Phoenix has never materially altered its disclosures to shareholders about the risks of this litigation.  Instead, Phoenix has continuously represented that it is "regularly involved in litigation" as part of its ordinary activities "as an insurer."  These lawsuits, however, are far from the ordinary activities of an insurer.

104.     In addition, based upon information provided by Phoenix's own former employees, Phoenix has, in furtherance of its illicit scheme, concealed relevant information in discovery in litigation and/or destroyed documents that were relevant to actual or potential litigation.  For example, despite the obvious relevance of the user guide that Phoenix prepared in connection with its efforts to market and sell policies using non-recourse premium financing and the script that Defendant Philip Polkinghorn read encouraging Phoenix's sales force to sell policies using non-recourse premium financing (*see* paragraphs 61-63 above), Phoenix has never, upon information and belief, produced these documents in discovery despite numerous requests seeking them.

105.     The multiple litigations involving Phoenix are facets of its anticompetitive and exclusionary conduct summarized in this Complaint, and reflect Phoenix's intent to litigate issues without regard to the merits and for the purpose of injuring market rivals and participants, including Plaintiff.

## A.     PHL Has Improperly Refused or Delayed the Processing of Policy Transfers

106.     One of the early manifestations of Defendants' anticompetitive scheme was Phoenix's refusing to process, or delaying the processing of, policy assignments or transfers.  In February 2009, in the midst of Phoenix's financial crisis, several trusts that owned Phoenix policies submitted change of ownership forms requesting that Phoenix change the ownership of

their policies to a new owner, which the trusts were expressly permitted to do under the law and under the terms of their policies.  Phoenix, however, did not respond to these requests for weeks. Then, on March 9, 2009, just a few days after Phoenix's two largest distributors abandoned it and three days after its stock hit an all-time low, Phoenix responded to the requests by refusing to record the policy transfers and instead demanding that the policyholders provide Phoenix with a variety of documents in a bad faith attempt to delay the transfers of the policies.  Phoenix has thus forced its policyholders to sue Phoenix to enforce their right to transfer their policies.

107.    Phoenix's failures and refusals to record the policy changes of ownership were intended to have the effect, and have the actual effect, of substantially depressing demand for Phoenix policies in the secondary market.

### B.    Phoenix Refuses to Tell Policyholders Whether It Will Honor Their Policies

108.    Even when Phoenix records the transfer of a policy, Phoenix has refused to honor its policy obligations and created uncertainty about whether it will ultimately honor its obligations to pay death benefits due under policies.  In one case, the Receiver for an investment firm that invested in the secondary market for Phoenix life insurance policies sued Phoenix in the U.S. District Court for the Central District of California seeking to rescind two Phoenix policies after Phoenix refused to confirm it would honor the policies.  *See Mosier v. Phoenix Life Ins. Co.*, Case No. SACV12-00227 PSG (Ex) (Central District of California).

109.    The investment firm purchased one of the Phoenix policies, a $5 million policy, in March 2005, and the other, a $6 million policy, in November 2005.  As alleged in the Receiver's complaint, Phoenix has collected approximately $4.8 million in premium payments on the two policies.

110.     The Receiver further alleges that, after becoming concerned he might be paying premiums on policies that Phoenix did not intend to honor, he asked Phoenix to verify in writing that it would honor its contractual obligations under the policies.  Phoenix refused to do so.  Yet when the Receiver, in response, then asked Phoenix to return the premiums that had been paid on the policies, Phoenix refused to do this as well.

111.     Phoenix's refusal to tell policyholders (or confirm in writing) whether it will in fact honor its own policies has had the intended effect of impairing the value of policies and making it extremely difficult, if not impossible, to sell those policies on the secondary market.  As the Receiver has alleged: "Phoenix currently expects the Receiver and [the investor] to continue making significant premium payments . . . while refusing to confirm whether Phoenix will honor the Policies.  Phoenix wants [the investor] to continue making premium payments on the Policies so that Phoenix can later refuse to honor the Policies and retain the premiums.  ***At best***, it is uncertain whether Phoenix will honor its obligations, and this uncertainty destroyed the very essence of the insurance relationship."  (Emphasis in original).

112.     Phoenix has engaged in similar tactics with respect to Plaintiff's policies as well.  Even as Phoenix refuses to confirm that it will honor the terms of its own policies, Phoenix continues to issue annual statements and premium notices to policyholders, and expects them to continue paying premiums.  The annual statements Phoenix sends also state that policyholders "should consider requesting more detailed information about [their] policy to understand how it may perform in the future," but when policyholders request such information, Phoenix delays as long as it can before responding, and even when it does respond, Phoenix refuses to confirm it will honor the policy.  By refusing to confirm that it will honor the terms of its policies, Phoenix

is attempting to force policyholders to lapse or surrender the policies or else sue Phoenix to confirm that Phoenix will honor its policies.

### C.   Phoenix Has Improperly Attempted to Raise the COI Rates on Its Policies

113.   Universal life insurance is a form of permanent life insurance also known as "flexible premium" adjustable life insurance.  Unlike whole life insurance, which requires fixed monthly premium payments, universal life insurance allows a policyholder to pay as much money as it wants into the policy account (subject to certain limitations), and, each month, the account accrues interest as provided under the policy.  Various charges and fees are deducted from the policy account, including the cost of insurance (or COI) charge.

114.   COI is supposed to represent the insurance company's cost to bear the risk of mortality under a life insurance policy.  It is considered to be the cost of "pure insurance."  The COI charge is typically the largest of various charges associated with a universal life insurance policy.

115.   Under a universal life insurance policy, policyholders can pay more into their accounts (above the COI and other charges) if they wish to accumulate tax-deferred interest, or they can pay just enough to cover their monthly policy charges if they wish to invest their funds elsewhere.  Because of the flexibility it offers policyholders, universal life insurance is the most common form of life insurance purchased on the secondary market, and investors who purchase such policies typically opt to pay only the premiums needed to cover their monthly charges.

116.   Although Phoenix's universal life insurance policies permit it to adjust the COI rates, Phoenix can only do so based on certain specific factors set forth in the policies, the most significant of which is Phoenix's expectations of future mortality.  It is well known that, over the past several years, mortality has *improved*, not worsened, which would logically entail a

decrease in COI rates. Phoenix, however, has increased the COI rates on its policies in clear breach of its contractual obligations. Phoenix is the only insurer that has raised COI rates in the face of improving mortality.

117.    Phoenix's policies generally provide (with some variations) that Phoenix's right to change COI rates is subject to the following terms:

1.    Any change in [COI] rates will be made on a uniform basis for all insureds in the same class. No change in rates will occur due to any change in the Insured's health or occupation.

2.    Any change in [COI] rates will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the [COI] rates.

3.    Any change in [COI] rates will be based on a change in [Phoenix's] expectations of future investment earnings, mortality, persistency and expense/administrative costs.

4.    Any change in [COI] rates will comply with any procedures and standards that may be on file with the insurance official of the jurisdiction where the policy is delivered.

118.    Despite these and similar representations, in early 2010, Phoenix began notifying policyholders that it was raising the COI rates on policies unless policyholders maintained sufficient "accumulated policy values." In other words, Phoenix told policyholders that if they did not overfund their policies with premium payments, thereby paying amounts in excess of those required to cover the monthly charges, Phoenix would penalize such policyholders by increasing their COI rates.

119.    By increasing the COI rates only on policyholders who exercised their right to maintain lower accumulated policy values (typically institutional investors in the secondary market), Phoenix breached its policies in several respects:

a. The policies provide that COI rates will be based only on certain enumerated factors that include Phoenix's expectations of future mortality and persistency. "Accumulated value" is not a factor on which the COI rates can be based.

b. The increase in the COI rates does not apply to an entire class of insureds, but only to those who maintain lower accumulated policy values (typically, investors that purchased their policies on the secondary market).

c. By increasing the COI rates, Phoenix is trying to recoup past investment losses, which is expressly prohibited by the terms of the policies.

d. Phoenix's COI rate increases are wholly unjustified because mortality has improved, thus justifying a decrease – not increase – in the COI rates.

120. Phoenix's COI rate increases were also specifically intended to induce "shock lapses" by its policyholders. In other words, the rate increases were designed to shock policyholders into lapsing or surrendering their policies so that Phoenix could free up reserves associated with such policies and never have to pay the death benefits on them. Chief Financial Officer Peter Hoffmann surreptitiously alluded to the success of this strategy when he casually reported, during the Company's second quarter earnings call on August 1, 2012, that Phoenix had recently experienced a high number of lapses "in the universal life block of business."

121. Furthermore, Phoenix's efforts to increase the COI rates on policyholders who exercise their right not to accumulate a policy value for investment purposes and pay only the minimum monthly policy charges flies in the face of the various representations Phoenix made when marketing and selling its policies, including Phoenix's representations that its products were "designed to balance protection and cash accumulation with features suited to meet policyholders' evolving personal or business planning needs"; that they were suitable for buyers

who wished to "minimize long term insurance costs while seeking competitive returns"; and that the policies would allow policyholders "to lower premiums, as well as adjust the amount and timing of premium payments" and give them "increased choice and policy design flexibility to meet [their] needs." Policyholders purchased Phoenix policies based on these representations, as well as the language of the policies, the projected future costs of the policies based on illustrations provided by Phoenix, and an expectation that Phoenix would conduct its business in good faith.

122.    In short, when policyholders exercised their right to fund premiums at their discretion and only as needed to cover their minimum monthly charges, Phoenix singled out those policyholders by raising their COI rates. This rate increase renders the concept of "flexible premiums" illusory. Policyholders are forced to fund more premiums into their account than they otherwise would need or want to, or else pay prohibitively high COI rates. Phoenix has thus deprived policyholders of one of the most essential rights of universal life insurance – the right to manage and fund their own accounts according to their needs and desires.

123.    Moreover, by increasing the COI rates based on accumulated values and singling out investor-owned policies, Phoenix wants to force policyholders either to (a) pay exorbitant premiums that Phoenix knows would no longer justify the ultimate death benefits (and thus would render the policies uneconomic investments), or (b) lapse or surrender their policies and forfeit the premiums they have previously paid. Phoenix, in turn, will make a huge profit – either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) while retaining the premiums that have been paid to date.

124.    When some policyholders and trade organizations complained about Phoenix's COI rate increases to the New York Department of Financial Services (the "NY DFS"), the NY

DFS advised Phoenix that its COI increases based on a policy's accumulated value violated the terms of its policies and New York law.  Phoenix agreed to rescind the COI increase, ***but only in New York***.  After rescinding these COI increases, Phoenix then announced a second, even larger round of COI increases in New York, in obvious retaliation against policyholders who complained, forcing them to incur further costs to defend their rights.

