UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LIMA LS PLC,<br><br>                Plaintiff,<br><br>       v.<br><br>PHL VARIABLE INSURANCE COMPANY,<br>a Connecticut corporation; PHOENIX LIFE<br>INSURANCE COMPANY, a New York<br>corporation; THE PHOENIX COMPANIES,<br>INC., a Connecticut corporation; JAMES D.<br>WEHR, an individual; PHILIP K.<br>POLKINGHORN, an individual; EDWARD<br>W. CASSIDY, an individual; and DONA D.<br>YOUNG, an individual, and DOES 1-20,<br>inclusive,<br><br>                Defendants. | No. 12-CV-01122 (RNC) |

## PLAINTIFF'S RICO CASE STATEMENT PURSUANT TO THE LOCAL RULES' STANDING ORDER IN CIVIL RICO CASES

Pursuant to the District of Connecticut's Local Rules' Standing Order in Civil RICO

Cases, Plaintiff Lima LS plc ("Plaintiff"), by its attorneys, hereby submits this RICO Case

Statement. The allegations in the Complaint are supported by a substantial amount of evidence

already in Plaintiff's possession. However, given the nature of the fraud and other wrongdoing

alleged in the Complaint, Plaintiff expects that a significant amount of relevant information is

exclusively in the Defendants' possession and will only be available to Plaintiff after discovery.

Plaintiff therefore reserves the right to amend this RICO Case Statement as additional

information is learned and discovery is obtained.

1. **The alleged unlawful conduct that is claimed to be in violation of 18 U.S.C. §§ 1962(a), (b), (c) and/or (d).**

Plaintiff asserts claims for violations of 18 U.S.C. §§ 1962(c) and (d).  Plaintiff alleges that the Individual Defendants (James D. Wehr, Philip K. Polkinghorn, Edward W. Cassidy, and Dona D. Young) violated 18 U.S.C. § 1962(c) by conducting or participating in the conduct of an enterprise's affairs through a pattern of racketeering activity involving mail and wire fraud.  Plaintiff alleges that each of the Individual Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).  Each of the Individual Defendants is a current or former executive officer, board member, and shareholder of The Phoenix Companies, Inc. ("PNX"), Phoenix Life Insurance Company ("PLIC"), and PHL Variable Insurance Company ("PHL").

The alleged unlawful conduct involves fraudulently representing Phoenix's intent to honor the terms of Phoenix insurance policies that have been bought and sold on the secondary market for life insurance.  Each of the Individual Defendants have directed and allowed Phoenix to issue written statements to policyholders representing that their policies are valid, are in force, and have value.  Phoenix makes these representations to induce policyholders to continue paying premiums on the policies.  At the same time, however, the Individual Defendants have no intent to permit Phoenix to honor many of these policies.  Instead, they are directing Phoenix to take actions that are intended to force policyholders to lapse their policies either now or in the future.  But even if they are unable to force policyholders to lapse their policies, the Individual Defendants will direct Phoenix to refuse to pay the death benefits when they come due or attempt to void the policies while at the same time attempting to keep the premiums.

The object of the conspiracy was to misrepresent Phoenix's intent to honor policies that were bought and sold on the secondary market so that Phoenix can continue to collect substantial insurance premiums from policyholders and, later, force policyholders to lapse their policies, refuse to pay death benefits when policies mature, or seek to void policies. The ultimate objective of the conspiracy is to maximize the amount of premiums that Phoenix collects and keeps while never paying the death benefits so that the Individual Defendants can personally profit through continued personal compensation and their ownership interests in Phoenix.

**2.      The identity of each defendant and the alleged misconduct and basis of liability of each defendant.**

The Individual Defendants are the defendants named in the RICO counts. Defendant James D. Wehr is the President and Chief Executive Officer of PNX. Defendant Philip K. Polkinghorn is the Executive Vice President of Business Development of PNX and the President of PNX's Life and Annuity Business Segment. Defendant Edward W. Cassidy is the Executive Vice President of Distribution of PNX. Defendant Dona D. Young was the President of PNX from 2000 to April 15, 2009, the Chief Executive Officer and Chairman of the Board of PNX from 2003 to April 15, 2009, and a consultant to PNX until at least April 15, 2010. Upon information and belief, each of these individuals holds or has held other board and executive officer positions for the Phoenix entities.

The alleged misconduct and the basis of liability of each defendant. This lawsuit revolves around a failing life insurance company and management's desperate and illegal attempts to keep Phoenix afloat so they can continue to pay themselves millions of dollars each year. Meanwhile, Phoenix is secretly trying to purge billions of dollars of future liabilities by

causing policyholders to lapse or surrender their policies, refusing to pay death benefits when policies mature, and canceling its own policies while keeping the premiums.

Between roughly 2003 and 2009, Phoenix made hundreds of millions of dollars selling billions of dollars in life insurance policies that were later sold to investors on the secondary market for life insurance.  In addition to lining their own pockets, Phoenix's management took the premiums generated from these sales and sunk them in high-risk investments.  They also planned to take these revenues and buy life insurance policies on the secondary market, which would increase demand for Phoenix policies in the primary market and help hedge against the mortality risks from the Company's new sales of life insurance.  Management's strategy was to use the demand for life insurance policies in a burgeoning secondary market to generate substantial premium revenue from new sales of life insurance in the primary market.

That seemingly flawless plan crumbled when the national financial crisis struck in 2008, causing Phoenix to incur over a billion dollars of losses on its investment portfolio.  Within a matter of months, Phoenix's stock price plunged from $13.98 per share to $0.29 per share, as the Company lost nearly a billion and a half dollars in shareholder equity, suffered several credit rating agency downgrades that crippled the Company's ability to sell new life insurance, and lost two of its main distributors who stopped selling Phoenix policies due to concerns about the Company's reputation and ability to pay future claims.  As a result, Phoenix today writes only a tiny fraction of the volume of life insurance it once did.  Indeed, in 2011, PHL, the primary insurance-issuing subsidiary, made only about $1.5 million in premiums from new sales of life insurance compared to $324 million in 2007.

