UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LIMA LS PLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>PHL VARIABLE INSURANCE COMPANY, a Connecticut corporation; PHOENIX LIFE INSURANCE COMPANY, a New York corporation; THE PHOENIX COMPANIES, INC., a Connecticut corporation; JAMES D. WEHR, an individual; PHILIP K. POLKINGHORN, an individual; EDWARD W. CASSIDY, an individual; and DONA D. YOUNG, an individual, and DOES 1-20, inclusive,<br><br>                    Defendants. | No. 12-CV-01122 (WWE) |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................................ 3

        A.      The Scheme to Monopsonize the Secondary Market for Phoenix Policies .......... 3

        B.      The Scheme to Defraud Policyholders ................................................. 5

III.    ARGUMENT ...................................................................................................... 6

        A.      Legal Standard Applicable to a Motion to Dismiss ............................. 6

        B.      Lima's Complaint Sufficiently Pleads RICO Claims ........................... 7

                1.      Defendants' assertions about "STOLI" are irrelevant ............... 7

                2.      Lima has adequately alleged how the Individual Defendants
                        operated and managed the Phoenix Enterprise ......................... 8

                3.      Lima has adequately alleged mail and wire fraud ................... 11

                4.      Lima was injured and has RICO standing ............................... 17

                5.      Lima has sufficiently alleged a RICO conspiracy .................... 21

                6.      The McCarran-Ferguson Act, 15 U.S.C. §§ 1011, *et seq*., does not
                        apply ...................................................................................... 21

        C.      Lima's Complaint Sufficiently Pleads Antitrust Claims ................... 22

                1.      Lima has adequately alleged monopolization and attempted
                        monopolization under Section 35-27 of the Connecticut Antitrust
                        Act ......................................................................................... 22

                        a.      Lima has pled a plausible relevant product market, which
                                involves a fact-intensive inquiry ................................ 22

                                (1)     *Kodak*-type secondary markets ....................... 24

                                (2)     Lima has adequately alleged the *Kodak* factors ........... 26

                                (3)     Defendants fail to distinguish *Kodak* .............. 27

                        b.      Defendants' non-*Kodak* cases are inapposite and irrelevant ....... 29

                        c.      Lima has adequately alleged Phoenix's market power in the
                                relevant market ............................................................. 32

                        d.      The Complaint alleges anticompetitive and exclusionary
                                conduct ........................................................................ 36

                2.      Lima has adequately alleged concerted action in violation of
                        Section 35-28 of the Connecticut Antitrust Act ..................... 39

        D.      Lima's Complaint Sufficiently Pleads a CUTPA Claim ................... 39

        E.      Lima's Complaint Sufficiently Pleads Fraud and Conspiracy Claims ............... 40

## TABLE OF CONTENTS
(continued)

**Page**

IV.    CONCLUSION ................................................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Alternative Electrodes, LLC v. Empi, Inc.*,
    597 F. Supp. 2d 322 (E.D.N.Y. 2009) ..........................................................28, 29, 38

*American Buying Ins. Servs. v. S. Kornreich & Sons*,
    944 F. Supp. 240 (S.D.N.Y. 1996) ...............................................................8, 11, 20, 21

*American Int'l Group, Inc. v. ACE INA Holdings, Inc.*,
    722 F. Supp. 2d 948 (N.D. Ill. 2010), *amended on other grounds*, 2010 U.S. Dist. LEXIS
    96863 (N.D. Ill. Sept. 16, 2010) .....................................................................10

*Anderson News, LLC v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) .............................................................................7, 40

*In re Apple and AT&TM Antitrust Litig.*,
    596 F. Supp. 2d 1288 (N.D. Cal. 2008) .............................................................27, 28

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................6, 7

*B.V. Optische Industrie de Oude Delft v. Hologic, Inc.*,
    909 F. Supp. 162 (S.D.N.Y. 1995) .....................................................................32

*Baisch v. Gallina*,
    346 F.3d 366 (2d Cir. 2003) .............................................................................10, 20

*Bansavich v. McLane Co.*,
    2008 WL 4821320 (D. Conn. Oct. 31, 2008) ....................................................32

*Baskin v. Hawley*,
    807 F.2d 1120 (2d. Cir. 1986) .........................................................................13

*Bastian v. Petren Resources Corp.*,
    892 F.2d 680 (7th Cir. 1990) ...........................................................................19

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................7, 23

*Bennett Silvershein Assoc. v. Furman*,
    1997 WL 531310 (S.D.N.Y. Aug. 28, 1997) .....................................................11, 13

*Book v. Mortgage Elec. Registration Sys.*,
    608 F. Supp. 2d 277 (D. Conn. 2009) ................................................................15

*Bridge v. Phoenix Bond & Indem. Co.*,
    539 U.S. 639 (2008) .......................................................................................14, 20

# TABLE OF AUTHORITIES
(continued)

**Page**

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d Cir. 2007)................................................................37

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) .......................................................................23

*Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York*,
  808 F. Supp. 213 (S.D.N.Y. 1992), *aff'd without op.*, 99 F.3d 401 (2d Cir. 1995)........................14

*City of New York v. Group Health Inc.*,
  649 F.3d 151 (2d Cir. 2011)..........................................................30, 31

*City of Vernon v. Southern California Edison Co.*,
  955 F.2d 1361 (9th Cir.), *cert. denied*, 506 U.S. 908 (1992).......................................36

*Covad Communications Co. v. BellSouth Corp.*,
  299 F.3d 1272 (11th Cir. 2002), *vacated on other grounds*, 540 U.S. 1147 (2004) .....................37

*Crab House of Douglaston, Inc. v. Newsday, Inc.*,
  801 F. Supp. 2d 64 (E.D.N.Y. 2011) ........................................8, 10, 15, 17

*Datel Holdings Ltd. v. Microsoft Corp.*,
  712 F. Supp. 2d 974 (N.D. Cal. 2010) ..............................................27, 29

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ....................................................................... passim

*Envirosource, Inc. v. Horsehead Resource Dev. Co.*,
  1997 U.S. Dist. LEXIS 12570 (S.D.N.Y. Aug. 21, 1997) .......................................23

*Finn v. Barney*,
  471 F. App'x 30 (2d Cir. 2012)........................................................17

*First Capital Asset Mgmt. Inc. v. Satinwood, Inc.*,
  385 F.3d 159 (2d Cir. 2004)..............................................................8

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994)..............................................................18

*Foman v. Davis*,
  371 U.S. 178 (1962) .......................................................................40

*Geneva Pharmaceuticals Technology Corp. v. Barr Labs, Inc.*,
  386 F.3d 485 (2d Cir. 2004).........................................................24, 33, 39

# TABLE OF AUTHORITIES
(continued)

**Page**

*GICC Capital Corp. v. Technology Fin. Group,*
  30 F.3d 289 (2d Cir. 1994) ..................................................................................18

*Giuliano v. Fulton,*
  399 F.3d 381 (1st Cir. 2005) ...............................................................................18

*Hack v. President & Fellows of Yale College, abrogated on other grounds by Swierkiewicz v.*
  *Sorema N.A.*, 534 U.S. 506 (2002), 237 F.3d 81 (2d Cir. 2000) ...........................30, 36

*Hanover Shoe v. United Shoe Machine Corp.,*
  392 US. 481 (1968) .............................................................................................34

*Hemi Group, LLC v. City of New York,*
  __ U.S. __, 130 S. Ct. 983 (2010) ......................................................................17, 20

*Humana Inc. v. Forsyth,*
  525 U.S. 299 (1999) ............................................................................................21

*Image Technical Servs., Inc. v. Eastman Kodak Co.,*
  125 F.3d 1195 (9th Cir. 1997), *cert. denied*, 523 U.S. 1094 (1998) ......................28, 33

*Kramer v. Time Warner, Inc.,*
  937 F.2d 767 (2d Cir. 1991) ................................................................................17

*Lincoln House, Inc. v. Dupre,*
  903 F.2d 845 (1st Cir. 1990) ...............................................................................18

*Liquidation Comm'n of Banco Intercontinental, S.A. v. Alvarez Renta,*
  530 F.3d 1339 (11th Cir. 2008) ...........................................................................18

*McLaughlin v. Anderson,*
  962 F.2d 187 (2d Cir. 1992) ................................................................................10

*McLaughlin v. CitiMortgage, Inc.,*
  726 F. Supp. 2d 201 (D. Conn. 2010) ..................................................................15

*Mendlow v. Seven Locks Facility,*
  86 F. Supp. 2d 55 (D. Conn. 2000) .....................................................................15

*Moore v. PaineWebber, Inc.,*
  189 F.3d 165 (2d. Cir. 1999) ........................................................................13, 14, 19

*Morrow v. Black,*
  742 F. Supp. 1199 (E.D.N.Y. 1990) .....................................................................10

# TABLE OF AUTHORITIES
(continued)

**Page**

*Mosier v. Phoenix Life Ins. Co.*,
No. 8:12-CV-00227 (C.D. Cal. Aug. 7, 2012) ........................................................38

*Motorola Credit Corp. v. Uzan*,
322 F.3d 130 (2d Cir. 2003)......................................................................17, 18

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
2012 U.S. Dist. LEXIS 16946 (S.D. Cal. Feb. 10, 2012) ...........................19

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
268 F.R.D. 652 (S.D. Cal. 2010) .............................................................36

*Newcal Indus., Inc. v. IKON Office Solution*,
513 F.3d 1038 (9th Cir. 2008) .......................................................23, 27, 32

*North American Energy Sys., LLC v. New England Energy Mgmt.*,
269 F. Supp. 2d 12 (D. Conn. 2002)...........................................................32

*Powers v. British Vita P.L.C.*,
57 F.3d 176 (2d. Cir. 1995).......................................................................17

*Primetime 24 Joint Venture v. National Broadcasting Co.*,
219 F.3d 92 (2d Cir. 2000)...................................................................37, 38

*Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*,
2012 U.S. Dist. LEXIS 88313 (D. Del. June 26, 2012) .................................8

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997)...............................................................28, 31, 32

*Re-Alco Indus., Inc. v. Nat'l Center for Health Educ.*,
812 F. Supp. 387 (S.D.N.Y. 1993) ............................................................32

*Rebel Oil Co. v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir.), *cert. denied*, 516 U.S. 987 (1995)....................23, 33, 34

*Reves v. Ernst & Young*,
507 U.S. 170 (1993) ..............................................................................8, 11, 21

*Rohfling v. Manor Care, Inc.*,
172 F.R.D. 330 (N.D. Ill. 1997) .................................................................31

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007).....................................................................16

# TABLE OF AUTHORITIES
(continued)

**Page**

*Russell v. Transamerica Occidental Life Ins. Co.*,
  2006 U.S. Dist. LEXIS 63086 (M.D. Ala. Aug. 31, 2006) ........................................................17

*S.Q.K.F.C., Inc. v Bell Atl. TriCon Leasing Corp.*,
  84 F.3d 629 (2d Cir. 1996) ........................................................................................................11

*Schmuck v. United States*,
  489 U.S. 705 (1989) ............................................................................................................14, 15

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
  473 U.S. 479 (1985) ....................................................................................................................7

*Skyline Travel, Inc. v. Emirates*,
  2012 WL 2016479 (2d Cir. June 6, 2012) ................................................................................32

*Smith v. Our Lady of the Lake Hosp., Inc.*,
  960 F.2d 439 (5th Cir. 1992)......................................................................................................14

*Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.*,
  414 Fed. App'x 372 (2d Cir. 2011) ............................................................................................30

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
  547 F.3d 406 (2d Cir. 2008)........................................................................................................17

*Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., LP*,
  985 F.2d 102 (2d Cir.1993)........................................................................................................12

*In re Sterling Foster & Co., Inc., Sec. Litig.*,
  222 F. Supp. 2d 216 (E.D.N.Y. 2002) .......................................................................................16

*Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank*,
  934 F.2d 976 (8th Cir. 1991)......................................................................................................15

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) (Sotomayor, J.) ...............................................................22, 24, 33

*Trollinger v. Tyson Foods, Inc.*,
  370 F.3d 602 (6th Cir. 2004)................................................................................................19, 20

*Trustees of the Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mechanical, Inc.*,
  886 F. Supp. 1134 (S.D.N.Y. 1995) ..........................................................................................11

*United States v. Diaz*,
  176 F.3d 52 (2d Cir.), *cert. denied*, 528 U.S. 875 (1999)............................................................8

**TABLE OF AUTHORITIES**
(continued)

**Page**

*United States v. Grinnell Corp.,*
    384 U.S. 563 (1966) ...................................................................................22, 23

*United States v. Pizzonia,*
    577 F.3d 455 (2d Cir. 2009) ..............................................................................21

*United States v. Starr,*
    816 F.2d 94 (2d Cir. 1987) ................................................................................17

*United States v. Triumph Capital Group, Inc.,*
    260 F. Supp. 2d 444 (D. Conn. 2002) ..........................................................14, 15

*United States v. Zichettello,*
    208 F.3d 72 (2d Cir. 2000), *cert. denied sub nom. Lysaght v .U.S.*, 531 U.S. 1143 (2001) ...........21

*Universal Computer Systems, Inc. v. Volvo Cars of North America, Inc.,*
    1997 WL 1433879 (S.D. Tex. Sept. 29, 1997)....................................................31

*Waterbury Hosp. v. U.S. Foodservice, Inc.,*
    2009 U.S. Dist. LEXIS 117403 (D. Conn. Dec. 15, 2009) ................................15

*Williams v. Mohawk Indus., Inc.,*
    465 F.3d 1277 (11th Cir. 2006) ........................................................................19

**STATE CASES**

*Andy's Oil Serv., Inc. v. Hobbs,*
    9 A.2d 433 (Conn. App. Ct. 2010) ...................................................................12

*Billington v. Billington,*
    220 Conn. 212 (Conn. 1991)............................................................................40

*Elida, Inc. v. Harmor Realty Corp.,*
    177 Conn. 218 (1979).......................................................................................39

*Freeman & Mills, Inc. v. Belcher Oil Co.,*
    11 Cal. 4th 85 (1995)........................................................................................13

*Harp v. King,*
    835 A.2d 953 (Conn. 2003) ..............................................................................40

*Shea v. First Federal Savings & Loan Ass'n,*
    439 A.2d 997 (Conn. 1981) ..........................................................................22, 32

*State v. Hossan-Maxwell, Inc.,*
    181 Conn. 655 (1980).......................................................................................34

# TABLE OF AUTHORITIES
(continued)

**Page**

**FEDERAL STATUTES**

15 U.S.C. § 1012(b)....................................................................................................21

18 U.S.C. § 1341.........................................................................................................14

18 U.S.C. § 1962(c)..................................................................................................2, 8

18 U.S.C. § 1962(d)................................................................................................2, 21

18 U.S.C. § 1964(c)....................................................................................................17

McCarran-Ferguson Act, 15 U.S.C §§ 1011, *et seq* ..............................................2, 21

Sherman Act, 15 U.S.C. § 2........................................................................................22

Sherman Act § 1....................................................................................................25, 39

**STATE STATUTES**

Conn. Gen. Stat. § 35-24, *et seq*. (the "CAA")..........................................................22

Conn. Gen. Stat. § 35-27........................................................................................1, 22

Conn. Gen. Stat. § 35-28........................................................................................1, 39

Conn. Gen. Stat.§ 35-44b............................................................................................22

Conn. Gen. Stat. § 38a-446 ............................................................................ Appendix B

Conn. Gen. Stat. § 38a-816 ....................................................................... 39, Appendix B

Conn. Gen. Stat. §§ 42-110a, *et seq*.("CUTPA") ...........................................2, 3, 39, 40

Connecticut Unfair Insurance Practices Act ("CUIPA") ...........................................39, 40

**RULES**

Fed. R. Civ. P. 9(b)......................................................................................................21

Fed. R. Civ. P. 12(b)(6)................................................................................................1

Fed. R. Civ. P. 15(a)(2)...............................................................................................40

## TABLE OF AUTHORITIES
(continued)

Page

**TREATISES AND OTHER SOURCES**

1 ABA Section of Antitrust Law, ANTITRUST LAW DEVELOPMENTS
  (6th ed. 2007) ............................................................................................................23

III P. Areeda and H. Hovenkamp, ANTITRUST LAW (3d ed. 2008)..............................................36, 39

Black's Law Dictionary (8th ed. 2004) ...........................................................................12

Random House Dictionary of the English Language (2d ed. 1987) ...................................................12

Plaintiff Lima LS plc ("Lima" or "Plaintiff") respectfully submits this Memorandum in Opposition to Defendants' Motion to Dismiss ("Motion") filed pursuant to Fed. R. Civ. P. 12(b)(6).

