UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LIMA LS PLC, | No. 12-CV-01122 (WWE) |
| Plaintiff, | |
| v. | |
| PHL VARIABLE INSURANCE COMPANY, a Connecticut corporation; PHOENIX LIFE INSURANCE COMPANY, a New York corporation; THE PHOENIX COMPANIES, INC., a Connecticut corporation; JAMES D. WEHR, an individual; PHILIP K. POLKINGHORN, an individual; EDWARD W. CASSIDY, an individual; and DONA D. YOUNG, an individual, and DOES 1-20, inclusive, | |
| Defendants. | |

**PLAINTIFF'S SUR-REPLY IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................... 1

II.     DISCUSSION ................................................................................................................. 1

        A.      Lima's Complaint Sufficiently Pleads RICO Claims ........................................... 1

                1.      Lima has adequately alleged how the Individual Defendants
                        operated and managed the Phoenix Enterprise ........................................ 1

                2.      Lima has adequately alleged the predicate acts of mail and wire
                        fraud ......................................................................................................... 3

                3.      Lima has adequately alleged RICO damages ........................................... 5

                4.      The McCarran-Ferguson Act is inapplicable ........................................... 7

        B.      Lima's Complaint Sufficiently Pleads Antitrust Claims ...................................... 7

                1.      Lima has adequately alleged the relevant market .................................... 7

                2.      Lima has alleged that Phoenix is a market participant with market
                        power ......................................................................................................... 9

                3.      Lima has adequately alleged exclusionary conduct ................................. 9

        C.      Lima's Complaint Sufficiently Pleads a CUTPA Claim .................................... 10

III.    CONCLUSION ............................................................................................................. 10

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alternative Electrodes, LLC v. Empi, Inc.,*
   597 F. Supp. 2d 322 (E.D.N.Y. 2009) ..................................................................10

*Bennett Silvershein Assoc. v. Furman,*
   1997 WL 531310 (S.D.N.Y. Aug. 28, 1997) ..........................................................1

*Crabhouse of Douglaston, Inc. v. Newsday, Inc.,*
   418 F. Supp. 2d 193 (E.D.N.Y. 2006) ....................................................................2

*Crabhouse of Douglaston, Inc. v. Newsday, Inc.,*
   801 F. Supp. 2d 64 (E.D.N.Y. 2011) ......................................................................3

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
   504 U.S. 451 (1992) .............................................................................................7, 8

*Eaves v. Designs for Fin., Inc.,*
   785 F. Supp. 2d 229 (S.D.N.Y. 2011) ....................................................................3

*Full Draw Prods. v. Easton Sports, Inc.,*
   182 F.3d 745 (10th Cir. 1999).................................................................................9

*GICC Capital Corp. v. Tech. Fin. Group,*
   30 F.3d 289 (2d Cir. 1994)......................................................................................6

*Kramer v. Time Warner Inc.,*
   937 F.2d 767 (2d Cir. 1991)....................................................................................4

*Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,*
   334 U.S. 219 (1948) ................................................................................................8

*Mills v. Polar Molecular Corp.,*
   12 F.3d 1170 (2d Cir. 1993)................................................................................2, 3

*Mosier v. Phoenix Life Ins. Co.,*
   No. 8:12-CV-00227 (C.D. Cal. Aug. 7, 2012) .......................................................4

*Ozbakir v. Scotti,*
   764 F. Supp. 2d 556 (W.D.N.Y. 2011)...................................................................2

*Reves v. Ernst & Young,*
   507 U.S. 170 (1993) ................................................................................................2

*Russell v. Transamerica Occ. Life Ins. Co.*,
  2006 U.S. Dist. LEXIS 63086 (M.D. Ala. Aug. 31, 2006) ...........................................6

*State Farm Mut. Auto Ins. Co. v. Grafman*,
  655 F. Supp. 2d 212 (E.D.N.Y. 2009) ...................................................................7

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001)..................................................................................8

