UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LIMA LS PLC, | : |
| Plaintiff, | : |
| | : |
| v. | :    3:12-cv-1122 (WWE) |
| | : |
| PHL VARIABLE INSURANCE COMPANY, | : |
| PHOENIX LIFE INSURANCE COMPANY, | : |
| THE PHOENIX COMPANIES, INC., | : |
| JAMES D. WEHR, PHILIP K. | : |
| POLKINGHORN, EDWARD W. CASSIDY, | : |
| DONA D. YOUNG and DOES 1-20, | : |
| Defendants. | : |

**MEMORANDUM OF DECISION ON DEFENDANTS' MOTION TO DISMISS**

In this action, plaintiff Lima LS PLC has brought its complaint concerning life insurance policies bought on the secondary market against defendants PHL Variable Insurance Company ("PHL"), Phoenix Life Insurance Company ("PLIC"), The Phoenix Companies, Inc. ("PNX") (collectively, the "Phoenix Defendants"), James Wehr, Philip Polkinghorn, Edward Cassidy, Dona Young and Does 1-20 (collectively, the "Individual Defendants"). Plaintiff alleges the following counts: (1) monopsony[1]/monopoly in violation of Connecticut General Statutes §§ 35-27 and 35-28 against the Phoenix Defendants; (2) attempted monopsony/monopoly in violation of Connecticut General Statutes §§ 35-27 and 35-28 against the Phoenix Defendants; (3) violation of the Connecticut Unfair Trade Practices Act ("CUTPA") against the Phoenix Defendants; (4)

---

[1]"Monopsony power is market power on the buy side of the market. . . . As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'" Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc., 549 U.S. 312, 321 (2007). The equation for measuring market power in monopsony is a "mirror image" of the relationships creating market power in a seller. Todd v. Exxon Corp., 275 F.3d 191, 202 (2d Cir. 2001)

violation of the Racketeering Influenced and Corrupt Organizations Act against the Individual Defendants; and (5) common law fraud and conspiracy against all defendants.

Defendants now move to dismiss this complaint for failure to state plausible claims for relief.  For the following reasons, the motion to dismiss will be granted in part and denied in part.

## I.  BACKGROUND

For purposes of ruling on a motion to dismiss, the Court accepts all allegations of the complaint as true.

Plaintiff is a company incorporated in England and Wales with limited liability.  Its principal place of business is London.

The Phoenix Companies ("PNX") is the parent company of PHL Variable Insurance Company ("PHL") and Phoenix Life Insurance Company ("PLIC").  PNX's officers and directors overlap with the officers and directors of defendants PHL and PLIC.  PLIC issued the life insurance policies owned by plaintiff.

James Wehr is the President and Chief Executive Officer of PNX.  Philip Polkinghorn is the Executive Vice President of Business Development of PNX and President of PNX's Life and Annuity Business Segment.  Edward Cassidy is the Executive Vice President of Distribution of PNX.  Dona Young was the President of PNX from 2000 to April 15, 2009; the Chief Executive Officer and Chairman of the Board of PNX from 2003 to April 15, 2009; and a consultant to PNX until at least April 15, 2010.

The Phoenix Defendants have targeted the market of high net worth individuals,

2

who may want to invest in life insurance with the knowledge that they might sell their policies in the future on the secondary market.  The Phoenix Defendants have relied upon the existence of the secondary market for life insurance to drive the primary market for life insurance policies with high death benefits.

Plaintiff is a participant and investor in the secondary market for Phoenix life insurance policies.  Plaintiff holds the interest in 197 Phoenix policies (the "Policies") currently in force that were issued between 2003 and 2009.  The Phoenix Defendants have collected premiums paid by plaintiff on these policies, although plaintiff has lapsed or surrendered 52 policies.  Plaintiff acquired the interest in the policies in December 2010 through its acquisition of five limited liability companies that held interests in the Policies.  Plaintiff has resold or attempted to resell Phoenix policies to other investors in the secondary market.

After the stock market crashed in 2008, the Phoenix Defendants sustained massive financial losses and faced difficulty in meeting contractual obligations on billions of dollars in life insurance policies.  In response to a weak financial position, the Individual Defendants and other corporate officers orchestrated a plan designed to eliminate the liabilities associated with the life insurance policies.  Defendants launched an aggressive campaign to attack and undermine previously-issued policies by refusing to honor or record transfers of ownership.  Through such strategy, a policy issued by defendants would become undesirable even to the policyholders, who would be faced with the decision whether to continue paying premiums in light of the uncertainty concerning the future payment of benefits by the Phoenix Defendants.  Thus, the uncertainty created by defendants would induce policyholders to lapse or surrender

3

their policies back to the Phoenix Defendants.  The Phoenix Defendants would then be able to keep all or most of the premiums without shedding the future liabilities associated with the policies.

Defendants have engaged in tactics to maintain or attain a monopsony for the Phoenix Defendants in light of their unique position to control the value of Phoenix life insurance policies on the secondary market.  The Phoenix Defendants have driven the secondary market purchasers out of the market while forcing secondary market sellers to decide whether to continue to pay premiums or sell their policies back for nothing or next to nothing.