125.    Phoenix's COI rate increases are a deliberate tactic designed to injure competition in the secondary market.  Phoenix changed its approach to COI rates and adopted its anticompetitive and exclusionary policy after it had already sold billions of dollars of universal life insurance policies on the primary market.  Phoenix's new COI rate policy of basing COI rates on "accumulated policy values" is designed to have the effect, and does have the effect, of substantially eliminating demand for Phoenix policies on the secondary market by wrongfully imposing new charges on policyholders and creating uncertainty about the future costs of Phoenix policies, including whether Phoenix will improperly try to raise COI rates again in the future.

126.    Phoenix also represented to policyholders that "[t]he primary drivers of the COI rate adjustments were changes in our expectations of future mortality, persistency, and investment earnings, factors referenced in the policy."  That statement appears to be untrue, as Phoenix was telling a completely different story in its quarterly earnings call for the first quarter of 2010 – just before Phoenix announced its first COI increase.  During that call, the Chief Financial Officer, Peter Hofmann, reported, "Benefits are lower largely because of favorable mortality," and that "experience this quarter was favorable, particularly as measured against the four quarter moving average."  In the previous quarter, Hofmann reported, "[universal life] mortality in 2009 was below long-term expectations," and "overall mortality was in-line with

expectations."  These reports came after Defendant Wehr reported, with respect to unfavorable mortality results in the second quarter of 2009, "[W]e do not believe the mortality this quarter signals any underlying issue with the quality of our UL business.  I should remind you that in the four previous quarters, we had favorable mortality experience."

127.    Phoenix also refused to provide its policyholders with information showing that its COI rate increases were proper.  Instead, when such information was requested, Phoenix told policyholders, "Your request for supporting data permitting Phoenix to change the cost of insurance in accordance with the policies seeks PHL's proprietary pricing experience and other confidential information . . . ."  Phoenix thus forced its policyholders to commence litigation just to find out Phoenix's rationale for the COI increases.

128.    Phoenix knew its COI increases breached the terms of its policies.  In its 2009 Form 10-K, Phoenix stated, "[W]e are implementing an increase in the cost of insurance rates for certain universal life policies effective April 1, 2010."  These increases, Phoenix said, would likely "result in claims against us by policyholders."  And just as Phoenix anticipated, several policyholders have now sued Phoenix for its COI increases.  To date, there are at least four lawsuits against Phoenix asserting breach of contract and related claims arising from Phoenix's COI rate increases, including a New York class action, a RICO mail and wire fraud action filed by an investment fund whose investors include CalPERS, an action by the subsidiary of an insurance company that purchased nearly $900 million of Phoenix policies on the secondary market, and an action filed by U.S. Bank, as securities intermediary for Lima LP.

**D.    Phoenix Has Issued False and Misleading Policy Illustrations**

129.    Insurers issue policy illustrations to policyholders to show them how their policies are expected to perform over a certain period of time based on various assumptions, including

future policy costs.  Phoenix has issued false and misleading policy illustrations that applied

future COI rates that were not the *actual* COI rates to be charged, but *higher* rates.  Phoenix

purposefully overstated the COI rates in these policy illustrations to induce policyholders to pay

more than they actually had to, or alternatively, they would misprice or undervalue their policies,

which would cause them to make misinformed decisions to lapse or surrender their policies.

Phoenix's false illustrations were also intended to destroy the value of Phoenix's policies and

cause potential buyers in the secondary market for Phoenix policies to decide not to purchase

policies they might otherwise purchase.  Upon information and belief, based on these false and

misleading illustrations, some policyholders let their policies lapse or surrendered them back to

Phoenix because they believed they would have to pay higher COI rates than Phoenix could, or

actually intended to, charge.

### E.   Phoenix Has Regularly Denied Claims for Death Benefits on Baseless and Pretextual Grounds

130.   Also as part of its anticompetitive scheme, Phoenix has unjustifiably refused to

pay death benefits due under its policies.

131.   For example, Phoenix improperly refused to pay the death benefit due under three

$10 million life insurance policies owned by Lima.  Phoenix advanced the pretextual reason that

it would not pay the claims until U.S. Bank or Lima provided Phoenix with a document that they

did not have and that had no bearing on Phoenix's obligation to pay.

132.   Specifically, two years prior to the deaths of the two insureds involved, and

*before* Lima acquired the policies (which was also well after the expiration of the two-year

contestability periods), Phoenix released collateral assignments (liens) on the policies.  The

collateral assignments were apparently released in connection with the sale of security

agreements that covered the policies.  The releases – which Phoenix clearly knew about and accepted, because Phoenix itself recorded them – had nothing to do with Lima's subsequent acquisition of the policies.  After Phoenix recorded the releases of the collateral assignments, Phoenix sent letters confirming it had done so.  Phoenix also continued to issue annual statements and verifications of coverage that further confirmed that the collateral assignments had been released.  But when the insureds passed away, and the death benefits came due, Phoenix refused to pay.  Phoenix claimed it could not pay the benefits unless Lima provided Phoenix with a schedule to a purchase agreement to which Lima was not a party, which Phoenix said it needed to prove that its own prior conduct in releasing the collateral assignments had, in fact, been correct.  U.S. Bank was then compelled to sue Phoenix to obtain payment.

133.    Phoenix's wrongful behavior then continued during the litigation over these policies.  For example, when confronted with its own prior letters confirming its releases of the collateral assignments, Phoenix said that these letters "did not make any representation regarding the underlying validity of the Releases" and "did not represent that Phoenix had investigated or confirmed their validity."  One court has already rejected this absurd defense, and Lima expects the second court will do the same soon.  But in any event, the prior lien holders have already affirmatively disclaimed any interest in these policies, further evidencing the frivolousness of Phoenix's position.

134.    Nevertheless, Phoenix used this pretense to delay the payment of $30 million to Lima for six months, after which Phoenix was finally forced to pay.  Phoenix, however, was able to delay reporting the payment of these claims through two quarterly earnings reports while also making several hundred thousands of dollars in interest.  Moreover, Phoenix engages in this sort of conduct in order to make Plaintiff and other actual and potential market participants believe

they cannot rely on Phoenix's own representations and policy information received directly from Phoenix. With such unreasonable conduct and the resulting uncertainty, no potential market participant would be willing to compete with Phoenix in the acquisition of Phoenix policies in the secondary market.

135.    In fact, Phoenix has resisted paying 100% of Lima's death benefit claims since U.S. Bank filed the first COI lawsuit as the securities intermediary for Lima. Although the rest of the life insurance industry, on average, denies significantly less than 1% of all death benefit claims, Phoenix has resisted paying *every one* of the claims Lima submitted since the COI action was filed, and it is clear Phoenix has done this in retaliation for the filing of the COI lawsuit and in furtherance of its anticompetitive and exclusionary scheme.

136.    In fact, in 2008 (the year before Phoenix began engaging in its anticompetitive and exclusionary activities), PHL denied less than 1% of the total death benefit claims it received and only slightly more than the life insurance industry's average. Since then, however, in 2009, 2010, and 2011, PHL has denied 12.37%, 16.20%, and 20.87% in total death benefit claims made in those years, reflecting a massive and steady increase in the amount of death benefits refused since the inception of its anticompetitive and exclusionary scheme.

137.    And Phoenix has recently stepped up its efforts to resist paying death benefit claims: While Phoenix resisted $34 million in death benefit claims in 2011, less than six months into 2012, Phoenix has already resisted paying approximately $50 million in death benefit claims. Thus, Phoenix is on pace to resist $100 million in death benefits this year and more than the 20.87% of claims it refused to pay in 2011.

### F.   Phoenix Refuses to Return the Premiums It Has Collected When Seeking to Rescind or Void Its Own Policies

138.    It is fundamental that when an insurance company seeks to rescind a policy, it must return the premiums it previously collected.  That is the law under any contract, and it is the only rule that is fair.  "If an insurance company could retain premiums while also obtaining a rescission of a policy, it would have the undesirable effect of *incentivizing insurance companies to bring rescission suits as late as possible as they continue to collect premiums at no actual risk*."  *National Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 565 (D. Del. 2010) (emphasis added); *Sun Life Assur. Co. of Canada v. Berck*, 719 F. Supp. 2d 410, 418-19 (D. Del. 2010).  Worse yet, allowing an insurance company to keep the premiums when rescinding a policy would only encourage insurers to issue policies even though they knew of some problem with the application (such as false information).  Insurers would simply issue the policy, take the premiums, and later rescind the policy and keep the premiums.[6]

139.    Despite this basic principle, Phoenix has engaged in a rampant bad faith practice of trying to rescind policies and keep the premiums.  Indeed, in March of this year alone, Phoenix filed seven lawsuits in Delaware on one day seeking to rescind policies that Phoenix issued as many as seven years ago.  In utter disregard of Delaware law requiring it to return the previously paid premiums when it rescinds a policy, Phoenix asked the courts in those lawsuits to allow it to keep the several millions of dollars in premiums that it happily collected from its

---

[6] Phoenix's policies expressly provide that when Phoenix rescinds a policy, it must return the premiums.  Section 21 of one policy form states:  "If we contest the validity of all or a portion of the face amount provided under this policy, the amount we pay with respect to the contested amount will be limited to the higher of a return of any paid premium required by us for the contested face amount or the sum of any Monthly Deductions made under this policy for the contested face amount."

policyholders over the years.[7]  Phoenix's improper motives are clear:  the mere threat that an investor would have to litigate to obtain the return of the premiums on a rescinded policy would cause secondary market purchasers to pay much less for a Phoenix policy because of the risk of incurring litigation costs and delays simply to recover their investments.

140.    In one case, *PHL Variable Insurance Co. v. The Faye Keith Jolly Irrevocable Life Insurance Trust*, 2012 WL 850916 (11th Cir. Mar. 14, 2012), PHL filed an action against the insured and the policy owner for negligent misrepresentation in connection with a $10 million policy.  PHL alleged that the insured and the policy owner misrepresented the insured's assets on the policy application and sought damages, rescission of the policy, and the right to keep the premiums previously paid by the Trust owner, which was a secondary market purchaser of the policy.

141.    The insured defaulted on the claims against him, and the district court rescinded the policy.  However, as part of its improper tactics, PHL also asserted baseless claims for damages against the secondary market purchaser in an effort to keep the investor's premiums when rescinding the policy.  The court rejected PHL's claims, denied PHL's motion for summary judgment, and granted summary judgment in the trust's favor.

142.    Unabashed by its loss in the lower court, Phoenix appealed the ruling.  On appeal, the Eleventh Circuit reached the same conclusion as the trial court.  The Eleventh Circuit rejected PHL's arguments that the trust had made false statements in connection with the insurance application, and as a result, held that PHL had no right to retain any premiums.

143.    The facts of *Jolly* have merited significant attention from the press and confirm that Phoenix filed the lawsuit merely as part of its anticompetitive and exclusionary scheme.

---

[7] One of these courts has already rejected Phoenix's unlawful attempt to void a policy and, at the same time, keep the premiums.  In striking Phoenix's request to keep the premiums, the court observed that Phoenix's request was "exactly" what Delaware law prohibited.