Thus, Phoenix and its management have been trying to recoup the Company's massive losses by eradicating the liabilities associated with billions of dollars in policies that Phoenix

sold between approximately 2003 and 2009 – a significant portion of which is now owned by investors who purchased them on the secondary market.  Since as early as 2009, Phoenix has been engaged in a subversive scheme to create uncertainty about whether it will honor the terms of its own policies, forcing policyholders like Plaintiff to have to decide whether to (a) forfeit their investments by lapsing or surrendering their policies back to Phoenix, and let Phoenix keep all or most of the premiums while it never has to pay the death benefits, or (b) continue paying premiums to Phoenix, even though Phoenix might never honor their policies but will nevertheless keep their premiums (even after increasing them).  All the while, Phoenix continues to induce policyholders to continue paying premiums to Phoenix by affirmatively representing to them in policy statements and correspondence that their policies are "in force" and "active."  But after collecting premiums for years, Phoenix then tries to keep their premiums and void their policies or refuse to pay the death benefits when they come due.

The Individual Defendants have conducted the affairs of Phoenix through a pattern of racketeering activity that includes fraudulently inducing Plaintiff and other policyholders to continue paying premiums to Phoenix while the Individual Defendants have no intention of allowing Phoenix to honor the terms of its own policies.  The racketeering activity includes the following:

A. <u>Premium Notices</u>

Each of the Individual Defendants have induced Plaintiff to continue to pay premiums to Phoenix by directing and causing Phoenix to send, or approving Phoenix's sending of, premium notices to Plaintiff in interstate commerce, through the United States Postal Service ("Postal Service") and/or interstate wires (by email or facsimile), advising Plaintiff that Plaintiff must continue to pay premiums to keep its policies in force.

All of Plaintiff's policies were issued over four years ago.  Each time Phoenix mailed a premium notice to Plaintiff, Phoenix affirmatively represented that, to its knowledge and belief, the subject policy was valid and enforceable and that Phoenix did not intend to challenge the policy or refuse to pay the death benefit, and that if premiums are paid, Phoenix will honor the policy.  For example, by telling Plaintiff that a policy's cash value has been depleted and that Plaintiff must pay a certain amount of money "in order to prevent a lapse," Phoenix represented to Plaintiff that it considered Plaintiff's policy to be a valid policy, that the policy had a cash value that had accumulated from Plaintiff's premium payments, and that Plaintiff's valid policy could lapse (an invalid policy cannot lapse).  Upon information and belief, these statements were false because Phoenix intended to claim in each instance that the policy is not valid, but instead is void for lack of insurable interest or some other reason.  Likewise, by urging Plaintiff to pay money to prevent the loss of "valuable coverage," Phoenix represented to Plaintiff that Phoenix intends to provide coverage under the policy and that such coverage had value.  Upon information and belief, these statements were and are false because Phoenix had and has no intent to provide "valuable coverage," but instead plans to try to force Plaintiff to lapse or surrender the policy or else deny coverage on the ground that the policy is void for lack of insurable interest or some other reason.

Upon information and belief, each of the Individual Defendants directed and caused Phoenix to mail, or approved Phoenix's mailing of, these premium notices to Plaintiff, and directed and caused Phoenix to collect, or approved Phoenix's collection of, the premiums billed, without disclosing to Plaintiff that the Individual Defendants secretly intended to have Phoenix deny the death benefits and/or the validity of the Policies or, through other actions, force Plaintiff to lapse or surrender its policies.  Thus, each time Phoenix used the Postal Service and/or

interstate wires to send premium notices to Plaintiff, Phoenix fraudulently concealed its intention to deny the death benefits and/or the validity of the policies or, through other actions, force Plaintiff to lapse or surrender its policies.

B.     Annual Statements

Each of the Individual Defendants have also induced Plaintiff to continue to pay premiums to Phoenix by directing and causing Phoenix to send, or approving Phoenix's sending of, annual statements to Plaintiff in interstate commerce, through the Postal Service and/or interstate wires (by email or facsimile), advising Plaintiff that Plaintiff's policies were valid.

Each time Phoenix mailed an annual statement to Plaintiff, Phoenix affirmatively represented that, to its knowledge and belief, the subject policy was valid and enforceable and that Phoenix did not intend to challenge the policy or refuse to pay the death benefit, and that if premiums are paid, Phoenix will honor the policy.  For example, by telling Plaintiff that a policy was "In Force" and had a certain "Date of Issue," Phoenix represented to Plaintiff that it considered Plaintiff's policy to be a valid policy that was "in force," and that the policy had been validly issued as of the issue date.  Upon information and belief, these statements were false because Phoenix intended to claim in each instance that the policy is not valid, but instead is void *ab initio* (*i.e.*, never issued) for lack of insurable interest or some other reason.  Likewise, by advising Plaintiff that the policy had a Base Policy Face Amount, Beginning Value, Surrender Value, Net Surrender Value, and Net Death Benefit, Phoenix represented to Plaintiff that Phoenix considered Plaintiff's policy to be valid, because only a valid policy has such values. Upon information and belief, these statements were false because Phoenix intended to claim in each instance that the policy is not valid, but instead is void for lack of insurable interest or some other reason.

Upon information and belief, each of the Individual Defendants directed and caused Phoenix to mail, or approved Phoenix's mailing of, these annual statements to Plaintiff without disclosing to Plaintiff that the Individual Defendants secretly intended to have Phoenix deny the death benefits and/or the validity of the Policies or, through other actions, force Plaintiff to lapse or surrender its policies.  Thus, each time Phoenix used the Postal Service and/or interstate wires to send annual statements to Plaintiff, Phoenix fraudulently concealed its intention to deny the death benefits and/or the validity of the policies or, through other actions, force Plaintiff to lapse or surrender its policies.