## I.     INTRODUCTION

After losing over a billion dollars during the 2008 financial crisis, Phoenix[1] and its management orchestrated a strategy to force policyholders to lapse their policies so that Phoenix could shed billions in liabilities.  The pretext for this scheme is what Defendants now call by the sinister-sounding name "Stranger Originated Life Insurance" (or "STOLI"), but that they not long ago called their "bread and butter."  Defendants didn't care about STOLI when they actively sold policies they knew would be resold to investors in the secondary market.  But after making hundreds of millions of dollars selling such policies, their profits evaporated in reckless investments (and the gold-plated compensation packages they gave themselves).  At that point, Defendants concocted a scheme to continue to collect millions in premiums and raise rates on investor-owned policies while at the same time trying to force lapses and planning to cry "STOLI" to avoid paying the policies they couldn't force to lapse.

Rather than address these allegations, Defendants' Motion ignores and mischaracterizes them, obfuscating both the facts and the law.  Instead of legal argument, Defendants appeal to extrajudicial "facts" such as the irrelevant fact that Lima wants to make a profit when it is Phoenix that is trying to "lock in" its profits by forcing policyholders such as Lima to lapse their policies or by seeking to invalidate their policies while keeping their premiums.  Defendants say it is "absurd" that the executives of a failing life insurance company would devise such a scheme, but their scheme is neither unprecedented nor implausible.  It is real.  And their feigned indignation is no legal basis for dismissal.

Lima's Complaint asserts five claims.  In ***Counts I and II***, Lima alleges that Phoenix has unlawfully monopolized or attempted to monopolize the secondary market for Phoenix life insurance policies in violation of Connecticut General Statutes §§ 35-27 and 35-28.  In ***Count III***, Lima alleges

---

[1] The term "Phoenix" refers to The Phoenix Companies, Inc., Phoenix Life Insurance Company, and PHL Variable Insurance Company.  The term "Individual Defendants" refers to Defendants James D. Wehr, Philip K. Polkinghorn, Edward W. Cassidy, and Dona D. Young.

that Phoenix's anticompetitive and exclusionary conduct also violates the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a, *et seq*. In *Count IV*, Lima asserts RICO claims predicated upon mail and wire fraud against the Individual Defendants under 18 U.S.C. §§ 1962(c) and (d). Finally, in *Count V*, Lima alleges common law fraud and conspiracy against all Defendants. Defendants move to dismiss each of these claims.

**RICO:** Defendants move to dismiss Plaintiff's RICO claims on the grounds that (i) Lima has not adequately alleged how the Individual Defendants were involved in the racketeering acts; (ii) Lima has not alleged mail and wire fraud, but only anticipatory breaches of contract based on true statements; (iii) Lima lacks RICO standing because Lima has not been injured; (iv) Lima has not alleged a RICO conspiracy; and (v) the McCarran-Ferguson Act exempts Defendants' activities from RICO liability. Each of these arguments is meritless.

*First*, Lima has alleged in detail a pattern of racketeering activity in which Defendants engaged and how the Individuals Defendants participated in, conducted, and directed the activity. *Second*, Lima has adequately alleged mail and wire fraud. Defendants' assertion that Lima has only alleged anticipatory breaches of contract is simply wrong and ignores the allegations of the Complaint. In particular, Defendants ignore Lima's allegations (supported by substantial evidence cited in the Complaint) that Defendants have falsely represented that they believe Phoenix policies to be valid and "in force," when Defendants in fact intend to take the opposite position in the future. *Third*, Lima has RICO standing because Lima has been directly and proximately injured by the pattern of racketeering activity directed at Lima and other policyholders. *Fourth*, Lima's RICO conspiracy allegations are adequate for the reasons stated above. *Fifth*, the McCarran-Ferguson Act does not exempt Defendants' fraudulent conduct from RICO's reach because application of RICO would not invalidate, impair, or supersede any state insurance law, as no state law authorizes fraud by an insurance company (or anyone else).

**Antitrust:** Defendants move to dismiss Lima's antitrust claims on the grounds that (i) the relevant product market (the secondary market for life insurance policies) cannot be limited to the Phoenix brand; (ii) Phoenix has no market power because its acquisition of policies through lapses or

surrenders is not the economic equivalent of a sale; and (iii) Lima has not alleged that Phoenix engaged in anticompetitive conduct.  Again, these arguments are meritless.

*First*, Defendants' argument that the relevant market cannot be limited to the Phoenix brand ignores the controlling Supreme Court decision in *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992), which holds that single-brand secondary markets exist when certain conditions are present, as they are here.  Instead of confronting *Kodak*, Defendants rely on irrelevant non-*Kodak* cases.  *Second*, Defendants' formalistic argument that Phoenix has no market power because it does not participate in the secondary market when policies are lapsed or surrendered ignores that (i) the Complaint alleges facts establishing that policy lapses, sales, and surrenders are economic equivalents; (ii) under *Kodak*, the proper market definition is an *economic* question that can only be determined after a factual inquiry into the "commercial realities" that policyholders face; and (iii) the Complaint pleads *direct* evidence of monopsony market power through the non-competitive prices for Phoenix policies in the secondary market.[2]  *Third*, Lima has alleged exclusionary (and fraudulent) conduct.

**Unfair Trade Practices**:  Defendants move to dismiss Lima's CUTPA claim on the ground that, in the insurance context, CUTPA is limited to acts of boycott, coercion, or intimidation.  *First*, Lima **has** alleged coercion and intimidation of policyholders by Phoenix.  *Second*, CUTPA reaches many of the other forms of anticompetitive conduct that the Complaint describes.

**Fraud:**  Defendants move to dismiss Lima's common law fraud claim on the same grounds as their RICO arguments.  Those arguments fail for the same reasons discussed above and others.

## II.   FACTUAL BACKGROUND

### A.   The Scheme to Monopsonize the Secondary Market for Phoenix Policies

Following its demutualization in 2001, Phoenix suffered from mismanagement of capital, including "inefficient capital allocation" and an "excessive cost and overhead structure."  Compl. ¶¶ 53-56.  Phoenix tried to increase its revenues by designing and selling life insurance policies that Phoenix knew would be resold in the secondary market.  *Id.* ¶¶ 57-76.  As Phoenix's own employees

---

[2] Specifically, the Complaint alleges that, while secondary market prices for Phoenix policies have plummeted, market prices for policies issued by other insurers have remained relatively flat.  Compl. ¶ 151.

have testified, and Phoenix's own documents reveal: (a) Phoenix targeted the market of older people who took out large life insurance policies using third-party financing; (b) Phoenix sought out these large policies for the big premiums that came with them; and (c) Phoenix knew these policies would later be sold to investors in the secondary market. *Id.* From 2003 to 2007, Phoenix sold billions in such policies, ***more than tripling*** its annual premium revenue during that period. *Id.* ¶¶ 75, 76.

To hedge its substantial exposure under these policies, Phoenix planned to participate directly in the secondary market on the buyer side, and it created a subsidiary to do so. *Id.* ¶¶ 79-80, 83.  But when the financial crisis struck, Phoenix took it on the chin.  It lost over a billion dollars in high-risk investments, was abandoned by its two largest distributors, downgraded by credit rating agencies, found itself barely able to write new any life insurance business, and lacked the capital and liquidity to proceed with its plans to legitimately buy back policies in the secondary market. *Id.* ¶ 84-89.

Faced with billions in potential liabilities on life insurance policies largely owned by investors, and practically incapable of selling new life insurance to generate profits, Defendants devised a plan to eliminate Phoenix's liabilities by mounting a campaign to attack and undermine Phoenix's own policies.  *Id.* ¶¶ 89-92.  This anticompetitive campaign, as detailed in the Complaint, consisted of (i) refusing or delaying policy transfers, *id.* ¶¶ 106-112; (ii) unlawfully raising cost of insurance ("COI") rates, *id.* ¶¶ 113-128; (iii) issuing false and misleading policy illustrations, *id.* ¶ 129; (iv) resisting death benefit claims on baseless and pretextual grounds (for example, that Phoenix was "shocked" to find out that its policies were actually resold to investors, even though Phoenix had tracked the ownership and payment history of these policies all along), *id.* ¶¶ 130-137; (v) unlawfully retaining premiums on policies it sought to rescind, *id.* ¶¶ 138-147; and (vi) instituting objectively baseless litigation to drive up the cost of owning a Phoenix policy, *id.* ¶¶ 99-102.

The purpose of this plan was to destroy the value of Phoenix policies so that policyholders would not want to keep their policies, and Phoenix would be the only buyer of its own worthless paper.  *Id.* ¶¶ 91-93.  Forced policy lapses or surrenders would allow Phoenix to keep all or most of the premiums while shedding its future liabilities.  *Id.* ¶ 93.  This scheme is a textbook example of monopsonization through the elimination of competing buyers in a market.

The Complaint further alleges that Defendants' unlawful scheme has worked.  Today, there are very few, if any, secondary market buyers of Phoenix policies, and secondary market prices for Phoenix policies have plummeted while prices offered for other insurers' policies have remained relatively flat.  *Id.* ¶¶ 16, 151.  Lapse rates for Phoenix policies have skyrocketed because policyholders can no longer sell their Phoenix policies in a competitive secondary market.  *Id.* ¶ 151. In 2009, 2010, and 2011, Phoenix's lapse rates were approximately ***double*** Phoenix's lapse rates in the years preceding its scheme.  *Id.*[3]

Phoenix's scheme is thus far from implausible.  It makes perfect, if unlawful, sense.  And it is evidenced not just by statistical data and public records, but in internal documents describing Phoenix's efforts to induce "shock lapses" by policyholders and to audit policies owned by secondary market purchasers – even as they continue to pay premiums to Phoenix.  *Id.* ¶¶ 120, 192.  But don't take Lima's word for it: Defendant Wehr himself has said that Phoenix policies owned by investors are "worthless" because Phoenix is able to "manage its liabilities" for those policies.  *Id.* ¶ 92.

## B.      The Scheme to Defraud Policyholders

The Individual Defendants conceived of this scheme as a way to gradually shed Phoenix's liabilities.  To ensure the success of their scheme, they made a calculated decision: having encouraged the issuance of policies likely to end up with investors, they would now use the cry of "STOLI" as an excuse not to pay them.  Compl. ¶ 192.  But instead of immediately seeking to rescind all of these so-called "STOLI" policies, they decided to continue collecting premiums and ***raise the COI rates on them***, hoping that policyholders would eventually lapse their policies.  *Id.*[4]  (The Individual Defendants used this fraudulent income stream to justify  the millions they paid themselves.  *Id.* ¶ 194.)  This created a "no lose" situation for Phoenix.  Either the policies would lapse, eliminating the

---

[3] Over that same period, Phoenix steadily increased its rate of resisting the payment of death benefits.  *Id.* ¶ 136. In 2011, Phoenix resisted over 20% of the total death benefit claims it received (a rate ***2,000%*** higher than the industry average), and Phoenix is on pace to deny an even greater percentage in 2012.  *Id.* ¶¶ 136, 137. Meanwhile, Phoenix has been entrenched in over 80 lawsuits involving around ***$3.6 billion dollars*** in Phoenix policies sold in the secondary market.  *Id.* ¶ 100.
[4] Phoenix intentionally waited to implement its COI rate increases in order to collect more premiums before causing policyholders to lapse their policies.

potential liabilities, or, if they did not lapse, Phoenix would continue receiving premiums on them and later refuse to pay the death benefits or attempt to void the policies as "STOLI" while keeping all of the premiums. *Id.* ¶ 192. Indeed, the Individual Defendants "directed Phoenix to conduct an internal audit of its investor-owned policies, and they have identified policies that Phoenix intends to challenge if it is unable to force the owners to lapse their policies first." *Id.*

To induce Lima and other policyholders to continue paying premiums to Phoenix, the Individual Defendants did not tell policyholders that Phoenix intended to contest the validity of their policies. To the contrary, the Individual Defendants directed Phoenix to continue to send by mail or wire verifications of coverage, annual statements, illustrations, and correspondence assuring Lima and others that their policies were "effective," "active," "in force," had "value," and provided "valuable coverage." Compl. ¶¶ 197-213. These representations were all false. They conveyed Phoenix's belief that the subject policies were "effective," "active," "in force," had "value," and provided "valuable coverage" when, in fact, Phoenix did not believe the policies were valid or in force (or at least intended to take the position that the policies were not valid and in force), and Phoenix did not intend to provide valuable coverage (or any coverage at all). *Id.*

The Complaint further alleges that each of the Individual Defendants devised, caused, and directed this fraudulent scheme, and that they each personally reaped millions through their personal compensation, ownership interests, and additional stock purchases.[5]

## III.   ARGUMENT

### A.   Legal Standard Applicable to a Motion to Dismiss

To survive a motion to dismiss, a complaint need only allege facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "When there are well-pleaded factual allegations a court should assume their veracity and then determine whether they

---

[5] *Id.* ¶¶ 17, 92, 192-195, 199, 203, 207, 222, 259. Indeed, since the inception of their fraudulent scheme, the Individual Defendants collectively have made ***more money than Phoenix itself***. *Id.* ¶ 195.

plausibly give rise to an entitlement to relief." *Id.* at 679.  The court must assume "'*that all the [factual] allegations in the complaint are true*.'"  *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (emphasis in original)) (reversing dismissal of antitrust complaint for failure to allege a plausible conspiracy).  Further, in the antitrust context, a court should determine whether an antitrust claim's factual allegations are "plausible" in light of common economic experience.  *See Twombly*, 550 U.S. at 565.

### B.      Lima's Complaint Sufficiently Pleads RICO Claims

Defendants do not argue that Lima has failed to allege a RICO enterprise, a sufficient pattern of activity, or that the Individual Defendants were distinct from the enterprise.  This renders many of the RICO decisions they cite inapposite, because they were decided on grounds not argued here.  In any event, all of Defendants' asserted arguments for dismissal are meritless.[6]

### 1.      Defendants' assertions about "STOLI" are irrelevant

As an initial matter, Defendants assert that Phoenix issued STOLI policies, *see* Mot. at 3-6, and argue that this fact inoculates them from liability for fraud because, in their view, STOLI is illegal.  This argument is specious.  As alleged in the Complaint (with substantial factual support), Phoenix *knowingly* issued billions in policies it now calls "STOLI" and collected hundreds of millions in premiums on those policies.  Only later, when Phoenix lost hundreds of millions in investments, did the Individual Defendants secretly decide they would no longer honor these policies, using "STOLI" as a pretext.  Worse yet, they directed Phoenix to continue to collect premiums on these policies, and induced Lima and other policyholders to continue paying premiums by telling them their policies were "effective," "in force," "active," had "value," and provided "valuable coverage," even though Phoenix had decided not to treat their policies as such.  This is fraud.