*Trollinger v. Tyson Foods, Inc.*,
  370 F.3d 602 (6th Cir. 2004)................................................................................5

*Weyerhaeuser v. Ross-Simmons Hardwood Lumber Co.*,
  549 U.S. 312 (2007) ..........................................................................................8


**STATE CASES**

*Crowther v. Guidone*,
  183 Conn. 464 (1981)......................................................................................3, 4

*Harp v. King*,
  834 A.2d 953 (Conn. 2003) ................................................................................5

*PHL Variable Ins. Co. v. ESF QIF Trust*,
  No. 12-317-LPS (D. Del.)................................................................................4, 6

## I.     INTRODUCTION

Defendants' Reply does nothing to justify the dismissal of any of the claims in the Complaint filed by Plaintiff Lima LS plc ("Lima").  It does, however, put new twists on the fundamental flaws made in Defendants' moving papers, and Lima respectfully submits this Sur-Reply to highlight and respond briefly to those deficiencies.  In particular, Defendants continue to (i) mischaracterize Lima's claims; (ii) ignore the Complaint's extensive factual allegations; (iii) make up facts not alleged in the Complaint; and (iv) cite straw-man cases that are inapposite to the claims and allegations made here.

## II.    DISCUSSION

### A.     Lima's Complaint Sufficiently Pleads RICO Claims

#### 1.     Lima has adequately alleged how the Individual Defendants operated and managed the Phoenix Enterprise

Defendants acknowledge that to connect the Individual Defendants to the Phoenix Enterprise, Lima need only allege that the Individual Defendants had "actual control" over the enterprise.  Reply at 3.  Here, the Complaint alleges that the Individual Defendants, including Defendants Wehr and Young[1], are all current or former senior officers of Phoenix who did far more than just control the Phoenix Enterprise.  The Complaint alleges that they formulated the fraudulent scheme as a way of addressing Phoenix's dire financial situation in 2008 (which they, in particular Defendants Young and Wehr, were responsible for), and they directed the fraudulent scheme.  Opp. at 8-9 and App. A.  Among other things, the Complaint alleges that the Individual Defendants, including Defendants Young and Wehr, formed an Insiders' Circle to orchestrate and carry out the scheme in secret, Compl. ¶¶ 90-91; they directed cost of insurance ("COI") increases designed to shock policyholders into lapsing policies, as they have no intention of permitting Phoenix to honor its policies, *id.* ¶ 17;[2] and they directed an internal audit of investor-owned policies and privately identified policies that Phoenix

---

[1] Contrary to Defendants' assertion, Lima has alleged an "open-ended" or continuing pattern of racketeering, not a "closed-ended" one, so cases on "closed-ended" patterns are inapposite.  Young is not relieved of responsibility for creating and establishing the open-ended pattern merely because she left Phoenix before it was completed.  *See Bennett Silvershein Assoc. v. Furman,* 1997 WL 531310 (S.D.N.Y. Aug. 28, 1997) at *2.  The subsequent predicate acts of mail and wire fraud were incident – indeed, essential – to the scheme; without them, the scheme could not succeed.

[2] And Defendant Wehr has made public misrepresentations about these COI rate increases.  Compl. ¶ 126.

intends to challenge if it is unable to force owners to lapse their policies first, *id.* ¶ 192.

Instead of addressing these and other specific allegations of the Complaint,[3] Defendants cite inapposite cases for the proposition that "formulaic" or "conclusory" recitations of the *Reves*[4] operation or management test are insufficient. *See, e.g., Ozbakir v. Scotti*, 764 F. Supp. 2d 556, 572 (W.D.N.Y. 2011). In *Ozbakir*, the plaintiff alleged "in very general terms" that the individual defendants "controlled, or were alter egos, of the corporate defendants" and that one defendant had "some part" in directing the enterprise's affairs. *Id.* Here, Lima does not just allege that the Individual Defendants had "some part" in directing the fraudulent activity or make conclusory allegations that the Individual Defendants "controlled, or were alter egos" of the enterprise. Lima alleges that the Individual Defendants formulated the fraudulent scheme and that they operated and managed the Phoenix Enterprise to execute the scheme, including by directing Phoenix to send out policy statements and notices that they knew contained false information.