The Phoenix Defendants' alleged anticompetitive acts in controlling the secondary market include: (1) refusing to record the transfer of ownership of policies to prevent the secondary market sales of policies to buyers other than the Phoenix Defendants; (2) refusing to tell policyholders whether the policies would be honored; (3) improperly raising cost of insurance ("COI") rates for unauthorized purposes, including targeting policies that were purchased by competitors in the secondary market for policies; (4) raising COI rates on policies that the Phoenix Defendants later contend are void; (5) issuing false and misleading policy illustrations that reflect higher future COI charges to cause policyholders to misprice their policies and/or cause them to make a decision to lapse or surrender their policies; (6) reneging on verifications of coverage; (7) informing policyholders that they cannot rely on the Phoenix Defendants' written statements; (8) improperly denying death benefit claims on the ground that the policies are invalid; (9) delaying and refusing to pay death benefits for pretextual and bad faith reasons; and (10) refusing to return the premiums collected when seeking to rescind or

4

void policies.

Defendants have allegedly used litigation for an improper anticompetitive purpose by initiating lawsuits without regard to fact or law seeking to void policies.  The Phoenix Defendants are now parties in approximately 86 lawsuits.

The Phoenix Defendants' conduct has resulted in a diminished secondary market for their life insurance policies.  Any buyers are only willing to purchase policies at severely reduced prices because they do not know whether the terms of the policies will be honored.  Plaintiff has suffered and will continue to suffer financial injury because it has been deprived of revenue and profits that it would have made on the policies had the value of such policies not been diminished by defendants' anticompetitive conduct.

## II.  DISCUSSION

The function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  Ryder Energy Distrib. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984).  When deciding a motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader.  Hishon v. King, 467 U.S. 69, 73 (1984).  The complaint must contain the grounds upon which the claim rests through factual allegations sufficient "to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  A plaintiff is obliged to amplify a claim with some factual allegations to allow the court to draw the reasonable inference that the defendant is liable for the alleged conduct.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

5

With regard to allegations of fraud or fraudulent conduct, a plaintiff must comply with the higher pleading standard required by Federal Rule of Civil Procedure 9.  In order to satisfy Rule 9(b), a complaint must: (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements or omissions were made; and (4) explain why the statements or omissions were fraudulent.  Antian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 88 (2d Cir. 1999).  A plaintiff may make general allegations of malice, intent, knowledge or other state of mind, but the facts must give rise to a strong inference of fraudulent intent. Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).  The purpose of the specificity requirement is:  (1) to ensure that a complaint provides a defendant with fair notice of plaintiff's claim; (2) to safeguard a defendant's reputation from improvident charges; and (3) to protect defendant from a strike suit.  O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991).

### A.    Antitrust

Plaintiff has brought its antitrust claims pursuant to the Connecticut Antitrust Act, Connecticut General Statutes §§ 35-24 through 35-45.  Specifically, plaintiff has alleged claims for monopsony and attempted monopsony under Section 35-27, which provides that "every contract, combination or conspiracy to monopolize, or attempt to monopolize, or monopolization of any part of trade or commerce is unlawful;" and Section 35-28, which prohibits contracts, concerted action or conspiracy to engage in certain anticompetitive action, including, inter alia, price fixing; controlling rates or fees; limiting production, sale or supply; allocating or dividing customers or markets; or refusals to deal with another party.

6

Defendants assert that plaintiff's Section 35-28 claims fail because plaintiff cannot establish concerted action; and that plaintiff's Section 35-27 claim fails because (1) the relevant product market cannot be limited to the Phoenix Defendants' brand; (2) Phoenix Defendants have no market power; and (3) plaintiff has not alleged that the Phoenix Defendants engaged in anticompetitive conduct.  Generally, Connecticut courts follow federal precedent to interpret the Connecticut Antitrust Act unless the text of the statute or other relevant state law requires a different interpretation.  Westport Taxi Serv., Inc. v. Westport Transit Dist., 235 Conn. 1, 15 (1995).

      1.    Section 35-28

Section 35-28 has been interpreted to codify federal case law relevant to "per se" antitrust violations, notably Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, which prohibits restraints of trade effected by a contract, combination or conspiracy.  Elida, Inc. v. Harmor Realty Corp., 177 Conn. 218, 227 (1979); Southern New England Tel. Co. v. Coho, 2005 WL 3112732, *2 (Conn. Super. 2005).  A violation of Section 35-28 requires an unlawful contract, combination or conspiracy to commit certain anticompetitive acts, and therefore, it requires a plurality of actors.  Shea v. First Federal Savings & Loan Ass'n of New Haven, 184 Conn. 285, 306 (1981).  Here, plaintiff claims that the Phoenix Defendants, which comprise a parent corporation and two wholly-owned subsidiaries, violated Section 35-28.  However, action by a corporation and its wholly-owned subsidiaries cannot constitute a conspiracy or concerted action between distinct legal entities.  Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769 (1984); Austrian M.D. v. United Health Grp., Inc., 2007 WL 2363301, *7 (Conn. Super. 2007).  Accordingly, the claims of Section 35-28

7

violation will be dismissed.

      2.    <u>Section 35-27</u>

Section 35-27 is patterned after Section 2 of the Sherman Act.  <u>Wyatt Energy,</u>

<u>Inc. v. Motiva Enterprises, LLC</u>, 2013 WL 2321454, *4 (Conn. May 30, 2013).  Thus,

plaintiff's claim of monopsony in violation of Section 35-27 requires proof of (1)

possession of monopsony/monopoly power in a relevant market and (2) the willful

acquisition or maintenance of that power as distinguished from growth attributable to a

superior product, business acumen or historic accident.  <u>Shea</u>, 184 Conn. at 305.

      a.    Relevant Market

The relevant market refers to the relevant product market and the relevant

geographic market.  <u>PepsiCo, Inc. v. Coca-Cola Co.</u>, 315 F.3d 101, 105 (2d Cir. 2002).