According to a June 11, 2011 article in *The Hartford Courant* entitled "Emeralds Add Glitter to Insurance Battle," Jolly was employed by a cemetery and had few, if any, assets.  In his Phoenix application, he claimed to have owned nearly a billion dollars in emeralds that he salvaged from a sunken Spanish vessel in the Gulf of Mexico.  *The Hartford Courant* noted that "at the heart of the story, as pieced through court records, is the question of how Phoenix could have approved the policy in the first place.  Jolly's application contained wild discrepancies and claims that could easily have been debunked."  PHL, however, refused to comment as to "why the company accepted Jolly's application despite such glaring discrepancies."  The real story is clear.  To get its hands on more and more premiums, Phoenix turned a blind eye to obvious application inaccuracies, but now, to avoid paying out on such policies, Phoenix has seized on such errors feigning false surprise about them.

144.    As the insurer and reviewer of policy applications, Phoenix was uniquely situated to examine policy applications for discrepancies and misrepresentations.  This is precisely what other, responsible insurers do, and they routinely request documents to support statements made in applications.  Because purchasers of policies in the secondary market do not have access to the same information Phoenix does when it underwrites a policy, in determining whether a policy has been validly issued, secondary market purchasers rely heavily on Phoenix's underwriting, the fact that Phoenix issued the policy, and the fact that Phoenix did not contest the policy during the two-year contestability period.

145.    Once Phoenix found itself in dire financial straits and unable to earn enough revenue by selling life insurance, Phoenix stepped up its efforts to try to rescind policies that it underwrote, issued, and did not contest when it could have, and at the same time keep all the premiums it collected over the years.  This sham legal tactic is designed to deter investors from

buying Phoenix policies and destroy competition in the secondary market for Phoenix policies so that existing policyholders will have no one other than Phoenix to sell their policies to.

146.    Phoenix has, in effect, reversed its position regarding the secondary market, which it previously embraced and in which it intended to participate.  Instead, Phoenix now routinely denies death benefits and seeks to rescind policies that its customers purchased from Phoenix and sold to investors long ago.  Phoenix now takes the position that these policies were void from the very beginning due to application errors, for lack of "insurable interest," or other pretexts, and argues this somehow permits Phoenix to keep all of the premiums it has collected over the years while never actually providing any insurance.  Phoenix has engaged in this practice not because of any legitimate concern about the policies – which it happily sold and collected premiums on for years – but because it has found itself in severe financial distress as a result of the mismanagement of its business.

147.    In short, Defendants made a calculated decision to use Phoenix's existing policyholders as their primary source of revenue.  By engaging in the anticompetitive and exclusionary conduct described herein, Defendants have created so much uncertainty about whether Phoenix will perform under its own policies that virtually no one will buy a Phoenix policy on the secondary market.  Because policyholders cannot sell their policies to anyone other than Phoenix, Phoenix's pernicious conduct has left policyholders with only two economically inefficient options:  (a) sell their policies back to Phoenix for nothing or next to nothing; or (b) continue to pay premiums to Phoenix with no assurance that Phoenix will ever pay the death benefits under these policies.

## X.  THE SUCCESS OF PHOENIX'S ANTICOMPETITIVE CAMPAIGN

148.    From its perspective, Phoenix's unlawful scheme has been largely successful.  As a result of Phoenix's conduct, there are now significantly fewer buyers of Phoenix policies on the secondary market.  For example, immediately after Phoenix initiated its broad-based COI rate increases in 2011, Plaintiff received an email indicating that one of its buyers was "***putting on hold all purchases of PHX policies***."  In another example, one potential buyer of Plaintiff's policies sent an email identifying among its purchase criteria, "***No Phoenix paper***."

149.    Any buyers that still exist are only willing to purchase Phoenix policies at severely reduced prices, because they have no idea whether Phoenix will ultimately honor the terms of its own policies.  There are several indications that the steep discounts offered on Phoenix policies are the result of Phoenix's wrongful conduct.

150.    First, the value of a life insurance policy should increase over time naturally, but the value of Phoenix policies on the secondary market has actually decreased.  A policy's value should increase naturally because premiums have been paid to cover the risk of death in the earlier years, when a policy's COI rates exceed the relatively low risk of death.  The insurance company uses these premium payments to build a surplus that is then used to pay the death benefits in the later years when more insureds are expected to die.  In the later years of a policy, the COI rate is lower than the actual risk of death, but the insurance company has already built up a surplus from the earlier years to compensate for this.  Thus, an investor that wants to purchase a policy that has been in force for several years will pay more for the policy because the future COI rate, relative to the risk of death, will be less than the COI rate in the earlier years. This temporal relationship between the cost of insurance and the risk of death is illustrated in the diagram below:



151.    Second, the prices offered for policies issued by other insurers have remained relatively flat since early 2009.  On the other hand, the prices offered for Phoenix policies have plummeted from the prices offered in early 2009.  Many policyholders have, in fact, been unable to find any buyers at all and have been forced to lapse or surrender their policies to Phoenix, as reflected by Phoenix's relatively high lapse rates.  In 2009, 2010, and 2011, the lapse rates for all PHL policies were 8.0%, 9.3%, and 7.3%, respectively.  These rates are shockingly higher than PHL's lapse rates for the two years preceding the implementation of Defendants' anticompetitive scheme, which were just 4.3% and 5.4%, and, upon information and belief, Phoenix expects even higher lapse rates on investor-owned policies in the future.

152.    Third, according to Phoenix's public filings, Phoenix has increased its risk-based capital ratio over the last two years.  Risk-based capital represents an amount of capital based on an assessment of risks that a company should hold to protect customers against adverse developments.  The risk-based capital ratio represents the total capital of the company (as determined by formula) divided by the company's risk-based capital (as determined by formula) and measures the amount of capital that an insurance company has to support its overall business

operations.  The increase in Phoenix's risk-based capital ratio should make Phoenix's policies

less risky (*i.e.*, there is less risk that Phoenix will not have sufficient capital to meet its policy

obligations) and thus more valuable.  Yet while Phoenix claims to be financially stronger, prices

offered for Phoenix's policies have fallen dramatically.

## XI.  PHOENIX'S ANTICOMPETITIVE PURPOSE AND INTENT

153.    Defendants' anticompetitive and exclusionary conduct has no valid or legitimate

business justification.  Rather, Defendants made a calculated decision to change course and

engage in illegal conduct because their reckless decisions caused the Company to sustain

massive losses, jeopardizing their shareholders and policyholders while they continued to line

their own pockets.  Defendants, therefore, needed to find a way to recoup those losses.  The

purpose and effect of their illicit scheme is to destroy competition in the secondary market by

ensuring that buyers and potential buyers for Phoenix policies cannot successfully invade or

erode Phoenix's dominant and entrenched market position, so that Phoenix can force its

policyholders to surrender their policies back to Phoenix.

154.    Indeed, Defendants have undertaken their anticompetitive and exclusionary

actions with the specific intent to monopsonize the secondary market for Phoenix life insurance

policies by eliminating, destroying, or foreclosing any meaningful competition.  Defendants'

scheme is designed to thwart competition while allowing Phoenix to pay anticompetitive, below-

market prices (*i.e.*, zero dollars in the case of lapses) for Phoenix life insurance policies on the

secondary market while avoiding the payment of death benefits.  Indeed, Defendants' scheme

has injured every single participant in the secondary market for its policies, including:

(a) the existing policyholders who are unable to sell their policies now and who are being forced to continue paying premiums to Phoenix or else sell their policies back to Phoenix for nothing or virtually nothing;

(b) the former policyholders who were forced to lapse or surrender their policies back to Phoenix (upon information and belief, many investors who purchased Phoenix policies in the secondary market sustained hundreds of millions of dollars in losses by being forced to surrender their policies to Phoenix as a result of Phoenix's anticompetitive campaign); and

(c) the former policyholders who were forced to sell their policies to secondary market purchasers at substantial losses.

155. Defendants' intentional, sweeping, and disruptive conduct – organized, orchestrated, and implemented by Defendants – is willful, malicious, and oppressive. Consequently, an award of exemplary or punitive damages in an amount sufficient to punish and deter Defendants is also justified.

## XII.  THE RELEVANT MARKETS

### A.  Relevant Product Market

156. The relevant product market for purposes of Plaintiff's claims is the secondary market for life insurance policies issued by Phoenix.

157. Although the primary and secondary markets both involve life insurance, the markets are separate and distinct, and there is no competition between the two markets.

158. In the primary market, insurance companies and their agents and brokers market and sell insurance products to prospective insureds, and prospective insureds seek insurance policies from insurance companies.  Prospective insureds fill out applications, undergo medical

tests, and are otherwise investigated (or underwritten) by the insurance companies.  In contrast, in the secondary market, potential insureds do not seek policies from insurance companies; instead, actual insureds (or investors who purchased policies on the secondary market) seek to sell policies they own.

159.    Furthermore, in the primary market, buyers generally seek to obtain life insurance for the purpose of obtaining insurance protection, although some consumers have purchased life insurance in the primary market not for insurance protection but largely as an investment.  In the secondary market, however, buyers always purchase policies exclusively as investments and never for insurance protection.  And in the case of insurance companies, they purchase policies back from policyholders on the secondary market in order to release the death benefit liabilities associated with them or to hedge against their own mortality risks.  Professional or institutional buyers are the main participants in the secondary market, but they generally do not participate in the primary market.

160.    Additionally, in the primary market, the products are *potential* life insurance policies, because insureds must apply and qualify for policies.  On the secondary market, the products are *actual* life insurance policies that have been issued and are in force.

161.    Thus, while life insurance policies are involved in both the primary and secondary markets, the secondary market is separate and distinct.  In the secondary market, investors seek a critical bundle of rights that include the right to receive the policy death benefits coupled with the right to sell or resell interests in the policies.  Indeed, the right to sell or resell the interest in a policy is a critical right that gave rise to the secondary market and allows it to continue to exist. In the primary market, insureds generally seek life insurance for different reasons, including income protection, tax-deferred growth, and the avoidance of potential estate tax liability.  The

primary market involves individuals' applications for life insurance policies for personal financial planning purposes; the secondary market involves investments in alienable interests in in-force life insurance policies strictly for investment purposes.

162.     In other words, insurers' issuance of policies, combined with their willingness and agreement to respect the right to transfer policies, effectively converts potential life insurance policies into a new product – the resalable interest in in-force policies.  This is somewhat similar to the manner in which individual mortgages have been bundled together and sold as separate products known as collateralized debt obligation ("CDO") securities.  Although the primary market for mortgages and the secondary CDO market both in some sense involve mortgages, the markets and the relevant products are separate and distinct.  Investors in the CDO market seek to purchase a distinct bundle of rights that define the nature of that market; individual mortgagors or mortgage seekers do not participate in the CDO market at all.