C.      Verifications of Coverage

Each of the Individual Defendants have also induced Plaintiff to continue to pay premiums to Phoenix by directing and causing Phoenix to send, or approving Phoenix's sending of, verifications of coverage to Plaintiff in interstate commerce, through the Postal Service and/or interstate wires (by email or facsimile), advising Plaintiff that Plaintiff's policies were valid.

Each time Phoenix mailed a verification of coverage to Plaintiff, Phoenix affirmatively represented that, to its knowledge and belief, the subject policy was valid and enforceable and that Phoenix did not intend to challenge the policy or refuse to pay the death benefit, and that if premiums are paid, Phoenix will honor the policy.  For example, by telling Plaintiff that a policy was "Active," "In Force" and had a certain "Policy Issue Date," Phoenix represented to Plaintiff that it considered Plaintiff's policy to be a valid policy that was "active" and "in force," and that the policy had been validly issued as of the Policy Issue Date.  Upon information and belief, these statements were false because Phoenix intended to claim in each instance that the policy is not valid, but instead is void *ab initio* (*i.e.*, never issued) for lack of insurable interest or some

other reason.  Likewise, by advising Plaintiff that the policy had a Total Account Value, Gross Death Benefit, Net Death Benefit, and Surrender Charge, Phoenix represented to Plaintiff that Phoenix considered Plaintiff's policy to be valid, because only a valid policy has such values.  In addition, by telling Plaintiff that "[t]his statement indicates the value of this contract as of the date specified" and that Plaintiff could "cancel or replace this policy," Phoenix represented to Plaintiff that the policy was a valid contract that had a certain value as of the date specified and that the policy was a valid policy that could be canceled or replaced (an invalid policy cannot be canceled or replaced).  Upon information and belief, these statements were false because Phoenix intended to claim that the policy is not valid, but instead is void for lack of insurable interest or some other reason.

Upon information and belief, each of the Individual Defendants directed and caused Phoenix to mail, or approved Phoenix's mailing of, these verifications of coverage to Plaintiff without disclosing to Plaintiff that the Individual Defendants secretly intended to have Phoenix deny the death benefits and/or the validity of the policies or, through other actions, force Plaintiff to lapse or surrender its policies.  Thus, each time Phoenix used the Postal Service and/or interstate wires to send verifications of coverage to Plaintiff, Phoenix fraudulently concealed its intention to deny the death benefits and/or the validity of the Policies or, through other actions, force Plaintiff to lapse or surrender its policies.

D.    Policy Illustrations

Each of the Individual Defendants have also induced Plaintiff to continue to pay premiums to Phoenix by directing and causing Phoenix to send, or approving Phoenix's sending of, policy illustrations to Plaintiff in interstate commerce, through the Postal Service and/or interstate wires (by email or facsimile), advising Plaintiff that Plaintiff's policies were valid.

Each time Phoenix mailed an illustration to Plaintiff, Phoenix affirmatively represented that, to its knowledge and belief, the subject policy was valid and enforceable and that Phoenix did not intend to challenge the policy or refuse to pay the death benefit, and that if premiums are paid, Phoenix will honor the policy.  For example, by telling Plaintiff that a policy was "In Force" for a certain number of years and months and that the policy had a certain "Policy Issue Date," Phoenix represented to Plaintiff that it considered Plaintiff's policy to be a valid policy that was "in force," and that the policy had been validly issued as of the Policy Issue Date.  Upon information and belief, these statements were false because Phoenix intended to claim in each instance that the policy is not valid, but instead is void *ab initio* (*i.e.*, never issued) for lack of insurable interest or some other reason.  Likewise, by advising Plaintiff that the policy had a Base Face Amount, Total Death Benefit, and Account Value, Phoenix represented to Plaintiff that Phoenix considered Plaintiff's policy to be valid, because only a valid policy has such values.  In addition, by telling Plaintiff that if premiums are received late or paid in a more frequent pay mode, "the policy may terminate earlier than shown," Phoenix represented to Plaintiff that the policy is a valid contract that could terminate earlier than shown (an invalid policy cannot terminate).  Upon information and belief, these statements were false because Phoenix intended to claim in each instance that the policy is not valid, but instead is void for lack of insurable interest or some other reason.

Upon information and belief, each of the Individual Defendants directed and caused Phoenix to mail, or approved Phoenix's mailing of, these illustrations to Plaintiff without disclosing to Plaintiff that the Individual Defendants secretly intended to have Phoenix deny the death benefits and/or the validity of the policies or, through other actions, force Plaintiff to lapse or surrender its policies.  Thus, each time Phoenix used the Postal Service and/or interstate wires

to send illustrations to Plaintiff, Phoenix fraudulently concealed its intention to deny the death benefits and/or the validity of the Policies or, through other actions, force Plaintiff to lapse or surrender its policies.

        E.      Cost of Insurance ("COI") Letters

Each of the Individual Defendants have also induced Plaintiff to continue to pay premiums to Phoenix by directing and causing Phoenix to send, or approving the sending of, notices regarding COI rates to Plaintiff in interstate commerce, through the Postal Service, advising Plaintiff that Plaintiff's policies were valid.

Each time Phoenix mailed a COI letter to Plaintiff, Phoenix affirmatively represented that, to its knowledge and belief, the subject policy was valid and enforceable and that Phoenix did not intend to challenge the policy or refuse to pay the death benefit, and that if premiums are paid, Phoenix will honor the policy.  For example, by telling Plaintiff that a policy was "subject to this rate increase" and that the policy had an "anniversary" and "accumulated policy value," Phoenix represented to Plaintiff that it considered Plaintiff's policy to be a valid policy that was subject to a rate increase, that the policy had been validly issued on the anniversary date, and that the policy had a certain accumulated value.  Upon information and belief, these statements were false because Phoenix intended to claim in each instance that the policy is not valid, but instead is void *ab initio* (*i.e.*, never issued) for lack of insurable interest or some other reason and thus there was, according to Phoenix, no accumulated policy value.  Likewise, by advising Plaintiff that a COI rate change was "in accordance with the terms of your policy," Phoenix represented to Plaintiff that Phoenix considered Plaintiff's policy to be valid, because Phoenix could only be basing the rate increases on the "terms" of a valid policy.  This statement was false because

Phoenix intended to claim in each instance that the policy is not valid, but instead is void for lack of insurable interest or some other reason.