Furthermore, Defendants' arguments about STOLI and insurable interest are contract

---

[6] Defendants' observation that RICO claims can be "stigmatizing" (Mot. at 8) is a *non-sequitur*.  Lima is not precluded from pursuing a RICO claim because Defendants perceive some kind of "stigma."  **To avoid this stigma, Defendants should not violate the law**.  Nor is RICO's application limited to cases of organized crime and "mob bosses."  Even so-called "legitimate" enterprises "enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences."  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985).

arguments. Lima's fraud claims, however, "sound in tort, not contract. The predicate acts that [Lima] allege[s] are mail and wire fraud. The damages resulting from these causes of action are not measured exclusively, if at all, by the benefit of the bargain method." *American Buying Ins. Servs. v. S. Kornreich & Sons*, 944 F. Supp. 240, 244 (S.D.N.Y. 1996). Therefore, Defendants cannot evade liability by simply asserting that all of Lima's policies are STOLI and invalid (which they are not). *Id.* at 244-45 (refusing to dismiss RICO claim even though defendants argued that the contract between the parties was illegal under New York insurance law). Courts may award damages arising from unenforceable contracts where the plaintiff is a victim of the defendant's misrepresentation. *Id.*[7]

### 2.    Lima has adequately alleged how the Individual Defendants operated and managed the Phoenix Enterprise

Ignoring many of the Complaint's allegations, Defendants argue that "Lima makes no particularized factual allegations regarding [the] alleged fraudulent scheme, what actions any of these individuals took in furtherance of such scheme, or how any of these individual defendants were involved in illegal racketeering activity." Mot. at 9. The Complaint, however, alleges all of these details. For the Court's convenience, these details are repeated in the attached **Appendix A**.

The "conduct" element under 18 U.S.C. § 1962(c) requires only that "one [] participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).[8] The *Reves* "operation or management test" sets forth a "low hurdle to clear at the pleading stage." *Crab House of Douglaston, Inc. v. Newsday, Inc.*, 801 F. Supp. 2d 64, 74 (E.D.N.Y. 2011) (cit. omit.); *see also First Capital Asset Mgmt., Inc.,* 385 F.3d at 176 (whether a defendant operated or managed the affairs of an enterprise is essentially one of fact).

---

[7] Moreover, to the extent Phoenix asserts that it has acted lawfully with regard to any particular policy or policy denial, that assertion raises a question of fact that cannot be resolved on Defendants' Motion. *See, e.g., Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*, 2012 U.S. Dist. LEXIS 88313 (D. Del. June 26, 2012) (denying insurer's motion for summary judgment because validity of policy raised questions of fact).

[8] The word "participate" in the statute "makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise . . . ." *First Capital Asset Mgmt. Inc. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (quoting *Reves*, 507 U.S. at 185). The defendant need not act in a "managerial role." *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir.), *cert. denied*, 528 U.S. 875 (1999). One can still be liable "for directing the enterprise's affairs if he exercised broad discretion in carrying out the instructions of his principal." *Id.* (cit. omit.).

The Complaint describes a fraudulent scheme that involves the mailing and wiring of fraudulent premium notices, annual statements, verifications of coverage, policy illustrations, and COI letters to Lima and other policyholders.  Compl. ¶¶ 192-223.  Phoenix made false and misleading statements that Lima's policies were "effective," "in force," "active," had "value," and provided "valuable coverage."  *Id.* ¶¶ 192, 222.  As further described in detail in Section III.B.3 below, these statements were false, and Defendants knew it.

The Complaint also alleges how the Individual Defendants conducted the fraudulent scheme:

- The Individual Defendants are and were senior executives of Phoenix who have been managing Phoenix since 2008 or early 2009 through an "Insiders' Circle" that has been "closing ranks, burying information, and working to prevent information from leaking because 'they have some exposure.'"  Compl. ¶ 90.

- In response to Phoenix's precarious financial position, the Insiders' Circle orchestrated a plan designed to eliminate the liabilities associated with billions in policies that Phoenix had aggressively sold and that were now largely owned by investors that purchased them in the secondary market.  *Id.* ¶ 91.

- The Individual Defendants "made a conscious decision that Phoenix would not honor policies that were owned by investors that purchased their policies in the secondary market, including the Lima Policies."  *Id.* ¶ 222.

- The Individual Defendants directed Phoenix to make affirmative misrepresentations and conceal facts about Phoenix's intent not to honor policies purchased by investors in the secondary market.  *Id.*

- The Individual Defendants "directed Phoenix to conduct an internal audit of its investor-owned policies, and they [] identified policies that Phoenix intends to challenge if it is unable to force the owners to lapse their policies first."  *Id.* ¶ 192.

- The Individual Defendants "mis[led] holders of [Phoenix] policies to continue making premium payments while intending to raise COI rates, seek to rescind or void policies (and keep the premiums), and refuse to pay the death benefits on policies when they matured."  *Id.* ¶ 222.

- The Individual Defendants "secretly intended to have Phoenix deny the death benefits and/or the validity of the Policies or, through other actions [such as COI rate increases], force Plaintiff to lapse or surrender its policies."  *Id.* ¶¶ 199, 203, 207, 210, 213.

- The Individual Defendants have "invested heavily" in, and reaped huge financial rewards from, their fraudulent scheme.  *Id.* ¶ 193.  Since the inception of the scheme, they collectively have made over ***$18 million***, which is ***more than Phoenix itself has made during that time***.  They stand to gain even more as Phoenix continues to accept premium payments on policies it will never honor.  *Id.* ¶¶ 193-196.

Defendants ignore these well-pleaded factual allegations in their discussion of Lima's RICO

allegations.  Mot. at 12.  These allegations more than meet the pleading requirements under Rule 9.

The only decision Defendants cite in support of their claim that Lima's allegations lack sufficient detail is *McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992), whose facts are nothing like those here.  In *McLaughlin*, plaintiffs alleged that defendants engaged in a scheme to force plaintiffs to surrender a HUD housing project.  A HUD official who was not a defendant sent an allegedly fraudulent letter.  There was no link between the letter and several defendants, and the plaintiff made only "conclusory assertions" that one defendant (an officer of a defendant financing company) was "behind" the letter or the "source" of it.  Here, Lima has pled much more than that the Individual Defendants were "behind" the mail and wire fraud; Lima has alleged that they are or were senior officers of Phoenix and that they ***specifically directed*** Phoenix to send the fraudulent mailings.[9]

Furthermore, Lima need not allege that the Individual Defendants personally committed predicate acts.  To allege a claim under RICO, it is sufficient that the defendant caused such mailings to be made.  *See Crab House*, 801 F. Supp. 2d at 86.  Indeed, a person can be liable so long as he or she was "acting with knowledge that the use of the mails will follow in the ordinary course of business, and that the use of the mails could have been reasonably foreseen."  *Baisch v. Gallina*, 346 F.3d 366, 374 (2d Cir. 2003) (internal quotes and cit. omit.).  Because Lima need not allege that any of the Individual Defendants personally committed mail fraud, the Complaint need not "particularize any predicate acts committed by [them]."  *Morrow v. Black*, 742 F. Supp. 1199, 1204 (E.D.N.Y. 1990).

Defendants also incorrectly argue that Defendants Polkinghorn and Cassidy could not have had a role in directing the content of correspondence because they were merely members of Phoenix's business development and sales team.  *See* Mot. at 13.  Polkinghorn, however, was the head of the Life and Annuity Division.  He and Cassidy were both members of the "Insiders' Circle" who operated and controlled the Phoenix Enterprise and who orchestrated and directed the fraudulent

---

[9] *Cf. American Int'l Group, Inc. v. ACE INA Holdings, Inc.*, 722 F. Supp. 2d 948, 965 (N.D. Ill. 2010) ("Even given the heightened requirements of Rule 9(b), 'there is a presumption that false and misleading 'group published information' [such as annual reports, press releases, and prospectuses] is a collective action of the company's officer [sic] and directors.'") (cit. omit.), *amended on other grounds*, 2010 U.S. Dist. LEXIS 96863 (N.D. Ill. Sept. 16, 2010).

mailings to policyholders.  Compl. ¶¶ 90-91, 192-223.  These allegations are more than sufficient to state a claim under RICO.  *See, e.g., Reves*, 507 U.S. at 185; *American Buying Ins. Servs*, 944 F. Supp. at 247 (defendants' role in the conduct of the enterprise need not be pled with particularity).

The same is true of Defendant Young.  It is irrelevant that Lima did not purchase the Lima Policies before the end of Young's tenure at Phoenix.  Young was Phoenix's President, Chief Executive Officer, and Chairman of the Board for years.  She helped devise Defendants' fraudulent scheme, and she directed and implemented it while she worked for Phoenix.  It is neither impossible nor implausible that both Defendants Young and Wehr helped orchestrate the fraudulent scheme, as the scheme was incepted as early as 2008, and Young did not leave Phoenix until at least 2010. Young bears responsibility for the misrepresentations that she set in motion, even if they postdated her departure.  *See Bennett Silvershein Assoc. v. Furman*, 1997 WL 531310, *2 (S.D.N.Y. Aug. 28, 1997) ("Even mailings that take place after a scheme has been effectuated may come within the prohibition of the mail fraud statute, so long as they are necessary to the execution of the scheme.") (cit. omit.).[10]

### 3.    Lima has adequately alleged mail and wire fraud

Defendants advance a number of arguments that Lima has not adequately alleged mail or wire fraud, but each is meritless.[11]

**<u>Lima has alleged more than anticipatory breaches of contract</u>**.  Although Defendants claim that "Lima's allegations are nothing more than a failed attempt to turn a non-cognizable anticipatory breach of contract claim into a RICO claim," Mot. at 17, this case is not about an anticipatory breach of contract.  An anticipatory breach occurs when a party ***repudiates*** a contract.

---

[10] In any event, where, as here, information about the exact decision-making process and internal paper trail at issue is exclusively within the hands of the defendants, a plaintiff need not allege these facts in detail.  *See, e.g., Trustees of the Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mechanical, Inc.*, 886 F. Supp. 1134, 1145 (S.D.N.Y. 1995) (refusing to dismiss RICO claim where plaintiffs alleged that the individual defendants were "the owners and controlling officers of the corporate defendants").

[11] To bring a RICO claim for mail fraud, plaintiffs must allege only (1) the existence of a scheme to defraud, (2) a defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme.  *See S.Q.K.F.C., Inc. v Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996).  The elements of wire fraud are similar; for the sake of simplicity, Lima's discussion will focus on mail fraud, as the bulk of Phoenix's fraudulent communications were sent through the mail.

*See Andy's Oil Serv., Inc. v. Hobbs*, 9 A.2d 433, 442 (Conn. App. Ct. 2010). Lima, however, does not allege that Phoenix repudiated its policies. Lima alleges that Phoenix **affirmed** them by repeatedly misrepresenting that it would provide coverage when in fact it had no such intent. This is fraud.[12]

**Phoenix's mailings contained false and misleading statements**. Defendants contend that their statements that the Lima Policies were "effective," "in force," "active," had "value," and provided "valuable coverage" were truthful because they meant only that "premiums were being paid (or needed to be paid) to keep each policy in force." Mot. at 14-15. This interpretation strains ordinary usage as badly as it does credulity. "Effective" means "in operation at a given time." BLACK'S LAW DICTIONARY (8th ed. 2004) at p. 554. "In force" means "in operation, effective." RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1987) at p. 748. "Valuable coverage" under a life insurance policy means that if the insured dies, the death benefit will be paid.

Defendants' bald assertion of "common sense" is anything but. "Common sense" would tell a person receiving a premium notice that the insurance company intends to treat the policy as valid if premiums are paid. A policyholder would, no doubt, be surprised to learn that her insurer considered her "effective" policy to be void *ab initio*. Moreover, Lima has alleged, *inter alia*, that:

> Each time Phoenix mailed a COI letter to Plaintiff, Phoenix **affirmatively represented** that, to its knowledge and belief, **the subject policy was valid and enforceable and that Phoenix did not intend to challenge the policy or refuse to pay the death benefit, and that if premiums are paid, Phoenix will honor the policy**. **For example**, by telling Plaintiff that a policy was "**subject to this rate increase**" and that the policy had an "**anniversary**" and "**accumulated policy value**," **Phoenix represented to Plaintiff that it considered Plaintiff's policy to be a valid policy that was subject to a rate increase, that the policy had been validly issued on the anniversary date, and that the policy had a certain accumulated value**. Upon information and belief, these statements were false because Phoenix intended to claim in each instance that the policy is not valid, but instead is void *ab initio* (*i.e.*, never issued) for lack of insurable interest or some other reason and thus there was, according to Phoenix, no accumulated policy value. **Likewise, by advising Plaintiff that a COI rate change was "in accordance with the terms of your policy," Phoenix represented to Plaintiff that Phoenix considered Plaintiff's policy to be valid**, because Phoenix could only be basing the rate increases on the "terms" of a valid policy. This statement was false

---

[12] *See, e.g., Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., LP*, 985 F.2d 102, 105 (2d Cir.1993) (extent of contractual rights not controlling; "If, as plaintiffs contend, defendants continually misrepresented that they would not close the track and were not interested in developing the property, defendants fraudulently induced plaintiffs to take actions and make expenditures that would result in their financial injury. Plaintiffs' complaint seeking recovery for these injuries reads in tort, not in contract.").

because Phoenix intended to claim in each instance that the policy is not valid, but instead is void for lack of insurable interest or some other reason.

Compl. ¶ 212 (emphasis added); *see also id.* ¶¶ 198, 202, 206, 209.

Furthermore, if, as Lima alleges – and Defendants admit in their Motion – Phoenix did not believe that the Lima Policies were valid because Defendants considered them to be "STOLI," then Phoenix's statements that the Lima Policies were "effective," "in force," "active," had "value," and provided "valuable coverage" were so misleading that Defendants had a duty to disclose their true belief. Many of the Lima Policies are, in fact, governed by state laws under which Phoenix owes a fiduciary duty to disclose this fact to Lima.[13] But "[e]ven where there is no 'fiduciary relationship, it is nonetheless fundamental that a person who speaks has a duty to disclose enough to prevent his words from being misleading. A statement disclosing favorable information but omitting all reference to material unfavorable facts breaches that duty. This principle is plainly applicable to the question of whether a defendant has engaged in fraudulent concealment.'" *Bennett Silvershein Assoc.*, 1997 WL 531310 at *6 (citing *Baskin v. Hawley*, 807 F.2d 1120, 1132 (2d. Cir. 1986)).

Whether by affirmative misrepresentation or omission, Phoenix's statements were false and misleading. *See Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d. Cir. 1999). In *Moore*, plaintiffs alleged that PaineWebber engaged in a fraudulent scheme to trick IRA customers into buying universal life insurance by disguising a life insurance policy as an investment package similar to an IRA. PaineWebber characterized the account as a "savings" plan featuring "cash accumulation" and "implied" that the money "deposited" would be a floor for growth:

> This impression was reinforced by periodic statements mailed to the plaintiffs in which the plaintiffs' aggregate annual "deposits" were allegedly shown as a portfolio holding analogous to stocks or cash accounts. But the money was not actually accumulating in the manner indicated. Some of it was lost as insurance premiums and hence was recoverable only if the plaintiffs died prematurely.

*Id.* at 170-71. The court found that, because plaintiffs "***might***" have "***reasonably***" believed based on the defendant's representations that the value of their accounts would – as in an IRA – always have

---

[13] For example, under California law, courts recognize a "special relationship" between the insurer and policyholder characterized by "elements of public interest, adhesion, and fiduciary responsibility." *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85, 91 (1995).

been at least as great as the sum of their contributions, there were "material misrepresentations" as to the value of the transaction. *Id.* at 170-71 (emphasis added). Like the misled plaintiffs in *Moore*, Phoenix policyholders might reasonably have believed – as Lima reasonably did – that Phoenix's statements that their policies were "effective," "in force," "active," had "value," and provided "valuable coverage" meant just that.