Defendants also cite *Crabhouse of Douglaston, Inc. v. Newsday, Inc*., 418 F. Supp. 2d 193 (E.D.N.Y. 2006). In *Crabhouse*, the court analyzed allegations made against several individual defendants and found that some of the allegations were insufficient because the complaint alleged that certain actions were taken by one *or* more of the defendants. *Id.* at 207-208. The court held that these "disjunctive allegations [were] inadequate." *Id.* at 208. Although the court also held that "purely conclusory" allegations of direction are insufficient to state a claim under RICO, the court found that the plaintiff's allegations that certain individuals directed others to falsely inflate sales figures were sufficient to state a claim under RICO. *Id.* at 208. Here, Lima has not alleged any conduct in the disjunctive. Lima has alleged that ***each*** of the Individual Defendants engaged in specific conduct, including directing others to mail policy notices and statements that they knew contained false information. Compl. ¶¶ 192-223.[5] Citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d

---

[3] *See* Appendix A to Lima's Opposition.

[4] *Reves v. Ernst & Young*, 507 U.S. 170 (1993).

[5] Indeed, the plaintiffs in *Crabhouse* subsequently filed an amended complaint, and the court later found that the plaintiffs had cured any prior deficiency as to one defendant where the plaintiffs alleged, *inter alia*, that he acted jointly with another to direct and supervise other defendants to make fraudulent reports and prepare false and

Cir. 1993), Defendants also argue that Lima cannot rely merely on executive titles to hold an individual defendant liable, but as *Mills* itself holds, a person's knowledge of or participation in the fraud *is* sufficient to hold the individual liable. *Id.* at 1175. Here, Lima has alleged that each of the Individual Defendants personally knew of and directed (*i.e.*, participated in) the fraud.

2.      **Lima has adequately alleged the predicate acts of mail and wire fraud**

In arguing that Lima has failed to adequately allege predicate acts, Defendants continue to mischaracterize Lima's claims. They assert that the scheme described in the Complaint is dependent upon "speculative assumptions about . . . legal opinions" concerning policy validity. Reply at 1. But as Lima explained in its opposition brief, whether policies are, in fact, valid is not the issue. Lima has alleged a scheme whereby Defendants have misrepresented their ***beliefs*** about the validity of policies and their ***intentions*** to honor them. In particular, to induce policyholders like Lima to continue paying premiums to Phoenix, Defendants have represented that they believe the policies are "effective," "in force," "active," have "value," and provide "valuable coverage." If, as Lima has alleged, Defendants do not, in fact, believe the policies are effective, in force, active, have value, and will provide valuable coverage, Defendants have misrepresented the facts of their beliefs and intentions, not the legal conclusion about whether the policies are valid. *See Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 253 (S.D.N.Y. 2011) ("Plaintiffs do not allege merely that [defendant's] opinions turned out to be wrong, but instead that [defendant] ***did not actually believe its opinions when it communicated them*** . . . . Such statements are indeed actionable as fraudulent misrepresentations.") (emphasis added); *Crowther v. Guidone*, 183 Conn. 464, 467 (1981).[6] As the Court in *Growther* explained:

---

fraudulent materials to send to the plaintiffs. *See Crabhouse of Douglaston, Inc. v. Newsday, Inc.*, 801 F. Supp. 2d 64, 85 (E.D.N.Y. 2011).