Market definition is a fact-intensive inquiry that is generally not determined on a motion

to dismiss.  <u>See</u> <u>Todd</u>, 275 F.3d at 199.  At this stage of the case, a plaintiff must plead

a market that is plausible and rational.  <u>IHS Dialysis Inc. v. Davita, Inc.</u>, 2013 WL

1309737, *4 (S.D.N.Y. 2013).

In this instance, the relevant market is the secondary market for life insurance

policies issued by the Phoenix Defendants.  Defendants argue that plaintiff cannot

establish a rational or plausible single-brand market.  <u>See</u> <u>Green Country Food Mkt.,</u>

<u>Inc. v. Bottling Group, LLC</u>, 371 F.3d 1275, 1282 (10th Cir. 2004) (explaining that

single-brand markets do not generally constitute the relevant market).

Plaintiff counters that it can establish a single-brand market based on <u>Eastman</u>

<u>Kodak Co. v. Image Tech. Servs., Inc.</u>, 504 U.S. 451 (1992) and its progeny as applied

to the plaintiff's allegations of monopsony.

In Kodak, independent service organizations ("ISOs") that serviced Kodak copying and micrographic equipment alleged that Kodak unlawfully tied the sale of Kodak machines with the sales of parts and monopolized or attempted to monopolize the sale of service of Kodak machines.  Kodak competed with the ISOs for service contracts relevant to Kodak equipment.  After Kodak restricted access to its parts, the ISOs were unable to obtain service contracts due to the lack of supply of parts.  The Supreme Court held that market power in the secondary market for replacement parts and service for Kodak equipment could be unlawful, although Kodak lacked economic power in the primary market for photocopiers and micrographic equipment.  Id. at 481. Specifically, it was plausible to infer Kodak's exertion of market power based on evidence of locked-in customers, high information and switching costs, and discriminatory pricing.  Id. at 477.  Important factors to the Supreme Court's holding included (1) the fact that Kodak consumers had not entered into a contract to consume Kodak parts and services upon purchase of certain Kodak equipment; and (2) difficulties with obtaining accurate information and the costs of switching brands prevented consumers from discovering that the purchase of the Kodak brand entailed a "de facto" commitment to consume only supracompetitively priced Kodak service contracts.  Newcal Indus. v. IKON Office Solution, 513 F.3d 1038, 1046 (9th Cir. 2008).

Thus, the Court must consider whether plaintiff has sufficiently alleged the Kodak factors: (1) high switching costs faced by a substantial number of customers; (2) high information costs faced by a substantial number of customers; and (3) exploitation of the "locked-in" customers.  Commercial Data Servers, Inc. v. International Business Machines Corp., 262 F. Supp. 2d 50, 71 (S.D.N.Y. 2003).

9

As to the first factor, plaintiff has alleged that purchasers of Phoenix life insurance policies become locked into a Phoenix-specific secondary market due to high switching costs involving a lengthy application process.  Plaintiff also alleges that another life insurance company is not likely to insure the same individual with an additional policy and that need for additional policies from another insurer is diminished.  As to information costs, plaintiff has alleged that the "lifecycle cost of universal life insurance policies generally, and of Phoenix policies in particular, is not transparent to prospective insureds in the primary market; it is instead difficult to understand and opaque."  Plaintiff alleges further that "[c]onsumers who are the primary market purchasers of life insurance have little or no access" to information concerning the basis of the COI rate, which is "essential to the understanding of the true lifecycle cost of a life insurance policy."  The complaint maintains that "insurers do not disclose precisely how they have priced their policies, and they write their contracts in a manner that makes them virtually incomprehensible to policyholders."  Relevant to the third factor, plaintiff asserts that the Phoenix Defendants changed practices by raising or attempting to raise the COI rates on policyholders who exercised their right to maintain lower accumulated policy values and that the change in practices was not known or foreseeable to policyholders at the time of policy purchase.

Plaintiff refutes defendants' assertion that plaintiff cannot establish a plausible single-brand market without an allegation of tying.  Plaintiff argues that it need not allege any tying of product sales because this case involves a monopsony.  Plaintiff explains that, in a monopsony, the primary market seller (the secondary market monopsonist) seeks to buy products in the secondary market at low costs and cuts off

the secondary market seller from other potential buyers; by contrast, in a monopoly, the primary market seller seeks to sell additional products in the secondary market, which can be achieved by tying the primary market purchaser to additional purchases of secondary products from the same seller.  See Eastman Kodak, 504 U.S. at 464 n.9. Thus, plaintiff maintains that it has sufficiently established a plausible monopsony by alleging that potential buyers of the policies have been driven out of the secondary market.  Taking the allegations as true, the Court finds that plaintiff has alleged a plausible market based on a single-brand market.

      b.    Market Power

     Defendants assert that plaintiff cannot plausibly allege that the Phoenix Defendants held and maintained market share and market power over a sustained period of time as required for an antitrust claim.  See Todd, 275 F.3d at 199. Defendants argue that no barriers exist to prevent other purchasers from entering the market and that the Phoenix Defendants do not participate in the market.