163.     The relevant product market includes all types of life insurance policies, although as a practical matter term life insurance is rarely sold on the secondary market (its limited term makes it too risky for most investors), and whole life insurance policies are only infrequently transferred (its fixed premium rates render it too expensive).  The majority of life insurance on the secondary market is universal life insurance because of the flexibility it offers policyholders with respect to the timing and amount of premium payments.

164.     Other financial instruments are not substitutes for life insurance policies and cannot be included in the same relevant market.  Investors in the secondary market for life insurance buy the economic interests in life insurance policies because they are seeking a particular risk/reward profile that differs substantially from the risk/reward profiles of other financial products.  In other words, investors purchase interests in life insurance policies because

the price movements in those interests are largely uncorrelated with those of other financial products.  Most, if not all, secondary market investors do not view other financial products as viable substitutes for life insurance product investments.

**B.      Relevant Geographic Markets**

165.     The relevant geographic markets for purposes of Plaintiff's claims consist of (i) the nationwide domestic primary market for the issuance of life insurance policies and (ii) the worldwide secondary market, including the United States, for the purchase and sale of Phoenix life insurance policies.

166.     The primary life insurance market is nationwide.  Although some insurance companies do business in only certain states, there are a number of insurance companies that compete with each other in many geographic areas, and U.S. consumers have a choice of insurance companies when they are shopping for potential policies.

167.     The secondary market for Phoenix life insurance policies is worldwide.  Investors from all over the United States, Europe, and elsewhere can and do (or, more accurately, used to) compete with each other to purchase Phoenix policies from insureds or from other investors.  Most of these transactions have involved U.S. parties and intermediaries and took place in, and directly affected, U.S. commerce.

**XIII.  THE SECONDARY MARKET FOR PHOENIX POLICIES**

168.     There is a separate secondary market or aftermarket for Phoenix life insurance policies.  On this secondary market, insureds can (or, more accurately, used to be able to) sell their Phoenix policies.  An insured may sell a Phoenix policy to a life settlement company, which in turn may resell it to others (*e.g.*, banks, investment funds, or other financial institutions).  In most states, the initial sale must be made to a licensed life settlement provider.

169.    As already noted, prospective purchasers of life insurance policies can choose from different life insurance companies in the primary market for life insurance.  Once an individual initially purchases a life insurance policy from Phoenix, however, she or he becomes locked into a Phoenix-specific secondary market, because, among other things:

a.    The life insurance policy application process is lengthy and complex, and often includes a mandatory physical exam and other medical tests.  Insureds do not wish to incur the substantial inconvenience and transaction costs associated with switching companies (each insurance company uses different forms; each typically requires a new medical exam; and each typically charges an application fee).  As insureds age, they generally become less likely to pass new or additional medical exams to qualify for other insurance, and if they are still insurable, they will in some circumstances pay rates on a new policy higher than those on a policy they purchased years earlier for the reasons discussed above.  As one life insurance commentator observed, many insureds "can't shop for new coverage because they are no longer insurable."  As a result, once an insured obtains a Phoenix life insurance policy, the insured is unlikely to switch to another insurer.  To the extent the insured participates in a secondary life insurance market, the insured is limited to the secondary market for Phoenix life insurance policies.

b.    Once an insured has a policy in place, other life insurance companies are less likely to offer additional policies on the same insured, because they do not want to over-insure individuals.

c.    Additionally, once an insured acquires a policy, the insured often has less need for additional insurance.

170. The above factors, as well as Defendants' anticompetitive and exclusionary conduct, deter or prevent Phoenix policyholders from readily or easily switching to other insurers once they have acquired Phoenix policies. Phoenix policyholders are, accordingly, substantially "locked in" to Phoenix policies. The costs of switching insurance brands are simply too high to allow for meaningful inter-brand competition in the secondary market. Policyholders will therefore tolerate a substantial level of decreased prices in the secondary market before even considering the possibility of switching insurance brands. And, in many cases, they simply will have no other economically viable alternative because advanced age or changes in their health have made them uninsurable under a new policy with another carrier.

171. Similarly, owners of Phoenix policies who purchased their policies on the secondary market are also locked in to the secondary market for Phoenix policies. They cannot substitute policies issued by other insurance companies for the Phoenix policies they own. They cannot compel insureds to take out other insurance, nor can they compel insureds to transfer other insurance policies to them. Once an investor in the secondary market purchases a Phoenix policy, it is locked into that policy unless and until it can sell or transfer it or chooses to lapse it.

172. In addition, competition in the primary market for life insurance cannot discipline or prevent anticompetitive or exclusionary activity in the secondary market for Phoenix life insurance policies. The lifecycle cost of universal life insurance policies generally, and of Phoenix policies in particular, is not transparent to prospective insureds in the primary market; it is instead difficult to understand and opaque. For example, the COI rate is based on a number of assumptions by insurance companies, including assumptions about mortality, persistency (lapse rates), interest rates, expenses, taxes, and statutorily-required reserves. Consumers who are the primary market purchasers of life insurance have little or no access to this information, which is

essential to a full understanding of the true lifecycle cost of a life insurance policy.  As a result, when prospective insureds are considering the purchase of Phoenix policies, they cannot and do not evaluate the true lifecycle costs of those policies.  This is especially true because insurers do not disclose precisely how they have priced their policies, and they write their contracts in a manner that makes them virtually incomprehensible to policyholders.

173.    In recent years, Phoenix has altered its practices, engaged in the exclusionary conduct described above, and thereby created enormous uncertainty about the value of the billions of dollars in Phoenix policies purchased by investors on the secondary market, including uncertainty about the cost to keep Phoenix's policies in force.  These changed practices or pricing structures were not known to Phoenix's policyholders at the time they purchased their Phoenix policies and were not reasonably foreseeable to them.

174.    As a result of the above lock-in factors, lifecycle pricing opacity, and Phoenix's unpredictable and altered practices, there is a separate, relevant secondary market for Phoenix-branded life insurance policies.  People who purchase Phoenix policies do not have realistic alternatives on the primary insurance market once they are locked in to Phoenix policies.  Nor can they anticipate and foresee the extent of the lock-in prior to the purchase of Phoenix policies because of the lifecycle pricing opacity of life insurance.

175.    Cross-elasticities also demonstrate that the secondary market for Phoenix life insurance policies is a separate market.  In a typical monopoly case, cross-elasticity of demand is an economic variable that measures the change in the quantity of a product demanded by consumers relative to the change in price of another (the monopolized) product.  In the monopsony context, the elasticity of demand measures the relative demand of new, potential, or fringe buyers.  Typically, cross-elasticity of supply measures the relative responsiveness of the

quantity supplied to changes in price.  In a monopsony case, cross-elasticity of supply measures the ability of sellers to switch to other buyers of the product and avoid the low-paying buyer (the monopsonist).

176.    Upon information and belief, in the secondary market, there is no (or no significant) cross-elasticity of demand or supply.  If Phoenix lowers the prices it will pay for Phoenix policies on the secondary market to below-competitive levels, policyholders will not and cannot substitute away from Phoenix and towards other buyers because of (a) the lock-in factors described above, (b) Phoenix's anticompetitive and exclusionary practices (which are strategic barriers to entry and expansion), and (c) other barriers to buyer entry and expansion described below.

## XIV.  PHOENIX'S MARKET POWER IN THE SECONDARY MARKET

177.    Phoenix has market (or monopsony) power in the secondary market. Circumstantial and direct evidence supports the conclusion that Phoenix has substantial market power.

178.    As to circumstantial evidence, upon information and belief, Phoenix now buys, through lapses and surrenders, over 75% of the Phoenix policies being bought and sold on the secondary market.  This high market share, combined with the entry and expansion barriers described below, establishes Phoenix's market power in the secondary market.

179.    As to direct evidence, because Phoenix dominates its secondary market, and because Phoenix has the sole ability to refuse to pay death benefits, refuse to approve policy transfers, and raise COI charges, Phoenix now does not need to (and does not) offer fair or market value for such policies.  Instead, having eliminated potential alternative buyers, Phoenix can, and does, force policyholders who want to sell their policies to lapse or surrender their

policies, in effect, selling their policies back to Phoenix for prices drastically below those that would be offered in a competitive secondary market.

180.    Lapses or surrenders of policies are the economic equivalent of Phoenix purchases of those policies, but also allow Phoenix to avoid paying the death benefits.  Phoenix's lapse rates are direct evidence of Phoenix's market (monopsony) power.  When Phoenix buys back a policy through a lapse or surrender, Phoenix pays nothing or almost nothing.  In a truly competitive market, Phoenix would have to buy the policies for fair value, at prices well above the cash surrender value.

### A.    The Secondary Market Features Substantial Entry and Expansion Barriers

181.    There are substantial entry barriers surrounding the secondary market for Phoenix life insurance policies.  These entry barriers include:

a.    <u>Control of an essential resource</u>.  Phoenix controls the supply of the policies that it issues, and it also controls the policy transfer process by approving or disapproving transfers and/or commencing litigation to challenge transfers or rescind or void policies that have been sold or transferred.  It also has the power to approve or deny claims made on the policies.  As described above, in recent years, Phoenix has undertaken a campaign of anticompetitive and exclusionary behavior designed to maintain or acquire monopsony power in the secondary market for Phoenix policies.  Phoenix's power and practices enable it to control the essential resource in the secondary market – the Phoenix insurance policies (or the transferrable interest in such policies).

b.    <u>Issuer advantages</u>.  Sellers of policies have limited information about the availability of buyers other than the company that issued the policy because most

policy forms only describe the surrender option and not the settlement option. (Only a few states require insurers to disclose a life settlement as an option for insureds.)  Additionally, insurers typically require a simple one-page form to effect the surrender of a policy.  On the other hand, when a policyholder wants to settle her or his policy to a party other than the insurer, the insurer usually requires the execution of multiple forms containing extensive disclosures and disclaimers intended to deter the life settlement transaction.

c.    Higher capital costs for new entrants.  New buyer-entrants in the secondary market have higher capital costs than existing participants, and these capital costs are not applicable to Phoenix.

d.    Technical know-how.  Investors in the secondary market need substantial and sophisticated know-how and custom computer software to accurately price Phoenix life insurance policies and portfolio risks.  They also need to be able to track policies and premium payments to ensure that policies do not lapse. Assembling this know-how requires substantial time, effort, and capital.

182.    Phoenix's anticompetitive and exclusionary conduct, described further above, also constitutes a strategic entry barrier.  Through its anticompetitive and exclusionary conduct, Phoenix has substantially eliminated other buyers from the secondary market and prevented the participation of potential buyers in that market.

183.    Additionally, the secondary market for Phoenix life insurance policies exhibits substantial expansion barriers.  Firms currently participating in this market as buyers (other than Phoenix itself) confront the first entry barrier described above – Phoenix's near exclusive control of its own life insurance policies.  This entry barrier concurrently functions as an expansion

barrier, especially through the operation of Phoenix's anticompetitive and exclusionary practices (supra).  Firms that currently participate in the secondary market cannot meaningfully expand their purchases of Phoenix policies on the secondary market in light of Phoenix's anticompetitive and exclusionary conduct.