Upon information and belief, each of the Individual Defendants directed and caused Phoenix to mail, or approved the mailing of, these COI letters to Plaintiff without disclosing to Plaintiff that the Individual Defendants secretly intended to have Phoenix deny the death benefits and/or the validity of the policies or, through the COI rate increases and other actions, force Plaintiff to lapse or surrender its policies. Thus, each time Phoenix used the Postal Service to send COI letters to Plaintiff, Phoenix fraudulently concealed its intention to deny the death benefits and/or the validity of the Policies or, through the COI rate increases and other actions, including potential future COI rate increases, force Plaintiff to lapse or surrender its policies.

**3.     The identity of the alleged wrongdoers, other than the defendants listed in response to paragraph 2, and the alleged misconduct of each wrongdoer.**

Plaintiff has a reasonable, good faith basis to believe that there are other wrongdoers who will be identified during the course of discovery, including individuals who have directed, approved, and/or known about the wrongful and unlawful conduct complained of.

**4.     The identity of the alleged victims and the manner in which each victim was allegedly injured.**

Plaintiff (as well as other policyholders who purchased their Phoenix policies on the secondary market) is a victim of the Individual Defendants' pattern of racketeering activity, overt acts, fraudulent scheme and conspiracy.

Plaintiff is the owner of the economic interests in a substantial number of Phoenix life insurance policies. Each of the Individual Defendants have obtained money and property belonging to Plaintiff as a result of their RICO violations. Plaintiff has been injured in its

business and property by each of the Individual Defendants' overt acts of mail and wire fraud and by their aiding and abetting each other's acts of mail and wire fraud, and by each of the Individual Defendants' conduct of an enterprise's affairs through a pattern of racketeering activity.

Plaintiff reasonably relied on the misrepresentations and omissions as described herein, including by continuing to pay premiums on them.  As a direct and proximate cause of the Individual Defendants' conduct and/or participation, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity, Plaintiff has been injured in its business and property in an amount to be proven at trial, which consists of unpaid death benefits and approximately $154 million in premiums that have been paid to Phoenix.

**5.      A description of the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim, which shall include the following information:**

**a.      The alleged predicate acts and the specific statutes which were allegedly violated;**

Each of the Individual Defendants' predicate acts of "racketeering" within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to:

a.      <u>Mail Fraud</u>:  The Individual Defendants have violated 18 U.S.C. § 1341 by directing or causing Phoenix to send or receive materials via the U.S. mail or commercial interstate carriers for the purpose of executing their fraudulent scheme to obtain money by means of false or fraudulent pretenses, misrepresentations, promises, and/or omissions.  The materials sent via U.S. mail or commercial interstate carriers include, but are not limited to, premium notices,

annual policy statements, verifications of coverage, policy illustrations, and COI letters.  *See* Response to Item 2 *supra*.

b.      Wire Fraud:  The Individual Defendants have violated 18 U.S.C. § 1343 by directing or causing Phoenix to transmit and receive materials by wire for the purpose of executing their fraudulent scheme to obtain money by false or fraudulent pretenses, misrepresentations, promises, and/or omissions.  The materials sent via wire include, but are not limited to, premium notices, annual policy statements, verifications of coverage, policy illustrations, and COI letters. *See* Response to Item 2 *supra*.

**b/c.      The dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts; if the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, the "circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The time, place and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made shall be identified;**

For the purpose of executing and/or attempting to execute the scheme to, among other things, defraud or obtain money by means of false or fraudulent pretenses, representations, or promises described herein, each of the Individual Defendants, in violation of 18 U.S.C. § 1341, caused matter and things to be delivered by the Postal Service or by private or commercial interstate carrier, and/or received matter and things from the Postal Service or private or commercial interstate carriers.  These acts were done intentionally and knowingly and with the specific intent to advance the Individual Defendants' scheme, or with knowledge that the use of

the mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

The Individual Defendants carried out their scheme in different states and could not have done so unless they used the Postal Service or private or commercial interstate carriers.

For the purpose of executing and/or attempting to execute above-described scheme to, among other things, defraud or obtain money by means of false or fraudulent pretenses, representations, or promises described herein, the Individual Defendants, in violation of 18 U.S.C. § 1343, transmitted, caused to be transmitted and/or received by means of wire communication in interstate and foreign commerce, various writings, signs, and signals. These acts were done intentionally and knowingly with the specific intent to advance the Individual Defendants' scheme, or with knowledge that the use of wire communications would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

The matter and things sent by or at the direction of each of the Individual Defendants via the Postal Service, private or commercial carrier, wire or other interstate electronic media include, *inter alia*:

a. Premium notices that falsely and fraudulently represented that, according to Phoenix, Plaintiff's policies were valid, had a cash value that had accumulated from Plaintiff's premium payments, and that Plaintiff's valid policies could lapse (an invalid policy cannot lapse), and that further falsely and fraudulently represented that Phoenix intended to honor the policies and that Phoenix was not aware of any facts upon which it might contest the policies or conduct a further examination into the origination of the policy to determine whether to contest it in the future.

b.      Annual statements that falsely and fraudulently represented that, according to Phoenix, Plaintiff's policies were valid and "in force" and validly issued as of the issue date, and that further falsely and fraudulently represented that Phoenix intended to honor the policies and that Phoenix was not aware of any facts upon which it might contest the policies or conduct a further examination into the origination of the policy to determine whether to contest it in the future.