Finally, Defendants also erroneously suggest that, to sustain a RICO claim, each and every mailing must be fraudulent. This clearly is not the law. As the United States Supreme Court has held, "It is sufficient for the mailing to be incident to an essential part of the scheme . . . or a step in [the] plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (internal quotes, cit. omit.); *see also Bridge v. Phoenix Bond & Indem. Co.*, 539 U.S. 639, 647 (2008).[14] Phoenix's policy statements and correspondence all furthered Defendants' fraudulent scheme by enabling Phoenix to collect premiums on policies Defendants never intended to honor. Indeed, Defendants could not have implemented their scheme without the mailings. The mailings, therefore, are actionable under RICO whether or not they contain express misrepresentations (and here they do).

**<u>Mailing "routine" but fraudulent insurance correspondence constitutes a pattern of racketeering activity</u>**. It is no defense that Defendants directed their fraud through what they now call "routine" correspondence. *See Bridge*, 539 U.S. at 644-45 (RICO scheme grounded in mailing of notices required by Illinois law. For example, in *United States v. Triumph Capital Group, Inc.*, 260 F. Supp. 2d 444 (D. Conn. 2002), the court denied a motion to dismiss a RICO claim involving allegations of corruption in the administration of Connecticut state pension assets. The defendants argued that the letters alleged to constitute the mail fraud were "routine, after the fact, intrinsically

---

[14] Thus, even innocuous or "innocent" mailings are sufficient RICO predicates as long as they further a fraudulent scheme. *See Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 445 (5th Cir. 1992). This is because the basis for a mail fraud claim is the underlying *scheme* to defraud; the mail is only used to carry it out. *See Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York*, 808 F. Supp. 213, 228 (S.D.N.Y. 1992) ("Even mailings which are 'innocent' or routine when viewed in isolation, may still satisfy the mailing element under the mail fraud statute where the mailing is part of the execution of the scheme as conceived by the perpetrators at the time."), *aff'd without op.*, 99 F.3d 401 (2d Cir. 1995). (The mail fraud statute provides that "mail fraud" occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting to do so." 18 U.S.C. § 1341.)

14

innocent documents that had nothing to do with executing or concealing the alleged scheme." *Id.* at 460. The court, however, held that "as long as a mailing is tangentially related to the scheme, it is a proper predicate . . . Likewise, a mailing may be made 'for the purpose of executing' a scheme or artifice to defraud even if it is intrinsically innocent, routine or mandated by law." *Id.* (cit. omit.). Here, Defendants' scheme involves ***thousands*** of "routine" mailings that were false and misleading ***and*** designed to further the Individual Defendants' fraudulent scheme.[15]

The decisions Defendants cite are not to the contrary. They involved highly conclusory allegations, including three by *pro se* litigants.[16] In the other, *Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank*, 934 F.2d 976 (8th Cir. 1991), a bank was sued under RICO by a longtime customer who could not obtain funds from the bank when one of his loans was in default. In affirming summary judgment in favor of the bank, the Eighth Circuit wrote:

> Banking inevitably involves dealing with problem loans. However, the fact that a bank has had problem loans in the past and has moved to protect its position in regard to a current problem loan is not, by itself, indicative of a pattern of racketeering. Bankers do not become racketeers by acting like bankers. . . . Foreclosing on problem loans is not a criminal act and having had problem loans in the past does not make one a racketeer. Mere allegations cannot raise a single transaction to the level of RICO.

*Id.* at 981-82. In all of these decisions, the court found defendants were merely engaging in a good

---

[15] *See also Waterbury Hosp. v. U.S. Foodservice, Inc.*, 2009 U.S. Dist. LEXIS 117403 (D. Conn. Dec. 15, 2009) at **62-63 (RICO scheme can consist of mailing standardized documents containing identical false representations). *See also Schmuck*, 489 U.S. at 714-15 (rejecting claim that routine mailings that are innocent in themselves cannot supply the mailing element of the mail fraud statute); *Crab House*, 801 F. Supp. 2d at 86 (RICO scheme to submit false newspaper circulation reports to a private auditor in order to drive up advertising rates; scheme used regular mailings of promotional and marketing materials and invoices with inflated advertising figures).

[16] *See Book v. Mortgage Elec. Registration Sys.*, 608 F. Supp. 2d 277, 282 (D. Conn. 2009) (single mortgage foreclosure case; defendant's attorneys left message warning plaintiff that his property would be sold if he did not pay his debt; the attorneys made arguments in court, such as waiver of certain defenses and offering to withdraw a motion if plaintiff dropped his appeal; "Because those claims are nothing more than conduct undertaken in the ordinary course of business or litigation and cannot be fairly characterized as extortion that is independently wrongful under RICO, Book has failed to establish a colorable RICO claim against MERS."); *Mendlow v. Seven Locks Facility*, 86 F. Supp. 2d 55, 58 (D. Conn. 2000) (inchoate *pro se* allegations of kidnapping and forced medical treatment; "Plaintiff's unsubstantiated and conclusory allegations that certain named and unnamed defendants participated in certain enterprises and took actions at unspecified times and places are insufficient to state a RICO claim."); *McLaughlin v. CitiMortgage, Inc.*, 726 F. Supp. 2d 201, 216 (D. Conn. 2010) (*pro se* litigant with patently ludicrous "vapor money" and "unlawful money" "theories"; conclusory and factually-unfounded assertion that CitiMortgage committed mail or wire fraud in attempting to collect a single allegedly unlawful debt (a valid promissory note) was insufficient to support a RICO claim).

faith exercise of their legal rights.  Here, however, Lima has alleged a scheme whereby Phoenix, having issued policies it knew would be sold to investors, has continued to charge and collect hundreds of millions in premiums while intending to dishonor and contest those same policies.

**Defendants misrepresented the facts, not the law**.  Defendants assert that whether an insurance policy constitutes a valid, enforceable agreement is a question of law, and that statements of law cannot support a mail fraud claim.  *See* Mot. at 15.  This argument is as disingenuous as it is wrong.  As explained above, Lima has alleged a scheme whereby Defendants have misrepresented *their own beliefs and intentions* about whether the policies are valid and whether they intend to honor them.  Here, in particular, Defendants have misrepresented that they regarded the policies as being "effective," "in force," "active," having "value," and providing "valuable coverage."

**Lima was not aware of the risk of Phoenix's scheme**.  Defendants bluster that their fraudulent scheme is "implausible" and "absurd," then assert, in the same breath, that Lima foresaw just that scheme when it bought Phoenix policies.  To support this inconsistent argument, Defendants refer the Court to the Lima "Listing Particulars."  The Court, however, may only consider the Listing Particulars if it is "incorporated in [the complaint] by reference" or is a document "upon which [the complaint] *solely* relies and . . . is *integral to the complaint*."  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (cit. omit., emphasis in original).  The Listing Particulars is neither of these things, and therefore should not be considered on Defendants' Motion.[17]

In any event, the Listing Particulars do not disclose that Defendants were engaged in a fraudulent and anticompetitive scheme.  They speak only about general risks such as "the risk of litigation," the "risk of an illiquid secondary market," and the risk that some policies might be STOLI. Even assuming, *arguendo*, that Lima was aware of these general risks, there is no reason to believe that Lima was aware of Defendants' fraudulent and anticompetitive scheme.  *See In re Sterling Foster & Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 216, 249-50 (E.D.N.Y. 2002) (boilerplate disclosures do not

---

[17]This is not a case where a plaintiff alleges there were fraudulent statements in a document filed with a government agency, such as the SEC, and the court takes judicial notice of the fact that the document was filed with the agency.  *See id.* at 510.  Here, the fraud is extrinsic to Lima's own purported statements.

mean that a reasonable investor would realize the probability of fraud; "to hold otherwise would mean that every statement describing the risks associated with an investment would place potential investors on notice of the probability that they will be defrauded.").[18]

### 4.    Lima was injured and has RICO standing

RICO provides that "[a]ny person injured in his business or property by reason of" a RICO violation may bring a civil action to recover treble damages.  18 U.S.C. § 1964(c); *see Crab House*, 801 F. Supp. 2d at 73.  RICO plaintiffs must establish actual ("but for") and proximate causation.  *See Hemi Group, LLC v. City of New York*, __ U.S. __, 130 S. Ct. 983, 989 (2010).  Defendants make several confused arguments that Lima (i) asserts unripe claims; (ii) has not been injured or was injured only derivatively; or (iii) has not been proximately injured.  Each of these arguments is meritless.

**Ripeness**:  To begin with, a defrauded plaintiff need not wait until its pockets have been picked clean before bringing a RICO mail or wire fraud claim.  *See United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (scheme to defraud requires proof of a fraudulent intent, but proof of actual completed fraud is not required).  It is "not necessary to prove that anyone was actually defrauded," as long as the plaintiff "adequately allege[s] intent to defraud."  *Powers v. British Vita P.L.C.*, 57 F.3d 176, 184 (2d. Cir. 1995).  *See also Russell v. Transamerica Occidental Life Ins. Co.*, 2006 U.S. Dist. LEXIS 63086 (M.D. Ala. Aug. 31, 2006) at *6 (mailing of fraudulent premium notices immediately gave rise to a ripe common law fraud claim).  Lima does not have to keep paying Phoenix millions every month while Defendants try to force Lima to lapse its policies through COI rate increases and other actions described in the Complaint, nor must Lima wait until after Phoenix has refused to pay Lima the death benefits and refused to refund premiums to bring its claims.

Defendants' reliance upon *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003), is misplaced.  There, the court held that in a RICO action brought by a ***secured creditor*** who is

---

[18]Moreover, even if judicial notice were proper, which it is not here on a 12(b)(6) motion, a court taking judicial notice could take notice only of the fact that the Listing Particulars says what it says, and not for any other evidentiary purpose.  *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008); *see also Finn v. Barney*, 471 F. App'x 30, 32 (2d Cir. 2012).  What Lima actually knew, and when it knew it, are fact issues.

fraudulently induced to make a loan and seeks to recover the value of the loan itself, the plaintiff's damages cannot be established until it is determined that the collateral is insufficient to make the plaintiff whole, and if so, by how much.  Such a plaintiff's claim is unripe because the fraud defendant is not liable for all losses that may occur, but only those actually suffered, after the lender has exhausted the bargained-for remedies available to it.  *Id.* at 136.  Even the court in *Motorola* acknowledged that where a plaintiff is **unsecured**, and there is no collateral on which to foreclose, the plaintiff's RICO claim is ripe.  *Id.* Here, Lima is like an unsecured creditor, and its RICO claim is ripe. *See GICC Capital Corp. v. Technology Fin. Group*, 30 F.3d 289, 293 (2d Cir. 1994) (the possibility of a future action on an unsecured note did not defeat plaintiff's standing to pursue a RICO claim alleging a scheme to defraud); *Liquidation Comm'n of Banco Intercontinental, S.A. v. Alvarez Renta*, 530 F.3d 1339, 1351 (11th Cir. 2008) ("[T]here is no per se rule – in this Circuit, the Second Circuit, or elsewhere – that a plaintiff must pursue every other avenue of recovery, such as realization on collateral or claims for fraud or breach of contract, before his RICO claim is ripe.").[19]

Defendants also ignore the fact that, as of the date of the Complaint, Lima **had already lapsed or surrendered** (*i.e.*, sold to Phoenix) 52 policies with a total face amount of $229 million and received $0 in return for $16 million in premiums paid.  Compl. ¶ 25.  Phoenix also has failed to pay, or delayed paying, claims on $33 million in Phoenix policies since Lima's securities intermediary

---

[19] *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847 (1st Cir. 1990), *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994), and *Giuliano v. Fulton*, 399 F.3d 381, 389 (1st Cir. 2005), are not to the contrary.  The *Lincoln House* court dismissed a claim on ripeness grounds where the racketeering was alleged to facilitate fraudulent conveyances of property, but Lincoln did "not allege that the . . . purported pattern of racketeering caused damages which Lincoln ha[d] already incurred."  *Id.* at 847.  The plaintiff's claim **wholly depended** upon favorable resolution of a state court contract case that had not yet occurred.  Thus, the plaintiff had not yet been harmed, and its injury was only hypothetical.  "If Lincoln were to lose the breach of contract action in New Hampshire state court, Lincoln would have no RICO claim against the Dupres."  *Id.*  Here, however, Lima has already suffered concrete harm: Lima has **already** paid premiums for policies Defendants do not intend to honor, and Lima has **already** suffered a loss in the value of its policies.

*First Nationwide Bank* was similar to *Motorola Credit Corp.  First Nationwide Bank* held that when a plaintiff that has issued nonrecourse mortgage loans sues defendants for misrepresentations in connection with the loans, the plaintiff's claim is not ripe because the value of the collateral has not yet been determined.  *See* 27 F.3d at 767-69.  Lima owns no collateral that must be valued before Lima's losses can be determined.

In *Giuliano*, the court focused on whether the complaint sufficiently alleged a **pattern** of so-called "closed end" racketeering, and in that context held that a proposed or anticipated fraudulent act cannot be counted as a predicate act in furtherance of a closed-end scheme.  Here, Lima has alleged a broad pattern of racketeering activity sufficient to support application of RICO.  *Giuliano* is thus inapposite.

sued Phoenix challenging its attempts to induce shock lapses through COI increases.  *Id*. ¶ 134-5.[20]
These allegations establish that the RICO scheme has ***already*** caused Lima injury and damages.

<u>**Non-derivative injury**</u>: Defendants' own cases prove that Lima's injuries are not wholly
derivative of third party injuries.  In *Trollinger v. Tyson Foods, Inc*., 370 F.3d 602 (6th Cir. 2004), the
Sixth Circuit noted that shareholders often lack RICO standing to sue for injuries to their corporations
because they are only indirectly injured.  *Id*. at 614.  The court, however, reversed the dismissal of a
RICO complaint alleging that Tyson had violated the law by procuring undocumented immigrants to
work in its factories, thereby depressing wages and injuring lawful workers.  Although the union
negotiated the wages under a collective bargaining agreement, the workers' injuries were not wholly
derivative of the union's injuries.  *Id*. at 616.  The employees had an employment relationship with
Tyson, and they were paid by Tyson.  *Id*.[21]  Here, Lima has a direct contractual relationship with
Phoenix, and Lima has been injured ***directly*** by the fraudulent scheme.

<u>**Payment of premiums injury**</u>: Defendants argue that Lima cannot recover policy premiums
because premiums are not damages that would not have occurred "but for" Phoenix's false statements.
Mot. at 20.[22]  Defendants miss the self-evident point that ***Lima would not have purchased and paid
premiums on Phoenix policies had it known the nature of Defendants' unlawful scheme***.  Lima has
paid millions in policy premiums it would not otherwise have paid but for Defendants' fraudulent
conduct.[23]  That is an actual, but-for injury caused by their racketeering.  *See Moore*, 189 F.3d at 172
(alleged misrepresentations which were made for the purpose of inducing purchases and investments

---

[20] Defendants misleadingly suggest that Lima's lawsuits against Phoenix for its unlawful conduct have "proven unsuccessful."  Mot. at 7.  The Court's judicial notice of the litigation records in these cases, however, will reveal that all of these matters are still pending and scheduled to commence trial in 2013.

[21] *See also Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1289 (11th Cir. 2006) (under RICO, lawful workers could challenge employer's scheme to hire illegal workers that depressed wages of lawful workers).

[22] Defendants argue lack of but-for causation, but not proximate causation, as to payment of premiums injury.