[6] Defendants suggest that Lima is trying to have it "both ways" by alleging that Phoenix knowingly issued "illegal" policies that entitle Lima to damages. Reply at 2. But it is Defendants, not Lima, who are trying to have it "both ways." Defendants claim it is perfectly legal to misrepresent their intent to contest a policy so they can continue to collect millions of dollars in premiums on policies they do not intend to pay. According to Defendants, if a court later finds they were wrong that a policy was invalid, they will simply pay the death benefit that they owed all along. But if a court later determines that a policy is invalid (as was their position all along), they will never pay the death benefit but still try to pocket the premium payments they fraudulently induced Lima to pay. This is fraud. If Defendants believe a policy is invalid, they are committing fraud by telling Lima and other policyholders that their policies are "effective," "in force," "active," have "value," and provide "valuable coverage," and continuing to collect premium payments on such a policy.

> To require the representation to be made as a statement of fact, however, is quite different than to require that the statement be factual as opposed to legal. . . . *The latter inquiry in which the defendants would have us engage seeks to erect a barrier to shield from liability those defendants whose misrepresentation happens to concern the law. We decline to license such deceit*.

183 Conn. at 467 (emphasis added).

Defendants also argue that they had no duty to disclose their fraudulent scheme, relying upon *Mosier v. Phoenix Life Ins. Co*., No. 8:12-CV-00227 (C.D. Cal. Aug. 7, 2012). *Mosier*, however, is not a fraud case, and the court in *Mosier* did not decide whether and when an insurer has a duty to disclose its belief that a policy is invalid, especially when the insurer makes misleading statements about such belief.[7]  As alleged here, Phoenix's refusal to tell policyholders whether it believes their policies are invalid forms a critical part of Defendants' fraud.   Indeed, in other lawsuits where policyholders have sued Phoenix alleging that Phoenix intends to challenge their policies in the future, Phoenix has virtually admitted its concealment of its true intentions:

> **Court:** All right.  Your client [Phoenix], of course, is an entity.  What if there is an internal document from your client that says the following 14 policies will not be paid upon death?  Do we have adversity yet?

> **Counsel for Phoenix:** Not until [Phoenix] actually either communicate[s] that to the other party, to the other side. . . . Until we actually take some action that communicates our intentions to the other side of the contract, or they – you know, that would actually be a communication towards them.  That would put them on notice.  That would create an adversity between the two parties.

*PHL Variable Ins. Co. v. ESF QIF Trust*, No. 12-317-LPS (D. Del.), Hearing Transcript on Motion to Dismiss dated November 8, 2012 ("ESF Transcript") at 8:14-25.[8]  Thus, Defendants' argument here is premised on the notion that Phoenix does not have to tell policyholders that it believes their policies are invalid, even as it tells them that their policies are "effective," "in force," "active," have "value," and provide "valuable coverage," while collecting their premiums.  Phoenix is wrong.  This is fraud.

Defendants also attempt to defend their fraudulent conduct by claiming their actions amount to "nothing more than anticipatory breach."  Reply at 2.  This argument is specious.  As Lima has

---

[7] *Mosier* also has nothing to do with whether Defendants committed fraud by affirmative misrepresentations or fraudulent concealment.

[8] A copy of the transcript is attached hereto as Exhibit 1.  Lima requests that the Court take judicial notice of the transcript.  *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

explained, an anticipatory breach occurs when a party repudiates a contract. Lima does not allege that Defendants repudiated Phoenix's policies, but that Defendants fraudulently **affirmed** them by repeatedly misrepresenting that they believe the policies are "effective," "in force," "active," have "value," and provide "valuable coverage." Opp. at 11-12. That is fraud, not anticipatory repudiation.

Defendants also make the absurd argument that their fraudulent statements are not actionable because they are "unchanged in tone, tenor or content since creation and execution of the scheme." Reply at 2. But this characterization (even if true) is of no legal significance. What matters is whether Phoenix's statements were false at the time they were made. The "tone and tenor" of those misrepresentations is not an element of a fraud claim.[9]

### 3.     Lima has adequately alleged RICO damages

Lima seeks two primary types of RICO damages (neither of which precludes the other, and the extent of which will be proven by facts in discovery).[10] First, Lima seeks damages in the form of premiums already paid. These damages relate to policies for which Phoenix has collected premiums but for which Phoenix had and has no intent to pay the death benefits. These damages are concrete, ascertainable, non-speculative, and ripe, and Defendants cannot seriously contend otherwise.