     Plaintiff has alleged that the Phoenix Defendants retain a 75% share of the secondary market for Phoenix life insurance policies, which should be sufficient to establish market power for antitrust purposes.  Image Tech. Servs. Inc. v Eastman Kodak Co.,125 F.3d 1195, 1206 (9th Cir. 1997) (65% market share establishes a prima facie case of market power).  Defendants complain that this percentage includes the policies that have lapsed and been surrendered to the Phoenix Defendants, which are occurrences provided for by the life insurance contract.

     Plaintiff counters that the Court should focus upon the "economic reality of the market at issue."  Eastman Kodak, 504 U.S. at 467.  Plaintiff points out that the

Supreme Court affirmed that market power could derive from a defendant's ability to use leases to exclude competitors from the market.  Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 486 n.3 (1968).  Plaintiff has alleged that the lapses or surrenders are the economic equivalent of a purchase and involve a transfer of the policy in exchange for consideration; that the Phoenix Defendants intended to buy policies in the secondary market; and that the Phoenix Defendants included language in the policies affording the right to offer "consideration" in amounts not set by contract. Further, plaintiff has alleged that the Phoenix Defendants have gained market power in the secondary market as a result of anticompetitive and exclusionary conduct such as fraudulent statements, refusals to pay, and COI rate increases.  The Court finds that plaintiff has adequately alleged that the Phoenix Defendants have market power.  The Court should determine the factual issues concerning the economic reality of the market, including the barriers to entry, on summary judgment.

      c.     Exclusionary Conduct

Defendants assert that plaintiff has failed to allege exclusionary conduct or anticompetitive acts.  Defendants maintain that the alleged policy correspondence, legal actions, COI rate increases, policy illustrations, and refusals to confirm coverage constitute lawful conduct that may have created uncertainty among the investors.

Exclusionary conduct consists of acts that tend to impair the opportunities of rivals and that do not further competition on the merits or do so in an unnecessarily restrictive way.  Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 n.32 (1985).

        i.     Litigation

Plaintiff has alleged that defendants pursued a "massive wave of litigation" against policyholders and have taken litigation positions in order to interfere with secondary market competition.  Defendants contend that the litigation represents a legitimate effort to seek redress from the courts and that such conduct is immune from antitrust liability.  See Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510-11 (1972).  An exception to this immunity exists when litigation is used as an anticompetitive weapon.  Kearney v. Foley & Larner, LLP, 590 F.3d 638, 643-44 (9th Cir. 2009).  The antitrust plaintiff must demonstrate that the lawsuit was (1) objectively baseless, and (2) a concealed attempt to interfere with the plaintiff's business relationships rather than an attempt to achieve a legal remedy.  Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60 (1993).

Defendants maintain that abundant legal precedent affirms that insurers may challenge policies for lack of an insurable interest even after the two-year contestibility provision has expired.  See PHL Variable Ins. Co. v. Charter Oak Trust, 2012 WL 2044416, *6 (Conn. Super. 2012); PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust, 28 A.3d 1059, 1067 (Del. Supr. 2011).  In accordance with this precedent, defendants have legitimately pursued litigation to challenge insurance policies that appear to lack insurable interests.[2]  Accordingly, the Court finds defendants' litigation was not objectively baseless and is therefore immune from antitrust liability.

---

[2]Courts have also held that the Phoenix Defendants are entitled to retain premiums on a policy that has been found to have been fraudulently procured.  PHL Variable Ins. Co. v. Morello Irrevocable Trust, 645 F.3d 965, 970 (8th Cir.2011).

ii.     Refusals to Verify Policies

Plaintiff alleges as exclusionary conduct the Phoenix Defendants' refusals to verify policy validity and payment of benefits on future policy claims.  Defendants maintain that there is no legal obligation to do so.

In an unpublished decision, the Central District of California noted:  "Phoenix's obligation to pay the death benefits is contingent on the Receiver's continued performance of the insurance contracts by timely paying the premiums.  In sum, Phoenix's obligations are not yet due, may never become due if the Receiver decides to stop paying the premiums, and, in event the Policies do mature, Phoenix may decide to pay them."  Mosier v. Phoenix Life Insurance Co., 3:12cv227 (PSG-E) (C.D. Cal. August 7, 2012).  The Court recognizes the contingent nature of the Phoenix Defendants' obligation to pay benefits.  However, a recent decision concerning a factually analogous case from the District of Minnesota is instructive.

The District Court of Minnesota considered the plausibility of a fraud claim based on allegations that PHL had represented that a life insurance policy was "in force," "issued" and had "value," although PHL actually considered the policy void and intended to challenge it.  U.S. Bank National Assoc. v. PHL Variable Insurance Co., 2013 WL 2936099 (D. Minn. June 14, 2013). The Court ruled that the claim of fraud based on affirmative misrepresentation failed because PHL's statements that the policy was "in force" "issued" and had "value" were not false at the time.  However, the Court held that PHL could be liable for fraudulent nondisclosure.  Based on the allegations, PHL had a duty to disclose that it considered the policy void and would challenge it:  (1) PHL had sole knowledge of its intentions; and (2) PHL's communications had led U.S.