## XV.  THE EFFECT OF PHOENIX'S CONDUCT ON TRADE OR COMMERCE

184.     Phoenix's anticompetitive and exclusionary conduct described herein has affected and restrained, and continues to affect and restrain, both commerce within the State of Connecticut (intrastate commerce) as well as interstate trade or commerce.  At least part of Phoenix's monopsonization and attempted monopsonization occurred within the State of Connecticut.

## XVI.  INJURY-IN-FACT AND DAMAGES

185.     By reason of, and as a direct and proximate result of, Defendants' anticompetitive and exclusionary practices and conduct, Lima has suffered, and will continue to suffer, financial injury to its business and property.

186.     As a result, Lima has been deprived of revenue and profits it would have otherwise made, has suffered diminished market growth, has sustained a loss of goodwill, and has suffered an impairment of the value of the Phoenix life insurance policies it owns.

187.     Lima has not yet calculated the precise amount of its damages with respect to the approximately $1.4 billion in Phoenix policies that Lima owns or has owned, but it will do so at an appropriate time during this case.  However, Lima estimates that the damages are in the hundreds of millions of dollars.

## XVII.  ANTITRUST INJURY AND STANDING

188.    Phoenix's anticompetitive practices have directly injured owners of Phoenix policies.  Phoenix policy owners have largely been foreclosed from selling their policies on the secondary market (except to Phoenix itself, which buys them through lapses or surrenders). Lima, as an owner of the financial interest in several Phoenix policies, has been injured substantially and directly by Phoenix's anticompetitive and exclusionary practices, including by its inability to sell its Phoenix policies to buyers other than Phoenix, forcing Lima in some cases to lapse or surrender its policies back to Phoenix.  This injury – as a seller in a market Phoenix has monopsonized or attempted to monopsonize – is antitrust injury for which Lima has standing to challenge.

189.    Additionally, as a buyer or potential buyer of Phoenix policies, Lima is a competitor or potential competitor of Phoenix in the secondary market and has also suffered direct antitrust injury in this respect.

190.    Phoenix's practices have harmed competition in the secondary market for Phoenix life insurance policies.  Phoenix's practices have all but foreclosed competition in the purchase or repurchase of interests in Phoenix policies, and have driven down prices on the secondary market well below competitive levels.

191.    Phoenix's conduct has produced antitrust injury in the form of at least the following anticompetitive, exclusionary and injurious effects upon competition in the secondary market for Phoenix life insurance policies:

a.    Competition in the purchase of Phoenix life insurance policies has been

substantially and unreasonably restricted, lessened, foreclosed and eliminated;

b.      The secondary market for Phoenix life insurance policies will continue to be artificially restrained or monopsonized;

c.      Barriers to entry into the market have been raised;

d.      Barriers to expansion of buyers in the market have been raised;

e.      Consumer and investor choice has been, and will continue to be, significantly limited and constrained as to the buyers of Phoenix life insurance policies;

f.      Competitors of Phoenix in the secondary market for the purchase of Phoenix life insurance policies have been injured and excluded from the market; and

g.      Phoenix will continue to pay anticompetitive, below-market prices to the detriment of consumers and other owners of Phoenix insurance policies.

## XVIII.  THE INDIVIDUAL DEFENDANTS' PATTERN OF RACKETEERING

192.    To ensure the success of their scheme, the Individual Defendants resolved that Phoenix would not honor policies they knew or suspected to be owned by investors.  Phoenix would instead continue to collect premiums on those policies, but at the same time try to force the owners to lapse them.  If the policies do not lapse, Phoenix will simply refuse to pay the death benefits or attempt to void the policies by claiming the policies were void *ab initio*, as so-called "STOLI policies," while trying to keep all of the premiums.  Indeed, upon information and belief, the Individual Defendants have directed Phoenix to conduct an internal audit of its investor-owned policies, and they have identified policies that Phoenix intends to challenge if it is unable to force the owners to lapse their policies first.

193.    The Individual Defendants have never disclosed, and never could disclose, their illicit strategy to Phoenix's shareholders and policyholders, but they and the Insiders' Circle have invested heavily in it.  During a four-month period in 2009, Defendant Wehr bought over

110,000 shares of PNX stock; Defendant Polkinghorn purchased over 48,000 shares of his own; and Chief Financial Officer, Peter Hofmann, purchased over 41,000 shares.  Since recently stepping up their efforts to deny death benefits and force lapses and surrenders, the Insiders' Circle has also doubled-down on the success of their unlawful scheme.  In addition to the tens of thousands of shares they purchased in 2009, several members of the Insiders' Circle recently purchased thousands of additional shares.  On May 10, 2012, Defendant Wehr purchased another 100,000 shares.  On May 4, 2012, Defendant Polkinghorn purchased 10,000 shares.  On May 15, 2012, the Executive Vice President and Chief Investment Officer of PNX, Christopher Wilkos, purchased 25,000 additional shares.  And on May 17, 2012, the General Counsel, John Mulrain, purchased another 10,000 shares.

194.    These share purchases are bewildering given that Phoenix today writes only a tiny fraction of the volume of life insurance it issued before 2009.  In 2011, PHL, as a company, received a *little more than $1.5 million* in premiums from sales of new life insurance[8].  The Individual Defendants know these minimal life insurance sales are utterly incapable of sustaining Phoenix as a going concern.  However, the Individual Defendants also know that there is, upon information and belief, around $10 billion in Phoenix policies in force and owned by investors at this time, which Phoenix has no intent to pay.[9]  Thus, if, for example, Phoenix ultimately pays the death benefits on only 50% of these policies – by forcing policyholders to lapse or surrender their policies before they mature or by denying the death benefits – Phoenix would release over $400 million of statutory capital.  With PNX stock trading at around $1.43 per share, a market

---

[8] This was less than what Ed Humphrey made 2006 and less than 10% of Humphrey's 2007 premium quota.  *See* paragraphs 61-62 above.
[9] According to Phoenix's public filings, Phoenix also has the option to recapture the risk on policies ceded to its reinsurers.  Phoenix exercises this valuable right when it finds it "financially advantageous" to "reassume the risk rather than continue paying reinsurance premiums."  Upon information and belief, Defendants have exercised, or intend to exercise, this option with Phoenix's reinsurers with respect to at least a portion of the billions of dollars in investor-owned policies, so that they personally can capture the benefits of their plan never to pay the death benefits on these policies.

capitalization of approximately $166 million, and a book value of $865 million, Lima estimates

that PNX stock would increase in value by about $0.62 per share, or 43%, assuming a constant

price to book value ratio (of approximately 0.19x).  Defendant Wehr alone would realize a profit

of about $130,200 based solely on the 210,000 shares he has purchased since 2009.[10]

195.    In short, Phoenix is now in the "business" of denying death benefits and

"managing [its] liabilities," and the Insiders' Circle has never disclosed this to the public because

they continue to pay themselves millions of dollars every year as though Phoenix were like any

other insurance company.  In fact, without taking into account the millions previously paid to

Defendant Young, in each of the past three years, while PNX stock has dropped almost 50% in

value, the Insiders' Circle has collectively made more money than Phoenix itself.  In 2009, the

Insiders' Circle earned nearly $8 million in total compensation, while the Company lost $319

million.  In 2010, the Insiders' Circle earned over $9 million, while the Company lost $12.6

million.  And in 2011, the Insiders' Circle earned close to $9 million (also excluding Defendant

Cassidy's compensation, which is not publicly available), while the Company made just $8.1

million.  These figures are illustrated below:[11]

|  | 2009 | 2010 | 2011 |
|---|---|---|---|
| **Jim Wehr** | $3,439,396 | $3,509,365 | $3,766,804 |
| **Philip Polkinghorn** | $1,239,199 | $1,465,951 | $1,748,831 |
| **Ed Cassidy** | $1,156,405 | $1,656,101 | Not available |
| **Dona Young** | Not available | Not available | Not available |
| **Peter Hofmann** | $1,017,833 | $1,255,717 | $1,806,679 |

---

[10] This does not include options and restricted stock units.  Wehr alone owns a total of 1,144,838 shares, options, and restricted stock units.
[11] Individual compensation includes stock options and pension value.

| | | | |
|---|---|---|---|
| **Christopher Wilkos** | $980,920 | $1,294,594 | $1,423,124 |
| **Total** | **$7,833,753** | **$9,181,728** | **$8,745,438** |
| **PNX Change in Share Price (From Prior Year)** | $3.17 1/2/09<br><br>$2.78 12/31/09<br><br>-$0.39<br><br>-12.3% | $2.78 12/31/09<br><br>$2.54 12/31/10<br><br>-$0.24<br><br>-8.6% | $2.54 12/31/10<br><br>$1.68 12/30/11<br><br>-$0.86<br><br>-33.9% |
| **PNX Net Income/(Loss)** | ($319 million) | ($12.6 million) | $8.1 million |

196.    In connection with Defendants' overall strategy to attain or maintain a monopsony on the secondary market for Phoenix policies, the Individual Defendants have conducted the affairs of Phoenix through a pattern of racketeering activity that includes fraudulently inducing Plaintiff and other policyholders to continue paying premiums to Phoenix while the Individual Defendants have no intention of allowing Phoenix to honor the terms of its own policies.

### A.    Premium Notices

197.    The Individual Defendants have induced Plaintiff to continue to pay premiums to Phoenix by causing Phoenix to send premium notices to Plaintiff in interstate commerce, through the United States Postal Service and/or interstate wires (by email or facsimile), advising Plaintiff that Plaintiff must continue to pay premiums to keep its policies in force.  Specifically, these notices state:[12]

a.    "The cash value of your policy has been depleted, and is no longer sufficient to support the monthly charges and consequently entered its 61 day grace period at the time."

_____

[12] Specific language is taken from exemplar policies.  The stated dates, amounts, and other policy-specific information are different for each document.

b.    "At a minimum, $4,432.72 must be received by us on or before 01/31/2012, in order to prevent a lapse."

c.    "We urge you to prevent the loss of ***this valuable coverage*** by sending your payment today."  (Emphasis added).

198.    Each time Phoenix mailed a premium notice to Plaintiff, Phoenix affirmatively represented that, to its knowledge and belief, the subject policy was valid and enforceable and that Phoenix did not intend to challenge the policy or refuse to pay the death benefit, and that if premiums are paid, Phoenix will honor the policy.  For example, by telling Plaintiff that a policy's cash value has been depleted and that Plaintiff must pay a certain amount of money "in order to prevent a lapse," Phoenix represented to Plaintiff that it considered Plaintiff's policy to be a valid policy, that the policy had a cash value that had accumulated from Plaintiff's premium payments, and that Plaintiff's valid policy could lapse (an invalid policy cannot lapse).  Upon information and belief, these statements were false because Phoenix intended to claim in each instance that the policy is not valid, but instead is void for lack of insurable interest or some other reason.  Likewise, by urging Plaintiff to pay money to prevent the loss of "valuable coverage," Phoenix represented to Plaintiff that Phoenix intends to provide coverage under the policy and that such coverage had value.  Upon information and belief, these statements were and are false because Phoenix had and has no intent to provide "valuable coverage," but instead plans to try to force Plaintiff to lapse or surrender the policy or else deny coverage on the ground that the policy is void for lack of insurable interest or some other reason.