c.      Verifications of coverage that falsely and fraudulently represented that, according to Phoenix, Plaintiff's policies were valid, "active" and "in force," and validly issued as of the issue date, and that further falsely and fraudulently represented that Phoenix intended to honor the policies and that Phoenix was not aware of any facts upon which it might contest the policies or conduct a further examination into the origination of the policy to determine whether to contest it in the future.

d.      Policy illustrations that falsely and fraudulently represented that, according to Phoenix, Plaintiff's policies were valid and "in force" and that the policy had been validly issued as of the issue date, and that further falsely and fraudulently represented that Phoenix intended to honor the policies and that Phoenix was not aware of any facts upon which it might contest the policies or conduct a further examination into the origination of the policy to determine whether to contest it in the future.

e.      COI letters that falsely and fraudulently represented that, according to Phoenix, Plaintiff's policies were valid and subject to a rate increase, that the policies had been validly issued on their anniversary date(s), that the policies had a certain accumulated value, that Phoenix intended to honor the policies, and that Phoenix was not aware of any facts upon which

it might contest the policies or conduct a further examination into the origination of the policy to determine whether to contest it in the future.

<u>Recent Example of Predicate Acts</u>

In a recent example, Phoenix made several representations to Plaintiff that a policy was validly issued, in force, and had a positive account value.  However, when the insured died and Plaintiff submitted a claim for the death benefit, Phoenix refused to pay.  Just ***two weeks*** after Phoenix affirmatively represented to Plaintiff that the policy was validly issued, in force, and had a positive account value, Phoenix claimed that the policy was invalid and that Phoenix was entitled to keep all of the premiums it had collected on the policy, including premiums that Plaintiff paid in reliance on Phoenix's representations that the policy was valid, in force, and had a positive account value.  The circumstances of this fraud are outlined below:

On January 20, 2011, Phoenix issued an annual statement for the policy.  The annual statement represented, among many other things:

**Policy Status:  In Force**

**Policy Value as of 1/21/2010:  $51,900.76**

**Policy Value as of 1/20/2011:  $26,497.67**

In reliance on these representations, Plaintiff continued paying premiums to Phoenix to keep the policy in force, reasonably believing that Phoenix intended to honor the terms of the policy.

Several months later, on October 21, 2011, just two weeks before the insured died, Phoenix issued a policy illustration to Plaintiff.  The illustration represented, among many other things:

**Issue Date: 01/21/2008**

**Years In Force:  3**

**Months In Force:  10**

**Gross Account Value:  $26,243.14**

Two weeks after Phoenix made these representations, on November 4, 2011, the insured passed away, and Plaintiff, through its securities intermediary, made a claim for the death benefit shortly thereafter.  Phoenix, however, refused to pay.

In the lawsuit that Plaintiff filed seeking payment of the death benefit, Phoenix has claimed that the policy "is null and void *ab initio* and is of no force and effect from its inception."  Phoenix has also sought an order from the court "that it may retain all premiums paid" on this allegedly invalid policy.

Thus, just two weeks before the insured died, Phoenix said that the policy was "issued" on January 21, 2008.  But after the insured died and Phoenix received a claim for the death benefit, Phoenix said the policy was "void *ab initio*" – *i.e.*, it was never issued to begin with. Before the insured died, Phoenix said that the policy was "in force" and had been "in force" for three years and ten months.  But after the insured died and Phoenix received a claim for the death benefit, Phoenix said that the policy "is of no force and effect."  Before the insured died, Phoenix said that the policy had an account value on January 21, 2010 of $51,900.76 and an account value on January 20, 2011 of $26,243.14, which values were built up from premium payments. But after the insured died and Phoenix received a claim for the death benefit, Phoenix said that the policy is invalid and has sought "an order that it may retain all premiums paid."

Phoenix still has not paid the death benefit on the policy.

<u>Other Predicate Acts</u>

The dates of fraudulent premium notices, annual statements, verifications of coverage, illustrations, and COI letters – listed by policy number – are detailed in Appendix C to the Complaint.  Plaintiff reproduces Complaint Appendix C as Exhibit A to this Statement.  The

fraudulent statements and misrepresentations in Exhibit A were made and delivered by Phoenix to Plaintiff through the Postal Service, private or commercial carrier, wire or other interstate electronic media.  They were made, approved, authorized, or directed by the Individual Defendants as part of their racketeering scheme and pattern of racketeering.

        **d.**      **Whether there has been a criminal conviction for violation of the predicate acts;**

To date, there has not been a criminal conviction for violation of the predicate acts.

        **e.**      **Whether civil litigation has resulted in a judgment in regard to the predicate acts;**

Plaintiff is not aware of any judgment entered in civil litigation to date regarding predicate acts.

        **f.**      **The manner in which the predicate acts form a "pattern of racketeering activity"; and**

The Individual Defendants' predicate acts form a "pattern of racketeering activity" of multiple acts of racketeering activity within the past 10 years.  In fact, each of the Individual Defendants have committed, directed, or authorized hundreds or thousands of acts of racketeering.  Each predicate act was related, had a similar purpose, involved the same or similar participants and methods of commission, had similar results, and impacted similar victims, including Plaintiff.  The predicate acts of racketeering activity were related to each other in furtherance of the scheme described above to maximize collection of premiums while minimizing payment of death benefits.  The predicate acts of racketeering have been and are continuous.  There was repeated conduct during the period between as early as 2009 and

continuing to the present.  The conduct therefore constituted a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

> **g.     Whether the alleged predicate acts relate to each other as part of a common plan, and if so, a detailed description of the common plan.**

The Individual Defendants' predicate acts form a "pattern of racketeering activity" of multiple acts of racketeering activity within the past 10 years.  In fact, each of the Individual Defendants have committed, directed, or authorized hundreds or thousands of acts of racketeering.  Each predicate act was related, had a similar purpose, involved the same or similar participants and methods of commission, had similar results, and impacted similar victims, including Plaintiff.  The predicate acts of racketeering activity were related to each other in furtherance of the scheme described above to maximize collection of premiums while minimizing payment of death benefits.  The predicate acts of racketeering have been and are continuous.  There was repeated conduct during the period between as early as 2009 and continuing to the present.  The conduct therefore constituted a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

> **6.     A detailed description of the alleged enterprise for each RICO claim, which shall include:**

> **a.     The names of the individuals, partnerships, corporations, associations, or other legal entities, which allegedly constitute the enterprise;**

Phoenix (which consists of at least PNX, PLIC, and PHL) is the enterprise (the "Phoenix Enterprise").