[23] Because Phoenix's scheme itself has depressed policy values, cases such as *Bastian v. Petren Resources Corp*., 892 F.2d 680 (7th Cir. 1990) – which hold that where fraud is ***entirely unrelated*** to the reasons for a drop in investment value, there is no "loss causation" – are inapposite.  *Cf. In re Nat'l W. Life Ins. Deferred Annuities Litig*., 2012 U.S. Dist. LEXIS 16946 (S.D. Cal. Feb. 10, 2012) at *22 (RICO causation shown where plaintiffs' damages are a foreseeable and natural consequence of a RICO mail and wire fraud scheme that misrepresented annuity features and caused diminished earnings).

establish but-for causation; it was manifestly foreseeable to defendants at time of transaction that the plaintiffs could have done something else with their money).[24]

**Market value injury**:  Finally, Defendants ignore that the depression of the value of all of Lima's policies as a result of the fraud perpetrated on *all* policyholders also constitutes a direct, proximate, and cognizable RICO injury.[25]  Lima has alleged the "direct relationship" between acts and harm required to establish RICO causation.  *Hemi Group,* 130 S. Ct. at 989-91.  As the Complaint alleges, all of Defendants' fraudulent conduct is part of a single unified scheme to shed billions in liabilities by avoiding the payment of death benefits on policies owned by institutional secondary market purchasers.  Defendants' fraudulent conduct towards all of these policyholders harms (and was intended to harm) each one of them, including Lima, by driving down the value of their policies.  Such devaluation is a proximate RICO injury.  *See Trollinger*, 370 F.3d at 616.

The harm to Lima from fraud on all policyholders is similar to the circumstances in *Bridge v. Phoenix Bond & Indem. Co.*, 539 U.S. 639 at 533, where defendants directed agents to misrepresent to a county that they qualified as independent bidders at a county-run property auction.  The defendants participated in the auction, and the plaintiffs – facing additional bidders – lost some of the property they otherwise would have won.  This intended, foreseeable harm caused by *misrepresentations to the county* was a proximate RICO injury *to the private plaintiffs*.  *Id*. at 641.  Reliance by the plaintiff is not an element of a RICO claim.  *Id*.; *see also Baisch*, 346 F.3d at 374 (frauds directed at different parties were linked and intertwined, and plaintiff had RICO standing to challenge third-party fraud that proximately caused injury to plaintiff).[26]  Moreover, the existence of proximate causation is primarily a question of fact that should not be resolved on a motion to dismiss.  *See*, *e.g.*, *Trollinger*,

---

[24] Nor can Defendants avoid liability by arguing that any injury is caused by a court's ruling on the validity of a particular policy – and not by Defendants' own actions.  It is not the invalidity of the policy that would cause Lima to lose the premiums it paid, but rather Phoenix's *false statements* that induced Lima to pay those premiums.  *See American Buying Ins. Servs,* 944 F. Supp. at 244-45.

[25] For example, as part of the fraudulent scheme to avoid paying death benefits, Phoenix issued misleading COI letters to induce "shock" lapses by policyholders.  This, among other things, has reduced the value of Phoenix policies on the secondary market. Compl. ¶¶113-128.

[26] As the *Bridge* Court wrote, if "an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers, but not the rivals themselves," it would "certainly seem" that the rivals suffered a RICO injury.  *See id*. at 649-50.

370 F.3d at 619.

### 5.     Lima has sufficiently alleged a RICO conspiracy

For the reasons discussed above, Lima has adequately alleged that the Individual Defendants agreed or conspired to participate in an enterprise's affairs through a pattern of racketeering. Moreover, the *Reves* "operation or management" test does not apply to RICO conspiracy claims. *See United States v. Pizzonia*, 577 F.3d 455, 462 n.4 (2d Cir. 2009). Assuming a RICO enterprise exists, to state a Section 1962(d) claim, a plaintiff must prove only that the defendants "know the general nature of the conspiracy and that the conspiracy extends beyond [their] individual roles." *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000) (quotes and cit. omit.), *cert. denied sub nom. Lysaght v .U.S.*, 531 U.S. 1143 (2001). As documented in **Appendix A**, the Complaint fairly alleges that each of the Individual Defendants knew about (and directed) the fraudulent scheme.[27]

### 6.     The McCarran-Ferguson Act, 15 U.S.C. §§ 1011, *et seq.*, does not apply

The McCarran-Ferguson Act precludes application of other federal laws to the "business of insurance" where there is a state law "enacted . . . for the purpose of regulating the business of insurance" ***and*** the federal law would "invalidate, impair, or supersede" the state law (unless the federal law "specifically relates" to the business of insurance). 15 U.S.C. § 1012(b).

Defendants are wrong that RICO cannot apply in the insurance context. In *Humana Inc. v. Forsyth*, 525 U.S. 299 (1999), the Supreme Court held that "RICO can be applied [in the insurance context] in harmony with the State's regulation. When federal law is applied in aid or enhancement of state regulation, and does not frustrate any declared state policy or disturb the State's administrative regime, the McCarran-Ferguson Act does not bar the federal action." *Id.* at 303. Here, Lima has sued Defendants for mail and wire fraud. Compl. ¶¶ 197-223. There is no declared state policy or state administrative regime that authorizes Phoenix to engage in a pattern of racketeering activity through a massive wave of fraudulent correspondence and other wrongdoing. Applying RICO will only aid and advance, not frustrate, any state policy or administrative regime.

---

[27] The Rule 9(b) heightened pleading standard does not apply to the averment of conspiracy under Section 1962(d). *See American Buying Ins. Servs*., 944 F. Supp. at 247.

### C.        Lima's Complaint Sufficiently Pleads Antitrust Claims

Lima brings its antitrust claims under the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24, *et seq.* (the "CAA").  As under Section 2 of the federal Sherman Act, 15 U.S.C. § 2, a claim for monopolization under the CAA requires proof of (1) the possession of monopoly power in a relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.  *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Shea v. First Federal Savings & Loan Ass'n*, 439 A.2d 997, 1006 (Conn. 1981).  Defendants have driven their competitors from the market by making Phoenix policies so undesirable that virtually no one else will buy them.

Defendants do not argue that the CAA does not apply to their activities or maintain that Lima has not adequately alleged antitrust injury or standing.  Nor do Defendants argue that the CAA does not reach monopsonization (*i.e.*, buyer-side monopolies).[28]   Instead, Defendants advance three meritless arguments that Lima has not (i) pled a cognizable relevant product market, (ii) alleged that Phoenix has monopoly power, or (iii) alleged anti-competitive or exclusionary conduct.

#### 1.        Lima has adequately alleged monopolization and attempted monopolization under Section 35-27 of the Connecticut Antitrust Act

##### a.        Lima has pled a plausible relevant product market, which involves a fact-intensive inquiry

Antitrust law requires a plaintiff to allege a relevant product market.  However, market definition is a quintessential ***factual*** issue for the jury to decide.  *See Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) (Sotomayor, J.) (reversing dismissal of antitrust claim for failure to allege a plausible market) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").  As courts have consistently recognized, proper market definition can be determined only after a factual inquiry into the "commercial realities" faced by consumers.  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504

---

[28] Defendants also concede that Connecticut courts follow federal precedent when interpreting the CAA unless the statutes or other pertinent state law require a different interpretation.  *See* Mot. at 24; *see also* Conn. Gen. Stat.§ 35-44b ("It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes.").

U.S. 451, 482 (1992) ("*Kodak*"), citing *Grinnell Corp.*, 384 U.S. at 572; *see also Envirosource, Inc. v. Horsehead Resource Dev. Co.*, 1997 U.S. Dist. LEXIS 12570 (S.D.N.Y. Aug. 21, 1997) at *8 (denying motion to dismiss) ("Extensive analyses of reasonable interchangeability and cross elasticity of demand . . . are not required at the pleading stage . . . . 'Market definition . . . is generally ultimately a question of fact which can be determined only after a factual inquiry into the commercial realities faced by consumers.'") (cit. omit.).[29]

Specifically, a court should determine whether an antitrust claim's market allegations are "plausible" in light of common economic experience, *see Twombly*, 550 U.S. at 565, not formalistic notions or preconceptions.  Generally, product market definition in antitrust cases focuses on the economic interchangeability of products.  "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).[30]  "If consumers view the products as substitutes, the products are part of the same market."  *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1435 (9th Cir.), *cert. denied*, 516 U.S. 987 (1995).

Defendants concede that a secondary market for life insurance exists.  Mot. at 3.  Relying upon general principles of product interchangeability and cross-elasticity, Defendants argue that single-brand product markets are rare, *see* Mot. at 26, and that Lima has impermissibly narrowed the relevant market definition to Phoenix life insurance policies, as opposed to all life insurance policies, *see id.* at 27.[31]  Defendants, however, ignore relevant Supreme Court and Second Circuit precedent:

---

[29] "Because the boundaries of the relevant market are determined by marketplace facts, motions to dismiss directed to the way the relevant market is defined in the pleadings are often unsuccessful."  1 ABA Section of Antitrust Law, ANTITRUST LAW DEVELOPMENTS 612 (6th ed. 2007).  *See also, e.g., Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) (market definition is fact issue).

[30] In economic terms, two products are reasonably interchangeable where there is sufficient cross-elasticity of demand.  Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product.  *See Todd*, 275 F.3d at 201-02.  However, in a monopsony case, the inquiry into buyers' and sellers' roles is reversed; the question is whether sellers would respond to a decrease in product price by switching to other buyers.  *See id.* at 202.  *Cf.* Compl. ¶ 175 (discussing elasticity in monopsony context).

[31] Phoenix argues that Lima's "Particulars" show that it invested in a portfolio of insurance policies, which are all one asset class.  *See* Mot. at 27.  But the purported fact that policies are in a single asset class no more defeats a Phoenix-branded secondary market than the fact that all copier parts are specific instances of "replacement parts" defeated a market for Kodak-branded parts.  *See Kodak*.  Nor does the fact that Lima purchased other

> Reasonable interchangeability sketches the boundaries of a market, ***but there may also be cognizable submarkets which themselves constitute the appropriate market for antitrust analysis***.   Defining a submarket requires a ***fact-intensive inquiry*** that includes consideration of ". . . practical indicia . . ." . . . . ***The emphasis always is on the actual dynamics of the market rather than rote application of any formula***.

*Geneva Pharmaceuticals Technology Corp. v. Barr Labs, Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (cit. omit., emphasis added) (reversing summary judgment and finding that generic bioequivalent drugs were their own product market, separate from the market for the brand drug).   To survive a dismissal motion, an alleged product market must only bear a "rational relation" to the analysis of interchangeability of use or cross-elasticity of demand.   *See Todd*, 275 F.3d at 200.

Defendants also barely mention *Kodak*, where the Supreme Court held that single-brand secondary markets do indeed exist when other branded products may not be reasonably interchangeable.   Whistling past the graveyard, Defendants acknowledge that "one brand of a product can constitute a separate market." Mot. at 26 (quoting *Kodak*, 504 U.S. at 482), then hasten to bury *Kodak* in a footnote and discuss inapposite non-*Kodak* lower court case law.   However, Lima has properly alleged a *Kodak*-type single-brand secondary market in which Phoenix has market power.

### (1)    *Kodak*-type secondary markets

The primary market at issue in *Kodak* was the market for photocopiers and micrographic equipment.   The secondary or aftermarkets at issue were the markets for long-term service contracts to maintain this equipment and the related market for replacement parts.   *See id*. at 455-57.   Kodak manufactured and sold equipment in the primary market, but it also offered long-term service agreements and replacement parts.   Although Kodak provided 80% to 95% of the service for Kodak machines, *see id*. at 457, and controlled nearly 100% of the parts market, *see id*. at 481, it had a much smaller share of the primary market (dominated by other companies).   *See id*. at 465 n.10.

The plaintiffs in *Kodak* were independent service organizations ("ISOs") who repaired and serviced Kodak equipment using Kodak parts.   The ISOs filed suit after Kodak implemented a new policy of selling Kodak replacement parts only to buyers of Kodak equipment who used Kodak

---

brands around the same time establish as a matter of law that all policies are in the same relevant market; businesses could purchase Kodak equipment and Xerox equipment around the same time, but still suffer antitrust injury in the Kodak parts secondary market.   *See id*.

service (or who repaired their own machines).[32]  *See id.* at 458.  The plaintiffs brought a Sherman Act Section 1 tying claim (alleging a tie of parts to service) and a Section 2 monopolization claim (alleging that Kodak had monopolized the aftermarkets for service and parts).  They did not allege that Kodak had market power in the primary market for photocopiers and equipment.  Nor did plaintiffs allege that Kodak had market power in the general market for all such durable-equipment services.  Instead, they alleged market power only in a ***submarket*** consisting of those customers that had already purchased Kodak-brand equipment and that needed replacement parts and services for that particular equipment – *i.e.*, they alleged a single-brand aftermarket.  *See id.* at 456-59.  The antitrust theory was that Kodak was engaging in illegal practices to prevent the ISOs from competing with Kodak in the aftermarket for service of Kodak-brand equipment.  Owners of Kodak-brand equipment, the plaintiffs alleged, were forced to purchase replacement parts and services only from Kodak.  S*ee id.* at 463.

In affirming the Ninth Circuit's decision that Kodak was not entitled to summary judgment, the Supreme Court held that the secondary or aftermarket could indeed be limited to a single brand (Kodak).  *See id.* at 481.  In so doing, the Court rejected Kodak's argument that the existence of competition in the primary equipment market precluded any finding of monopoly power in derivative aftermarkets, *see id.* at 466, because higher service prices will necessarily lead to a disastrous drop in equipment sales, *see id.* at 472.  The Court based its rejection on two factors:

***First***, for the service after-market price to affect equipment demand in the primary market, consumers must inform themselves of the total cost of the "package" – equipment, service, and parts – at the time of purchase.  "[T]hat is, consumers must engage in accurate lifecycle pricing."  *Id.* at 473.  But life-cycle pricing of complex, durable equipment is difficult and costly.  *See id.*  Much of the information is difficult – some of it impossible – to acquire at the time of purchase.  *See id.*  And even if consumers are theoretically capable of acquiring and processing the complex body of information, they may choose not to do so, because acquiring the information can be expensive.  *See id.* at 474.[33]

---

[32] Kodak parts were not compatible with competitors' machines, and *vice versa*.  *Kodak*, 504 U.S. at 457.

[33] Although large, sophisticated customers might be able to deduce accurate lifecycle pricing information, if the manufacturer can engage in price discrimination, it can charge the more sophisticated customers less and the

These problems become even more acute when the seller of the product *changes* its policies such that purchasers in the initial market could not have known of the full costs they would incur.

*Second*, if the cost of brand switching is high, consumers who already have purchased the equipment, and thus are "locked in," will tolerate some level of service-price increases before changing equipment brands. "Under this scenario, a seller profitably could maintain supracompetitive prices in the aftermarket if the switching costs were high relative to the increase in service prices, and the number of locked-in customers were high relative to the number of new purchasers." *Id*. at 476.

*Kodak* thus confirms the existence of single-brand aftermarkets. If certain factors (namely lifecycle pricing opacity and relatively high lock-in costs) are alleged to exist, pretrial judgment on the market definition issue is inappropriate.

**(2)      Lima has adequately alleged the *Kodak* factors**

Lima's allegations fit squarely within the *Kodak* framework. Lima has alleged in detail (a) how Phoenix life insurance policies exhibit both (i) lifecycle product pricing opacity and (ii) high switching costs and (b) how Phoenix hid its secondary market intentions and policies from policyholders (particularly the insureds it encouraged to take out life insurance policies likely to be sold to investors), only to implement its new restrictive policy pricing, transfer, and payment policies after policyholders had already been locked in. In particular, Lima has alleged the following:

- Lock in of insureds. "Once an individual initially purchases a life insurance policy from Phoenix . . . she or he becomes locked into a Phoenix-specific secondary market . . . ." Compl. ¶ 169. That is because (a) switching costs are high (there is a complex and lengthy application process which often involves a physical exam and medical tests; as insureds age, they become less likely to qualify for other insurance, and even if they do it may be substantially more expensive); (b) once an insured has a policy in place, other life insurance companies are less likely to offer additional policies on the same insured, because they do not want to over-insure individuals; and (c) once an insured acquires a policy, the insured often has less need for additional insurance. *See id*. "Phoenix policyholders are, accordingly, substantially 'locked in' to Phoenix policies. The costs of switching insurance brands are simply too high to allow for meaningful inter-brand competition in the secondary market. Policyholders will therefore tolerate a substantial level of decreased prices in the secondary market before even considering the possibility of switching insurance brands. And, in many cases, they simply will have no other economically viable alternative because advanced age or changes in their health have

less sophisticated customers more, and the sophisticated "will be unable to prevent the exploitation of the uninformed." *Kodak*, 504 U.S. at 475.

made them uninsurable under a new policy with another carrier." *Id.* ¶ 170.