Second, Lima seeks damages in the form of the lost value (or lost market value) of its Phoenix policies. Defendants assert that Lima did not plead these damages, but the Complaint seeks any "actual damages . . . sustained by reason of Defendants' violations of [RICO] law." *Id.* at p. 94. That prayer for relief encompasses lost market value and any other damages Lima may prove. Although Defendants also argue that this lost market value was caused by factors other than their fraud, Reply at 8, this is a fact issue that cannot be resolved on a motion to dismiss. *See*, *e.g.*, *Trollinger v. Tyson*

---

[9] Lima has also adequately pled a common law fraud claim against the Individual Defendants. Lima has alleged that each Individual Defendant committed fraud, not merely that each conspired to do so (although it alleges that as well). Defendants' reliance upon the intra-enterprise conspiracy doctrine is misplaced. The doctrine only applies when an officer's conduct is not "in furtherance of personal considerations" extraneous to the company's interest. *See Harp v. King*, 834 A.2d 953, 974 (Conn. 2003). Here, however, Lima has alleged that the Individual Defendants acted to further their own economic interests. Compl. ¶¶ 192-196.

[10] Lima is not, as Defendants suggest, seeking "unpaid death benefits" as RICO damages, except to the extent Phoenix has already improperly denied a death benefit claim. Thus, Defendants' feigned concern that claims for future death benefits are not yet ripe or are speculative is misplaced.

*Foods, Inc.*, 370 F.3d 602, 619 (6th Cir. 2004).

Finally, as to proximate causation, Defendants argue – without citing any authority – that any damages suffered by Lima will only occur, if at all, in the future, if and when a court determines that a given policy is not valid.  Reply at 8-9.  Defendants again miss the point: Lima would not have acquired the policies, valued them as it did, paid premiums, or continued to pay premiums on them if Lima knew about the fraud.  Lima does not have to wait to bring its claims (while continuing to pay money to Defendants) until Phoenix consummates the fraud by denying claims or seeking to invalidate policies while keeping millions of dollars in premiums.  *See GICC Capital Corp. v. Tech. Fin. Group*, 30 F.3d 289, 293 (2d Cir. 1994) (possibility of a future action on an unsecured note did not defeat RICO standing to allege a scheme to defraud); *Russell v. Transamerica Occ. Life Ins. Co.*, 2006 U.S. Dist. LEXIS 63086 (M.D. Ala. Aug. 31, 2006) at *6 (mailing of fraudulent premium notices gives rise to a ripe common law fraud claim).[11]

Defendants' argument that Lima has not suffered any damages appears to be based on the remarkable position that Phoenix provides a "service" when it collects premiums on policies it has no intent to honor.  As Phoenix argued in the *ESF QIF Trust* action noted above:

> **Court:** . . . Let's just stipulate for the moment, let's take a hypothetical policy, your client has no intention of paying it today.  They could change their mind tomorrow, but today they have no intention of paying it.  What product or service are you providing at that point?  Are you really providing insurance today if your intention is not to pay?
>
> **Counsel for Phoenix:** . . . What the company is providing, these are universal insurance policies so they're going to accumulate value based on the performance of the company.  So there actually is, even if the company had an intent not to pay a death benefit when it becomes due, there is still an accumulation of value and a savings component that is occurring within the policy.  So even in that situation, there is still some value that is being transmitted, a service that is being provided.