Bank to believe that it would honor the policy when PHL actually intended to challenge it.  This holding is consistent with the legal principle that a duty to disclose known facts is imposed on a party insofar as it voluntarily makes a disclosure.  Macomber v. Travelers Property and Cas. Corp., 261 Conn. 620, 635 (2002).  Plaintiff has alleged that defendants made numerous representations by mail that the Policies were valid, in force and that the Policies would not be contested, but that defendants intended not to honor the policies and to contest them.  Taking these allegations as true, the Court finds that defendants did have a duty to disclose a known intention to contest or not to honor the Policies.  The Court will leave plaintiff to its proof.

iii.     Refusals to Record Transfers of Ownership

Plaintiff alleges that, in March 2009, the Phoenix Defendants refused to record transfers of ownership in response to requests by several trusts.  Defendants maintain that plaintiff should have alleged other instances where the Phoenix Defendants refused to record ownership changes and that plaintiff has failed to allege that defendants have refused to record transfers of ownership relevant to plaintiff's Policies. However, plaintiff has alleged that such bad faith conduct was intended to, and did, substantially depress demand for Phoenix policies in the secondary market.  Plaintiff has alleged the requisite facts to establish plausible exclusionary conduct.  It need not allege that defendants refused to record transfers of ownership relevant to plaintiff's Policies or cite to other instances of such conduct.

iv.     Policy Liens

Plaintiff asserts that the Phoenix Defendants have revived policy liens to limit transferability and avoid payment of claims.  At paragraph 132, plaintiff alleges:

15

"Phoenix claimed it could not pay the benefits [that had become due when the insureds passed away] unless plaintiff provided Phoenix with a schedule to a purchase agreement to which plaintiff was not a party, which Phoenix said it needed to prove that its own prior conduct in releasing the collateral assignments had, in fact, been correct." At paragraph 134, plaintiff alleges:

> Phoenix used this pretense to delay the payment of $30 million to Lima for six months, after which Phoenix was finally forced to pay. . . . Phoenix engages in this sort of conduct in order to make Plaintiff and other actual and potential market participants believe they cannot rely on Phoenix's own representations and policy information received directly from Phoenix. With such unreasonable conduct and the resulting uncertainty, no potential market participant would be willing to compete with Phoenix in the acquisition of Phoenix policies in the secondary market.

Defendants contend that this conduct cannot be considered exclusionary because plaintiff has now been paid in full. However, plaintiff has alleged sufficient facts to establish plausible anticompetitive conduct based on defendant's revival of previously released liens.

> v.   Policy Correspondence and Notice of COI Rate Increases

Plaintiff has alleged that the Phoenix Defendants issued false policy statements; and that defendants' notices of COI rate increases[3] and fraudulent policy illustrations

---

[3]Defendants argue that the allegedly improper COI increases predate plaintiff's acquisition of the Policies. COI increases were recognized by plaintiff as a risk factor bearing the value of its investment. The publicly available "Listing Particulars" issued by plaintiff in connection with a security offering involving the Policies states that "at least one life insurance company publicly announced an increase in its cost of insurance policies earlier this year, which creates a meaningful possibility that the cost of insurance under one or more Policies may be higher than currently anticipated since such increase may include Policies within the Portfolio as well as lead to similar increases by such insurance company or other insurance companies that affect other Policies." However, the Court cannot determine on this motion to dismiss the extent to which plaintiff was aware of the alleged COI increases by the Phoenix Defendants prior

overstating the COI rates represented part of a fraudulent scheme to induce lapses of policies and thereby monopsonize the secondary market.  The Court must consider the allegations to be true on a motion to dismiss, and therefore, it cannot determine whether defendants' conduct was actually legal or fraudulent at this stage of the pleadings.

       3.    Attempted Monopsony

Plaintiff has alleged attempted monopsony, which requires allegations that (1) defendants engaged in predatory or anticompetitive conduct; (2) defendants had the intent to monopsonize; and (3) there was a dangerous probability of achieving monopsony power.  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993).

Defendants maintain that there is no risk of the alleged monopsony because plaintiff has not alleged a plausible market, market power or exclusionary conduct.  For the reasons previously articulated with regard to the claim of monopsony, the Court finds that plaintiff has alleged a plausible attempted monopsony claim.

**B.**    **CUTPA**

Plaintiff has based its CUTPA claim upon violation of the Connecticut Unfair Insurance Practices Act ("CUIPA").[4]  Plaintiff alleges that the Phoenix Defendants' anticompetitive conduct violates CUIPA's prohibition of "[b]oycott, coercion, and

_____

to acquisition of the Policies.

[4]The Connecticut Supreme Court has not yet decided whether a private right of action exists under CUIPA.  U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co., 2013 WL 791462, *10 n.10 (S.D.N.Y. 2013).  However, it is well settled that violations of CUIPA may be alleged as a basis of CUTPA.  Nazami v. Patrons Mut. Ins. Co., 280 Conn. 619, 625 (2006).

intimidation" as unfair and deceptive acts in the business of insurance.  Defendants

maintain that plaintiff has not alleged conduct giving rise to a CUTPA claim within the

insurance context.

Defendants argue that a "boycott" has been defined within the context of antitrust

law as "a concerted refusal to deal" with a disfavored purchaser or seller.  <u>St. Paul Fire

& Marine Ins. Co. v. Barry</u>, 438 U.S. 531, 536 (1978); and that "coercion" and

"intimidation" have been defined by courts as compulsion accompanied by threats of

serious harm or words that place the complainant in a state of fear.  <u>See</u> <u>United States

v. Paris</u>, 2007 WL 3124724, at *12 (D. Conn.  2007) (defining coercion in the context of

a federal criminal statute prohibiting sex trafficking by fraud, force or coercion); <u>State v.