199.    Upon information and belief, the Individual Defendants caused Phoenix to mail these premium notices to Plaintiff, and collect the premiums billed, without disclosing to Plaintiff that the Individual Defendants secretly intended to have Phoenix deny the death benefits

and/or the validity of the Policies or, through other actions, force Plaintiff to lapse or surrender its policies.  Thus, each time Phoenix used the United States Postal Service and/or interstate wires to send premium notices to Plaintiff, Phoenix fraudulently concealed its intention to deny the death benefits and/or the validity of the Policies or, through other actions, force Plaintiff to lapse or surrender its policies.

200.    Phoenix has sent these premium notices to Plaintiff at least once a year since Plaintiff purchased the Policies.  Attached hereto as Appendix C is a Schedule identifying the dates Phoenix sent such notices.  Phoenix has also provided Plaintiff with wiring instructions for the payment of premiums and accepted premium payments by interstate wire transfer.  Phoenix mailed these notices as part of the Individual Defendants' plan to defraud Plaintiff into paying premiums to Phoenix, which Plaintiff did.

**B.**    **Annual Statements**

201.    The Individual Defendants have also induced Plaintiff to continue to pay premiums to Phoenix by causing Phoenix to send annual statements to Plaintiff in interstate commerce, through the United States Postal Service and/or interstate wires (by email or facsimile), advising Plaintiff that Plaintiff's policies were valid.  Specifically, these notices state:

a.    "Date of Issue:  February 10, 2006."

b.    "Policy Specifications as of February 09, 2012."

c.    "Policy Status:  ***In Force***."  (Emphasis added).

d.    "Base Policy Face Amount:  $10,000,000.00"

e.    "Beginning Value as of 02/10/2011:  $77,636.82."

f.    "Surrender Value"

g.    "Net Surrender Value"

h.      "Net Death Benefit:  $10,000,000."

202.    Each time Phoenix mailed an annual statement to Plaintiff, Phoenix affirmatively represented that, to its knowledge and belief, the subject policy was valid and enforceable and that Phoenix did not intend to challenge the policy or refuse to pay the death benefit, and that if premiums are paid, Phoenix will honor the policy.  For example, by telling Plaintiff that a policy was "In Force" and had a certain "Date of Issue," Phoenix represented to Plaintiff that it considered Plaintiff's policy to be a valid policy that was "in force," and that the policy had been validly issued as of the issue date.  Upon information and belief, these statements were false because Phoenix intended to claim in each instance that the policy is not valid, but instead is void *ab initio* (*i.e.*, never issued) for lack of insurable interest or some other reason.  Likewise, by advising Plaintiff that the policy had a Base Policy Face Amount, Beginning Value, Surrender Value, Net Surrender Value, and Net Death Benefit, Phoenix represented to Plaintiff that Phoenix considered Plaintiff's policy to be valid, because only a valid policy has such values.  Upon information and belief, these statements were false because Phoenix intended to claim in each instance that the policy is not valid, but instead is void for lack of insurable interest or some other reason.

203.    Upon information and belief, the Individual Defendants caused Phoenix to mail these annual statements to Plaintiff without disclosing to Plaintiff that the Individual Defendants secretly intended to have Phoenix deny the death benefits and/or the validity of the Policies or, through other actions, force Plaintiff to lapse or surrender its policies.  Thus, each time Phoenix used the United States Postal Service and/or interstate wires to send annual statements to Plaintiff, Phoenix fraudulently concealed its intention to deny the death benefits and/or the validity of the Policies or, through other actions, force Plaintiff to lapse or surrender its policies.

204.    Phoenix has sent these annual statements to Plaintiff at least once a year since Plaintiff purchased the Policies.  Attached hereto as Appendix C is a Schedule identifying the dates Phoenix sent such annual statements.  Phoenix mailed these annual statements as part of the Individual Defendants' plan to defraud Plaintiff into paying premiums to Phoenix, which Plaintiff did.

### C.    Verifications of Coverage

205.    The Individual Defendants have also induced Plaintiff to continue to pay premiums to Phoenix by causing Phoenix to send verifications of coverage to Plaintiff in interstate commerce, through the United States Postal Service and/or interstate wires (by email or facsimile), advising Plaintiff that Plaintiff's policies were valid.  Specifically, these notices state:

a.    "Policy Issue Date:  May 29, 2008."

b.    "Payment Information Status:  *Active*."  (Emphasis added).

c.    "Total Account Value:  $32,130.55."

d.    "Gross Death Benefit:  $10,000,000.00."

e.    "Net Death Benefit:  $10,000,000.00."

f.    "Surrender Charge:  -$513,738.30."

g.    "This statement indicates *the value of this contract as of the date specified*."  (Emphasis added).

h.    "Should anyone suggest that you *cancel or replace this policy*, we recommend that you contact your advisor or Phoenix's Client Service."  (Emphasis added).

206.    Some verifications of coverage also state that a policy is "in force."  Each time Phoenix mailed a verification of coverage to Plaintiff, Phoenix affirmatively represented that, to its knowledge and belief, the subject policy was valid and enforceable and that Phoenix did not

intend to challenge the policy or refuse to pay the death benefit, and that if premiums are paid, Phoenix will honor the policy.  For example, by telling Plaintiff that a policy was "Active," "in force" and had a certain "Policy Issue Date," Phoenix represented to Plaintiff that it considered Plaintiff's policy to be a valid policy that was "active" and "in force," and that the policy had been validly issued as of the Policy Issue Date.  Upon information and belief, these statements were false because Phoenix intended to claim in each instance that the policy is not valid, but instead is void *ab initio* (*i.e.*, never issued) for lack of insurable interest or some other reason. Likewise, by advising Plaintiff that the policy had a Total Account Value, Gross Death Benefit, Net Death Benefit, and Surrender Charge, Phoenix represented to Plaintiff that Phoenix considered Plaintiff's policy to be valid, because only a valid policy has such values.  In addition, by telling Plaintiff that "[t]his statement indicates *the value of this contract as of the date specified*" and that Plaintiff could "cancel or replace this policy," Phoenix represented to Plaintiff that the policy was a valid contract that had a certain value as of the date specified and that the policy was a valid policy that could be canceled or replaced (an invalid policy cannot be canceled or replaced).  Upon information and belief, these statements were false because Phoenix intended to claim that the policy is not valid, but instead is void for lack of insurable interest or some other reason.

207.    Upon information and belief, the Individual Defendants caused Phoenix to mail these verifications of coverage to Plaintiff without disclosing to Plaintiff that the Individual Defendants secretly intended to have Phoenix deny the death benefits and/or the validity of the Policies or, through other actions, force Plaintiff to lapse or surrender its policies.  Thus, each time Phoenix used the United States Postal Service and/or interstate wires to send verifications of coverage to Plaintiff, Phoenix fraudulently concealed its intention to deny the death benefits

and/or the validity of the Policies or, through other actions, force Plaintiff to lapse or surrender its policies.

**D.    Policy Illustrations**

208.    The Individual Defendants have also induced Plaintiff to continue to pay premiums to Phoenix by causing Phoenix to send policy illustrations to Plaintiff in interstate commerce, through the United States Postal Service and/or interstate wires (by email or facsimile), advising Plaintiff that Plaintiff's policies were valid.  Specifically, these notices state:

a.    "Issue Date:  02/10/2006."

b.    "Years Inforce:  6."

c.    "Months Inforce:  2."

d.    "Net Death Proceeds:  $10000000.00"

e.    "Gross Account Value:  $14389.87."

f.    "If premiums are received late or paid in a more frequent pay mode, values will be less than illustrated, and in fact, the policy may terminate earlier than shown."

209.    Each time Phoenix mailed an illustration to Plaintiff, Phoenix affirmatively represented that, to its knowledge and belief, the subject policy was valid and enforceable and that Phoenix did not intend to challenge the policy or refuse to pay the death benefit, and that if premiums are paid, Phoenix will honor the policy.  For example, by telling Plaintiff that a policy was "Inforce" for a certain number of years and months and that the policy had a certain "Policy Issue Date," Phoenix represented to Plaintiff that it considered Plaintiff's policy to be a valid policy that was "in force," and that the policy had been validly issued as of the Policy Issue Date. Upon information and belief, these statements were false because Phoenix intended to claim in each instance that the policy is not valid, but instead is void *ab initio* (*i.e.*, never issued) for lack

of insurable interest or some other reason.  Likewise, by advising Plaintiff that the policy had a

Base Face Amount, Total Death Benefit, and Account Value, Phoenix represented to Plaintiff

that Phoenix considered Plaintiff's policy to be valid, because only a valid policy has such

values.  In addition, by telling Plaintiff that if premiums are received late or paid in a more

frequent pay mode, "the policy may terminate earlier than shown," Phoenix represented to

Plaintiff that the policy is a valid contract that could terminate earlier than shown (an invalid

policy cannot terminate).  Upon information and belief, these statements were false because

Phoenix intended to claim in each instance that the policy is not valid, but instead is void for lack

of insurable interest or some other reason.

210.    Upon information and belief, the Individual Defendants caused Phoenix to mail

these illustrations to Plaintiff without disclosing to Plaintiff that the Individual Defendants

secretly intended to have Phoenix deny the death benefits and/or the validity of the Policies or,

through other actions, force Plaintiff to lapse or surrender its policies.  Thus, each time Phoenix

used the United States Postal Service and/or interstate wires to send illustrations to Plaintiff,

Phoenix fraudulently concealed its intention to deny the death benefits and/or the validity of the

Policies or, through other actions, force Plaintiff to lapse or surrender its policies.

### E.    COI Letters

211.    The Individual Defendants have also induced Plaintiff to continue to pay

premiums to Phoenix by causing Phoenix to send notices regarding COI rates to Plaintiff in

interstate commerce, through the United States Postal Service, advising Plaintiff that Plaintiff's

policies were valid.  Specifically, these notices state:

a.  "Your policy referenced above will be subject to this rate increase on your next policy anniversary beginning 2/7/2011 unless your accumulated policy value is maintained at a sufficient level."

b.  "This increase is ***in accordance with the terms of your policy*** and the adjusted rates for the cost of insurance will remain below the maximum guaranteed cost of insurance rates we are permitted to charge your policy."  (Emphasis added).