**b.     The structure, purpose, function and course of conduct of the enterprise;**

The Phoenix Enterprise consists of at least three corporations. PNX is a Connecticut corporation. PHL is a Connecticut corporation. PLIC is a New York corporation. All three companies have their principal places of business and nerve centers in Hartford, Connecticut. PLIC and PHL issue insurance policies. PNX does not. PNX is the direct parent of PLIC. PLIC is the direct parent of PNX.

The Phoenix Enterprise constitutes a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4) because it consists of a corporation and its subsidiaries. The Phoenix Enterprise has an ascertainable structure and purpose beyond the scope and commission of the Individual Defendants' predicate acts and conspiracy to commit such acts, and the Phoenix Enterprise is separate and distinct from each of the Individual Defendants.

Phoenix has engaged in a series of fraudulent and unlawful practices. Phoenix engaged in this course of conduct at the direction, and with the approval, of each of the Individual Defendants as part of their unlawful racketeering scheme. The object of the racketeering scheme was to misrepresent Phoenix's intent to honor policies that were bought and sold on the secondary market so that Phoenix could continue to collect substantial insurance premiums from policyholders and, later, force policyholders to lapse their policies, refuse to pay death benefits when policies mature, or seek to void policies. The ultimate objective of the scheme is to maximize the amount of premiums that Phoenix collects and keeps while never paying the death benefits so that the Individual Defendants can personally profit through personal compensation and their ownership interests in Phoenix.

Each of the Individual Defendants have participated in the conduct of and have controlled and operated the Phoenix Enterprise by, among other things, directing, authorizing, or allowing the issuance of:

a.      Premium notices that falsely and fraudulently represented that, according to Phoenix, Plaintiff's policies were valid, had a cash value that had accumulated from Plaintiff's premium payments, and that Plaintiff's valid policies could lapse (an invalid policy cannot lapse), and that further falsely and fraudulently represented that Phoenix intended to honor the policies and that Phoenix was not aware of any facts upon which it might contest the policies or conduct a further examination into the origination of the policy to determine whether to contest it in the future.

b.      Annual statements that falsely and fraudulently represented that, according to Phoenix, Plaintiff's policies were valid and "in force" and validly issued as of the issue date, and that further falsely and fraudulently represented that Phoenix intended to honor the policies and that Phoenix was not aware of any facts upon which it might contest the policies or conduct a further examination into the origination of the policy to determine whether to contest it in the future.

c.      Verifications of coverage that falsely and fraudulently represented that, according to Phoenix, Plaintiff's policies were valid, "active" and "in force," and validly issued as of the issue date, and that further falsely and fraudulently represented that Phoenix intended to honor the policies and that Phoenix was not aware of any facts upon which it might contest the policies or conduct a further examination into the origination of the policy to determine whether to contest it in the future.

d.      Policy illustrations that falsely and fraudulently represented that, according to Phoenix, Plaintiff's policies were valid and "in force" and that the policy had been validly issued as of the issue date, and that further falsely and fraudulently represented that Phoenix intended to honor the policies and that Phoenix was not aware of any facts upon which it might contest the policies or conduct a further examination into the origination of the policy to determine whether to contest it in the future.

e.      COI letters that falsely and fraudulently represented that, according to Phoenix, Plaintiff's policies were valid and subject to a rate increase, that the policies had been validly issued on their anniversary date(s), that the policies had a certain accumulated value, that Phoenix intended to honor the policies, and that Phoenix was not aware of any facts upon which it might contest the policies or conduct a further examination into the origination of the policy to determine whether to contest it in the future.

**c.      Whether any defendants are employees, officers, or directors of the alleged enterprise;**

Defendant James D. Wehr is the President and Chief Executive Officer of PNX. Defendant Philip K. Polkinghorn is the Executive Vice President of Business Development of PNX and the President of PNX's Life and Annuity Business Segment.  Defendant Edward W. Cassidy is the Executive Vice President of Distribution of PNX.  Defendant Dona D. Young was the President of PNX from 2000 to April 15, 2009, the Chief Executive Officer and Chairman of the Board of PNX from 2003 to April 15, 2009, and a consultant to PNX until at least April 15, 2010.  Upon information and belief, each of these individuals holds or has held other executive officer positions for the Phoenix entities.

   **d.  Whether any defendants are associated with the alleged enterprise;**

Aside from their employment relationships, board memberships, and ownership interests, to Plaintiff's knowledge, each of the Individual Defendants is not otherwise associated with the Phoenix Enterprise.

   **e.  Whether plaintiff contends that the defendants are individuals or entities separate from the alleged enterprise, or that the defendants are the enterprise itself, or members of the enterprise;**

Each of the Individual Defendants is a current or former executive officer, board member, and shareholder of the enterprise, but each has an existence separate and distinct from the enterprise.

   **f.  If any defendants are alleged to be the enterprise itself, or members of the enterprise, an explanation as to whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.**

The Individual Defendants conducted or participated in the affairs of the enterprise through the pattern of racketeering activity, and they conspired to conduct or participate in the affairs of the enterprise through the pattern of racketeering activity.  The Individual Defendants are not the enterprise.

   **7.  Whether plaintiff contends that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.**

The Phoenix Enterprise has an ascertainable structure separate apart from the pattern of racketeering activity in which the Individual Defendants have engaged.