- <u>Lifecycle product cost opacity</u>.  "The lifecycle cost of universal life insurance policies generally, and of Phoenix policies in particular, is not transparent to prospective insureds in the primary market; it is instead difficult to understand and opaque.  For example, the COI rate is based on a number of assumptions by insurance companies, including assumptions about mortality, persistency (lapse rates), interest rates, expenses, taxes, and statutorily-required reserves.  Consumers who are the primary market purchasers of life insurance have little or no access to this information, which is essential to a full understanding of the true lifecycle cost of a life insurance policy.  As a result, when prospective insureds are considering the purchase of Phoenix policies, they cannot and do not evaluate the true lifecycle costs of those policies.  This is especially true because insurers do not disclose precisely how they have priced their policies, and they write their contracts in a manner that makes them virtually incomprehensible to policyholders." *Id.* ¶ 172.

- <u>A change in Phoenix's practices</u>.  Phoenix's change in practices was not known to Phoenix's policyholders at the time they purchased their policies and was not reasonably foreseeable to them. *Id.* ¶ 173.[34]

Thus, Lima has adequately alleged the *Kodak* factors that support a single-brand secondary market.  Defendants do not argue otherwise (and only briefly shrug that *Kodak* does not apply).  When a complaint alleges such factors, a court should not dismiss an antitrust claim based on a *Kodak*-type secondary market definition.  *See Kodak* (claim cannot be dismissed even at summary judgment); *Newcal*, 513 F.3d at 1045; *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974 (N.D. Cal. 2010) (refusing to dismiss *Kodak*-type claim involving aftermarket for Microsoft Xbox 360 accessories and add-ons); *In re Apple and AT&TM Antitrust Litig.*, 596 F. Supp. 2d 1288 (N.D. Cal. 2008) (finding a plausible aftermarket for iPhone voice and data services because the aftermarket restriction of iPhone users to AT&T services for five years was not disclosed to customers; only a two-year contract with AT&T was disclosed).

### (3)    **Defendants fail to distinguish *Kodak***

Hidden away in footnote 35 of their Motion, Defendants offer three superficial arguments why *Kodak* does not apply here.  Each of these is meritless.

***First***, Defendants assert – contrary to *Kodak* itself – that the *Kodak* theory applies only to

---

[34] Moreover, Lima has also alleged that Phoenix engages in price discrimination by raising or attempting to raise the COI rates on policyholders who exercised their right to maintain lower accumulated policy values (typically institutional investors in the secondary market).  Compl. ¶ 119.  The ability to practice price discrimination facilitates *Kodak*-type anticompetitive conduct in a secondary market.  *See supra* n. 33.

tying claims.  However, the *Kodak* theory is a theory of **market definition** that is applicable to all antitrust claims.  ***Tying*** is a type of substantive antitrust claim that can occur within a *Kodak*-type market, but the market definition can encompass other types of claims.

Indeed, in *Kodak*, the Supreme Court reversed a grant of summary judgment in favor of Kodak on **both** the plaintiff's tying claims and monopolization claims.  After remand and during trial, the plaintiffs dropped their tying claim and ***proceeded only on their monopolization claim*** (that Kodak used its monopoly over Kodak parts to attempt to create and to actually create a second monopoly over service of Kodak equipment).  The plaintiffs won at trial, and the Ninth Circuit affirmed the jury verdict, despite Kodak's arguments that the plaintiffs had not established market power in a relevant market.  *See Image Technical Servs., Inc. v. Eastman Kodak Co*., 125 F.3d 1195 (9th Cir. 1997), *cert. denied*, 523 U.S. 1094 (1998).  *See also Alternative Electrodes, LLC v. Empi, Inc*., 597 F. Supp. 2d 322, 334-35 (E.D.N.Y. 2009) (refusing to dismiss *Kodak*-type market allegation in a monopolization case; no tying claim alleged); *In re Apple and AT&TM Antitrust Litig*., 596 F. Supp. 2d 1288 (refusing to dismiss single-brand *Kodak*-type aftermarket monopolization claims; no tying claim presented).  Clearly, *Kodak* secondary market lock-in theory applies to monopolization claims, and Lima is aware of no decision holding to the contrary.[35]

***Second***, Defendants assert, without any support, that even if insureds are locked in to the Phoenix brand, secondary market purchasers are not.  This assertion again reflects Defendants' ease in gliding past inconvenient allegations in the Complaint, including:

> [O]wners of Phoenix policies who purchased their policies on the secondary market are also locked in to the secondary market for Phoenix policies.  They cannot substitute policies issued by other insurance companies for the Phoenix policies they own.  They cannot compel insureds to take out other insurance, nor can they compel insureds to transfer other insurance policies to them.  Once an investor in the secondary market purchases a Phoenix policy, it is locked into that policy unless and until it can sell or transfer or chooses to lapse it.

Compl. ¶ 171.  A limited choice of buyers defines monopsony.  To the extent Defendants contend there are other participants who might buy Phoenix policies, the Complaint alleges that other such

---

[35] Defendants cite *Queen City Pizza, Inc. v. Domino's Pizza, Inc*., 124 F.3d 430, 442-43 (3d Cir. 1997), in passing, but nothing in that case suggests that *Kodak* theory is limited to tying claims.

buyers have been driven out of the market.  To the extent Defendants contend that insureds are not the only potential *sellers* of policies because some may have been sold to others, that assertion also fails to overcome the Complaint's allegation that *all* of the owners of Phoenix policies (including Lima) who are also now locked into the Phoenix brand cannot practically find other buyers.

*Third*, Defendants argue that even if Lima is locked in to Phoenix policies, it has not suffered any "lock in" costs because "the factors that Lima claims are affecting its investment were 'fully disclosed long before' it purchased the block of policies."  Mot. at 28 n.35.  But Lima has alleged that Phoenix hid (or, only after the fact, adopted) its plan to issue policies destined for purchase by investors in the secondary market, intending later to deny death benefits on those policies and otherwise interfere or destroy policyholders' rights through COI rate increases and other unlawful conduct.  Compl. ¶¶ 1-18, 173.  These factual allegations cannot be disregarded on a motion to dismiss, nor can they be overcome by Phoenix's references to Lima's purported generic acknowledgment of risks in the "Listing Particulars" which, in any event, nowhere discuss the particular scheme and fraud alleged.  *See supra* at 16.  *See also Datel Holdings Ltd.*, 712 F. Supp. 2d at 988-89 (permitting *Kodak* aftermarket claim to proceed; alleged market was the market for Microsoft Xbox 360 accessories and add-ons; although Microsoft suggested users knowingly gave Microsoft the right to prohibit unauthorized accessories through its warranty and software license and its "Xbox Live" terms of use, any ambiguity about what users actually knew and agreed to prohibited granting a motion to dismiss); *Alternative Electrodes, LLC,* 597 F. Supp. 2d at 332 (on a motion to dismiss a monopolization claim predicated on fraudulent statements, a court cannot determine, as a matter of law, whether parties to an allegedly fraudulent transaction are without knowledge of the subject matter, or whether allegedly fraudulent statements are subject to neutralization).  What policyholders actually knew about Phoenix's scheme is a matter for discovery.

### b.    Defendants' non-*Kodak* cases are inapposite and irrelevant

Instead of confronting *Kodak* head-on, Defendants devote most of their market definition argument to easier pickings, focusing on inapposite and irrelevant decisions that do not involve secondary markets exhibiting *Kodak*-type lock-in factors.  Unlike the plaintiffs in those cases, who

knew about the restrictive secondary market policies when they entered into their transactions, Lima has expressly alleged in detail a secondary market featuring the *Kodak* lock-in factors, including pricing opacity, high brand switching costs, and purchasers' ignorance of Phoenix's true policies and intentions towards investor-owned life insurance.

For example, *Hack v. President & Fellows of Yale College*, 237 F.3d 81 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), is a case concerning the alleged tying of a Yale education to Yale student housing.  It did not involve a *Kodak* secondary market featuring limited lifecycle pricing information and high switching costs.  As the court acknowledged, the *Hack* plaintiffs might have alleged that they were "locked in" by their investment in housing which they could no longer use because of an abrupt change in university policy.  But those concerns were "not present here.  Yale's housing policies were fully disclosed long before plaintiffs applied for admission.  They had no 'lock-in' costs."  *Id.* at 87.

Similarly, in *Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.*, 414 Fed. App'x 372 (2d Cir. 2011), the plaintiffs brought a tying claim and alleged markets for (i) vacation properties in "the immediate vicinity" of the Village at Smugglers' Notch ("Village") and (ii) recreational facilities located in counties easily accessible from the Village.  *See id.* at 375.  As to the second "after" market created by the purchase of properties at the Village, the plaintiffs "were fully aware of [the Village]  policies and voluntarily signed purchase and sale agreements that expressly required purchasers to enter into one of three service contracts with [the Village] . . . .  As a result, [plaintiffs] knew that [the Village] retained significant power over their access to recreational facilities . . . ."  *Id.* at 377.  Thus, the policies were fully disclosed prior to the purchase of real estate and there were no *Kodak* lock-in costs.  *See id.*

In *City of New York v. Group Health Inc.*, 649 F.3d 151 (2d Cir. 2011), the City of New York objected to the merger of two health insurance providers, and alleged that the relevant market was the "low-cost municipal health benefits market."  This market included only those insurance plans that were inexpensive and that the City selected for inclusion in its employee health benefits program.  *See id.* at 154.  On summary judgment (not on a motion to dismiss), the District Court rejected this market

definition.  The Second Circuit affirmed, because the market was "defined by the City's preferences, not according to the rule of reasonable interchangeability and cross-elasticity of demand."  *Id*. at 156.  The alleged market ignored "the competition existing among insurance providers for the City's business, as well as the health insurance market for other large employers in the region."  *Id*.  In short, *City of New York* involved no secondary market or aftermarket at all, and thus no *Kodak*-type lock-in.

*Universal Computer Systems, Inc. v. Volvo Cars of North America, Inc*., 1997 WL 1433879 (S.D. Tex. Sept. 29, 1997), also did not involve a secondary market – let alone one with lock-in characteristics.  In that case, a firm that designed and marketed computer systems for automobile dealerships complained about Volvo's selection of competing firms as the exclusive vendors of computer systems for Volvo and Volvo dealers.  *See id*. at *2.  However, the plaintiff conceded that it competed nationwide and that it had long-term contracts with about 20% of all automobile dealers (including those offering brands other than Volvo).  *See id*.  For this reason, the court refused to recognize a relevant market limited to Volvo and its retail dealers.  *See id*. at *5.[36]

Finally, in *Queen City Pizza*, 124 F.3d 430, the Third Circuit rejected the franchisees' market definition (the market for Domino's approved pizza ingredients) because the boundaries of the market depended entirely upon a contractual obligation.  *See id*. at 438.  Market boundaries must be based on concepts of economic substitutability, and the only thing that prevented the franchisees from substituting other brands for Domino's-approved pizza ingredients was an ***explicit*** franchise agreement provision that the franchisees ***knowingly and voluntarily signed***.  *See id*.  "The 'critical distinction' between *Kodak* and *Queen City Pizza* "was that the Kodak customers did not knowingly enter into a contract that gave Kodak the exclusive right to provide parts and services for the life of the

---

[36] *Rohfling v. Manor Care, Inc*., 172 F.R.D. 330 (N.D. Ill. 1997), is also not a *Kodak*-type case.  There, a nursing home resident challenged his home's policy of using an affiliate's pharmaceutical services, and alleged a market of the sale of pharmaceutical products to residents of the nursing care provider's facilities.  In rejecting the market because there was no evidence that residents could not transfer to other facilities and buy pharmaceuticals from other companies, *see id*. at 346, the Court noted that *Kodak* did not apply because no lock-in was alleged: "[A]ny dissatisfied . . . resident can terminate his or her relationship with Manor Care on five days notice without any apparent pecuniary loss . . . . Hence, Manor Care residents are not 'locked in' to their relationship with Manor Care, and are free to seek interchangeable substitutes for Manor Care's services in a way that Kodak equipment owners are not."  *Id*. at 347.

equipment." *Newcal*, 513 F.3d at 1048.[37]  "Unlike the plaintiffs in *Kodak*, the Domino's franchisees could assess the potential costs and economic risks at the time they signed the franchise agreement. The franchise transaction between Domino's . . . and plaintiffs was subjected to competition at the pre-contract stage." *Queen City Pizza*, 124 F.3d at 440.  In *Kodak*, by contrast, consumers could not, at the time of purchase, reasonably discover that Kodak would monopolize the service market and charge supra-competitive prices for its service.  Kodak's market power in parts and services, therefore, did not arise from a knowing contractual arrangement.  *See Newcal*, 513 F.3d at 1048.  The same is true here – Phoenix's market power in the secondary market does not arise from express contractual provisions and disclosures to which insureds voluntarily agreed.  It arises from Phoenix's change of policy and fraudulent conduct.[38]

### c.   Lima has adequately alleged Phoenix's market power in the relevant market

Lima has more than adequately alleged facts to establish, either directly or circumstantially, that Phoenix has market power in the secondary market for Phoenix life insurance policies.

Market or monopoly power is "the ability of a single seller to raise price and restrict output." *Kodak*, 504 U.S. at 464 (cit. omit.).  *See also Shea*, 439 A.2d at 1006 (market power is the "power to

---

[37] Additionally, in *Queen City Pizza*, the aftermarket for pizza supplies was not dependent on the primary market for pizza franchises (the market for supplies would exist whether or not there was a market for pizza chain franchises).  Where the aftermarket is derivative of and dependent on the primary market, there can be a legally cognizable aftermarket in a single brand's products.  *See Newcal*, 513 F.3d at 1049.  That is the case here – the secondary market for Phoenix life insurance policies could not exist without the primary market.

[38] *Bansavich v. McLane Co.*, 2008 WL 4821320 (D. Conn. Oct. 31, 2008), also was a franchise case that rejected a market limited to franchisor-supplied materials because it was (i) contractually created and (ii) not a derivative aftermarket.  Defendants' other cases also do not involve secondary markets featuring *Kodak* factors. *See Skyline Travel, Inc. v. Emirates*, 2012 WL 2016479 (2d Cir. June 6, 2012) (rejecting primary market limited to air transportation for New Jersey residents of Indian or Pakistani ethnicity who desired to fly on Emirates between JFK airport and cities in India and Pakistan, especially in one-stop flights); *North American Energy Sys., LLC v. New England Energy Mgmt.*, 269 F. Supp. 2d 12, 16-17 (D. Conn. 2002) (rejecting primary market consisting only of energy conservation services provided by defendants' Small Business Program; same services could be and were offered independently); *B.V. Optische Industrie de Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 172 (S.D.N.Y. 1995) (primary market alleged to be chest equalization radiography, but pleadings did not refer to any reasonably interchangeable alternatives, nor offer any explanation of the narrow market definition) (granting leave to amend complaint); *Re-Alco Indus., Inc. v. Nat'l Center for Health Educ.*, 812 F. Supp. 387, 391-92 (S.D.N.Y. 1993) (rejecting market for one brand of copyrighted classroom educational materials; no *Kodak* or *Kodak* factor allegations).

fix or control prices or to exclude or control competition in the relevant market").[39]   Whether a defendant possesses market power is a factual question.  *See Todd*, 275 F.3d at 199-200.