ESF Transcript at 5:10 – 6:4.  As absurd as this may sound, even the "savings component" that

---

[11] The fact that Phoenix recently paid Lima on three policies that Phoenix refused to pay (only after Lima ***sued*** Phoenix) is irrelevant.  Defendants' fraudulent scheme does not entail denying every claim or challenging every policy.  As alleged in the Complaint, the Individual Defendants have directed an audit to identify specific policies they intend to challenge.  Compl. ¶ 192.  Moreover, an essential aspect of the scheme is that Defendants are secretly trying to force policyholders to lapse their policies before Phoenix ever has to deny a claim or contest a policy.  *Id.*

Phoenix cites is worthless if Phoenix intends, as it does, to keep the premiums when it seeks to invalidate a policy.[12]  Yet, according to Phoenix, as long as it is providing the "service" of taking Lima's money with no intent to pay the death benefit, Lima suffers no harm until Phoenix tells Lima it will not pay.  In other words, Phoenix argues that if a tree falls in the forest of its lies and is not heard, Lima suffers no actual harm from its fraud – at least, not until Phoenix declares to Lima that it will not pay a claim (as it knew all along it would do).

### 4.        The McCarran-Ferguson Act is inapplicable

For the McCarran-Ferguson exemption to apply, Defendants must establish that application of RICO here would frustrate state law, and Defendants have not done that.  Reply at 9.  *See, e.g., State Farm Mut. Auto Ins. Co. v. Grafman*, 655 F. Supp. 2d 212, 225 (E.D.N.Y. 2009) (denying motion to dismiss where defendant failed to show that application of RICO would frustrate state law).

### B.        Lima's Complaint Sufficiently Pleads Antitrust Claims

### 1.        Lima has adequately alleged the relevant market

Lima has alleged a *Kodak*-type[13] Phoenix-brand secondary market.  In their opening brief, Defendants argued that only tying ***claims*** support *Kodak*-type single-brand secondary markets.  Lima, in its opposition brief, demonstrated that no case has ever held this, and that numerous cases have recognized single-brand secondary markets even when no tying claim is presented.  Opp. at 27-28.  In their reply brief, Defendants return with a new bucket, but to the same dry well.  They now argue that a single-brand secondary market only makes sense ***in the context of*** a tie – even if no tying claim is presented – *i.e.*, where the primary market purchaser is forced to buy additional secondary products from the same seller.  Reply at 11.  Defendants' argument is misplaced for at least two reasons.

First, Defendants again cite no law that supports this assertion.  Instead, they simply announce their conclusion about what the law should be.  In doing so, they ignore the economic reality that this case is a monopsonization case, not a monopolization case.  In a monopoly case, the primary market

---

[12] Significantly, when Phoenix says that a policy provides "valuable coverage," coverage means the payment of the death benefit.  It does not mean "savings."  Thus, when Phoenix says that a policy provides "valuable coverage," but does not intend to pay the death benefit, Phoenix is committing fraud.
[13] *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992).

seller often wishes to *sell* additional products to purchasers in the secondary market, and tying is one way to achieve that end.  In a monopsony case, the primary market seller (*i.e.*, the secondary market monopsonist) wishes to *buy* products in the secondary market at bargain-basement prices and cut off secondary market sellers from other potential buyers.  There is no need for the monopsonist to engage in tying, and it makes no sense for it to do so, as it is not trying to sell additional products to the primary market purchaser.  Instead of *tying* product *sales*, the monopsonist *severs* other potential *buyers* from the secondary market.  Thus, the monopsonist engages in the mirror image of a tie.  *Cf. Weyerhaeuser v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 321 (2007) (there is a close theoretical connection between monopoly and monopsony; monopsony is the "mirror image" of monopoly); *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (same).