Myers</u>, 21 A.3d 499, 503 (Conn. App. 2011) (defining intimidation according to everyday

meaning).

Plaintiff does not address defendants' assertion that no cognizable boycott has

been alleged.  It counters that the complaint alleges that the Phoenix Defendants have

engaged in coercion and intimidation by trying to force policyholders to lapse or

surrender their policies.

The Court notes that defendants' cases defining "coercion" and "intimidation" are

not specific to the context of CUIPA.  Defendants have provided no authority indicating

that the Connecticut legislature intended that coercion and intimidation should be

afforded such meaning to maintain a CUIPA claim.  Accordingly, the Court will not

dismiss these claims on the motion to dismiss because the law does not firmly establish

that dismissal is proper.  See Acadia Ins. Co. v. Connecticut Light & Power Co., 2013 WL 467817, *1 (D. Conn. 2013) (dismissal on a motion to dismiss is not appropriate if the claim can be construed as plausible).

  Additionally, plaintiff contends that its allegations against defendants also satisfy the other provisions of CUIPA that prohibit misrepresentations, false advertising, false information and unfair claim settlement practices.  Although the complaint does not clearly allege that it asserts such violations of CUIPA, the Court finds that the complaint is susceptible to such interpretation.

Defendants also assert that plaintiff has not alleged damages.   For purposes of CUTPA, the extent of the loss need not always be proven with specificity but a party must show that the CUTPA violation produced some loss.  Nationwide Mut. Ins. Co. v. Mortensen, 606 F.3d 22, 30 (2d Cir. 2010).  In certain circumstances, nominal damages may be awarded on a CUTPA claim where a party has demonstrated liability but is unable to prove the amount of damages incurred.  See Whitaker v. Taylor, 99 Conn. App. 719, 733 (2007).  In ruling on this motion to dismiss, the Court cannot determine as a matter of law that plaintiff's claim fails for lack of damages.

Accordingly, the Court will allow plaintiff to amend the complaint to clarify the violations of CUIPA that it asserts within count three.

**C.    RICO**

Defendants argue that plaintiff's RICO allegations are deficient because (1) plaintiff has not adequately alleged how the Individual Defendants were involved in the racketeering acts; (2) plaintiff has alleged anticipatory breach of contract rather than mail and wire fraud; (3) plaintiff lacks standing because it has not been injured; (4)

plaintiff has failed to allege a conspiracy; and (5) the McCarran-Ferguson Act exempts defendants' activities from RICO liability.

       1.    <u>Individual Defendants' Alleged Conduct</u>

       Plaintiff alleges that the Individual Defendants are liable under the civil RICO statute, 18 U.S.C. § 1962(c), which provides that it is unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."  A RICO claim based on mail and wire fraud must satisfy Federal Rule of Civil Procedure 9(b) by pleading with particularity the circumstances constituting fraud.  <u>See</u> <u>Lundy v. Catholic Health Sys. of Long Island Inc.</u>, 711 F.3d 106, 119 (2d Cir. 2013).   Facts must be alleged as to each individual defendant.  <u>DeFalco v. Bernas</u>, 244 F.3d 286, 306 (2d Cir. 2001).

       A plaintiff must establish that a RICO person directed a RICO enterprise in a pattern of racketeering activity that proximately caused injury to plaintiff's business or property.  <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 496 (1985).  Here, plaintiff alleges that defendants perpetrated their fraudulent scheme through mailings.   A RICO "enterprise" must be separate and distinct from the "person" conducting the racketeering activities of the enterprise.  <u>DeFalco</u>, 244 F.3d at 307.  A corporate entity cannot be the "enterprise" and the "person" engaged in the activity prohibited under RICO.  <u>Bennett v. U.S. Trust Co. of N.Y.</u>, 770 F.2d 308, 315 (2d Cir. 1985). Accordingly, where "employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the

employees in association with the corporation do not form an enterprise distinct from the corporation.  Riverwoods v. Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir. 1994).

Defendants advance that the complaint is deficient because it lacks specific allegations concerning each defendant's participation in the enterprise. Defendants posit that the complaint alleges that defendants collectively "resolved" to prevent the Phoenix Defendants from paying claims on investor-owned policies and "directed" routine correspondence that failed to disclose the intent to void the policies.

Plaintiff counters that the complaint meets the requirement of alleging participation pursuant to Section 1962(c) as set forth by the "operation and management test" of Reves v. Ernst & Young, 507 U.S. 170, 185 (1993), which provides that in order to conduct or participate in the affairs of an enterprise, "one must participate in the operation or management of the enterprise itself."  A plaintiff must allege facts sufficient to establish that a RICO defendant had "part in directing the enterprise's affairs."  Id. at 179.

The complaint alleges, inter alia, that the Individual Defendants (1) are senior executives who formed an Insider's Circle that worked to bury information and prevent information from leaking; (2) "made a conscious decision" not to honor policies owned by investors that were purchased in the secondary market; (3) directed affirmative misrepresentations to policyholders about the decision not to honor the policies; (4) misled investors to continue making premium payments despite the intent to rescind or void the policies; and (5) directed notices to policyholders advising them that COI rates were being raised so as to shock policyholders into lapsing or surrendering their

21

policies.  Courts have dismissed actions where a plaintiff has alleged only that the

RICO defendant was involved in the alleged enterprise.  See In re Smithkline Beecham

Clinical Laboratories, Inc.,108 F. Supp. 2d 84, 99 (D. Conn. 1999) (citing cases).