212.  Each time Phoenix mailed a COI letter to Plaintiff, Phoenix affirmatively represented that, to its knowledge and belief, the subject policy was valid and enforceable and that Phoenix did not intend to challenge the policy or refuse to pay the death benefit, and that if premiums are paid, Phoenix will honor the policy.  For example, by telling Plaintiff that a policy was "subject to this rate increase" and that the policy had an "anniversary" and "accumulated policy value," Phoenix represented to Plaintiff that it considered Plaintiff's policy to be a valid policy that was subject to a rate increase, that the policy had been validly issued on the anniversary date, and that the policy had a certain accumulated value.  Upon information and belief, these statements were false because Phoenix intended to claim in each instance that the policy is not valid, but instead is void *ab initio* (*i.e.*, never issued) for lack of insurable interest or some other reason and thus there was, according to Phoenix, no accumulated policy value.  Likewise, by advising Plaintiff that a COI rate change was "in accordance with the terms of your policy," Phoenix represented to Plaintiff that Phoenix considered Plaintiff's policy to be valid, because Phoenix could only be basing the rate increases on the "terms" of a valid policy.  This statement was false because Phoenix intended to claim in each instance that the policy is not valid, but instead is void for lack of insurable interest or some other reason.

213.    Upon information and belief, the Individual Defendants caused Phoenix to mail these COI letters to Plaintiff without disclosing to Plaintiff that the Individual Defendants secretly intended to have Phoenix deny the death benefits and/or the validity of the Policies or, through the COI rate increases and other actions, force Plaintiff to lapse or surrender its policies. Thus, each time Phoenix used the United States Postal Service to send COI letters to Plaintiff, Phoenix fraudulently concealed its intention to deny the death benefits and/or the validity of the Policies or, through the COI rate increases and other actions, force Plaintiff to lapse or surrender its policies.

214.    In a recent example, Phoenix made several representations to Plaintiff that a policy was validly issued, in force, and had a positive account value.  However, when the insured died and Plaintiff submitted a claim for the death benefit, Phoenix refused to pay.  Just *two weeks* after Phoenix affirmatively represented to Plaintiff that the policy was validly issued, in force, and had a positive account value, Phoenix claimed that the policy was invalid and that Phoenix was entitled to keep all of the premiums it had collected on the policy, including premiums that Plaintiff paid in reliance on Phoenix's representations that the policy was valid, in force, and had a positive account value.  The circumstances of this fraud are outlined below:

215.    On January 20, 2011, Phoenix issued an annual statement for the policy.  The annual statement represented, among many other things:

**Policy Status:  In Force**

**Policy Value as of 1/21/2010:  $51,900.76**

**Policy Value as of 1/20/2011:  $26,497.67**

216.    In reliance on these representations, Plaintiff continued paying premiums to Phoenix to keep the policy in force, reasonably believing that Phoenix intended to honor the terms of the policy.

217.    Several months later, on October 21, 2011, just two weeks before the insured died, Phoenix issued a policy illustration to Plaintiff.  The illustration represented, among many other things:

**Issue Date: 01/21/2008**

**Years Inforce:  3**

**Months Inforce:  10**

**Gross Account Value:  $26,243.14**

218.    Two weeks after Phoenix made these representations, on November 4, 2011, the insured passed away, and Plaintiff, through its securities intermediary, made a claim for the death benefit shortly thereafter.  Phoenix, however, refused to pay.

219.    In the lawsuit that Plaintiff filed seeking payment of the death benefit, Phoenix has claimed that the policy "is null and void *ab initio* and is of no force and effect from its inception."  Phoenix has also sought an order from the court "that it may retain all premiums paid" on this allegedly invalid policy.

220.    Thus, just two weeks before the insured died, Phoenix said that the policy was "issued" on January 21, 2008.  But after the insured died and Phoenix received a claim for the death benefit, Phoenix said the policy was "void *ab initio*" – *i.e.*, it was never issued to begin with.  Before the insured died, Phoenix said that the policy was "in force" and had been "in force" for three years and ten months.  But after the insured died and Phoenix received a claim for the death benefit, Phoenix said that the policy "is of no force and effect."  Before the insured died, Phoenix said that the policy had an account value on January 21, 2010 of $51,900.76 and an account value on January 20, 2011 of $26,243.14, which values were built up from premium payments.  But after the insured died and Phoenix received a claim for the death benefit, Phoenix said that the policy is invalid and has sought "an order that it may retain all premiums paid."

221.    Phoenix still has not paid the death benefit on the policy.

222.    Upon information and belief, in late 2008 or early 2009, the Individual Defendants made a conscious decision that Phoenix would not honor policies that were owned by investors that purchased their policies on the secondary market, including the Lima Policies. Instead, the Individual Defendants would mislead holders of its policies to continue making premium payments while intending to raise COI rates, seek to rescind or void policies (and keep the premiums), and refuse to pay the death benefits on policies when they matured.  Upon information and belief, the Individual Defendants directed and caused Phoenix to make the above misrepresentations to Plaintiff, and conceal the facts described above from Plaintiff, to induce Plaintiff to continue to pay premiums to Phoenix.  Phoenix would then book the revenue from Plaintiff's premiums payments, and the Individual Defendants would personally profit from those payments through personal compensation and their ownership interests in Phoenix, as described in paragraphs 193 through 195 above.

223.    The Individual Defendants' unlawful scheme described above is ongoing.

## XIX.  CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**(Actual Monopolization in Violation of Conn. Gen. Stat. Sections 35-27 and 35-28)
Against PNX, PLIC, and PHL**

224.    Plaintiff hereby realleges and incorporates by reference herein each allegation set forth in paragraphs 1 through 223 above.

225.    Phoenix has monopoly (monopsony) power in the secondary market for Phoenix life insurance policies, with, on information and belief, over a 75% market share on the buy side of the market.

226.     Phoenix has acquired monopsony power, not as the result of a superior product, business acumen, or a historic accident, but as a result of the intentional anticompetitive and exclusionary conduct alleged above.  That conduct includes the use and manipulation of Phoenix life insurance policies, and the transfer rights associated with those policies, to prevent competition for the purchase of those policies.

227.     Significant barriers to entry and expansion – some strategically created by Phoenix itself – prevent other buyers or potential buyers from competing in the secondary market for the purchase of Phoenix life insurance policies, and serve to reinforce Phoenix's monopsony power.

228.     Phoenix's anticompetitive and exclusionary conduct has caused antitrust injury to Plaintiff and other Phoenix policyholders, potential buyers of Phoenix policies, consumers, and competition.

229.     By reason of, and as a direct and proximate result of, Phoenix's anticompetitive and exclusionary conduct, Plaintiff has suffered, and will continue to suffer, financial injury to its business and property.

230.     Phoenix's acquisition and abuse of its monopsony power violates Conn. Gen. Stat. sections 35-27 and 35-28.

## SECOND CAUSE OF ACTION

**(Attempted Monopolization in Violation of Conn. Gen. Stat. Sections 35-27 and 35-28) Against PNX, PLIC, and PHL**

231.     Plaintiff hereby realleges and incorporates by reference herein each allegation set forth in paragraphs 1 through 223 above.

232.    Phoenix has engaged in the anticompetitive and exclusionary conduct described above, including the use and manipulation of Phoenix life insurance policies, and the transfer rights associated with those policies, to prevent competition for the purchase of those policies.

233.    Phoenix has a dangerous probability of obtaining a monopsony in the secondary market for Phoenix life insurance policies.

234.    Phoenix has a specific intent to monopsonize the secondary market for Phoenix life insurance policies.

235.    Significant barriers to entry and expansion – some strategically created by Phoenix itself – prevent other buyers or potential buyers from competing in the secondary market for the purchase Phoenix life insurance policies, and serve to reinforce Phoenix's attempt to acquire monopsony power.

236.    Phoenix's anticompetitive and exclusionary conduct has caused antitrust injury to Plaintiff and other Phoenix policyholders, potential buyers of Phoenix policies, consumers, and competition.

237.    By reason of, and as a direct and proximate result of, Phoenix's anticompetitive and exclusionary conduct, Plaintiff has suffered, and will continue to suffer, financial injury to its business and property.

238.    Phoenix's attempt to acquire monopsony power violates Conn. Gen. Stat. sections 35-27 and 35-28.

## THIRD CAUSE OF ACTION

### (Unfair Trade Practices in Violation of Conn. Gen. Stat. Sections 42-110A, Et Seq.) Against PNX, PLIC, and PHL

239.    Plaintiff hereby realleges and incorporates by reference herein each allegation set forth in paragraphs 1 through 223 above.

240.    Conn. Gen. Stat. § 42-110b provides: "(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

241.    The Connecticut Unfair Insurance Practices Act ("CUIPA") prohibits unfair methods of competition in the insurance industry.  See Conn. Gen. Stat. §§ 38a-815, et seq. Under Section 816 of the CUIPA, "[b]oycott, coercion, and intimidation" are unfair and deceptive acts or practices in the business of insurance.  That is, "[e]ntering into any agreement to commit, or by any concerted action committing, any act of boycott, coercion or intimidation resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance" is an unfair method.  *Id*.

242.    Phoenix's anticompetitive and exclusionary conduct violates the CUIPA.  In particular, it constitutes "boycott," "coercion," or "intimidation" resulting in or tending to result in unreasonable restraint of, or monopoly in, the secondary market for Phoenix life insurance policies.  It is, therefore, an unfair method of competition and an unfair trade practice.

243.    In addition, because Phoenix's anticompetitive and exclusionary conduct violates the Connecticut Antitrust Act, it is an unfair method of competition and an unfair trade practice.

244.    Phoenix's conduct is also fraudulent, immoral, unethical, oppressive, or unscrupulous, and for that reason as well constitutes an unfair method of competition and an unfair and deceptive trade practice.

245.    Phoenix's conduct also causes substantial injury to consumers, competitors, and other business persons or entities, and for that reason as well constitutes an unfair method of competition and an unfair trade practice.

246.     Phoenix's anticompetitive and exclusionary conduct is not merely incidental to its primary business; rather, it directly concerns its primary business.

247.     By reason of, and as a direct and proximate result of, Phoenix's anticompetitive and exclusionary conduct, Plaintiff has suffered, and will continue to suffer, financial injury to its business and property.

## FOURTH CAUSE OF ACTION

### (Violation of RICO, 18 U.S.C. §§ 1962(c) and (d)) Against the Individual Defendants

248.     Plaintiff hereby realleges and incorporates by reference herein each allegation set forth in paragraphs 1 through 223 above.

249.     The Individual Defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of Phoenix (the "Phoenix Enterprise") through a pattern of racketeering.

250.     At all relevant times, the Individual Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3) because they are individuals and are capable of holding a legal or beneficial interest in property.

251.     The Phoenix Enterprise constitutes a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4) because it consists of a corporation and its subsidiaries.

252.     The Individual Defendants are employed by or associated with the Phoenix Enterprise within the meaning of 18 U.S.C. § 1962(c).

253.     The Individual Defendants used the Phoenix Enterprise as an instrument to carry out the elements of their fraudulent scheme and pattern of racketeering activity.  The Phoenix Enterprise has an ascertainable structure and purpose beyond the scope and commission of the

Individual Defendants' predicate acts and conspiracy to commit such acts, and the Phoenix Enterprise is separate and distinct from the Individual Defendants.