**8.**     **The alleged relationship between the activities of the enterprise and the pattern of racketeering activity, including a description of the manner in which the racketeering activity differs, if at all, from the usual and daily activities of the enterprise.**

The enterprise functions by providing insurance products and services, some of which are, or could be, legitimate and non-fraudulent.  However, the Individual Defendants, through the enterprise, have engaged in a pattern of racketeering activity with respect to a large block (approximately $10 billion in total face amount) of Phoenix life insurance policies that have been bought and sold on the secondary market.  These are policies that Phoenix sold during roughly the period between 2003 and 2008 and that Phoenix knew were destined to be sold on the secondary market.  The Individual Defendants' pattern of racketeering has involved the issuance of fraudulent premium notices, annual statements, verifications of coverage, policy illustrations, and COI letters to induce policyholders who purchased their policies on the secondary market to continue to pay premiums to Phoenix.  At the same time, however, the Individual Defendants have no intention of honoring many of these approximately $10 billion in policies.  Instead, they are directing Phoenix to take actions that are intended to force policyholders to lapse their policies in the future, such as by directing Phoenix to raise COI rates on investor-owned policies.  But even if Phoenix is unable to force policyholders to lapse their policies, the Individual Defendants will direct Phoenix to refuse to pay the death benefits when they come due or attempt to void the policies by claiming that they were void while at the same time attempting to keep the premiums.

9.      **The benefits, if any, the alleged enterprise receives or has received from the alleged pattern of racketeering.**

As of July 30, 2012, the Phoenix Enterprise has already received a total of $154 million in premiums on Plaintiff's policies alone.  The Phoenix Enterprise also has, among other things, (a) successfully forced Plaintiff to lapse a portion of the $229 million in policies (on which Phoenix has received $16.6 million in premiums) that Plaintiff has lapsed; (b) refused to pay Plaintiff at least $3 million in death benefits while attempting to keep all of the premiums; and (c) unlawfully resisted for six months the payment of $30 million in death benefits, forcing Plaintiff to incur costs and other burdens of litigation to receive payment.

Furthermore, upon information and belief, there are approximately $10 billion in Phoenix policies in force and owned by investors who purchased their policies on the secondary market. By engaging in the pattern of racketeering activity described herein, the Phoenix Enterprise plans to continue collecting premiums on these policies while intending not to honor many or most of them.  The Phoenix Enterprise is, instead, secretly trying to force these policyholders to lapse or surrender their policies before they mature (such as by sending out false premium illustrations that make the policies appear less economically attractive and unlawfully raising the cost of insurance rates), and if unsuccessful in forcing policies to lapse, the Phoenix Enterprise will either refuse to pay the death benefits when policies mature or attempt to void the policies while keeping the premiums (which, in and of itself, will force policyholders to lapse their policies). The Phoenix Enterprise thus intends to collect hundreds of millions of dollars in premiums payments while only paying the death benefits on a small fraction of policies owned by investors.  For every policy that the Phoenix Enterprise does not pay but is able to keep the premiums on, the Phoenix Enterprise will make a windfall profit.

For example, after collecting premiums on Plaintiff's policies for several years, the Phoenix Enterprise, in 2010 and 2011, began raising cost of insurance ("COI") rates on many of those policies, and Plaintiff believes that the Phoenix Enterprise intends to raise COI rates on all policies it can identify as investor-owned. These COI increases are specifically intended to cause "shock lapses" (a term used repeatedly by the Phoenix Enterprise itself in planning the increase) by policyholders. In other words, Phoenix specifically intended to implement these COI increases in order to force investor policyholders to lapse their policies. And if some investor-owned policies do not lapse, Phoenix will simply raise COI rates again to induce additional shock lapses.

The economic impact of Phoenix's shock lapse strategy is substantial. Using an average COI rate increase of 15% (the approximate average COI increase on Plaintiff's policies with such increases) and Plaintiff's estimate that Phoenix has raised COI rates on about $6 billion of the approximately $10 billion in Phoenix investor-owned policies , Plaintiff estimates that, over the span of just three years, Phoenix could be able to release between $290 million and $426 million of capital, while realizing an additional $63 million in premium revenue from higher COI rates on just the $6 billion in policies that have received COI increases to date. The release of capital, coupled with the aforementioned $63 million in additional revenue, could, on an after-tax basis, equate to an increase in PNX share price by between $59.32 and $82.63 per share, or between 181% and 252%.[1]

Even assuming the Phoenix Enterprise did not cause any shock lapses by illegally raising COI rates on investor-owned policies, the Phoenix Enterprise would, over the course of ten

---

[1] At $32.73 per share, Phoenix market capitalization is approximately $190M. Phoenix's statutory capital is $958M, resulting in a market capitalization equal to 20% of Phoenix's statutory capital. In a liquidation scenario (which is the clear end game for Phoenix now that it writes very little life insurance), shareholders would realize the full liquidation or cash value of the Company's statutory capital – not just 20%.

years, still realize approximately $421 million in additional premiums payments above the lawful premium rates, assuming a 15% increase on the entire $10 billion in Phoenix investor-owned policies.  All of this revenue would come from Phoenix's existing policyholders, including Plaintiff.  Plaintiff estimates, using the same assumptions described above, that this would result in an increase in the value of PNX stock by approximately $69.67 per share, or 213%.

Moreover, through the Phoenix Enterprise, the Individual Defendants have paid themselves millions of dollars every year in inflated salaries, even after shareholders voted against their compensation plan.  Without taking into account the millions previously paid to Defendant Dona D. Young, in each of the past three years, while PNX stock has dropped almost 50% in value, the "Insiders' Circle" (consisting of the Individual Defendants and several other senior Phoenix employees) has collectively made more money than Phoenix itself.  In 2009, the Insiders' Circle earned nearly $8 million in total compensation, while the Company lost $319 million.  In 2010, the Insiders' Circle earned over $9 million, while the Company lost $12.6 million.  And in 2011, the Insiders' Circle earned close to $9 million (also excluding Defendant Cassidy's compensation, which is not publicly available), while the Company made just $8.1 million.  This does not take into account the gains they stand to realize from the increase in the value of PNX shares based on the Phoenix Enterprise's illicit activities.