Market power can be proved either directly or circumstantially.  Direct proof of market power consists of evidence of restricted output and supra-competitive prices (or restricted buying and prices below the competitive level in the case of a monopsony).  *See Todd*, 275 F.3d at 206; *Rebel Oil*, 51 F.3d at 1434.  Although Defendants argue that Lima has not alleged market power, they simply ignore Lima's direct evidence of market power – ***depressed pricing and demand, and unusually high lapse rates***.[40]  Indeed, Defendants ***admit*** that secondary market pricing has been "depressed."  Mot. at 5.  Depressed pricing is ***direct*** evidence of market power that precludes dismissal.[41]  Although Defendants suggest that macroeconomic factors explain the depression, these factors do not explain why ***only Phoenix*** prices have been depressed.  These macroeconomic factors are also not mentioned in the Complaint and, at best, present questions of fact.

Lima has also alleged market power through circumstantial evidence.  Circumstantial proof of market power requires proof of one firm's large percentage share of the relevant market.  *See Todd*, 275 F.3d at 206.  Defendants do not contend that Lima has not alleged a sufficient market share to support a circumstantial case of market power.  Nor could they.  Lima has alleged that Phoenix has over a 75% share of the secondary market for Phoenix life insurance policies, which easily supports a monopolization claim.  *See Image Tech. Servs.*, 125 F.3d at 1206 (65% market share establishes a *prima facie* case of market power).[42]

---

[39] Monopoly power is commonly referred to as market power.  *See Image Tech. Servs.*, 125 F.3d at 1202.

[40] Compl. ¶ 148 (demand for Phoenix policies has been depressed); ¶ 149 (severely reduced prices); ¶¶ 150-151 (decreased value of Phoenix policies; "[m]any policyholders have . . . been unable to find any buyers at all and have been forced to lapse or surrender their policies to Phoenix"); ¶ 179 ("Phoenix can, and does, force policyholders who want to sell their policies to lapse or surrender their policies, in effect, selling their policies back to Phoenix for prices drastically below those that would be offered in a competitive secondary market."); ¶ 97 (hugely depressed prices for Phoenix policies).  Indeed, Lima has alleged that ***while the prices offered for policies issued by other insurers have remained relatively flat, secondary market prices for Phoenix policies have plummeted***.  *Id.* ¶ 151.

[41] *Cf. Geneva Pharms. Tech. Corp.*, 386 F.3d at 496-97 (substantially higher prices is evidence of a distinct customer group with brand allegiance and/or high risk sensitivity that was unwilling to switch from known brand name even in the face of a discounted alternative).

[42] Circumstantial proof of market power also requires a showing of entry barriers.  *See Rebel Oil*, 51 F.3d at 1439.  Although Phoenix suggests in one sentence and in its footnote 37 that Lima has not alleged any entry

Defendants, therefore, resort to arguing that Phoenix lacks market power because it does not participate in the secondary market.  Relying upon non-antitrust case law, Defendants offer legal definitions (cribbed from the worlds of tax and contract law) of the words "lapse," "surrender," and "sale" to argue that when a policyholder lapses or surrenders a policy, Phoenix is not engaged in a secondary market purchase.  This argument elevates form over substance.

As the Supreme Court has explained, "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.  This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'"  *Kodak*, 504 U.S. at 466-67 (cit. omit.).  In determining the existence of market power, the Court "has examined closely the economic reality of the market at issue."  *Id.* at 467.  For example, in *Hanover Shoe v. United Shoe Machine Corp.*, 392 US. 481 (1968), the Supreme Court approved findings in an earlier monopolization case brought by the government.  The lower court had directed United to offer shoe manufacturing machines for sale as well as for lease.  United had used its leases to tend to exclude other shoe machine manufacturers.  *See id.* at 486 n.3.  "[I]f leasing continues without an alternative sales system, United will still be able to monopolize that [the shoe machinery] market."  *Id.* (cit omit.)  Clearly, leases and sales were made in the same market, although a lease does not involve a formal (or full) transfer of title.[43]  Defendants' proffered distinctions between and among "lapse," "surrender," and "sale" disregard the economic realities of the market in favor of theoretical distinctions under contract and tax law that have no bearing on the realities of the market.

Defendants' formalistic distinctions also fail to take into account the facts that Lima has alleged, including:

___

barriers, that suggestion is absurd; the Complaint contains **an entire section** entitled "The Secondary Market Features Substantial Entry and Expansion Barriers."  *Id.* at 65.  Those barriers include, but are not limited to, Phoenix's own anticompetitive conduct.  *See Rebel Oil*, 51 F.3d at 1439.

[43] *Compare State v. Hossan-Maxwell, Inc.*, 181 Conn. 655 (1980), where the Supreme Court of Connecticut applied Connecticut antitrust law and affirmed a summary judgment that condemned a tying arrangement.  The arrangement tied the sale of certain real estate lots to real estate brokerage services for the **resale or lease** of the lots.  It is impossible to interpret the court's opinion as contemplating anything other than the fact that the resales and leases were in the same (tied product) market.

"Lapses or surrenders of policies are the *economic equivalent* of Phoenix purchases of those policies, but also allow Phoenix to avoid paying the death benefits.  Phoenix's lapse rates are direct evidence of Phoenix's market (monopsony) power.  When Phoenix buys back a policy through a lapse or surrender, Phoenix pays nothing or almost nothing.  In a truly competitive market, Phoenix would have to buy the policies for fair value, at prices well above the cash surrender value."  Compl. ¶ 180 (emphasis added).

Like a sale, a surrender is made in consideration of a payment (often a nominal amount).  Compl. ¶ 48.

Phoenix initially planned to participate directly in the secondary market on the buy side.  Compl. ¶ 79.  It actually launched a life settlement subsidiary, Phoenix Life Solutions, Inc.  Compl. ¶ 80.  Phoenix considered the business a "natural hedge for [its] core business" and an opportunity to "partner" with investors, investment banks, and other distributors of life insurance products, which were the types of institutions buying Phoenix policies on the secondary market.  *Id.*

In late 2007 or early 2008, Phoenix began including a provision in its universal life insurance policies that stated to policyholders: "If, however, you are offered consideration by a third party to transfer ownership of your policy or any interest in your policy . . .  no transfer of ownership shall take effect unless we . . . first have the *right to also offer consideration* for your policy.  We will require information satisfactory to us that is necessary for us *to determine the amount of such consideration* we will offer for your policy."  Compl. ¶ 81 (emphasis added).

As to the above provision, former Phoenix wealth management consultant Ed Humphrey testified: "What they are basically talking about here is *the right to bid* on a settlement policy . . . .  Because they are talking about a right *to offer consideration for assignment of a policy* . . . ."  Compl. ¶ 82 (emphasis added).

Thus, the Complaint alleges, in no uncertain terms, that (i) lapses, surrenders, and sales are economic equivalents; (ii) lapses and surrenders generally involve a transfer of the policy in exchange for consideration (the "surrender value" of a policy); (iii) Phoenix intended to buy policies in the secondary market; and (iv) Phoenix inserted language in its policies giving it the right to offer "consideration" for policies in amounts not set by the insurance contracts.  These allegations compel the conclusion that Phoenix was an economic buyer and participant in the secondary market.

Defendants also suggest that surrenders do not involve an exchange of consideration because the "surrender value," according to Phoenix, is always "owned" by the insured.  Mot. at 33.  Whether or not this is an accurate characterization, it is simply irrelevant.  Phoenix does not – and cannot – dispute that Phoenix pays the consideration for surrenders.  If Phoenix purchased policies in a competitive secondary market – as it initially contemplated doing, *see supra* at 4 – policyholders would receive more than the surrender value.  But because of Phoenix's anticompetitive scheme, the

surrender value is simply a monopsony price ceiling when it should, in fact, be a price floor.  *Cf. In re Nat'l W. Life Ins. Deferred Annuities Litig*., 268 F.R.D. 652, 660-61 (S.D. Cal. 2010) (certifying class of persons who purchased annuities either directly or through ***surrender*** of an existing insurance policy and asserted RICO fraud claims; "all of the[] class members ***purchased*** the relevant annuities") (emphasis added).  In any event, Phoenix's assertion that it was not a participant in the secondary market, at best, raises a factual issue that cannot be resolved at the pleading stage.

Defendants also argue that the power to cause a policy lapse or surrender undermines Lima's antitrust claims because economic power derived from contractual arrangements affecting a distinct class of consumers cannot serve as a basis for a monopolization claim.  *See* Mot. at 33, citing *Hack*. However, Lima has not alleged that Phoenix has market power in the secondary market merely because of its contractual rights to accept lapses or surrenders.  Rather, Lima has alleged that Phoenix has market power in the secondary market as a result of, among many other things, its anticompetitive and exclusionary conduct, which includes its fraudulent statements to policyholders, refusal to pay death benefits, and unlawful COI rate increases.  Compl. ¶¶ 95, 96 (Phoenix has abused its position).

### d.      The Complaint alleges anticompetitive and exclusionary conduct

Defendants appear to argue that Lima has failed to allege actual anticompetitive acts and has merely described lawful activity that has "created uncertainty" among investors.  This misstates both the facts and the law.  As a matter of law, exclusionary conduct consists of acts that:

> (1) are reasonably capable of creating, enlarging or prolonging monopoly power by impairing the opportunities of rivals; and (2) that either (2a) do not benefit consumers at all, or (2b) are unnecessary for the particular consumer benefits claimed for them, or (2c) produce harms disproportionate to any resulting benefits.

III P. Areeda and H. Hovenkamp, ANTITRUST LAW (3d ed. 2008) ¶ 651 at p. 96.  The fact that the antitrust defendants have also breached contractual rights does not insulate them from antitrust liability.  *See*, *e.g.*, *City of Vernon v. Southern California Edison Co*., 955 F.2d 1361, 1368 (9th Cir.) ("We are not convinced that antitrust liability may not be predicated on conduct which also happens to

create a contract dispute."), *cert. denied*, 506 U.S. 908 (1992).[44]

Defendants again mischaracterize Lima's allegations.  Defendants refer to Phoenix's conduct as "routine policy correspondence," the filing of "meritorious legal actions," and the like (Mot. at 34).  But in describing Phoenix's conduct, Defendants ignore Lima's allegations that Phoenix has refused to pay the death benefits on valid policies and refused or delayed policy transfers.  Compl. ¶¶ 5, 106-107.[45]  Moreover, Defendants' assertions about Phoenix's other anticompetitive actions are meritless.

**Phoenix's objectively baseless litigation regarding policy validity**.  Lima has alleged that Phoenix has pursued a massive wave of policyholder litigation[46] and has taken objectively baseless litigation positions in order to interfere with secondary market competition.  Compl. ¶ 102.  These allegations suffice to avoid any litigation privilege or immunity.  In *Primetime 24 Joint Venture v. National Broadcasting Co.*, 219 F.3d 92 (2d Cir. 2000), the Second Circuit held that in cases in which the "defendant is accused of bringing a whole series of legal proceedings," the test is not "retrospective" but "prospective."  *Id.* at 101.  The question is: "'Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?' . . .  [I]t is immaterial that some of the claims might, 'as a matter of chance,' have merit.  The relevant issue is whether the legal challenges 'are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the

---

[44] *See also Covad Communications Co. v. BellSouth Corp.*, 299 F.3d 1272, 1287 n.14 (11th Cir. 2002) ("BellSouth's argument that the essential facilities claim is an ordinary breach of contract claim does not support its motion to dismiss.  Covad's allegations of anticompetitive conduct can and do 'support antitrust liability' at the pleading stage . . . .  Breach of contract and antitrust are not mutually exclusive."), *vacated on other grounds*, 540 U.S. 1147 (2004); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 313 (3d Cir. 2007) (patent holder's intentionally false promise to license essential proprietary technology on fair and reasonable terms, coupled with industry organization's reliance on that promise when including the technology in an industry standard, and patent holder's subsequent breach of the promise is actionable anticompetitive conduct).

[45] The fact that Phoenix delayed paying claims on three Lima policies, and only paid after six months of litigation, Compl. ¶ 134, only reinforces Lima's claims.  These substantial delays decrease the value of policies and depress demand for them on the secondary market.

[46] Phoenix is a party to approximately *86 lawsuits* involving about *$3.6 billion* in Phoenix policies now owned by investors that purchased their policies on the secondary market.  Compl. ¶ 100.  This number is dozens more than the number for any other insurer and represents more than 50% of all similar lawsuits involving seven other insurers (some much larger than Phoenix) combined.  *Id.* ¶ 102.  This also amounts to about 17% of the total in outstanding death benefits for all PHL policies, or over 33% of the total face amount of PHL policies currently owned by investors.  *Id.* ¶ 100.

purpose of injuring a market rival.'" *Id.* (citations omitted). Lima's allegations plainly describe cognizable anticompetitive litigation conduct.[47]

**Phoenix's fraudulent policy correspondence**. Phoenix's issuance of thousands of pages of materially false policy statements constitutes cognizable anticompetitive conduct. The law is clear that false and misleading statements may provide a basis for antitrust claims. *See Alternative Electrodes, LLC,* 597 F. Supp. 2d at 332. On a motion to dismiss, a court cannot determine, as a matter of law, whether parties to an allegedly fraudulent transaction are without knowledge of the subject matter, or whether allegedly fraudulent statements are subject to neutralization. *See id.*

**COI rate increases**. Defendants argue that COI rate increases are, at most, contractual breaches. But, as explained *supra* at 4-5, the Complaint alleges that Phoenix issued COI letters as part of Defendants' fraudulent scheme to induce "shock" lapses and monopsonize the secondary market for Phoenix policies. Even if the COI rate increases are *also* contractual breaches, that does not immunize Defendants from antitrust liability. *See supra* at 36. Indeed, the New York Department of Insurance has found that the COI rate increases violate New York policy and law. Compl. ¶ 124.

**Fraudulent policy illustrations**. Phoenix's false and misleading policy illustrations, Compl. ¶ 129, are also actionable. *See Alternative Electrodes, LLC*, 597 F. Supp. 2d at 332. By overstating the COI rates, Phoenix intended to artificially depress the value of its policies and cause policyholders receiving such illustrations to lapse their policies (*i.e.*, sell them back to Phoenix). Compl. ¶ 129.