Second, there is no legal basis for treating a monopsony differently from a monopoly under the *Kodak* analysis (taking into account, of course, the reversed, "mirror image" positions of buyers and sellers).  To the contrary, whenever the Supreme Court has considered monopsony, it has always treated it as analytically equivalent to monopoly.  *See*, *e.g.*, *Weyerhaeuser*, 549 U.S. at 322 ("[M]onopoly and monopsony are symmetrical distortions of competition from an economic standpoint") (cit.omit.); *id.* at 321 ("[M]onopsony pricing . . . is analytically the same as monopoly or cartel pricing and [is] so treated by the law") (cit. omit.).  *See also Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 221-24, 235 (1948) (buyers' cartels, which depress pricing to monopsony levels, are illegal).  Thus, *Kodak* applies to monopsony and monopoly.

Defendants also assert that Lima has not alleged the *Kodak* factors of lifecycle product pricing opacity and high switching costs.  Reply at 13.  This assertion is baseless.  Lima has alleged these factors in great detail.  Compl. ¶¶ 172, 169-170.  Defendants' arguments ignore that the Court must accept Lima's well-pled allegations as true, and merely attempt to create factual disputes that cannot be resolved at the motion to dismiss stage.[14]

---

[14] Defendants mistakenly believe that Lima has alleged only that the secondary market pricing of Phoenix policies is opaque.  Reply at 13.  However, Lima has also alleged that total amounts *paid to Phoenix* (including the cost of insurance, or COI) are opaque.  Compl. ¶ 172.  Defendants' further assertion that primary insurance market purchasers are not forced to buy policies is a *non-sequitur*.  In all the *Kodak*-type cases, primary market

> 2.    **Lima has alleged that Phoenix is a market participant with market power**

Defendants again argue that Phoenix did not participate in the secondary market and therefore cannot monopsonize it.  Reply at 14.  But the Complaint's allegations establish that Phoenix was (and is) a secondary market participant.  Once it has issued a life insurance policy and collected premiums, Phoenix "buys back" that policy in the secondary market through some form of transaction prior to the payment of death benefits (*e.g.,* a purchase at fair market value, a zero-value lapse, or a nominal-value surrender).  The only question is how much Phoenix will have to pay to buy back the policy.  Here, for example, Phoenix initially planned to buy back policies at fair market value ("FMV") both directly and through a subsidiary, Compl. ¶¶ 79-80, but found itself economically unable to do so.  Because Phoenix is no longer able to buy policies at FMV, Phoenix today is forcing lapses and surrenders that achieve the same effect, but for a monopsony price well below FMV, *i.e.*, for a cash surrender price.

Indeed, Defendants dismiss the Complaint's allegations that ***only Phoenix*** secondary market pricing has been substantially depressed as beside the point.  Reply at 14.  However, Defendants miss the significance of these allegations.  Such depressed pricing is ***direct evidence*** of market power.  If Phoenix were not a market participant, such depressed pricing (in the absence of unique demand factors not alleged in the Complaint) would be economically implausible.

Finally, Defendants also assert that Lima has not alleged barriers to entry.  Reply at 14.  This assertion is simply not credible given that the Complaint contains an entire section discussing entry barriers.  *See id*. pp. 65-67.  Those barriers include, *inter alia*, control of an essential resource (the supply of Phoenix policies); higher capital costs for new market entrants; and substantial technical know-how.  Additionally, the barriers include Phoenix's ***own anticompetitive and exclusionary conduct***, which is a "strategic" entry barrier.  *Id*. ¶ 182; *see also*, *e.g.*, *Full Draw Prods. v. Easton Sports, Inc*., 182 F.3d 745, 756 (10th Cir. 1999) (anticompetitive conduct itself is an entry barrier).

> 3.    **Lima has adequately alleged exclusionary conduct**

As to exclusionary conduct, Defendants focus on Lima's allegations that Phoenix's litigation

---

purchases are not forced, but as a result of pricing opacity, lock-in, and high switching costs, consumers face anticompetitive effects in a single-brand secondary market.  That policyholders are trapped only ***after*** entering the Phoenix ecosystem is the point.

is objectively baseless and intended to interfere with competition in the secondary market. Defendants contend that (i) much of this litigation has been brought against, not by, Phoenix, and (ii) Lima has not cited a case where Phoenix has lost a claim or defense. Reply at 15-16. These points are irrelevant.