Although the complaint is highly detailed with regard to the value of defendants'

stock shares and marketing of insurance policies to be sold to investors in the

secondary market, the complaint lacks specific allegations as to actual acts specific to

each of the Individual Defendants.  At present, the complaint provides conclusory or

even speculative allegations regarding the Individual Defendants' intent, participation

and management of the alleged RICO Phoenix enterprise.  Plaintiff appears to rely

upon the corporate positions of the Individual Defendants to indicate their ability to

direct or manage the enterprise.  Accordingly, the Court will grant the motion to dismiss

on the ground that plaintiff has failed to allege conduct by the Individual Defendants

with adequate specificity.

Defendants also argue that plaintiff has failed to establish allegations of a

plausible RICO conspiracy pursuant to 18 U.S.C. § 1962(d), which provides that it is

"unlawful for any person to conspire to violate any of the provisions of" 18 U.S.C. §

1962(a), (b) or (c).  Thus, plaintiff must establish (1) that defendants agreed to facilitate

the operation of a RICO enterprise through a pattern of racketeering activity; and (2)

that defendants agreed to commit the requisite predicate acts in furtherance of a

pattern of racketeering activity in connection with the enterprise.  Cofacredit, S.A. v.

Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 244 (2d Cir. 1999).

Defendant asserts that plaintiff's claim for conspiracy also fails because plaintiff

has not sufficiently pleaded its RICO claim under Section 1962(c).  To the extent that

plaintiffs' Section 1962(c) claim is subject to dismissal, the Court will also dismiss the claim of conspiracy.

To determine whether plaintiff should be afforded the opportunity to replead, the Court must consider defendants' arguments relevant to lack of predicate acts, lack of injury and standing, and the McCarran-Ferguson Act.

2.    Mail and Wire Fraud

Plaintiff alleges that defendants used the mail and wires to send correspondence that contained mispresentations of fact or fraudulently concealed that defendants secretly intended to deny death claims on life insurance.  Plaintiff may not predicate a RICO claim on a hypothetical or anticipatory fraud.  Giuliano v. Fulton, 399 F.3d 381, 389 (1st Cir. 2005).  Thus, plaintiff may not rely on the allegation of misrepresentations to the policyholder, but it may predicate the mail and wire fraud on the alleged fraudulent nondisclosure. See Duska v. Middletown, 173 Conn. 124, 127 (1977) (explaining mere nondisclosure does not amount to fraud except when there is a failure to disclose known facts under circumstances that impose a duty to speak).  In light of this Court's prior discussion regarding the Phoenix Defendants' duty to disclose known facts relevant to defendants' intention to pay future policy benefits, the Court finds that plaintiff may predicate the RICO claims pursuant to Sections 1962(c) and 1962(d) on mail and wire fraud based on fraudulent nondisclosure.

3.    Injury and Standing

Defendants maintain that plaintiff's claims are unripe and lack the requisite injury.  RICO provides a cause of action to "[a]ny person injured in his business or property by reason of" a RICO violation.  18 U.S.C. § 1964(c).

23

Defendants complain that plaintiff has not yet submitted a death benefit claim, and therefore, it cannot assert that it has sustained damages due to defendants' failure to pay on the claim.  Defendants assert that plaintiff cannot seek recovery for payments on claims that it believes will not be honored.

The RICO violation at issue must be proximate cause of the injury to plaintiff's business or property.  Terminate Control Corp. v. Horowitz, 28 F.3d 1335, 1344 (2d Cir. 1994); a plaintiff must have sustained clear and definite damages.  Allstate Ins. Co. v. Lyons, 843 F. Supp. 2d 358, 374 (E.D.N.Y. 2012).  A claim will be dismissed for lack of statutory standing where the extent of damages remains unknown and the injury is speculative.  DeSilva v. North Shore-Long Island Jewish Health Sys., Inc., 770 F. Supp. 2d 497, 520 (E.D.N.Y. 2011).  Whether the claim involves "uncertain or contingent events that may not occur" represents an important consideration to the determination of a RICO claim's ripeness for adjudication.  Lincoln House, Inc. v. Dupre, 903 F.2d 845, 847 (1st Cir. 1990).

In this instance, plaintiff pleaded that it has already lost money due to Policies that have either lapsed or been surrendered, and that defendants have failed to pay or delayed making payments on $33 million in claims.  Plaintiff also asserts that defendants' fraudulent scheme has resulted in the devaluation of the Policies.  These alleged injuries are all susceptible to a proof because they are not contingent upon events that are yet to occur.

Plaintiff has also alleged that defendants' fraud-- including the statements concerning policy validity that failed to disclose the intent to challenge the Policies--has caused plaintiff to purchase the Policies and continue making premium payments.

24

Such injury is premised upon the contingency that plaintiff will not recover the benefits

of the Policies.  Accordingly, the Court will dismiss any claimed injuries that are hinged

upon facts that have yet to be determined.

   4. McCarran-Ferguson Act

   Defendants argue that plaintiff's claims are incompatible with the McCarran-

Ferguson Act.