254.    The Phoenix Enterprise has engaged in, and its activities have affected, interstate and foreign commerce by inducing policyholders within and without the United States to continue paying premiums to Phoenix.

255.    Each of the Individual Defendants has exerted substantial control over the Phoenix Enterprise and participated in the operation, and managed the affairs of, the Phoenix Enterprise.  The Individual Defendants have committed or aided and abetted the commission of at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that the Individual Defendants committed and/or conspired to commit or aided or abetted the commission of were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."  The pattern is ongoing, and there is a continuing threat that the Individual Defendants will engage in future similar predicate acts of racketeering activity in furtherance of their fraudulent scheme and in the conduct and/or participation in the conduct, directly or indirectly, of the Phoenix Enterprise's affairs.

256.    The Individual Defendants' predicate acts of "racketeering" within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to:

a.      Mail Fraud:  The Individual Defendants have violated 18 U.S.C. § 1341 by sending or receiving materials via the U.S. mail or commercial interstate carriers for the purpose of executing their fraudulent scheme to obtain money by means of false or fraudulent pretenses, misrepresentations, promises, and/or omissions. The materials sent via U.S. mail or commercial interstate carriers include, but are

not limited to, premium notices, annual policy statements, verifications of coverage, policy illustrations, and COI letters.

b. <u>Wire Fraud</u>:  The Individual Defendants have violated 18 U.S.C. § 1343 by transmitting and receiving materials by wire for the purpose of executing their fraudulent scheme to obtain money by false or fraudulent pretenses, misrepresentations, promises, and/or omissions.  The materials sent via wire include, but are not limited to, premium notices, annual policy statements, verifications of coverage, policy illustrations, and COI letters.

257.    The Individual Defendants knowingly and intentionally made these misrepresentations, acts of concealment, and failures to disclose to deceive Plaintiff.  The Individual Defendants either knew or recklessly disregarded that these were material misrepresentations and omissions, and Plaintiff relied on the misrepresentations and omissions as described herein.

258.    The Individual Defendants also conspired to violate 18 U.S.C. § 1962(c) as described herein.  The Individual Defendants have participated as co-conspirators with each other in these offenses and have performed overt acts in furtherance of the conspiracy, as described herein.

259.    By authorizing, orchestrating, directing, supervising, and participating in the conduct described herein, including the predicate acts of mail and wire fraud, the Individual Defendants committed willful misconduct and knowing violations of criminal laws, including RICO, 18 U.S.C. § 1962(c) and (d), and the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.  In implementing their unlawful scheme, the Individual Defendants were not acting in good faith and in or not opposed to the best interest of Phoenix.  Instead, they were acting to

further their own independent economic interests by using Phoenix as an unlawful enterprise to enrich themselves at the expense of policyholders, other shareholders, and Phoenix itself.

260.    The Individual Defendants have obtained money and property belonging to Plaintiff as a result of these statutory violations.  Plaintiff has been injured in its business and property by the Individual Defendants' overt acts of mail and wire fraud and by their aiding and abetting each others' acts of mail and wire fraud, and by the Individual Defendants' conduct of the Phoenix Enterprise's affairs through a pattern of racketeering activity.

261.    Plaintiff reasonably relied on the misrepresentations and omissions as described herein, including by purchasing the Policies and continuing to pay premiums on them.  As a direct and proximate cause of the Individual Defendants' conduct and/or participation, directly or indirectly, in the conduct of the affairs of the Phoenix Enterprise through a pattern of racketeering activity, Plaintiff has been injured in its business and property in an amount to be proven at trial, which consists of unpaid death benefits and approximately $154 million in premiums that have been paid to Phoenix.

262.    Plaintiff also is entitled to recover reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

### FIFTH CAUSE OF ACTION

### (Fraud and Conspiracy to Defraud) Against All Defendants

263.    Plaintiff hereby realleges and incorporates by reference herein each allegation set forth in paragraphs 1 through 223 above.

264.    As set forth in paragraphs 196 through 220, Defendants have made numerous material misrepresentations of fact to Plaintiff in premium notices, annual policy statements, policy illustrations, verifications of coverage, and letters demanding that Plaintiff pay increased COI rates.  These misrepresentations included representations that Defendants considered

Plaintiff's policies to be valid and in force, and that Phoenix did not intend to contest the Policies but intended to honor them.  Upon information and belief, these representations were false because Defendants had no intention of allowing Phoenix to honor the terms of the Policies, as they would either take actions to force Plaintiff to lapse or surrender its policies, or they would contest the Policies or refuse to pay the death benefits when they came due.  Defendants also had a duty to disclose these facts to Plaintiff but instead concealed them from Plaintiff.  Defendants had sole knowledge or access to these facts, and they knew that Plaintiff did not know them and could not have discovered them through reasonable diligence.  Plaintiff did not discover, and could not have discovered with reasonable diligence, the true facts until this year.

265.    Defendants knowingly and intentionally made these misrepresentations, acts of concealment, and failures to disclose to deceive and defraud Plaintiff.  Defendants either knew or recklessly disregarded that these were material misrepresentations and omissions, and Plaintiff reasonably relied on the misrepresentations and omissions as described herein, including by purchasing the Policies and continuing to pay premiums on them.

266.    Defendants have participated as co-conspirators with each other in the fraud against Plaintiff.  Each Defendant knowingly and willfully participated in the conspiracy and knowingly and willfully committed wrongful acts pursuant to, and in furtherance of, the conspiracy, as alleged herein.  Each Defendant knew that their conduct, and that of the conspiracy, was wrongful and had an unlawful purpose.

267.    As a direct and proximately result of Defendants' fraudulent misrepresentations and omissions, and as a direct and proximate result of Defendants' conspiracy and the wrongful acts committed pursuant to and in furtherance thereof, Plaintiff has been damaged in an amount to be proven at trial.

268.    Defendants' conduct was intentional, fraudulent, malicious, oppressive, and despicable conduct in conscious disregard for Plaintiff's rights so as to justify an award of exemplary and punitive damages in an amount appropriate to punish Defendant and deter future wrongful conduct.

## XX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court adjudge and decree as follows:

**A.**    **On the First Cause of Action**

1.    That the conduct alleged in the First Cause of Action herein be adjudged to be unlawful monopolization (monopsonization) in violation of Connecticut General Statutes sections 35-27 and 35-28;

2.    That Plaintiff recover actual damages, including pre-judgment and post-judgment interest, and trebling the amount of Plaintiff's damages sustained by reason of Defendants' violations of law;

3.    That Plaintiff be awarded reasonable attorneys' fees and costs of litigation;

4.    That Defendants' anticompetitive and exclusionary conduct be preliminarily and permanently enjoined;

5.    For a preliminary declaration that Plaintiff is not required to continue paying premiums to Phoenix and that Plaintiff be permitted to pay premiums into an interest-bearing escrow account until a final judgment is rendered in this action; and

6.    For such other and further relief as the Court deems just and proper.

**B.**   **On the Second Cause of Action**

1.      That the conduct alleged in the Second Cause of Action herein be adjudged to be an unlawful attempt to monopolize (monopsonize) in violation of Connecticut General Statutes sections 35-27 and 35-28;

2.      That Plaintiff recover actual damages, including pre-judgment and post-judgment interest, and trebling the amount of its damages sustained by reason of Defendants' violations of law;

3.      That Plaintiff be awarded reasonable attorneys' fees and costs of litigation;

4.      That Defendants' anticompetitive and exclusionary conduct be preliminarily and permanently enjoined;

5.      For a preliminary declaration that Plaintiff is not required to continue paying premiums to Phoenix and that Plaintiff be permitted to pay premiums into an interest-bearing escrow account until a final judgment is rendered in this action; and

6.      For such other and further relief as the Court deems just and proper.

**C.**   **On the Third Cause of Action**

1.      That the conduct alleged in the Third Cause of Action herein be adjudged to be an unfair trade practice in violation of Connecticut General Statutes section 42-110b;

2.      That Plaintiff recover actual damages, including pre-judgment and post-judgment interest;

3.      That Plaintiff be awarded punitive damages;

4.      That Plaintiff be awarded reasonable attorneys' fees and costs of litigation;

5.      That Defendants' anticompetitive and exclusionary conduct be preliminarily and permanently enjoined; and

6.      For a preliminary declaration that Plaintiff is not required to continue paying premiums to Phoenix and that Plaintiff be permitted to pay premiums into an interest-bearing escrow account until a final judgment is rendered in this action; and

7.      For such other and further relief as the Court deems just and proper.

**D.      On the Fourth Cause of Action**

1.      That Plaintiff recover actual damages, including pre-judgment and post-judgment interest, and treble the amount of its damages sustained by reason of Defendants' violations of law;

2.      That Plaintiff be awarded reasonable attorneys' fees and costs of litigation;

3.      That Defendants' fraudulent and unlawful conduct be preliminarily and permanently enjoined;

4.      For a preliminary declaration that Plaintiff is not required to continue paying premiums to Phoenix and that Plaintiff be permitted to pay premiums into an interest-bearing escrow account until a final judgment is rendered in this action; and

5.      For such other and further relief as the Court deems just and proper.

**E.      On the Fifth Cause of Action**

1.      That Plaintiff recover actual damages, including pre-judgment and post-judgment interest;

2.      That Plaintiff be awarded punitive damages;

3.      That Plaintiff be awarded reasonable attorneys' fees and costs of litigation;

4.      That Defendants' fraudulent and unlawful conduct be preliminarily and permanently enjoined;

5.      For a preliminary declaration that Plaintiff is not required to continue paying premiums to Phoenix and that Plaintiff be permitted to pay premiums into an interest-bearing escrow account until a final judgment is rendered in this action; and

6.      For such other and further relief as the Court deems just and proper.

## XXI.  DEMAND FOR JURY TRIAL

Plaintiff Lima hereby demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Respectfully submitted,

PLAINTIFF
LIMA LS PLC

/s/ Alfred U. Pavlis
Alfred U. Pavlis (ct08603)
Richard S. Gora (ct27479)
FINN DIXON & HERLING LLP
177 Broad Street
Stamford, CT  06901-2048
Tel: (203) 325-5000
Fax: (203) 325-5001
E-mail:  apavlis@fdh.com
            rgora@fdh.com

Of Counsel:

Stephen G. Foresta
Philipp Smaylovsky
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019-6142
Tel: (212) 506-5000
Fax: (212) 506-5151
E-mail:  sforesta@orrick.com
            psmaylovsky@orrick.com

Khai LeQuang
Howard M. Ullman
ORRICK, HERRINGTON & SUTCLIFFE LLP
2050 Main Street, Suite 1100

Irvine, CA 92614-8255
Tel: (949) 567-6700
Fax: (949) 567-6710
E-mail:  klequang@orrick.com
          hullman@orrick.com