**10.**      **The effect of the activities of the enterprise on interstate or foreign commerce.**

The Phoenix Enterprise has engaged in, and its activities have affected, interstate and foreign commerce by inducing policyholders throughout the United States to continue paying premiums to Phoenix.

11.     **If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:**

a.      **The identity of the individual(s) who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and**

b.      **The use or investment of such income.**

The Complaint does not allege a violation of 18 U.S.C. § 1962(a).

12.     **If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.**

The Complaint does not allege a violation of 18 U.S.C. § 1962(b).

13.     **If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:**

a.      **The individuals who are employed by or associated with the enterprise; and**

See response to Item 6(c) above.

b.      **Whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).**

The same entity is not both the liable person and the enterprise under § 1962(c).

14.     **If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the alleged conspiracy.**

The object of the conspiracy was to misrepresent Phoenix's intent to honor policies that were bought and sold on the secondary market so that Phoenix can continue to collect substantial insurance premiums from policyholders and, later, force policyholders to lapse their policies, refuse to pay death benefits when policies mature, or seek to void policies.  The ultimate

objective of the conspiracy is to maximize the amount of premiums that Phoenix collects and keeps while never paying the death benefits so that each of the Individual Defendants can personally profit through personal compensation and their ownership interests in Phoenix.

Each of the Individual Defendants committed, directed, or authorized overt acts of mail and wire fraud, and aided and abetted each other's acts of mail and wire fraud, to achieve the object of their conspiracy.  Each of the Individual Defendants agreed with each other to conduct, and cooperated with each other to conduct, the Phoenix Enterprise's affairs through a pattern of racketeering activity.  The racketeering activity is described in detail, above.

**15.     The alleged injury to business or property.**

Each of the Individual Defendants have obtained money and property belonging to Plaintiff as a result of their fraudulent and unlawful conduct.  Plaintiff has been injured in its business and property by each of the Individual Defendants' overt acts of mail and wire fraud and by their aiding and abetting each other's acts of mail and wire fraud, and by each of the Individual Defendants' conduct of the Phoenix Enterprise's affairs through a pattern of racketeering activity.

Plaintiff reasonably relied on the misrepresentations and omissions as described herein, including by continuing to pay premiums on them.  As a direct and proximate cause of the Individual Defendants' conduct and/or participation, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity, Plaintiff has been injured in its business and property in an amount to be proven at trial, which consists of unpaid death benefits and approximately $154 million in premiums that have been paid to Phoenix.

16.     **The direct causal relationship between the alleged injury and the violation of the RICO statute.**

Plaintiff reasonably relied on the misrepresentations and omissions as described herein, including by continuing to pay premiums on them.  As a direct and proximate cause of the Individual Defendants' conduct and/or participation, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity, Plaintiff has been injured in its business and property in an amount to be proven at trial, which consists of unpaid death benefits and approximately $154 million in premiums that have been paid to Phoenix.

17.     **The damages sustained for which each defendant is allegedly liable.**

Plaintiff reasonably relied on the misrepresentations and omissions as described herein, including by continuing to pay premiums on them.  As a direct and proximate cause of the Individual Defendants' conduct and/or participation, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity, Plaintiff has been injured in its business and property in an amount to be proven at trial, which consists of unpaid death benefits and approximately $154 million in premiums that have been paid to Phoenix.

Plaintiff seeks treble damages for the losses it has sustained as a result of the Individual Defendants' scheme.

18.     **A description of other federal causes of action alleged in the complaint, if any, and citation to the relevant statutes.**

No other federal causes of action are alleged in the Complaint.

19.     **A description of all pendent state claims alleged in the complaint, if any.**

Plaintiff also asserts a claim against Phoenix for monopsonization of the secondary market for Phoenix life insurance policies in violation of Connecticut law (Count I); a claim

against Phoenix for attempted monopsonization in violation of Connecticut law (Count II); a claim against Phoenix for unfair trade practices in violation of Connecticut law (Count III); and a claim against all Defendants for fraud and conspiracy to defraud (Count V).

**20.     Any additional information plaintiff feels would be helpful to the Court in processing the RICO claim.**

Plaintiff believes that a significant volume of additional relevant evidence supporting its claim will be obtained through discovery, and Plaintiff reserves the right to amend this Statement in order to provide the Court with additional information during discovery that will assist in the processing of the RICO claim asserted in this action.

Dated:  August 22, 2012     Respectfully submitted,

              PLAINTIFF LIMA LS PLC

              /s/ Richard S. Gora
              Alfred U. Pavlis (ct08603)
              Richard S. Gora (ct27479)
              FINN DIXON & HERLING LLP
              177 Broad Street
              Stamford, CT  06901-2048
              Tel: (203) 325-5000
              Fax: (203) 325-5001
              E-mail:  apavlis@fdh.com
                 rgora@fdh.com

               – and –

              Stephen G. Foresta
              Philipp Smaylovsky
              ORRICK, HERRINGTON & SUTCLIFFE LLP
              51 West 52nd Street
              New York, NY  10019-6142
              Tel:  (212) 506-5000
              Fax:  (212) 506-5151
              E-mail:  sforesta@orrick.com
                 psmaylovsky@orrick.com

              Khai LeQuang
              Howard M. Ullman

ORRICK, HERRINGTON & SUTCLIFFE LLP
2050 Main Street, Suite 1100
Irvine, CA  92614-8255
Tel:  (949) 567-6700
Fax:  (949) 567-6710
E-mail:  klequang@orrick.com

## <u>CERTIFICATION</u>

I hereby certify that on August 22, 2012, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Richard S. Gora
Richard S. Gora (ct27479)
FINN DIXON & HERLING LLP
177 Broad Street
Stamford, CT  06901-2048
Tel: (203) 325-5000
Fax: (203) 325-5001
E-mail: apavlis@fdh.com
        rgora@fdh.com