**Phoenix's refusals to confirm coverage**. Defendants argue that their refusal to confirm the validity of a policy is not unlawful because, in *Mosier v. Phoenix Life Ins. Co.*, No. 8:12-CV-00227 (C.D. Cal. Aug. 7, 2012), the court held that Phoenix has no duty to disclose whether it will pay a hypothetical future claim. Defendants miss the point. Not only are these refusals intended to further Defendants' fraudulent scheme by concealing Phoenix's intent not to honor its own policies, but Lima has expressly alleged that Phoenix's refusals are part of Defendants' anticompetitive scheme of

---

[47] Allegations that litigation was both subjectively and objectively baseless plausibly support the claim that litigation was used as an anticompetitive weapon, and are sufficient to withstand a motion to dismiss. *See Alternative Electrodes,* LLC, 597 F. Supp. 2d at 331. Here, Lima has alleged that Phoenix has engaged in scores of objectively baseless lawsuits with anticompetitive intent. *See supra* 37 & n.46.

exclusionary conduct.  Indeed, they are reasonably capable of creating, enlarging, or prolonging monopoly power by impairing the opportunities of rivals, and producing harms disproportionate to any resulting benefits.  They are thus a type of exclusionary conduct.  *See* Hovenkamp, at 96.[48]

### 2. Lima has adequately alleged concerted action in violation of Section 35-28 of the Connecticut Antitrust Act

Lima is not alleging a standalone conspiracy in restraint of trade between or among competitors.  Rather, Lima has alleged that Phoenix has monopsonized and attempted to monopsonize the secondary market for Phoenix life insurance policies through a scheme of anticompetitive conduct by forcing policyholders to lapse or surrender their policies back to Phoenix.  Compl. ¶ 17.  Every time policyholders agree to lapse or surrender policies as a result of this scheme, *see, e.g.*, Compl. ¶¶ 14, 16, 151 (detailing extremely high Phoenix lapse rates), Phoenix has engineered an agreement with a third party that furthers its anticompetitive and exclusionary scheme and its monopsonization. These lapse and surrender agreements are anticompetitive and unlawful concerted action under Section 35-28.  *Cf. Geneva Pharms. Tech. Corp*., 386 F.3d at 508 (exclusive dealing itself satisfies the Sherman Act § 1 requirement of coordinated action).[49]

### D. Lima's Complaint Sufficiently Pleads a CUTPA Claim

Defendants' argument that Lima has not adequately alleged a CUTPA claim is meritless for at least three reasons.  First, even if a CUTPA claim can be founded only upon acts of boycott, coercion, or intimidation under the Connecticut Unfair Insurance Practices Act ("CUIPA"), Phoenix has engaged in coercion and intimidation by trying to force policyholders to lapse or surrender their policies.  Second, CUIPA is *not* limited to acts of boycott, coercion, or intimidation.  Connecticut General Statutes Section 38a-816 also prohibits, *inter alia*: (i) misrepresentations and false advertising

---

[48] Defendants' argument about Lima's attempted monopolization claim merely incorporates by reference their arguments about Lima's actual monopolization claim.  For the reasons discussed above, Lima has adequately alleged attempted monopolization of the secondary market for Phoenix life insurance policies.

[49] Phoenix suggests that Section 35-28 codifies only *per se* violations of Section 1 of the Sherman Act (such as price fixing).  *See* Mot. at 24.  However, only subsection 35-28(d) was once "considered to be a codification of what have come to be known as 'per se' violations of the Sherman Act, notably § 1."  *Elida, Inc. v. Harmor Realty Corp*., 177 Conn. 218, 227 (1979).  Subsection 35-28(d), which relates to exclusive dealing, is not at issue here.  In any event, *Elida* held that even subsection 35-28(d) was *not* limited to *per se* violations, but encompasses Rule of Reason violations.  *See id*. at 229.

of insurance policies; (ii) false information and advertising generally; and (iii) unfair claim settlement practices. *See* **Appendix B**. The Complaint alleges that Phoenix violated all of these provisions.[50]  In addition to Defendants' numerous violations of CUIPA, Lima has alleged fraud against Phoenix, which fraudulent conduct supports Lima's CUTPA claims against Phoenix independent of its CUIPA violations.  Third, Defendants claim Lima makes no allegations to support an award of punitive damages.  The Complaint, however, alleges a willful, malicious, and oppressive scheme to defraud policyholders. Compl. ¶ 155.  Lima thus is entitled to punitive damages.

### E.     Lima's Complaint Sufficiently Pleads Fraud and Conspiracy Claims

Defendants' arguments against Lima's fraud and conspiracy claims incorporate their arguments about the RICO claims.  For the reasons discussed in section III.A above, these arguments are meritless.  Moreover, the Complaint alleges all of the elements of common law fraud, which are: (1) a false representation made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statements to its detriment. *See Billington v. Billington*, 220 Conn. 212, 217 (Conn. 1991) (cit. omit).  Lima has alleged (1) false representations (*e.g.*, Compl. ¶¶198, 202, 206, 209, 212); (2) known by Phoenix to be untrue (*id.*); (3) made with the intent of inducing reliance (*e.g.*, ¶¶ 192, 196); and detrimental reliance by Lima (*e.g.*, ¶¶ 200, 204, 216, 222).[51]

## IV.    CONCLUSION

Lima respectfully requests that the Court deny Defendants' Motion in its entirety.  If the Court finds any of Lima's claims deficient, Lima requests leave to amend, which should be freely granted.[52]

---

[50] Compl. ¶¶ 106-112 (improper refusals to process, and delays in processing, policy transfers); 121-126 (misleading misrepresentations followed by improper COI rate increases); 129-137 (false and misleading policy illustrations and baseless and pretextual death benefit denials).

[51] Relying on *Harp v. King*, 835 A.2d 953, 974 (Conn. 2003), Defendants also assert that an "intra-corporate conspiracy" is only actionable where defendant officers and directors acted outside the scope of their employment.  However, in *Harp*, plaintiff had alleged that the defendant officers were liable because they acted in concert with one another to the plaintiff's detriment. Here, Lima has also alleged that ***each*** Defendant committed or directed fraud against Lima. *See* Count V.  Moreover, the Individual Defendants' wrongful conduct was at least in part "in furtherance of personal considerations … extraneous to [Phoenix's] interest," *id.*, and so the intra-corporate conspiracy doctrine is inapplicable.

[52] Where a party requests leave to amend its complaint, permission generally should be freely granted. *See Anderson News*, 680 F.3d at 185, citing *Foman v. Davis*, 371 U.S. 178, 182 (1962), and Fed. R. Civ. P. 15(a)(2).

Dated:  October 29, 2012                    Respectfully submitted,

                                           PLAINTIFF LIMA LS PLC

                                         By:  /s/ Alfred U. Pavlis
                                           Alfred U. Pavlis (ct08603)
                                           Richard S. Gora (ct27479)
                                           Finn Dixon & Herling LLP
                                           177 Broad Street
                                           Stamford, CT  06901-2048
                                         Telephone:  (203) 325-5000
                                         Facsimile:  (203) 325-5001
                                         E-Mail:  apavlis@fdh.com
                                                rgora@fdh.com

                                         Stephen G. Foresta
                                         Philipp Smaylovsky
                                         ORRICK, HERRINGTON & SUTCLIFFE LLP
                                         51 West 52nd Street
                                         New York, NY  10019-6142
                                         Telephone:  (212) 506-5000
                                         Facsimile:  (212) 506-5151
                                         E-Mail:  sforesta@orrick.com
                                                psmaylovsky.com

                                         Khai LeQuang
                                         ORRICK, HERRINGTON & SUTCLIFFE LLP
                                         2050 Main Street, Suite 1100
                                         Irvine, CA  92614-8255
                                         Telephone:  (949) 567-6700
                                         Facsimile:  (949) 567-6710
                                         E-Mail:  klequang@orrick.com

                                         Howard M. Ullman (phv05664)
                                         ORRICK, HERRINGTON & SUTCLIFFE LLP
                                         The Orrick Building
                                         405 Howard Street
                                         San Francisco, CA  94105-2669
                                         Telephone:  (415) 773-5700
                                         Facsimile:  (415) 773-5759
                                         E-Mail:  hullman@orrick.com

**Appendix A: Summary of RICO Allegations Against the Individual Defendants**

**The Individual Defendants**

- The Individual Defendants are and were senior executives of Phoenix. Defendant Young was President of PNX from 2000 to April 15, 2009, and Chairman of the Board from April 1, 2003 to April 15, 2009. She remained a PNX consultant from April 15, 2009 to April 15, 2010. Compl. ¶¶ 11 n.3, 34.

- Wehr is the President and CEO of PNX. *Id.* ¶ 31.

- Polkinghorn is the Executive Vice President of Business Development of PNX and the President of PNX's Life and Annuity Business Segment. *Id.* ¶ 11, 32. He "directed Phoenix's product development teams to design policies that would be ideal for investors in the secondary market." *Id.* ¶ 11.

- Cassidy is the Executive Vice President of Distribution of PNX. *Id.* ¶ 33.

**The Individual Defendants' role in the plan to sell insurance policies destined for the secondary market**

- At Polkinghorn and Cassidy's direction, Phoenix relaxed the underwriting requirements for high net worth policies destined for the secondary market. *Id.* ¶ 11.

- In late 2005, Polkinghorn advised Phoenix's sales force that Phoenix would accept sales of policies using non-recourse premium financing. *Id.* ¶ 63.

- In 2006, Cassidy adopted a sales strategy that involved the use of a wide network of broker general agents and their subagents who had direct relationships with investors in the secondary market in order to boost the sales of policies that would likely later be sold in the secondary market. *Id.* ¶ 65.

- Phoenix's management, including Polkinghorn and Cassidy, "not only encouraged Phoenix's sales force to procure such policies, they virtually ***required*** them to do so." *Id.* ¶ 67 (emphasis in original).[1]

- Phoenix's sales representatives ("wealth management consultants") made millions of dollars in commissions on policies destined for the secondary market – something Phoenix's top executives were well aware of. *Id.* ¶ 68.

- Phoenix hid the extent of its secondary market participation from the public. *Id.* ¶ 69. Young personally misrepresented to shareholders and others that Phoenix was not engaged in STOLI sales. *Id.* ¶¶ 71, 77.[2]

- Phoenix was referred to as the "King of STOLI," which was a moniker attributable to the sale

---

[1] Defendants erroneously assert that the only allegations against Polkinghorn are that he held a conference call about non-recourse premium financing, that in 2006 he developed products ideal for the secondary market and encouraged STOLI, that in 2008 he made a statement regarding life settlements, and that he owns stock in and is paid by Phoenix. *See* Mot. at 12.

[2] Defendants erroneously assert that the only allegations against Young are that she was CEO until April 2009, provided consulting services until April 2010, was paid by Phoenix, and that she promoted the sale of STOLI policies in the mid-2000s. *See* Mot. at 12.

strategy adopted by Polkinghorn and Cassidy.  *Id.* ¶ 75.

- Young, Polkinghorn, and Cassidy "had no reservations about selling life insurance policies they knew were destined for the secondary market.  They used the secondary market to grow the Company's sales, and through their efforts, in 2006 and 2007, Phoenix issued billions of dollars more in life insurance than it had ever issued before or ever would issue during any other two-year period in its history."  *Id.* ¶ 76.[3]

- In 2007, Young commissioned a team to form a life settlement division to partner with broker general agents to broker Phoenix's purchases of policies in the secondary market.  *Id.* ¶ 79.  In other words, Young planned for Phoenix to buy back its policies in the secondary market as a hedge.

- Phoenix launched its life settlement subsidiary in April 2008.  Polkinghorn touted the virtues of life settlements and Phoenix's "knowledge of the high-net worth and affluent markets, our expertise in mortality in risk management, and our ability to be a partner of choice with firms that want to be involved in a new equation for the life settlement business."  *Id.* ¶ 80.

**<u>The Individual Defendants' role in the anticompetitive scheme</u>**

- Young and Wehr were primarily responsible for Phoenix's huge investment losses in the wake of the 2008 financial crisis.  *Id.* ¶ 84.  Wehr had directed Phoenix's risky investments which resulted in massive losses toward the end of 2008.  *Id.* ¶¶ 13, 78.

- Since 2008 or early 2009, Phoenix has been run by an "Insider's Circle" that included the Individual Defendants and that "has been closing ranks, burying information, and working to prevent information from leaking because 'they have some exposure.'"  *Id.* ¶90.

- In response to Phoenix's precarious financial position, the Insider's Circle orchestrated a plan designed to eliminate the liabilities associated with billions of dollars in policies that Phoenix had so aggressively sold and that were now largely owned by investors that had purchased them on the secondary market.  *Id.* ¶ 91.  The Insider's Circle decided to focus Phoenix's efforts on the secondary market for Phoenix policies.  *Id.*

- Defendants devised a strategy to engage in a pattern of anticompetitive and exclusionary conduct designed to restore Phoenix's previous position as a monopsonist buyer in the secondary market for Phoenix policies.  *Id.* ¶ 92.

**<u>The Individual Defendants' role in the pattern of racketeering</u>**

- The Individual Defendants "have directed Phoenix to issue notices to policyholders advising them that Phoenix is raising their COI rates.  These rate increases were specifically designed to 'shock' policyholders into immediately lapsing or surrendering their policies . . . ."  *Id.* ¶ 17.

- The Individual Defendants "have no intention of permitting Phoenix to honor the terms of its policies.  Their plan is instead to continue collecting premiums while trying to force future lapses and surrenders."  *Id.* ¶ 17.

- In early 2010, Wehr helped to misrepresent Phoenix's position on COI rate increases, telling

---

[3] Defendants erroneously assert that the only allegations against Cassidy are that he adopted a strategy of selling policies through a network of brokerage general agents, that he encouraged STOLI, and that he is paid by Phoenix. *See* Mot. at 12.

shareholders that Phoenix had favorable mortality experience. *Id.* ¶ 126. If that were true, COI rates should have decreased, not increased.[4]

- The Individual Defendants have directed Phoenix to conduct an internal audit of its investor-owned policies, and they have identified policies that Phoenix intends to challenge if it is unable to force the owners to lapse their policies first. *Id.* ¶ 192.

- The Individual Defendants caused Phoenix to mail fraudulent premium notices to Lima and to collect the premiums billed. *Id.* ¶ 199.

- The Individual Defendants caused Phoenix to mail fraudulent annual statements to Lima. *Id.* ¶ 203.

- The Individual Defendants caused Phoenix to mail fraudulent verifications of coverage to Lima. *Id.* ¶ 207.

- The Individual Defendants caused Phoenix to mail fraudulent policy illustrations to Lima. *Id.* ¶ 210.

- The Individual Defendants directed and caused Phoenix to mail fraudulent COI letters to Lima. *Id.* ¶ 222.

- The Individual Defendants authorized, orchestrated, directed, supervised, and participated in the racketeering acts described above. *Id.* ¶ 259.

### The Individual Defendants' economic motivation

- The Individual Defendants have invested heavily in Phoenix's anticompetitive strategy through stock purchases, despite the fact that the Individual Defendants know that (i) Phoenix's new life insurance sales are *de minimis* and cannot sustain Phoenix as a going concern and (ii) Phoenix has approximately $10 billion in policies force. *Id.* ¶¶ 193-94.

- By releasing statutory capital through forced policy lapses or surrenders, the Individual Defendants stand to make considerable profits through stock appreciation. *Id.* ¶ 194.

---

[4] Defendants erroneously assert that the only allegations against Wehr are that he made risky investments before 2008, that he became and is the CEO, and that he owns stock and is paid by Phoenix. *See* Mot. at 12.

## Appendix B: Connecticut General Statutes §§ 38a-816 and 38a-446

Under Section 38a-816, "unfair methods of competition" and "unfair and deceptive acts or practices in the business of insurance" include, *inter alia*:

(1) Misrepresentations and false advertising of insurance policies.  Making, issuing or circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement, sales presentation, omission or comparison which . . . (f) is a misrepresentation, including, but not limited to, an intentional misquote of a premium rate, for the purpose of inducing or tending to induce to the purchase, lapse, forfeiture, exchange, conversion or surrender of any insurance policy . . . .

(2) False information and advertising generally. Making, publishing, disseminating, circulating or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated or placed before the public, in a newspaper, magazine or other publication, or in the form of a notice, circular, pamphlet, letter or poster, or over any radio or television station, or in any other way, an advertisement, announcement or statement containing any assertion, representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business, which is untrue, deceptive or misleading . . . .

(6) Unfair claim settlement practices. Committing or performing with such frequency as to indicate a general business practice any of the following: (a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; (b) failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies; . . . (e) failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; (f) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; (g) compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; (h) attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application; . . . (n) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; . . . .

(20) Any violation of sections 38a-465 to 38a-465q, inclusive.

Section 38a-446 also prohibits discriminatory life insurance rates: "No life insurance company doing business in this state shall make or permit any distinction or discrimination in favor of individuals between insurants of the same class and expectation of life in the amount or payment of premiums or rates charged for policies of life or endowment insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the contracts it makes; nor shall any such company or any producer or other person make any contract of insurance or agreement as to such contract other than is plainly expressed in the policy issued thereon."