First, so much litigation has been brought against Phoenix because Phoenix has engaged in a host of unlawful ***non-litigation*** conduct, such as the denial of valid claims, improper refusal to process policy transfers, and unjustified increases in COI rates. To the extent Phoenix has taken ***extrajudicial*** actions that have caused policyholders to sue Phoenix to enforce their legal rights, Phoenix cannot now wrap itself in the cloak of ***litigation*** immunity.

Second, an antitrust plaintiff such as Lima need not await final resolution of other litigation against the antitrust defendant before bringing suit. Allegations that the other litigation was objectively baseless and intended to be anticompetitive support the claim that it was used as an anticompetitive weapon, and they are sufficient to withstand a motion to dismiss; whether the other litigation actually was baseless is a question of fact for discovery. *See Alternative Electrodes, LLC v. Empi, Inc.,* 597 F. Supp. 2d 322, 331 (E.D.N.Y. 2009).

### C.      Lima's Complaint Sufficiently Pleads a CUTPA Claim

Contrary to the Reply at 17, Lima has alleged coercion and intimidation of policyholders. *See*, *e.g.*, Compl. ¶¶ 14 ("Phoenix would leave policyholders who wanted to sell their policies with ***no choice*** but to lapse or surrender them back to Phoenix"); 17 (Individual Defendants' plan is "to ***force*** future lapses and surrenders."); 93 (if scheme is successful, policyholders would have "***no choice***" but to lapse or surrender their policies); 242-43 (Phoenix's actions amount to coercion and intimidation of policyholders) (emphasis added). These allegations state a CUTPA claim. Moreover, CUTPA reaches misrepresentations and false advertising of insurance policies, false information and advertising generally, and unfair claim settlement practices. The Complaint itself – and not merely Lima's opposition brief – alleges all three of these types of violations. *See id*. ¶¶ 106-112; 121-126; and 129-137. Lima has not amended its pleadings through motion practice.

## III.   CONCLUSION

Lima respectfully requests that the Court deny Defendants' Motion in its entirety.

Dated:  November 28, 2012    Respectfully submitted,

           PLAINTIFF LIMA LS PLC


By:  /s/ Khai LeQuang
   Khai LeQuang (phv05640)
   ORRICK, HERRINGTON & SUTCLIFFE LLP
   2050 Main Street, Suite 1100
   Irvine, CA  92614-8255
   Telephone:  (949) 567-6700
   Facsimile:  (949) 567-6710
   E-Mail:   klequang@orrick.com


   Howard M. Ullman (phv05664)
   ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
   405 Howard Street
   San Francisco, CA  94105-2669
   Telephone:  (415) 773-5700
   Facsimile:  (415) 773-5759
   E-Mail:   hullman@orrick.com


   Stephen G. Foresta
   Philipp Smaylovsky
   ORRICK, HERRINGTON & SUTCLIFFE LLP
   51 West 52nd Street
   New York, NY  10019-6142
   Telephone:  (212) 506-5000
   Facsimile:  (212) 506-5151
   E-Mail:   sforesta@orrick.com
      psmaylovsky.com


   Alfred U. Pavlis (ct08603)
   Richard S. Gora (ct27479)
   Finn Dixon & Herling LLP
   177 Broad Street
   Stamford, CT  06901-2048
   Telephone:  (203) 325-5000
   Facsimile:  (203) 325-5001
   E-Mail:  apavlis@fdh.com
      rgora@fdh.com

## CERTIFICATION

I hereby certify that on November 28, 2012, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

  /s/ Khai LeQuang
Khai LeQuang (phv05640)
ORRICK, HERRINGTON & SUTCLIFFE LLP
2050 Main Street, Suite 1100
Irvine, CA  92614-8255
Telephone:  (949) 567-6700
Facsimile:  (949) 567-6710
E-Mail:   klequang@orrick.com