   The McCarran-Ferguson Act provides that "continued regulation and taxation by

the several States of the business of insurance is in the public interest," and that

"silence on the part of the Congress shall not be construed to impose any barrier to the

regulation or taxation of such business by the several States." 15 U.S.C. § 1011.

Section 1012(b) provides that federal legislation not specifically relating to the business

of insurance cannot be "construed to invalidate, impair, or supersede any law enacted

by any State for the purpose of regulating the business of insurance."  The Supreme

Court has held that RICO is applicable in the insurance context when it aids or

enhances the state regulation and "does not frustrate any declared state policy or

disturb the State's administrative regime . . . ."  Humana Inc. v. Forsyth, 525 U.S. 299,

303 (1999).  Courts should not go out their way to find impairment of a state scheme

without clear indication of impairment.  Weiss v. First Unum Life Ins. Co., 482 F.3d 254,

268 (3d Cir. 2007).

    Defendants argue that application of RICO would disrupt Connecticut

insurance law that regulates the content of information transmitted to a policyholder.

Defendants point out that Connecticut insurance regulations require the issuance of

annual policy statements that specify information including policy values and death

benefits and production of an illustration that contains specific information.  However, defendants doe not elaborate as to how a federal cause of action seeking remedies for fraud related to the annual statements and illustrations will invalidate, impair and supersede Connecticut's insurance laws.

In Humana, the Supreme Court noted that Nevada law provided both statutory and common law remedies, including punitive damages for bad faith conduct, to check insurance fraud; RICO's provision for treble damages, which could be lower than a punitive damages award pursuant to Nevada law, appeared to complement the existing remedies. 525 U.S. at 311.  In Connecticut, punitive damages may be awarded upon a showing of fraud, O'Leary v. Industrial Park Corp., 211 Conn. 648, 651 (1989), or for violations of CUIPA brought pursuant to CUTPA.  United Technologies Corp. v. American Home Assur. Co., 118 F. Supp. 2d 174, 175 (D. Conn. 2000).  Connecticut common law punitive damages are limited to a plaintiff's litigation expenses less taxable costs.  Hylton v. Gunter, 142 Conn. App. 548, 2013 WL 1905333, *3 (2013).  However, CUTPA does not prescribe an approach for calculating punitive damages but instead leaves such determination to the discretion of the trial court.  Carrillo v. Goldberg, 141 Conn. App. 299, 313 (2013).  Thus, a plaintiff seeking relief under Connecticut law could recover damages exceeding RICO's treble damages.  See Humana, 525 U.S. at 313.  Accordingly, the Court finds no frustration of state policy by the instant RICO litigation.  The McCarran-Fergusan Act does not prohibit plaintiff's RICO claim.

### D.   Fraud and Conspiracy

Plaintiff alleges fraud and conspiracy against all defendants.  Defendants argue that the fraud and conspiracy claims fail for the same reason as the RICO claim.

Consistent with the discussion relevant to the RICO claim, plaintiff has not pleaded fraud with particularity with regard to the conduct by the Individual Defendants.

The Court will dismiss the claim of conspiracy with prejudice because the allegations concern conduct of employees acting in the scope of their duties for their employer.  The intracorporate conspiracy doctrine bars a finding of conspiracy among employees of a corporation where the wrongful conduct was performed within the scope of official duties where the conduct (1) occurs within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer.  Harp v. King, 266 Conn. 747, 782 (Conn. 2003); Metcoff v. Lebovics, 123 Conn. App. 512, 527 (2010) (an employee acts within the scope of his employment as long as he or she is discharging duties no matter how irregularly). The intracorporate conspiracy doctrine does not bar claims of conspiracy based on private acts performed by persons who work at the same place of employment.  Harp, 266 Conn. at 777.  Here, plaintiff argues that it has alleged that the Individual Defendants were motivated by personal self-interest.  However, the allegations establish that the Individual Defendants were also acting in their official duties within the scope their employment and motivated, at least in part, to further the interest of the Phoenix Defendants.

### E.    Repleading

Federal Rule of Civil Procedure 15 provides that leave to amend a pleading "shall be freely given when justice so requires."  Generally, courts permit repleading after granting a motion to dismiss.  Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991).  However, a district court has discretion to deny repleading where

27

there is no indication from a liberal reading of the complaint that an amendment will cure the deficiency of the complaint.  See Leonelli v. Pennwalt Corp., 887 F.2d 1195, 1198-99 (2d Cir. 1989).  The Court has found that plaintiff's claims of RICO violation and fraud fail for lack of particularity concerning the conduct of the Individual Defendants but that such claims are not otherwise deficient.  Accordingly, the Court will permit plaintiff the opportunity to replead its RICO and fraud claims with particularity.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS the motion to dismiss as to the alleged violations of Connecticut General Statutes § 35-28 and the claim of common law conspiracy, which are dismissed with prejudice.  The Court GRANTS the motion to dismiss as to the RICO and common law fraud claims, which are dismissed without prejudice. The Court DENIES the motion to dismiss as to the alleged violations of Connecticut General Statutes § 35-27, although the allegations that defendants' litigation constitutes exclusionary conduct are dismissed. The Court also DENIES the motion to dismiss the claim of CUTPA violation.

Within thirty days of this Ruling's filing date, plaintiff should file an amended complaint consistent with this Ruling.

Dated at Bridgeport, Connecticut, this 1st day of July 2013.

_____/s/_____
Warren W. Eginton
Senior United States District Judge