UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LIMA LS PLC,<br><br>    Plaintiff,<br><br>  v.<br><br>PHL VARIABLE INSURANCE COMPANY, a Connecticut corporation; PHOENIX LIFE INSURANCE COMPANY, a New York corporation; THE PHOENIX COMPANIES, INC., a Connecticut corporation; JAMES D. WEHR, an individual; PHILIP K. POLKINGHORN, an individual; and DONA D. YOUNG, an individual,<br><br>    Defendants. | No. 3:12-cv-01122 (WWE)<br><br>**AMENDED COMPLAINT FOR:**<br><br>**(1)  VIOLATIONS OF CONNECTICUT ANTITRUST ACT, CONN. GEN. STAT. §§ 35-24, ET SEQ.;**<br><br>**(2)  VIOLATIONS OF CONNECTICUT ANTITRUST ACT, CONN. GEN. STAT. §§ 35-24, ET SEQ.;**<br><br>**(3)  VIOLATIONS OF CONNECTICUT UNFAIR TRADE PRACTICES ACT, CONN. GEN. STAT. §§ 42-110A, ET SEQ.;**<br><br>**(4)  VIOLATIONS OF CONNECTICUT UNFAIR TRADE PRACTICES ACT, CONN. GEN. STAT. §§ 42-110A, ET SEQ.;**<br><br>**(5)  FRAUD;**<br><br>**(6)  VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1962(C) AND (D); AND**<br><br>**(7)  FRAUD**<br><br>**<u>JURY TRIAL DEMANDED</u>**<br><br>JULY 31, 2013 |

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................................................................................ 1

II. GENERAL BACKGROUND ...................................................................................... 5

III. JURISDICTION AND VENUE ................................................................................ 12

IV. THE PARTIES ......................................................................................................... 13

V. LIFE INSURANCE .................................................................................................. 15

VI. THE SECONDARY MARKET FOR LIFE INSURANCE ...................................... 17

VII. PHOENIX ................................................................................................................ 19

    A.       Phoenix's Struggles After Its Demutualization in 2001 ........................... 19

    B.       Phoenix's Use of the Secondary Market to Increase Sales in the Primary
           Market ...................................................................................................... 21

    C.       Phoenix's Massive Losses As a Result of the 2008 Financial Crisis ................ 34

VIII. DEFENDANTS' UNLAWFUL STRATEGY TO SHED BILLIONS OF
      DOLLARS OF FUTURE LIABILITIES..................................................................... 36

IX. DEFENDANT PHOENIX'S ANTICOMPETITIVE STRATEGY AND CONDUCT ........ 40

    A.       PHL Has Improperly Refused or Delayed the Processing of Policy
           Transfers ................................................................................................... 42

    B.       Phoenix Refuses to Tell Policyholders Whether It Will Honor Their
           Policies ..................................................................................................... 43

    C.       Defendant Phoenix Has Improperly Attempted to  Raise Insurance Rates
           on Its Policies ........................................................................................... 44

    D.       Phoenix Has Issued False and Misleading Policy Illustrations ......................... 50

    E.       Phoenix Has Regularly Denied Claims for Death Benefits on Baseless and
           Pretextual Grounds................................................................................... 51

    F.       Phoenix Refuses to Return the Premiums It Has Collected When Seeking
           to Rescind or Void Its Own Policies........................................................ 53

X. THE SUCCESS OF PHOENIX'S ANTICOMPETITIVE CAMPAIGN............................. 57

XI. PHOENIX'S ANTICOMPETITIVE PURPOSE AND INTENT ........................................ 60

XII. THE RELEVANT MARKETS ................................................................................. 61

    A.       Relevant Product Market ......................................................................... 61

    B.       Relevant Geographic Markets.................................................................. 64

XIII. THE SECONDARY MARKET FOR PHOENIX POLICIES............................................ 64

XIV. PHOENIX'S MARKET POWER IN THE SECONDARY MARKET ........................... 68

**TABLE OF CONTENTS**
(continued)

**Page**

XV. THE EFFECT OF PHOENIX'S CONDUCT ON TRADE OR COMMERCE .................. 71

XVI. INJURY-IN-FACT AND DAMAGES............................................................................... 71

XVII. ANTITRUST INJURY AND STANDING....................................................................... 72

XVIII. THE DEFENDANTS' FRAUDULENT SCHEME AND THE INDIVIDUAL
DEFENDANTS' PATTERN OF RACKETEERING ..................................................... 73

    A.    Premium Notices.......................................................................................... 79

    B.    Annual Statements ....................................................................................... 81

    C.    Verifications of Coverage ........................................................................... 83

    D.    Policy Illustrations ...................................................................................... 85

    E.    Insurance Rate Letters................................................................................. 87

XIX. CLAIMS FOR RELIEF .................................................................................................. 98

    FIRST CAUSE OF ACTION ................................................................................. 98

    SECOND CAUSE OF ACTION ............................................................................ 99

    THIRD CAUSE OF ACTION .............................................................................. 100

    FOURTH CAUSE OF ACTION .......................................................................... 103

    FIFTH CAUSE OF ACTION .............................................................................. 105

    SIXTH CAUSE OF ACTION .............................................................................. 107

    SEVENTH CAUSE OF ACTION ........................................................................ 113

XX. PRAYER FOR RELIEF................................................................................................. 115

    A.    On the First Cause of Action .................................................................... 115

    B.    On the Second Cause of Action ................................................................ 116

    C.    On the Third Cause of Action................................................................... 116

    D.    On the Fourth Cause of Action ................................................................. 117

    E.    On the Fifth Cause of Action .................................................................... 117

    F.    On the Sixth Cause of Action ................................................................... 118

    G.    On the Seventh Cause of Action ............................................................... 118

XXI. DEMAND FOR JURY TRIAL ................................................................................... 119

For its Complaint against Defendants PHL Variable Insurance Company ("PHL"), Phoenix Life Insurance Company ("PLIC"), and The Phoenix Companies, Inc. ("PNX") (collectively, "Phoenix" or the "Company"), and James D. Wehr, Philip K. Polkinghorn, and Dona D. Young (collectively, the "Individual Defendants" and, together with Phoenix, the "Defendants"), Plaintiff Lima LS plc ("Plaintiff" or "Lima") hereby alleges as follows:[1]

## I.

## INTRODUCTION

1.      This lawsuit revolves around a failing life insurance company and its management's desperate and illegal attempts to keep the Company afloat so they can continue to pay themselves millions of dollars each year.  After Defendant Phoenix experienced massive losses as a result of highly risky investment decisions, Defendants Wehr, Polkinghorn and Young, as well as other Phoenix executives, designed and implemented a secret scheme to purge billions of dollars of Phoenix liabilities and otherwise keep Phoenix in business through a pattern of anticompetitive, fraudulent and unfair conduct.  This action seeks relief from that unlawful scheme.

2.      In or about 2003, Defendant Phoenix and its executives—including Defendant Polkinghorn, then the Company's head of business development, Defendant Young, then the Company's President and Chief Executive Officer, and Defendant Wehr, through his involvement with Phoenix's product strategy group—devised a business plan expressly designed to take advantage of a new development in the life insurance industry:  the emergence of

---

[1]    The allegations herein are based upon personal knowledge as to Plaintiff's own actions, and as to all other matters are based upon information and belief supported by (among other things) media reports, court filings, filings with the U.S. Securities and Exchange Commission, and public statements by Defendants.  Plaintiff believes a reasonable opportunity for discovery will yield substantial evidentiary support for the allegations herein.

investors (such as pension funds, hedge funds and others) that were interested in purchasing life insurance policies in the secondary market.  Selling policies designed for resale in the secondary market was particularly attractive to Defendants because the policies sold in that market generally involved large amounts of coverage sold to older individuals, with correspondingly large premium payments.  As a result, between roughly 2003 and 2009, Defendant Phoenix made hundreds of millions of dollars selling billions of dollars in life insurance policies that were later resold to investors in the secondary market for life insurance.

3.      In addition to lining their own pockets, the Individual Defendants (and other Phoenix executives) took the premiums generated from these sales and directed them into high-risk investments.  By 2008, at the direction of Defendant Wehr, then the Company's Chief Investment Officer, Defendant Phoenix's investment portfolio included hundreds of millions of dollars of highly risky subprime and Alt-A residential mortgage-backed securities.

4.      The Individual Defendants also planned to take Defendant Phoenix's premium revenues and *buy* Phoenix life insurance policies in the secondary market, which would increase demand for Phoenix policies in the primary market and hedge against the mortality risks from the Company's new sales of life insurance.

5.      Thus, the Individual Defendants' strategy was straightforward:  (i) use the demand for life insurance policies in a burgeoning secondary market to generate premium revenue from new sales of life insurance in the primary market, (ii) turn a huge profit on those premiums by earning spreads on high-risk investments, and (iii) offset the Company's mortality exposure by buying Phoenix policies in the secondary market.

6.      That seemingly flawless plan crumbled when the national financial crisis struck in 2008, causing Defendant Phoenix to incur nearly a billion and a half dollars of losses on its

investment portfolio and to reveal the following in its 2008 annual report filed with the U.S.

Securities and Exchange Commission ("SEC"):

> The value of our investment portfolio has declined which has resulted in, and may continue to result in, higher realized and/or unrealized losses.  For example, in 2008 ***the value of our general account investments decreased by $1.3 billion***, before offsets, due to net unrealized losses on investments. . . . Further, ***certain types of securities in our investment portfolio, such as asset-backed securities supported by residential and commercial mortgages, have been disproportionately affected***.  Continued adverse capital market conditions could result in further realized and/or unrealized losses.  (Emphasis added).

7.      Within a matter of months, Defendant Phoenix's stock price plunged from $13.98 per share to $0.29 per share, Phoenix suffered several credit rating agency downgrades that crippled the Company's ability to sell new life insurance, and Phoenix lost two of its main distributors who stopped selling Phoenix policies due to concerns about the Company's reputation and ability to pay future claims.

8.      Since 2008, Defendant Phoenix and its management—including Defendants Wehr, Polkinghorn and Young—have been trying to recoup the Company's massive losses by executing an illicit scheme to eradicate the liabilities associated with the billions of dollars in policies that the Company aggressively sourced and sold between approximately 2003 and 2009.

9.      Specifically, the Individual Defendants caused Defendant Phoenix to engage in an unlawful plot to cause policyholders to lapse or surrender their policies back to Defendant Phoenix for nominal amounts, thereby eliminating (or materially reducing) Phoenix's potential liabilities.  To do so, Defendant Phoenix engaged in a variety of anticompetitive and exclusionary acts, described further below, designed to drive other potential purchasers of Phoenix policies out of the secondary market.

10.     Defendant Phoenix's conduct, along with the other anticompetitive and exclusionary conduct described below, has created great uncertainty in the secondary market as

to whether Defendant Phoenix will in fact honor these policies, thereby driving away potential

buyers of these policies—other than Phoenix itself.

11.     Accordingly, Plaintiff now brings this action against Defendants based on their

anticompetitive and exclusionary attempts to destroy competition and attain or maintain a

monopsony in the secondary market for life insurance policies issued by Defendant Phoenix.[2]

To accomplish this unlawful scheme, Defendants have used Defendant Phoenix's unique

position as the issuer of Phoenix policies to erect strategic barriers that have excluded other

buyers or potential buyers from this market.  As virtually the only buyer left in the market,

Defendant Phoenix is now able to set market prices at nothing or next to nothing.  Defendants'

conduct has not only injured market participants, it has undermined the integrity of Phoenix's

own life insurance contracts to the detriment of consumers, Phoenix's policyholders, potential

buyers of Phoenix policies, and competition in the secondary market.

12.     Defendants' conduct has also worked a fraud on Plaintiff and other policyholders.

Despite the fact that Defendant Phoenix and its executives, including Defendants Wehr,

Polkinghorn and Young, intentionally designed and marketed their life insurance products so that

they would be resold in the secondary market, Defendants Wehr, Polkinghorn and Young, upon

information and belief, secretly resolved not to permit Defendant Phoenix to honor these same

policies when they come due.  As part of their scheme, Defendants Wehr, Polkinghorn and

Young have caused Defendant Phoenix to issue false and misleading statements to policyholders

about the validity and status of their policies—affirmatively misrepresenting to policyholders in

policy statements and correspondence that their policies were "in force" and "active"—in an

---

[2]     A monopsony is a monopoly on the buyer side of a market and exists where a buyer dominates a market and has
the power to drive prices below competitive levels.  A monopsony is sometimes referred to as a buyer's
monopoly.

4

effort to continue to extract premium payments on policies they have no intention of allowing Defendant Phoenix to honor.  Once the policies come due, the Individual Defendants have caused Defendant Phoenix to attempt to void these policies while trying to keep the premiums already paid.  Moreover, upon information and belief, as part of the same fraudulent scheme, Defendant Wehr also caused Defendant PNX to issue false and misleading financial statements for 2009, 2010, 2011, and the first two quarters of 2012 in order to conceal the company's true financial condition and induce policyholders into continuing to make their premium payments.

13.     Defendants Wehr, Polkinghorn and Young have thus used Defendant Phoenix as an unlawful enterprise through which they have fraudulently induced Plaintiff and other policyholders on a repeated and regular basis to pay premiums to Defendant Phoenix, while Phoenix, at the direction of the Individual Defendants, has no intention of honoring these policies.  The Individual Defendants are, instead, attempting to force policyholders to lapse or surrender their policies, or else trying to rescind the policies or to deny the death benefits when the policies mature.  If their plan is successful, Defendant Phoenix will, over time, end up paying only a very small percentage of the death benefits on the policies it issued.

## II.

## **<u>GENERAL BACKGROUND</u>**

14.     Until relatively recently, consumers who wanted to sell their life insurance policies were limited to one potential purchaser—the company that issued the policy.  A person who owned a life insurance policy but no longer needed or wanted it had two economically inefficient options: (i) let the policy lapse and receive ***nothing*** in return for the cancellation of the policy; or (ii) surrender the policy back to the insurance company that issued it in exchange for a cash surrender value that was typically ***a nominal amount***.  Lapsing or surrendering a

policy is, in effect, selling the policy back to the insurance company that issued it.  That "sale" almost always results in a loss to the consumer and a windfall for the insurance company, which keeps most, if not all, of the premiums paid to date and never has to pay any death benefits to the policyholder.

15.     Over roughly the past decade, the emergence of a robust secondary market for life insurance has eliminated this market deficiency by providing consumers with a third, often superior option: they can sell (or "settle") their policies to a buyer other than the insurance company that issued them.[3]  That buyer, often a bank, insurance company, investment fund, pension fund, or other institutional investor that is seeking investments uncorrelated to the traditional equity and debt capital markets, may offer the consumer as much as, or even more than, **ten times** the cash surrender value offered by the insurance company that issued the policy. The investor that purchases the policy continues to pay premiums and will receive the death benefit when the policy matures, yielding a gain or loss on the investment that is equal to the difference between (i) the death benefit and (ii) the purchase price plus the additional premiums paid.  The investor may also sell or resell the policy to another investor in the secondary market. The secondary market has benefited consumers by providing a liquid market where they can sell their policies for fair value, as opposed to just lapsing or surrendering their policies to the insurance company that issued them and receiving nothing or very little in return.

16.     Insurance companies, including Defendant Phoenix, initially helped to create the secondary market for life insurance because it allowed them to sell significantly larger amounts of insurance.  Consumers who would not otherwise do so bought life insurance knowing they

---

[3]     As the United States Government Accountability Office observed in its July 2010 Report to the Special Senate Committee on Aging (the "GAO Report"):  "A policy owner with unneeded life insurance can surrender the policy to the insurer for its cash surrender value.  Or, the owner may receive more by selling the policy to a third-party investor through a life settlement."

could later sell their policies for fair market value if they did not need or want to keep their policies, and many consumers began purchasing life insurance with the knowledge they might one day be able to sell their policies for a profit.  In other words, the existence of a robust secondary market drove up the demand for life insurance in the primary market.  Defendant Phoenix, therefore, not only embraced the secondary market, Phoenix helped create it.

17.     Over the span of just a few years, Defendant Phoenix sold billions of dollars in policies that it knew would be resold in the secondary market.  Upon information and belief, Defendants Young, Polkinghorn and Wehr (through Phoenix's product strategy group and otherwise) directed Phoenix's product development teams to design their products to make them more attractive to investors in the secondary market.  Defendant Polkinghorn also actively encouraged Phoenix's sales force to seek out business through agents who had relationships with investors in the secondary market.

18.     Further, upon information and belief, Defendants Young and Polkinghorn directed Defendant Phoenix to relax, or even disregard its normal underwriting standards to facilitate sales of policies with the highest possible death benefits (so that Defendant Phoenix could receive the large amounts of premiums associated with such high-dollar policies).  Defendant Phoenix (either directly or through its producers) encouraged applicants to overstate their net worth and income, deliberately neglected to request documentary support to verify applicants' financials, and turned a blind eye to glaring inconsistencies and other red flags in policy applications.  Defendants did not care about whether the insureds needed or could afford the policies because they knew these policies would later be sold to investors in the secondary market.  Defendants cared only about receiving the premium payments.

19.     As a result of these sales and marketing practices, Defendant PHL increased its annual revenues from life insurance premiums **by over 350%, from $125 million in 2003 to $445 million in 2007**.  As Defendants had anticipated, most, if not all, of these additional premiums came from Defendant Phoenix's sales of universal life insurance, the most common type of life insurance purchased by investors in the secondary market.  Phoenix's management—including Defendants Young, Polkinghorn and Wehr—used these sales as a basis for enriching themselves with multimillion dollar executive compensation packages.

20.     Toward the end of 2008, however, Defendant Phoenix sustained massive losses on its risky investment portfolio, which, at the direction of Defendant Wehr, the Chief Investment Officer at the time, was comprised of hundreds of millions of dollars in high risk subprime and Alt-A residential mortgage-backed securities.  Defendant Phoenix's main distributors, State Farm Mutual Automobile Insurance Company ("State Farm") and National Life Group, publicly announced that they would no longer sell Phoenix products.  Compounding Defendant Phoenix's problems, several rating agencies downgraded Phoenix's financial ratings and future outlook, signaling that Defendant Phoenix might not be able to meet its obligations to pay claims in the future and crippling its ability to sell new life insurance policies in the primary market.

21.     Defendant Phoenix was left unable to compete in the primary market for life insurance due to rating agency downgrades and the loss of key distribution channels, and also unable to compete in the secondary market for life insurance due to limited capital and liquidity.  Faced with this market reality, Defendants Young, Polkinghorn and Wehr, upon information and belief, made a calculated decision:  Defendant Phoenix would scale back its sales of life insurance in the primary market and try to recapture its previous monopsony (and become the

8

sole buyer of its policies) in the secondary market by engaging in a series of anticompetitive and exclusionary acts designed to prevent or discourage the sales of its policies to third parties and create uncertainty as to whether Defendant Phoenix would perform under its own policies, so that no one other than Defendant Phoenix could or would buy a Phoenix policy in the secondary market. By thereby eliminating competition in the secondary market for its policies, Defendant Phoenix would leave policyholders who wanted to sell their policies with no choice but to lapse or surrender them back to Phoenix.

22. Defendants thus devised, and have executed, a carefully-conceived strategy that includes, *inter alia*: (i) refusing to pay death benefits when policies mature, despite having vetted those policies during the underwriting process at the time they were issued; (ii) refusing to record the transfers of ownership of its policies; (iii) refusing to tell policyholders whether Defendant Phoenix would honor its policies; (iv) forcing secondary market purchasers to incur substantial and unnecessary litigation costs and delays before obtaining the benefits of their policies; (v) resurrecting policy liens that Defendant Phoenix itself had released years earlier to avoid or to delay paying death benefits; (vi) seeking to rescind its policies on the ground that the policies were void from the very beginning, while attempting to keep the premiums it has collected over the years; (vii) improperly raising certain insurance rates (*i.e.*, the portion of the premium payment attributable to providing insurance, as opposed to other expenses and fees) on its policies, including singling out for such increases policies that were purchased by Phoenix's competitors in the secondary market; (vii) attempting to rescind policies even after improperly raising rates on those same policies; (viii) issuing false and misleading policy illustrations that inflate a policy's future charges to make the policy appear less valuable to policyholders and

secondary market purchasers; and (ix) singling out secondary market purchasers of Phoenix policies for other discriminatory treatment.

23.     As a result of Defendant Phoenix's anticompetitive and exclusionary conduct, there are very few, if any, buyers who remain willing to purchase Phoenix life insurance policies in the secondary market.  Defendant Phoenix's anticompetitive and exclusionary conduct, and the resulting uncertainty it has created, has destroyed the value of Phoenix policies and robbed policyholders of the once-precious ability to sell their policies in a competitive market.  The few buyers who do remain will only buy Phoenix policies at severe discounts and at prices that are far below the actual value of the policies in the absence of Defendant Phoenix's anticompetitive and exclusionary conduct.  That conduct has left Defendant Phoenix as a monopsonist or virtual monopsonist in the secondary market for its policies.

24.     Along with the Company's anticompetitive and exclusionary efforts in the secondary market, the Individual Defendants have caused Defendant Phoenix to misrepresent its intentions as to its outstanding policies now in the hands of investors in the secondary market. More particularly, at the Individual Defendants' direction, Defendant Phoenix has affirmatively and repeatedly represented to policyholders that their policies are valid and in force and have value, when in fact, upon information and belief, Phoenix has no intention of honoring these policies.  The Individual Defendants have thus sought to continue having Defendant Phoenix collect millions of dollars in premiums on entirely false pretenses.

25.     In addition, to disguise the true facts about Defendant Phoenix's deteriorating financial condition, and among other things, to continue to induce policyholders to make their premium payments, since at least 2009, Defendant Phoenix and its executives have published false and misleading financial information.  Indeed, Defendant Phoenix has now admitted that

the past *three-and-a-half years* of its financial statements have contained material errors and have failed to disclose Phoenix's lack of adequate internal and financial controls, even though Defendant Wehr and other executives have certified that the information contained in each of those publicly filed statements was true and accurate.

26.     The Individual Defendants have thus used Defendant Phoenix as an unlawful enterprise through which they have fraudulently induced Plaintiff and other policyholders to pay premiums to Defendant Phoenix, while Phoenix, at the direction of the Individual Defendants, has no intention of ever honoring their policies.  Instead, as Defendant Phoenix continues to collect premiums, the Individual Defendants have directed Phoenix to engage in actions designed to force Phoenix's policyholders to eventually lapse or surrender their policies before they ever mature.

27.     For example, upon information and belief, the Individual Defendants have approved and authorized impermissible insurance rate increases and directed Defendant Phoenix to issue vague notices to policyholders justifying the change to their policies.  Each of the Individual Defendants knew, however, that these rate increases were not legally justified and were specifically designed and intended to, among other things, "shock" various policyholders into immediately lapsing or surrendering their policies.  Indeed, many policyholders did, in fact, lapse or surrender their policies.

28.     But even if some policyholders do not lapse or surrender their policies as a result of the insurance rate increases, the Individual Defendants have concealed their intent not to allow Defendant Phoenix to honor the terms of its policies.  Their plan is instead to continue collecting premiums while trying to force future lapses and surrenders.  If a policyholder does not lapse or surrender his or her policy, Defendant Phoenix will then deny the death benefits when a claim is

made and take the position that the policy was void *ab initio* because it was purchased with the thought of potentially selling it to an investor (as many of Phoenix's policies were).

29.     As a result of Defendants' anticompetitive, fraudulent and unfair conduct, Defendant Phoenix's policyholders (including consumers who purchased their policies directly from Defendant Phoenix and investors who purchased policies from consumers or other investors in the secondary market) face a sinister dilemma: either (i) continue to pay premiums to Defendant Phoenix solely to protect their investments and hope that Phoenix will ultimately honor their policies, or else (ii) forfeit all or nearly all of their investments by selling their policies back to Defendant Phoenix for nothing or next to nothing.  In either case, Defendant Phoenix, and the Individual Defendants who devised and have invested in their unlawful and fraudulent enterprise, will make a huge profit.

30.     This Complaint is filed, and this action is instituted, to recover the damages caused by Defendants' past and continuing violations of law, as further detailed below.

### III.

### JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the Complaint alleges claims for relief arising under federal law, specifically the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).

32.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the action involves parties of diverse citizenship, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

33.     This Court has personal jurisdiction over the Defendants because they are found in this judicial district and because they conduct and transact business in this district.

34.     Venue is proper pursuant to 28 U.S.C. §§ 1391(a)(1), (a)(2), and 1391(b) and 18 U.S.C. § 1965(a) because one or more Defendants resides or reside in this judicial district, and a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district, and one or more Defendants transacts their affairs in this district.

## IV.

## THE PARTIES

35.     Plaintiff Lima LS plc is a company incorporated in England and Wales with limited liability, with its principal place of business and nerve center in London, England.

36.     Lima is a participant and investor in the secondary market for Phoenix life insurance policies.  As of July 25, 2013, Lima holds the interest in 181 Phoenix policies currently in force (the "In Force Policies").  These policies were issued between 2003 and 2008 and total $1.08 billion dollars in face amount.  Phoenix has collected approximately $169 million in premiums on the In Force Policies, and Lima continues to pay Phoenix approximately $2.6 million each month in premiums on these policies.  As of July 25, 2013, Lima has lapsed or surrendered (*i.e.*, sold to Phoenix) a total of 66 policies and received $0 in return for those polices (the "Lapsed Policies").  The Lapsed Policies had a total face amount of $303.5 million.  Phoenix received a total of $24.1 million in premiums on the Lapsed Policies before they were lapsed.  The In Force Policies and the Lapsed Policies are referred to herein, collectively, as the "Lima Policies" or the "Policies."  A list of the In Force Policies is set forth on Appendix A to the Complaint.  A list of the Lapsed Policies is set forth on Appendix B to the Complaint.

37.     Lima acquired the interests in the Policies in December 2010 through its acquisition of five limited liability companies that held the interests in the Policies and in April 2011 through its acquisition of a portfolio of additional policies.  After the December 2010

13

acquisition, four of the five limited liability companies were merged into one of the companies, Estate Planning, LLC, which was then converted to a limited partnership and renamed Lima Acquisition LP ("Lima LP").  Lima is the general partner of Lima LP.  The Policies are held, or were held (in the case of the Lapsed Policies), by U.S. Bank National Association ("U.S. Bank"), as securities intermediary for Lima LP.  At the time of the acquisitions, Lima had no knowledge of Defendants' fraudulent and unlawful scheme as described herein.

38.     Lima from time to time resells, or attempts to resell, Phoenix policies to other investors in the secondary market, primarily in the United States.  Lima may also be forced to lapse or surrender Phoenix policies (*i.e.*, sell policies back to Phoenix) in the future as a result of Defendants' unlawful conduct as described herein.

39.     Upon information and belief, Defendant PNX is a Connecticut corporation with its principal place of business and nerve center located in Hartford, Connecticut.  PNX is the parent company of Defendants PLIC and PHL.  PNX's officers and directors overlap with the officers and directors of Defendants PHL and PLIC.

40.     Upon information and belief, Defendant PLIC is a New York corporation with its principal place of business and nerve center located in Hartford, Connecticut.  PLIC issues life insurance policies, including policies owned by Lima.  PLIC is the indirect parent of Defendant PHL.

41.     Upon information and belief, Defendant PHL is a Connecticut corporation with its principal place of business and nerve center located in Hartford, Connecticut.  PHL issues life insurance policies, including policies owned by Lima.

42.     Defendant James D. Wehr is the President and Chief Executive Officer of PNX and, upon information and belief, resides in the State of Connecticut.

14

43.     Defendant Philip K. Polkinghorn was the Executive Vice President of Business Development of PNX and the President of PNX's Life and Annuity Business Segment until October 2012, when he resigned, and upon information and belief, resides in the State of Kansas.

44.     Defendant Dona D. Young was the President of PNX from 2000 to April 15, 2009; the Chief Executive Officer and Chairman of the Board of PNX from 2003 to April 15, 2009; and a consultant to PNX until at least April 15, 2010, and, upon information and belief, resides in the State of West Virginia.

## V.

## LIFE INSURANCE

45.     Life insurance is a multi-billion dollar industry in the United States.

46.     Life insurance policies are issued by insurance companies.  No other entities are authorized to provide life insurance.  A potential insured will apply for life insurance, either directly to a life insurance company or through a licensed and authorized insurance agent.

47.     Over the last few decades, insurance companies have transformed life insurance from a simple mechanism traditionally used to protect against the risk of death into an investment that consumers use for tax-deferred growth, to avoid potential estate tax liability, and even for short-term financial gain.  This transformation has occurred as insurers have designed new forms of life insurance, including universal and variable life insurance, which emphasize the investment features of life insurance.  Unlike traditional term life insurance (which provides life insurance for an agreed-upon period of time at fixed premiums) and whole life insurance (which provides a death benefit coverage over the insured's lifetime, in most cases for a level premium that is higher than the premium for comparable term insurance), universal life insurance gives policyholders the choice to pay solely for "pure insurance" or to pay more into a policy account

15

as an investment.  Universal life insurance policies are often described as combining a term life insurance policy (the "pure insurance" component) with a traditional savings account (the "investment" component).  Owners can pay premiums in any amount and at any time as long as enough money is paid to cover the cost of the "pure insurance" protection.

48.     Before a policy is issued, a prospective insured must be underwritten by the insurance company.  Underwriting standards may vary from insurer to insurer, but typically the prospective insured will have to fill out a lengthy application and undergo a comprehensive medical examination to determine that she or he is healthy enough to be insured.  The insurance company can also request other information material to its decision whether to issue a policy, what type of policy it will issue, and how much insurance it will issue.

49.     Once a policy is issued, the insured is responsible for paying premiums to keep the policy in effect.  Sometimes, life insurance policies are purchased by insureds themselves or trusts created to hold the policies, and sometimes they are purchased for insureds by or with the assistance of others, such as the insureds' employers.  At other times, insureds purchase policies with financing provided by a bank or other third party.

50.     Insurance companies are permitted by state insurance law to charge insureds different premiums only for certain recognized and actuarially relevant and valid reasons.  For example, older individuals may be charged higher premiums than younger individuals because their life expectancies are shorter.  Smokers may be charged higher premiums than non-smokers because their risk of an earlier death is higher.  However, insurers generally may not discriminate by charging different rates for people with similar life expectancies.

51.     If an insured dies while a policy is in force, the insurance company is responsible for paying the death benefit to the designated beneficiary or beneficiaries.

52.     Generally, the death benefit that is paid to the beneficiary is not included as income to the beneficiary for U.S. tax purposes.

53.     Most state insurance laws require that every policy include a provision known as a "contestability clause," which states that the insurer cannot contest the policy after two years from the date it is issued.  Contestability clauses were introduced over a century ago, after years of carrier abuse, to prevent carriers from trying to revisit their decision to issue a policy after they received years of premiums and at last received a claim for the death benefit.  Contestability clauses give "assurances to persons . . . that neither they nor their families, after the lapse of a given time, will be harassed with lawsuits when the evidence of the original transaction shall have become dim, or difficult of obtention, or when, perhaps, the lips of him who best knew the facts are sealed by death."  *Kansas City Mut. Life Ins. Co. v. Whitehead*, 123 Ky. 21, 27 (1906). Because an insurer cannot contest a policy after the contestability period, a life insurance policy becomes more valuable upon the expiration of the contestability period.

54.     The value of a life insurance policy also generally increases over time because premiums have already been paid on the policy, and the risk of death has generally increased as the insured has aged.

## VI.

## THE SECONDARY MARKET FOR LIFE INSURANCE

55.     Life insurance policies are transferrable or assignable, like other assets.  Over a century ago, the United States Supreme Court, in *Grigsby v. Russell*, 222 U.S. 149 (1911), held that a life insurance policy is private property that should be freely assignable at the will of the owner.  In so holding, Justice Holmes observed that "life insurance has become in our days one of the best recognized forms of investment and self-compelled saving.  So far as reasonable

17

safety permits, it is desirable to give to life policies the ordinary characteristics of property." *Id*. at 155-56.

56.     Despite the principles of transferability and assignability, until relatively recently, owners had the right to sell their policies, but few buyers were available.  Life insurance companies themselves were the only significant buyers of their own policies.  With few, if any, exceptions, life insurance companies would buy back only their own policies; they did not buy each other's policies.

57.     An insured who no longer wanted to keep his policy or pay its associated premiums had essentially two choices: (i) let the policy lapse and receive nothing in return for the cancellation of the policy, or (ii) surrender the policy back to the insurance company that issued it in exchange for a cash surrender value that was often a nominal amount.

58.     Insurance companies relished this arrangement.  For either zero cash outlay or a nominal payment, they could avoid paying the death benefits associated with policies while keeping almost all of the premiums that had already been paid.  Because there was no meaningful competition in any secondary market for their policies, insurance companies were able to reap a huge windfall when they were released of this liability.

59.     During the AIDS crisis of the 1980s, a nascent secondary market for life insurance policies emerged in the form of viatical settlements.  Through viatical settlements, third parties bought life insurance policies for more than their cash surrender value, allowing AIDS patients to access a portion of their life insurance benefits to pay for medicine and other health care costs.  Activity on this early secondary market, however, was limited to AIDS patients and others who were terminally ill, and it rarely involved the resale of policies by one investor to another.

60.     Within the past decade, the viatical settlements market has developed into a more diverse and complex secondary market that is not limited to AIDS patients or the terminally ill. By developing substantial know-how (including knowledge of how to value and price insurance policies and the utilization of sophisticated software to track and optimize premium payments), investors such as global insurance companies, multi-national banks, investment funds, pension funds, and other major financial institutions began to purchase and resell life insurance policies in this secondary market.

61.     This secondary market has created competition for insurance companies that had previously reaped a windfall from lapses and surrenders.  Consumers who no longer wanted to keep their policies could instead, as the GAO Report observed, "receive more by selling [their] [policies] to a third-party investor."  Competition created by the availability of secondary market purchasers has thus allowed consumers to realize the true value of their policies.

## VII.

## PHOENIX

**A.     Phoenix's Struggles After Its Demutualization in 2001**

62.     Defendant Phoenix is a life insurance company that has been in existence since approximately 1850.  According to its public filings, Defendant Phoenix's core business has been designing and marketing life insurance products "with a particular focus on the high-net-worth and affluent market."  Upon information and belief, Defendant Phoenix targeted this niche market because, as a smaller and lesser-known insurance company, it was unable to compete with larger insurance companies in the broader market.

63.     In 2001, Defendant Phoenix's predecessor, Phoenix Home Life Mutual Insurance Company, converted from a mutual insurance company owned by its policyholders to a stock insurance company, and was renamed The Phoenix Companies, Inc.  The Phoenix Companies,

Inc. went public on or about June 19, 2001 at $17.50 per share.  The President of the Company

when it went public was Defendant Young.

64.    Since Defendant Phoenix's demutualization in 2001 through 2004, the Company

struggled through numerous financial rating downgrades as a result of what one of its largest

shareholders later described as "inefficient capital allocation" and "excessive cost and overhead

structure."  In addition, Defendant Phoenix's diversions into other business segments, including

an asset management business through its subsidiary, Phoenix Investment Partners, Ltd.

("PXP"), were a massive financial drag on the company.  In 2003, PXP managed approximately

$59.2 billion in assets, which by the end of 2004 had dropped in value by nearly $20 billion as

the Company's repeatedly poor investment decisions resulted in huge losses to its investors.  By

2004, Defendant Phoenix's venture capital forays had also proved to be a huge failure.  As A.M.

Best Company, Inc. reported in 2003, "[Phoenix's] capital position has been constrained in the

last two years by significant capital losses on its venture capital portfolio, credit write downs and

losses on its equity investment in Aberdeen, a Scottish investment management company."

65.    Defendant Phoenix's stock hit a low in 2003 of $6.55 per share, down more than

60% since going public, while shares of many other life insurance companies that had gone

public during the same time period had increased significantly, some nearly doubling, as

illustrated below:



| STOCK PRICE CHANGE TO 3/14/2003 | Phoenix 6/20/01 - 3/14/03 | John Hancock 1/27/00 - 3/14/03 | Principal Financial 10/23/01 - 3/14/03 | MetLife 4/5/00 - 3/14/03 | Manulife Financial 9/24/99 - 3/14/03 |
|---|---|---|---|---|---|
| STOCK PRICE CHANGE TO 3/14/2003 | -60.92% | 58.25% | 28.48% | 67.61% | 98.52% |

**B.**     **Phoenix's Use of the Secondary Market to Increase Sales in the Primary Market**

66.     It was during this time period of financial struggle that Defendant Young took on the positions of Chief Executive Officer and Chairman of the Board of PNX.  It was also during this time that the secondary market for life insurance began to emerge, and the emergence of that market was a huge boon to Defendant Phoenix.  Not only were consumers then willing to buy life insurance knowing they had better options if they ultimately elected not to keep their policies, but many wealthy individuals began buying life insurance to avoid potential estate tax liabilities, as well as investing in life insurance knowing they could sell their policies in the future.  Indeed, as early as 2005, the life insurance industry acknowledged that the growth of the secondary market had driven an increased demand for policies with large death benefits in the primary market.

21

67.     As an insurance company that targeted the market of high net worth individuals,
Defendant Phoenix was fully aware of the desire of many of its customers to invest in life
insurance with the knowledge that they might sell their policies in the future.  Indeed, Defendant
Phoenix relied upon the existence of the secondary market to drive the primary market toward
policies with high death benefits because Defendant Phoenix knew investors wanted high-face-
value policies, and such policies carried with them high premium payment streams.

68.     To increase its sales of high-face-value policies, Defendant Phoenix was fast to
endorse the use of non-recourse premium financing, and, as the Individual Defendants were all
aware, many of the policies that Defendant Phoenix issued were purchased with such financing.
Under these arrangements, a lender would loan an insured funds to pay premiums for a policy,
and the policy would be pledged to secure the loan.  When the loan matured, usually after two
years, the insured could pay off the loan, surrender the collateral (the policy) to the lender, or sell
the policy and pay off the loan.  Non-recourse premium financing made it easier for consumers
to buy high-face-value policies, which in turn helped Defendant Phoenix sell more policies and
receive significantly more premium revenue.  Defendants Young and Polkinghorn, among other
Phoenix executives, therefore aggressively pursued premium-financed business.  Upon
information and belief, Defendant Young personally traveled around the country to encourage
others to conduct premium-financed business with Defendant Phoenix.

69.     In March 2006, Defendant Phoenix reported in its 2005 Form 10-K filed with the
U.S. Securities and Exchange Commission: "We experienced a significant increase in large
estate and business planning cases, some of which involved the use of non-recourse premium
financing."  This "significant increase" was no coincidence.  It occurred because, at the direction
of Defendant Phoenix's executives, including Defendants Young and Polkinghorn, Defendant

Phoenix actively encouraged its sales force to sell policies using non-recourse premium financing and also designed policies to be attractive to this market.

70.     In 2009, two investment companies that purchased several Phoenix policies in the secondary market filed actions against Defendant Phoenix alleging, among other things, that Defendant Phoenix fraudulently induced them and "a class of third party investors" to purchase Phoenix policies in the secondary market when, in fact, Defendant Phoenix planned to claim the policies were void and keep the premium payments.  In those actions, which were later consolidated (the "*Fenton* Action"), one of Defendant Phoenix's wealth management consultants, Ed Humphrey, testified to the following during his deposition:

> **Q.     After you started engaging in Non-Recourse Premium Financing Transactions for Phoenix, did Phoenix actively encourage its sales force to engage in these transactions, Non-Recourse Premium Financing transactions?**
>
> A.     **Yes.**
>
> **Q.     Can you tell us the names of any particular individuals that you dealt with at Phoenix that actually encouraged the sales force to put Non-Recourse Premium Finance on the books of Phoenix?**
>
> **A.     As far as my direct report, Kevin Lawler, was actively pursuing that business, and put together a user guide in 2005, a Non-Recourse user guide, which would help us find, you know, different kinds of – basically Kevin came to the wholesalers within the region in 2005 and asked us for all of the information on the Non-Recourse plans our brokers were using.  From that information, he put together a user guide which gave information on all different types of plans, what was available, and also what other companies were doing.  That was presented to us at our regional meeting.  The other person who asked for Non-Recourse was Bob Primmer, an executive, who was the head of the Life Insurance Department at the time.**
>
> **I went to a meeting in Newport, Rhode Island, near the end of September '05.  It was a rookie cabinet meeting for new wholesalers.  I started to get a good flow of the business, so I asked Bob at that meeting, knowing that there really wasn't much information on this, and how much Non-Recourse we should produce and his view on that.  He told me the more the merrier, as far as Non-Recourse cases.**

**Q.      When did Mr. Primmer say – he actually used the phrase "the more the merrier" when it came to putting Non-Recourse Premium Finance on the books of Phoenix?**

**A.      Yes, he did.**

**Q.      When did he say this?**

**A.      That was the end of September of 2005.**

71.      Defendant Phoenix attempted to "seal" Humphrey's transcript in the *Fenton*

Action, claiming it was confidential, but the judge rejected Phoenix's request, and the transcript

was made available to the public sometime in 2011.

72.      Also around late 2005, the head of Phoenix's Life and Annuity Business Segment,

Defendant Polkinghorn, held a conference call in which he read from a script advising Phoenix's

sales force that Defendant Phoenix would accept sales of policies using non-recourse premium

financing.

73.      Defendant Phoenix also knew that the policies it issued using non-recourse

premium financing were likely to be sold to investors in the secondary market.  As Humphrey

testified:

**Q.      When you said before that one of the earmarks of the Non-Recourse Premium Finance business was Single Life policies, was there a reason why it would be Single Life in a Non-Recourse Premium Finance transaction, if you know?**

**A.      The flip side of Non-Recourse Premium Financing was the settlement business.  These policies were basically destined to settle, and the settlement business worked in Single Life policies.  The majority of the business, the settlement business, was driven from Single Life policies.**

**\*\*\***

**Q.      So your understanding was that these Non-Recourse Premium Finance transactions were destined to be sold to a third-party investor and that the Single Life policy was a vehicle to do them?**

**Phoenix's counsel:  Objection.  Mischaracterizes testimony.**

**Q.      Is that correct?**

**A.     Yes.**

74.     In 2006, Defendant Phoenix adopted a sales strategy that involved the use of a
wide network of broker general agents and their subagents who had direct relationships with
investors in the secondary market.  Through these relationships, Defendant Phoenix's agents
would procure policies for insureds who were interested in potentially selling their policies to
investors in the secondary market.  One of Defendant Phoenix's underwriters during this time
period has confirmed that Defendant Phoenix "green-lighted" agents to write premium-financed
policies.  Many of these agents have acknowledged that Defendant Phoenix encouraged and
incentivized them to sell policies that would likely later be sold to investors.

75.     In fact, upon information and belief, at the direction of its executives, including
Defendants Young, Polkinghorn and Wehr (through Phoenix's product strategy group and
otherwise), in or about 2007, Defendant Phoenix created a list of approved premium financing
programs which could be used to finance the purchase of life insurance policies issued by
Phoenix.  Defendant Phoenix publicly represented that the Company had carefully vetted each of
the programs it approved and had full knowledge of the terms and conditions of each program.
Defendant Phoenix then issued policies whose premiums would be financed through these
approved programs.

76.     A senior underwriter who worked at Phoenix in 2008 corroborated that, during his
training, he was told that Defendant Phoenix accepted premium financing.  He said the Company
was not opposed to issuing policies that it knew would be sold to investors in the secondary
market and maintained a list of broker general agents, brokers, and agents that were approved to
write what Defendant Phoenix now disparagingly calls "stranger-originated life insurance" or
"STOLI" (or "investor-originated life insurance" or "IOLI") policies.  Another underwriter has
stated that the Company had a special underwriting group that was assigned to review and

underwrite STOLI policies.  Other former Phoenix employees have confirmed that Defendant

Phoenix accepted a large volume of STOLI business and that the Company's practice of doing so

was well known within the industry.

77.     Defendant Phoenix's management, including Defendants Polkinghorn and Young,

not only encouraged Phoenix's sales force to procure such policies, they virtually ***required*** them

to do so.  Among other things, Defendant Phoenix's management imposed sales quotas that

could only be met by procuring the type of high-face-value universal life insurance policies that

were being sought by investors in the secondary market.  For example, Ed Humphrey went from

having no sales quota in 2004 to being required to write $2 million in premiums in 2005, to write

$7.5 million in 2006, and then to write ***$20 million in 2007*** (which would have required him to

procure around ***half a billion dollars*** in life insurance death benefits in a single year).  When

Humphrey was asked at his deposition what percentage of his business came from the sale of

policies that were likely to be sold in the secondary market, Humphrey responded, "95 percent."

78.     Defendant Phoenix's top executives were well aware of Humphrey's business,

and rewarded him richly for it.  In 2006 alone, Humphrey made $1.8 million (compared to

$75,000 two years earlier, before he began soliciting policies destined for the secondary market),

and his immediate supervisor, Kevin Lawler, also made over a million dollars that year.  Based

on the sales of Phoenix wealth management consultants like Humphrey, Defendant Young made

nearly $4.5 million in 2006 (more than double what she earned two years earlier).

79.     Publicly, however, Defendant Phoenix maintained a different position.  Within

months of the conference call during which Defendant Polkinghorn advised Phoenix's sales

force that Defendant Phoenix would accept non-recourse premium-financed policies and

Phoenix's distribution to its sales force of the "user guide" on how to sell such policies,

Defendant Phoenix inaccurately told the public and its shareholders, in the same 2005 Form 10-K referenced above, "In the first quarter of 2006 we affirmed our position that we will not accept sales of policies that employ this type of premium financing . . . ."  Defendant Young reiterated this public position during an investor call for the first quarter of 2006 (held on April 26, 2006): "[W]e made a decision in January that . . . we would accept no non-recourse [premium] financing regardless of the program.  We had a limited period [in] which we allowed business that was in the pipeline to be concluded and paid . . . .  [T]hat period ended in mid-February and from that point forward, there's no non-recourse financing business."

80.     In reality, however, such business continued to be encouraged.  This was explained by another member of Defendant Phoenix's internal sales force, Max Labar, who has testified about Defendant Phoenix's attitude toward issuing life insurance policies that would later be sold to investors in the secondary market.  According to Labar, his manager Doug Koch "definitely encouraged that type of business privately."  As Labar testified in the *Fenton* Action:

> **Q.     In other words, as I understand what you're saying is, is public policy that's communicated to the outside worldwide, saying, "We don't want this investor-owned life insurance," but privately you're being told by Mr. Koch that the company actually wants this kind of business; is that right?**
>
> **Phoenix's counsel:  Object; mischaracterizes the testimony.**
>
> **Q.     Is that a correct statement?**
>
> **A.     I would say that's a correct statement. . . .**

81.     Labar further testified that, while Defendant Young represented to Defendant Phoenix's shareholders that Phoenix was not selling STOLI or IOLI, "privately it was a different matter," as employees were being told to "bring it on" and "crank it out."  Employees who refused to participate in this business would either "fail," "leave," or "be fired."  Labar also estimated that 80% of Phoenix's life insurance sales during this time period were what

Defendant Phoenix now calls STOLI or IOLI.  Another former Phoenix employee stated that in 2006 and 2007, together with PNX's Executive Vice President of Distribution, he presented information to Defendant Polkinghorn illustrating that Defendant Phoenix was continuing to issue so-called STOLI policies, contrary to its public statements.

82.    The sales and marketing strategy Defendant Phoenix adopted also involved a conscious decision to relax and to disregard Phoenix's traditional underwriting standards and requirements.  Among other things, Defendant Phoenix's underwriters and sales agents have said that the Company would grant "exceptions" to its normal underwriting guidelines to issue policies that would not otherwise be issued.  These "exceptions" included instances where it was apparent that the policy application contained false information about the insured's net worth and income.  This lax underwriting went hand-in-hand with Defendant Phoenix's aggressive sales approach in the lucrative market of selling life insurance to seniors, because an insurer that performs proper underwriting will likely reject a high percentage of applications and sacrifice short-term profits for long-term stability.  Defendant Phoenix, however, had no interest in such an approach; it cared only about generating premium revenue so that it could boost its short-term profits, improve its financial ratings, and enrich its executives.

83.    Accordingly, like mortgage lenders that issued loans to applicants who provided no documentary support for their income, Defendant Phoenix became a "no doc" insurer that issued huge, multi-million dollar policies without asking applicants for a single piece of documentary support.  As Humphrey has testified:

> **Q.    What was requested document-wise by Phoenix, and I am just asking, is it correct that no documentation was requested by Phoenix to support the financial information in the [policy] application?**
>
> **Phoenix's counsel:  Objection.  Asked and answered.  Mischaracterizes testimony.**
>
> **Q.    Is that correct?**

**A.      Yes.**

84.    Labar corroborated Humphrey's testimony, and he also warned state regulators

that Defendant Phoenix's underwriting practices would cost the Company in the long run:

**Q.      Well, did you have any understanding whether or not Phoenix had any –
cared whether or not those figures were accurate?**

**A.      They never verified it.  They never questioned it, not that I ever saw from
anyone, from talking to other, you know, [Phoenix wealth management consultants]
from business that I saw.**

**\* \* \***

**Q.      What I'm trying to ask you is this:  Your understanding from working at
Phoenix as a [wealth management consultant] is there really was not much
verification of anything except a signature?**

**A.      I never heard of it or saw it and there was never a process that was put in
place that said that they verify all that.**

**\* \* \***

**Q.      Did Phoenix care if their net worth figure [in their policy applications] was
accurate?**

**A.      In my opinion, no.**

**Phoenix's counsel:  Objection.  Asked and answered.  Mischaracterizes testimony.**

**Q.      And that is based upon your personal knowledge of the procedures at
Phoenix?**

**A.      Yes.**

**Q.      And as a [wealth management consultant] at Phoenix and the procedures
that you knew about at Phoenix, did Phoenix care about the accuracy of the income
figures in the applications?**

**A.      In my opinion, no.**

85.    Just as Defendant Phoenix represented to the public that it was not issuing STOLI

policies when in fact it was doing the very opposite, Defendants continued to reassure investors

that Phoenix's underwriting standards had not changed despite the direction from Defendants

29

Young and Polkinghorn that Defendant Phoenix relax and disregard its underwriting standards. For example, during an investor call held on April 26, 2006, Defendant Young stated, "There is no change in our underwriting discipline."  As indicated by the testimony cited above, that was simply not the case.

86.     The Individual Defendants' calculated strategy to target sales of policies that were likely to be premium-financed and to relax or even abandon its underwriting standards caused Defendant Phoenix to experience remarkable gains in revenue, share price, and production. From 2003 to 2007, Defendant PHL alone (the primary insurance-issuing subsidiary) increased its annual revenue from life insurance premiums *more than 350%*, from $125 million in 2003 to $445 million in 2007.  During that same timeframe, the parent company's stock, PNX, nearly tripled, climbing from a low in 2003 of $6.55 per share to a high in 2007 of $16.05 per share.  By the end of 2006, Defendant Phoenix's internal sales force was writing nearly *1,000% more* life insurance compared to what they were writing just one year earlier, and, upon information and belief, some members of their outside sales force increased their production by an even greater percentage.  Indeed, one of Defendant Phoenix's outside sales agents described this period at Phoenix as the "wild, wild west," and one of Phoenix's Regional Managing Directors referred to Defendant Phoenix at the time as the "King of STOLI" (a moniker attributable to the sales strategy adopted by Defendant Polkinghorn and others).

87.     Defendants had no reservations about selling life insurance policies they knew were destined for the secondary market.  They used the secondary market to grow the Company's sales, and thus increase the Individual Defendants' compensation, and through their efforts, in 2006 and 2007 (even after the public "no non-recourse" statement from Defendant

Young), Defendant Phoenix issued billions of dollars more in life insurance than it had ever issued before or ever would issue during any other two-year period in its history.

88.     Despite the Individual Defendants' awareness that Defendant Phoenix was issuing STOLI policies, they continued to make false public statements to conceal the true nature of Phoenix's business and the real source of its recent profitability.  For example, during an investor call for the second quarter of 2006 (held on July 27, 2006), Defendant Young inaccurately asserted that "non-recourse financing was not at all a factor" in Phoenix's increased sales for the quarter.

89.     Similarly, during an investor call for the third quarter of 2006 (held on October 26, 2006), Defendant Young declared that Defendant Phoenix had already met its "target of double-digit life sales growth for this year" and acknowledged that the Company's "sales were driven primarily by universal life."  Defendant Young, however, tried to obscure the precise nature of the Company's business by attributing its unprecedented growth in sales to "strong underwriting expertise especially for large policies, a complete and competitive core product portfolio, and innovative products and programs."  Ignoring the obvious impact that the secondary market had on Defendant Phoenix's sales in the primary market, and never once mentioning developments in the premium financing business that helped spur Phoenix's growth, Defendant Young instead attributed the Company's positive outlook to, of all things, a new program that provided discounts for insureds who maintained a target Body Mass Index.  When an analyst questioned her about this Body Mass Index program, Defendant Young defensively replied, "This was introduced in the third quarter, so I don't want you to conclude that the BMI impacted the third quarter sales."  Defendant Young never said specifically what contributed to Defendant Phoenix's huge sales in the first three quarters of 2006, but she knew exactly what

allowed Defendant Phoenix to achieve ***double-digit sales growth in just three quarters***—demand for Phoenix policies ***in the secondary market***.

90.     These sales, however, were not enough for Defendant Phoenix.  At the direction of Defendant Wehr, PNX's Chief Investment Officer at the time, Phoenix took these revenues and directed them into a variety of high-risk investments, including hundreds of millions of dollars in subprime and Alt-A mortgage-backed securities and other asset-backed securities.  As AM Best observed, "the company maintain[ed] higher than industry average exposure to commercial mortgage-backed securities, Alt-A residential mortgage-backed securities and below investment grade bonds as a result of its investment strategy."  While Defendant Phoenix's management was making these reckless bets with policyholder funds, those same executives were awarding themselves outlandish compensation packages—more than ***ten times*** as much as the average executive in the industry, based on total compensation relative to the company's market capitalization.  For example, between 2003 and 2008, Defendant Young received approximately $25 million in executive compensation, which was far more than the top executives of many larger and more successful insurance companies.

91.     Defendant Phoenix also planned to participate directly in the secondary market on the buy side.  In 2007, Defendant Young commissioned a team to form a life settlement division to partner with four of Phoenix's broker general agents that sold Phoenix policies in the primary market.  These agencies—Advance Planning Services, American Brokerage Services, Ash Brokerage, and Madison Brokerage—would, in addition to procuring policy sales for Defendant Phoenix in the primary market, at the same time broker sales of policies to Phoenix ***in the secondary market***.

92.     On April 1, 2008, Defendant Phoenix announced the launch of its life settlement subsidiary, Phoenix Life Solutions, Inc.  As Defendant Phoenix stated in its marketing materials, Phoenix considered this business a "natural hedge for [its] core business" and an opportunity to "partner" with investors, investment banks, and other distributors of life insurance products, which were the types of institutions buying Phoenix policies in the secondary market.

93.     Defendants Polkinghorn and Young (among other Phoenix executives) had knowledge of and were directly involved in the new life settlement venture.  In a statement announcing the launch of Phoenix Life Solutions, Inc., Defendant Polkinghorn declared, "It's time for the life insurance industry to step forward and recognize that life settlements can offer consumers numerous advantages, including increased flexibility with their personal assets . . . ." Polkinghorn continued, "Phoenix Life Solutions leverages Phoenix's knowledge of the high-net-worth and affluent markets, our expertise in mortality and risk management, and our ability to be a partner of choice with firms that want to be involved in a new equation for the life settlement business."  During an investor call for the second quarter of 2008 (held on July 31, 2008), Defendant Young stated,  "Phoenix Life Solutions is continuing to pursue an unmet need in the life settlements market."

94.     Defendant Phoenix's awareness of the secondary market and its desire to compete to buy policies in the secondary market for Phoenix policies is further reflected in the language of its own policies.  In late 2007 or early 2008, with the express approval of Defendants Young and Polkinghorn, Defendant Phoenix began including a provision in its universal life insurance policies that stated to policyholders:

> If, however, you are offered consideration by a third party to transfer ownership
> of your policy or any interest in your policy including a collateral or absolute
> assignment to such third party, no transfer of ownership shall take effect unless
> we or one of our affiliated companies first have the right to also offer

consideration for your policy.  We will require information satisfactory to us that is necessary for us to determine the amount of such consideration we will offer for your policy.

95.     Former Phoenix wealth management consultant Ed Humphrey explained the purpose of this language as follows:  "What they are basically talking about here is the right to bid on a settlement policy, in layman's terms.  Because they are talking about a right to offer consideration for assignment of a policy.  Basically what is known from this in the industry, is that Defendant Phoenix knew that there was going to be a large settlement business market and [Phoenix] was forming a subsidiary settlement company, and was going to, you know, obviously, want the right to bid on their contracts before it went out to a third party."

96.     Defendant Phoenix's business plan was simple.  Defendant Phoenix used the demand for policies in the secondary market to drive up sales in the primary market, and with the revenue generated from these sales, and the hoped-for profits from Defendant Wehr's risky investment strategy, Defendant Phoenix would then compete to buy policies in the secondary market through its life settlement division.  This life settlement division would then operate as a "hedge" against the mortality risks Defendant Phoenix took on with the billions of dollars of policies it sold in the primary market.

C.      **Phoenix's Massive Losses As a Result of the 2008 Financial Crisis**

97.     Unfortunately for Defendant Phoenix, "the wild, wild west" came to a screeching halt in 2008 when the financial crisis hit its peak.  In the span of just a few months, Defendant PNX's stock plummeted from $13.98 per share on September 19, 2008 to an all-time low of $0.29 per share on March 6, 2009.  Defendant PNX's public filings reflected a loss in shareholder equity from $2.279 billion in 2007 to $865 million in 2008, including a loss of nearly $5 billion in assets on its balance sheet during that period.  The individuals primarily responsible for these huge losses were Defendant Phoenix's top executives, including Defendant

Young, the President and Chief Executive Officer, and Defendant Wehr, the Chief Investment Officer and the former Senior Managing Director and Portfolio Manager of PXP, Phoenix's failed asset management business.

98.     Based in large part on Defendant Phoenix's enormous investment losses, on February 19, 2009, Moody's downgraded Phoenix's financial strength and senior debt ratings, and on March 2, 2009, S&P followed suit.  On March 4, 2009, Fitch also downgraded Defendant Phoenix's financial strength rating.

99.     On March 3 and March 4, 2009, Defendant Phoenix's two largest distributors, State Farm and National Life Group, publicly announced they would no longer sell Phoenix products.  In an earnings call for the first quarter of 2009 (held on May 5, 2009), Defendant Wehr acknowledged that the distributors had "stopp[ed] selling Phoenix products due to our recent rating downgrades."

100.    The loss of the distributors sparked a second round of downgrades by the rating agencies in March 2009.

101.    On March 10, 2009, AM Best downgraded Defendant Phoenix's credit rating from A to B++, citing the Company's "below average operating returns, recently declining life and annuity sales, and a diminished business profile following the loss of two of its most significant distribution relationships."  The report further observed that "the company is operating in a significant unrealized loss position within its general account investment portfolio, where it maintains an above-average exposure to below investment grade bonds."

102.    AM Best went on to comment, "Phoenix will also be challenged to grow statutory life and annuity premium following the announcement that its top two distributors—State Farm and National Life Group—have suspended sales of Phoenix's life and annuity products."

Throughout Defendant Phoenix's financial difficulties, the Company's executives continued to compensate themselves at the same rates as during its peak periods and still well above the levels of many larger (and more profitable) insurance companies, causing one of its institutional shareholders to comment in 2008:

> We believe it is clear that the Board of Directors has failed to exercise effective and responsible oversight on [shareholders'] behalf.  Instead, shareholders have been left with losses, policyholders have been left with downgraded ratings for their policies and management has been enriched.

103.    On April 15, 2009—about one month after the loss of Defendant Phoenix's two largest distributors and the second round of credit rating downgrades—Defendant Young abruptly resigned, although she continued to serve as a consultant to Phoenix.  Despite the Company's collapse, Defendant Young was the only executive officer who was replaced, and she retired with some $15 million in pension benefits.  The person chosen to replace her was Defendant Wehr—the same individual responsible for the Company's hundreds of millions of dollars in losses and its failed asset management segment, PXP.

**VIII.**

**DEFENDANTS' UNLAWFUL STRATEGY TO SHED
BILLIONS OF DOLLARS OF FUTURE LIABILITIES**

104.    As a result of the developments described above, Defendant Phoenix, by the end of 2008 or early 2009, found itself virtually unable to write new life insurance business.  The credit crisis also left Phoenix with little or no liquidity and thus no capital to fund its previously-planned life settlement division, which was terminated in late 2008.  The Company, however, was still faced with having to meet its contractual obligations on the billions of dollars in life insurance it had issued over the past several years—policies that were now largely owned by the investors that had purchased them in the secondary market.  Phoenix's reinsurers also began questioning the Company's underwriting practices and its concentration of high death benefit

policies, which ran contrary to the industry norm of issuing higher volumes of lower death benefit policies to generate a greater distribution of risk.

105.    As one former high-level executive described the situation, Defendant Phoenix found itself "in way over its head" with policies now largely owned by investors.  That same executive indicated that since 2008 or early 2009, the Company has been run by an "Insiders' Circle" that has been closing ranks, burying information, and working to prevent information from leaking because "they have some exposure."  This "Insiders' Circle," upon information and belief, has consisted of at least the following individuals:

- Defendant Wehr, the former Chief Investment Officer who replaced Defendant Young as the President and Chief Executive Officer of PNX in 2009;

- Defendant Polkinghorn, the President and Chief Executive Officer of PHL and the Executive Vice President of PNX's Life and Annuity Division;

- Defendant Young, the former President, Chief Executive Officer, and Chairman of the Board of PNX, who continued as a consultant to Phoenix until at least April 2010;

- Edward W. Cassidy, the Executive Vice President of Distribution of PNX;

- Peter A. Hofmann, the Senior Executive Vice President and Chief Financial Officer of PNX since 2008;

- Christopher M. Wilkos, who became the Executive Vice President and Chief Investment Officer of PNX in 2009; and

- John T. Mulrain, a member of Phoenix's legal department since 1992 and who became the Senior Vice President, Secretary, and General Counsel of PNX in 2009.

106.    In response to Defendant Phoenix's precarious financial position, upon information and belief, the Individual Defendants and other members of the Insiders' Circle

orchestrated a plan designed to eliminate the liabilities associated with the billions of dollars in policies that Phoenix had so aggressively sold, now largely owned by investors that had purchased them in the secondary market.  The Individual Defendants and other members of the Insiders' Circle knew that Defendant Phoenix could no longer compete in the primary market for life insurance because of rating downgrades and the loss of its key distribution channels.  Nor could Defendant Phoenix compete in the secondary market for life insurance policies generally, because it lacked the capital and liquidity to do so.  The Individual Defendants and other members of the Insiders' Circle therefore decided to focus Phoenix's efforts on the secondary market *for Phoenix policies*, where Phoenix policies were being bought and sold among investors.

107.    Defendants thus devised a strategy to engage in a pattern of anticompetitive and exclusionary conduct designed to restore Defendant Phoenix's previous position as a monopsonist buyer in the secondary market for Phoenix policies.  Defendants then launched an aggressive multi-faceted campaign to attack and undermine Phoenix's own policies by, among other things, increasing the costs of the policies, refusing to honor or record transfers of ownership of them, and creating uncertainty about them, so that no one—other than Phoenix— will buy a Phoenix policy in the secondary market.  Upon information and belief, all of these improper activities were expressly authorized by Defendants Young, Polkinghorn and Wehr.  By attacking and undermining its own policies, Defendant Phoenix has also made the policies undesirable to its own policyholders, who must continue to pay premiums to Phoenix without knowing whether Phoenix will ultimately honor the policies.  Defendant Wehr tacitly acknowledged this unlawful strategy by stating that Phoenix policies owned by investors are

"worthless" because Defendant Phoenix is able to "manage its liabilities" with respect to such policies.

108.    In other words, if Defendants' strategy were to succeed, policyholders would no longer want to keep their Phoenix policies, and Defendant Phoenix would be the only buyer willing to purchase them.  Phoenix's policyholders would thus have no choice but to lapse or surrender their policies back to Defendant Phoenix, allowing Phoenix to keep all or most of the premiums while shedding the future liabilities associated with those policies.

109.    In furtherance of this anticompetitive and exclusionary scheme, Defendants also committed a fraud on Phoenix's policyholders.  Specifically, upon information and belief, the Insiders' Circle, including Defendants Young, Polkinghorn and Wehr, determined that Defendant Phoenix would contest investor-owned policies once they came due, but that this intent would be kept secret, while Defendant Phoenix fraudulently induced policyholders to continue to pay their often substantial premiums.  Upon information and belief, Defendants Wehr, Polkinghorn and Young caused Defendant Phoenix to issue notices and other materials that falsely and misleadingly represented that the investors' policies were valid and in force, and had value, without ever disclosing that, in fact, when these policies came due, Phoenix would contest and refuse to pay the death benefit and challenge these policies as void, while seeking to retain the premiums paid prior to that time.

110.    By executing these various illicit strategies, as described in further detail below, Defendants sought to keep Defendant Phoenix afloat (and continue the Individual Defendants' oversized compensation from the firm) by (i) purging billions of dollars of liabilities amassed as a result of their own bad business and investment decisions and (ii) continuing to extract premium payments on false pretenses.

**IX.**

**DEFENDANT PHOENIX'S ANTICOMPETITIVE STRATEGY AND CONDUCT**

111.     Defendants have engaged in a variety of tactics to maintain or attain a monopsony for Defendant Phoenix, and these various tactics form part of a single, overall monopsonization scheme.  Each tactic cannot be weighed and understood in isolation, but must be evaluated as part of Defendants' overall exclusionary and anticompetitive strategy and objectives.

112.     Defendant Phoenix, as the counterparty to its own policies, is in a unique position to control the value of its policies in the secondary market.  For example, Phoenix must pay the death benefit under a policy; Phoenix generally must record an assignment of the policy if it is to be sold in the secondary market; only Phoenix can issue an annual statement or verification of coverage[4] under a policy; and Phoenix has the power to determine the insurance rates that holders of its policies must pay.

113.     Defendant Phoenix has abused this unique control in a variety of ways described below.  This anticompetitive conduct and the resulting uncertainty have driven secondary market purchasers out of the market while forcing secondary market sellers (its own policyholders) to have to decide whether to (i) continue to pay premiums to Phoenix with no assurances that Phoenix will honor its obligations or (ii) sell their policies back to the monopsonist Phoenix for nothing or next to nothing and allow Phoenix to reap a windfall by never having to pay the death benefits.

114.     The effects of Defendants' anticompetitive and exclusionary scheme are evident. Today, many potential buyers of life insurance policies expressly refuse to purchase Phoenix

---

[4]     A verification of coverage typically represents to a policyholder that the policy is valid and in force. Verifications of coverage may state, among other things, the current death benefit, policy value, and cash surrender value for the policy.

policies.  Even in the rare situations where secondary market buyers have expressed interest in Phoenix policies, they have offered hugely discounted prices because of Defendant Phoenix's anticompetitive and exclusionary conduct and the uncertainty it has created.

115.    Defendants' anticompetitive and exclusionary conduct was not clear to or foreseeable by policy buyers at the time they purchased Phoenix policies because Defendants' actions reflected a fundamental change in Defendant Phoenix's approach to the secondary market, and they were part of Defendants' secret attempt to maintain or attain a monopsony in the secondary market for Phoenix policies.  Defendants' anticompetitive actions have included, but are not limited to:

a.    Refusing to record the transfer of ownership of policies to prevent the secondary market sales of policies to buyers other than Defendant Phoenix;

b.    Refusing to tell policyholders whether Defendant Phoenix will honor its own policies;

c.    Improperly raising insurance rates for unauthorized purposes, including specifically targeting policies that were purchased by Defendant Phoenix's competitors in the secondary market for its policies (and thus reducing, or eliminating, the profitability of buying and selling policies in the secondary market);

d.    Raising the insurance rates on policies that Defendant Phoenix later contends are void policies;

e.    Issuing false and misleading policy illustrations that reflect higher future insurance rate charges to cause policyholders to misprice their policies and/or

cause them to make sub-optimal decisions about their policies, including lapsing or surrendering them to Defendant Phoenix;

f.   Reneging on verifications of coverage that it issued confirming that it has released prior liens on the policies;

g.   Telling policyholders they cannot rely on Defendant Phoenix's own written statements because Phoenix does not represent them to be true;

h.   Denying death benefit claims on the ground that Defendant Phoenix's policies are invalid when there is no factual basis for doing so;

i.   Delaying and refusing to pay death benefits for a variety of pretextual and bad faith reasons; and

j.   Refusing to return the premiums Defendant Phoenix has collected when seeking to rescind or void its own policies, thus attempting to retain a huge windfall, penalize innocent third-party purchasers, and force policyholders to incur costs to recover the premiums they paid.

Specifically:

**A.   PHL Has Improperly Refused or Delayed the Processing of Policy Transfers**

116.   One of the early manifestations of Defendants' anticompetitive scheme was Defendant Phoenix's refusal to process, or delay in the processing of, policy assignments or transfers.  In February 2009, in the midst of Defendant Phoenix's financial crisis, several trusts that owned Phoenix policies submitted change of ownership forms requesting that Phoenix change the ownership of their policies to a new owner, which the trusts were expressly permitted to do under the law and under the terms of their policies.  Defendant Phoenix, however, did not respond to these requests for weeks.  Then, on March 9, 2009, just a few days after Defendant Phoenix's two largest distributors abandoned it and three days after its stock hit an all-time low,

Defendant Phoenix responded to the requests by refusing to record the policy transfers and instead demanding that the policyholders provide Phoenix with a variety of documents in a bad faith attempt to delay the transfers of the policies.  Defendant Phoenix thus forced its policyholders to sue Phoenix to enforce their right to transfer their policies.  Upon information and belief, the three Individual Defendants each approved this policy and directed these activities.

117.    Defendant Phoenix's failures and refusals to record the policy changes of ownership were intended to have the effect, and have the actual effect, of substantially depressing demand for Phoenix policies in the secondary market.

**B.    Phoenix Refuses to Tell Policyholders Whether It Will Honor Their Policies**

118.    Even when Defendant Phoenix records the transfer of a policy, Phoenix has refused to honor its policy obligations and created uncertainty about whether it will ultimately honor its obligations to pay death benefits due under policies.  In particular, it has refused to confirm to policyholders whether it will honor those policies when they come due.

119.    Defendant Phoenix's refusal to tell policyholders (or confirm in writing) whether it will in fact honor its own policies—again, a practice, upon information and belief, approved and directed by the Individual Defendants—has had the intended effect of impairing the value of policies and making it extremely difficult, if not impossible, to sell those policies in the secondary market.

120.    Defendant Phoenix has, in fact, engaged in these tactics with respect to Plaintiff's policies.

121.    Even as Defendant Phoenix refuses to confirm that it will honor the terms of its own policies, Phoenix continues to issue annual statements and premium notices to policyholders, and expects them to continue paying premiums.  The annual statements Defendant

Phoenix sends also state that policyholders "should consider requesting more detailed information about [their] policy to understand how it may perform in the future," but when policyholders request such information, Phoenix delays as long as it can before responding, and even when it does respond, Phoenix refuses to confirm it will honor the policy.  By refusing to confirm that it will honor the terms of its policies, Defendant Phoenix is attempting to force policyholders to lapse or surrender the policies or else sue Phoenix to confirm that Phoenix will honor its policies.

C.    **Defendant Phoenix Has Improperly Attempted to Raise Insurance Rates on Its Policies**

122.    Universal life insurance is a form of permanent life insurance also known as "flexible premium" adjustable life insurance.  Unlike whole life insurance, which requires fixed monthly premium payments, universal life insurance allows a policyholder to pay as much money as it wants into the policy account (subject to certain limitations), and, each month, the account accrues interest as provided under the policy.  Various charges and fees are deducted from the policy account, including an insurance charge.

123.    The insurance charge is supposed to represent the insurance company's cost to bear the risk of mortality under a life insurance policy.  It is considered to be the cost of "pure insurance."  The insurance charge is typically the largest of various charges associated with a universal life insurance policy.

124.    Under a universal life insurance policy, policyholders can pay more into their accounts (above the insurance charge and other charges) if they wish to accumulate tax-deferred interest, or they can pay just enough to cover their monthly policy charges if they wish to invest their funds elsewhere.  Because of the flexibility it offers policyholders, universal life insurance is the most common form of life insurance purchased in the secondary market, and investors who

purchase such policies typically opt to pay only the premiums needed to cover their monthly charges.

125.     Although Defendant Phoenix's universal life insurance policies permit it to adjust the insurance rates, Phoenix can only do so based on certain specific factors set forth in the policies, the most significant of which is Phoenix's expectations of future mortality.  It is well known that, over the past several years, mortality has *improved*, not worsened, which would logically entail a decrease in insurance rates.  Defendant Phoenix, however, has increased the insurance rates on its policies in clear breach of its contractual obligations.  Defendant Phoenix is the only insurer that has raised insurance rates in the face of improving mortality.

126.     Defendant Phoenix's policies generally provide (with some variations) that Phoenix's right to change insurance rates is subject to the following terms:

1.     Any change in [insurance] rates will be made on a uniform basis for all insureds in the same class.  No change in rates will occur due to any change in the Insured's health or occupation.

2.     Any change in [insurance] rates will be determined prospectively.  We will not distribute past gains or recoup prior losses, if any, by changing the [insurance] rates.

3.     Any change in [insurance] rates will be based on a change in [Phoenix's] expectations of future investment earnings, mortality, persistency and expense/administrative costs.

4.     Any change in [insurance] rates will comply with any procedures and standards that may be on file with the insurance official of the jurisdiction where the policy is delivered.

127.     Despite these and similar representations, in early 2010, Defendant Phoenix began notifying policyholders that it was raising the insurance rates on policies unless policyholders maintained sufficient "accumulated policy values."  In other words, Defendant Phoenix told policyholders that if they did not overfund their policies with premium payments, thereby paying

amounts in excess of those required to cover the monthly charges, Phoenix would penalize such policyholders by increasing their insurance rates.

128.    By increasing the insurance rates only on policyholders who exercised their right to maintain lower accumulated policy values (typically institutional investors in the secondary market), Defendant Phoenix breached its policies in several respects:

a.      The policies provide that insurance rates will be based only on certain enumerated factors that include Defendant Phoenix's expectations of future mortality and persistency.  "Accumulated value" is not a factor on which the insurance rates can be based.

b.      The increase in the insurance rates does not apply to an entire class of insureds, but only to those who maintain lower accumulated policy values (typically, investors that purchased their policies in the secondary market).

c.      By increasing the insurance rates, Defendant Phoenix is trying to recoup past investment losses, which is expressly prohibited by the terms of the policies.

d.      Phoenix's insurance rate increases are wholly unjustified because mortality has improved, thus justifying a decrease – not increase – in the insurance rates.

129.    Defendant Phoenix's insurance rate increases were also specifically intended to induce "shock lapses" by its policyholders.  In other words, the rate increases were designed to shock policyholders into lapsing or surrendering their policies so that Defendant Phoenix could free up reserves associated with such policies and never have to pay the death benefits on them. Chief Financial Officer Peter Hofmann surreptitiously alluded to the success of this strategy when he casually reported, during the Company's second quarter earnings call on August 1,

2012, that Defendant Phoenix had recently experienced a high number of lapses "in the universal life block of business."

130.    Furthermore, Defendant Phoenix's efforts to increase the insurance rates on policyholders who exercise their right not to accumulate a policy value for investment purposes and pay only the minimum monthly policy charges flies in the face of the various representations Phoenix made when marketing and selling its policies, including Phoenix's representations that its products were "designed to balance protection and cash accumulation with features suited to meet policyholders' evolving personal or business planning needs"; that they were suitable for buyers who wished to "minimize long term insurance costs while seeking competitive returns"; and that the policies would allow policyholders "to lower premiums, as well as adjust the amount and timing of premium payments" and give them "increased choice and policy design flexibility to meet [their] needs."  Policyholders purchased Phoenix policies based on these representations, as well as the language of the policies, the projected future costs of the policies based on illustrations provided by Defendant Phoenix, and an expectation that Defendant Phoenix would conduct its business in good faith.

131.    In short, when policyholders exercised their right to fund premiums at their discretion and only as needed to cover their minimum monthly charges, Defendant Phoenix singled out those policyholders by raising their insurance rates.  This rate increase renders the concept of "flexible premiums" illusory.  Policyholders are forced to fund more premiums into their account than they otherwise would need or want to, or else pay prohibitively high insurance rates.  Defendant Phoenix has thus deprived policyholders of one of the most essential rights of universal life insurance—the right to manage and fund their own accounts according to their needs and desires.

132.    By increasing the insurance rates based on accumulated values and singling out investor-owned policies, Defendant Phoenix wants to force policyholders either to (i) pay exorbitant premiums that Phoenix knows would no longer justify the ultimate death benefits (and thus would render the policies uneconomic investments), or (ii) lapse or surrender their policies and forfeit the premiums they have previously paid.  Defendant Phoenix, in turn, will make a huge profit—either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) while retaining the premiums that have been paid to date.

133.    When some policyholders and trade organizations complained about Defendant Phoenix's insurance rate increases to the New York Department of Financial Services (the "NY DFS"), the NY DFS advised Phoenix that its insurance rate increases based on a policy's accumulated value violated the terms of its policies and New York law.  Defendant Phoenix agreed to rescind the insurance rate increase, ***but only in New York***.  After rescinding these insurance rate increases, Defendant Phoenix then announced a second, even larger round of insurance rate increases in New York, in obvious retaliation against policyholders who complained, forcing them to incur further costs to defend their rights.

134.    Defendant Phoenix's insurance rate increases are a deliberate tactic designed to injure competition in the secondary market.  Defendant Phoenix changed its approach to insurance rates and adopted its anticompetitive and exclusionary policy after it had already sold billions of dollars of universal life insurance policies on the primary market.  Defendant Phoenix's new insurance rate policy of basing insurance rates on "accumulated policy values" is designed to have the effect, and does have the effect, of substantially eliminating demand for Phoenix policies in the secondary market by wrongfully imposing new charges on policyholders

48

and creating uncertainty about the future costs of Phoenix policies, including whether Phoenix will improperly try to raise insurance rates again in the future.

135.    Defendant Phoenix also represented to policyholders that "[t]he primary drivers of the [insurance] rate adjustments were changes in our expectations of future mortality, persistency, and investment earnings, factors referenced in the policy."  That statement appears to be untrue, as Phoenix was telling a completely different story in its quarterly earnings call for the first quarter of 2010—just before Phoenix announced its first insurance rate increase.  During that call, the Chief Financial Officer, Peter Hofmann, reported, "Benefits are lower largely because of favorable mortality," and that "experience this quarter was favorable, particularly as measured against the four quarter moving average."  In the previous quarter, Hofmann reported, "[universal life] mortality in 2009 was below long-term expectations," and "overall mortality was in-line with expectations."  These reports came after Defendant Wehr reported, with respect to unfavorable mortality results in the second quarter of 2009, "[W]e do not believe the mortality this quarter signals any underlying issue with the quality of our UL business.  I should remind you that in the four previous quarters, we had favorable mortality experience."

136.    Defendant Phoenix also refused to provide its policyholders with information showing that its insurance rate increases were proper.  Instead, when such information was requested, Defendant Phoenix told policyholders, "Your request for supporting data permitting Phoenix to change the [insurance rate] in accordance with the policies seeks PHL's proprietary pricing experience and other confidential information . . . ."  Defendant Phoenix thus forced its policyholders to commence litigation just to find out Phoenix's rationale for the insurance rate increases.

137.     Defendant Phoenix knew its insurance rate increases breached the terms of its policies.  In its 2009 Form 10-K, Defendant Phoenix stated, "[W]e are implementing an increase in the [insurance] rates for certain universal life policies effective April 1, 2010."  These increases, Phoenix said, would likely "result in claims against us by policyholders."  And just as Phoenix anticipated, several policyholders have now sued Phoenix for its insurance rate increases.  To date, there are at least six lawsuits against Phoenix asserting breach of contract and related claims arising from Phoenix's insurance rate increases, including a New York class action, a RICO mail and wire fraud action filed by an investment fund whose investors include CalPERS, an action by the subsidiary of an insurance company that purchased nearly $900 million of Phoenix policies in the secondary market, and three actions filed by U.S. Bank, as securities intermediary for Lima LP (two in New York, and one in Delaware).

138.     Upon information and belief, the three Individual Defendants were directly involved in the decisions and events leading up to the improper rate increases.

**D.     Phoenix Has Issued False and Misleading Policy Illustrations**

139.     Insurers issue policy illustrations to policyholders to show them how their policies are expected to perform over a certain period of time based on various assumptions, including future policy costs.  Defendant Phoenix has issued false and misleading policy illustrations that applied future insurance rates that were not the ***actual*** insurance rates to be charged, but ***higher*** rates.  Phoenix purposefully overstated the insurance rates in these policy illustrations to induce policyholders to pay more than they actually had to, or alternatively, they would misprice or undervalue their policies, which would cause them to make misinformed decisions to lapse or surrender their policies.  Defendant Phoenix's false illustrations were also intended to destroy the value of Phoenix's policies and cause potential buyers in the secondary market for Phoenix policies to decide not to purchase policies they might otherwise purchase.  Upon information and

50

belief, based on these false and misleading illustrations, some policyholders let their policies
lapse or surrendered them back to Phoenix because they believed they would have to pay higher
insurance rates than Phoenix could, or actually intended to, charge.

**E.      Phoenix Has Regularly Denied Claims for Death Benefits
          on Baseless and Pretextual Grounds**

140.    Also as part of its anticompetitive scheme, Defendant Phoenix has unjustifiably
refused to pay death benefits due under its policies.  Upon information and belief, the three
Individual Defendants were specifically aware of this practice and authorized and directed
Phoenix employees to engage in this practice.

141.    For example, Defendant Phoenix improperly refused to pay the death benefit due
under three $10 million life insurance policies owned by Lima.  Phoenix advanced the pretextual
reason that it would not pay the claims until U.S. Bank or Lima provided Phoenix with a
document that Phoenix knew  they did not have and that had no bearing on Phoenix's obligation
to pay.

142.    Specifically, two years prior to the deaths of the two insureds involved, and
*before* Lima acquired the policies (which was also well after the expiration of the two-year
contestability periods), Defendant Phoenix released collateral assignments (liens) on the policies.
The collateral assignments were apparently released in connection with the sale of security
agreements that covered the policies.  The releases—which Defendant Phoenix clearly knew
about and accepted, because Phoenix itself recorded them—had nothing to do with Lima's
subsequent acquisition of the policies.  After Phoenix recorded the releases of the collateral
assignments, it sent letters confirming it had done so.  Defendant Phoenix also continued to issue
annual statements and verifications of coverage that further confirmed that the collateral
assignments had been released.  But when the insureds passed away, and the death benefits came

due, Phoenix refused to pay.  Phoenix claimed it could not pay the benefits unless Lima provided

Phoenix with a schedule to a purchase agreement to which Lima was not a party, which Phoenix

said it needed to prove that its own prior conduct in releasing the collateral assignments had, in

fact, been correct.  U.S. Bank was then compelled to sue Phoenix to obtain payment.

143.    Defendant Phoenix resisted and delayed the payment of $30 million to Lima for

six months, after which Phoenix was finally forced to pay.  Phoenix, however, was able to delay

reporting the payment of these claims through two quarterly earnings reports while also, upon

information and belief, making several hundred thousands of dollars in interest.  Moreover,

Defendant Phoenix engages in this sort of conduct in order to make Plaintiff and other actual and

potential market participants believe they cannot rely on Phoenix's own representations and

policy information received directly from Phoenix.  With such unreasonable conduct and the

resulting uncertainty, no potential market participant would be willing to compete with

Defendant Phoenix in the acquisition of Phoenix policies in the secondary market.

144.    After U.S. Bank filed the first insurance rate lawsuit as the securities intermediary

for Lima, Defendant Phoenix resisted paying nearly all of Lima's death benefit claims until this

action was filed.  Although the rest of the life insurance industry, on average, denies significantly

less than 1% of all death benefit claims, Defendant Phoenix resisted paying ***virtually all*** of the

claims Lima submitted between the filing of the insurance rate action and the filing of this

action, and it is clear Phoenix did this in retaliation for the filing of the insurance rate lawsuit and

in furtherance of its anticompetitive and exclusionary scheme.

145.    In fact, in 2008 (the year before Defendant Phoenix began engaging in its

anticompetitive and exclusionary activities), PHL denied less than 1% of the total death benefit

claims it received, only slightly more than the life insurance industry's average.  Since then,

however, in 2009, 2010, and 2011, Defendant PHL denied 12.37%, 16.20%, and 20.87% in total

death benefit claims made in those years, reflecting a massive and steady increase in the amount

of death benefits refused since the inception of its anticompetitive and exclusionary scheme.

Defendant PHL's death benefit denial rate for 2012 is unavailable, because in 2012 (with one de

minimis exception of $318,000), PHL failed to report the actual amount of claims denied to its

regulators on its form Schedule F, even though that amount is required to be included and had

been included by PHL in prior years.

146.    And, upon information and belief, Defendant Phoenix has continued to step up its

efforts to resist paying death benefit claims:  While PHL resisted $34 million in death benefit

claims in 2011, it resisted paying approximately $50 million in death benefit claims during the

first six months of 2012.  Thus, PHL was on pace to resist $100 million in death benefits in 2012.

Whether PHL met or even exceeded this projection cannot be verified, since as noted above,

PHL failed to provide full and accurate information to its regulators regarding its claim denials in

2012.

**F.    <u>Phoenix Refuses to Return the Premiums It Has Collected
       When Seeking to Rescind or Void Its Own Policies</u>**

147.    It is fundamental that when an insurance company seeks to rescind a policy, it

must return the premiums it previously collected.  That is the law under any contract, and it is the

only rule that is fair.  "If an insurance company could retain premiums while also obtaining a

rescission of a policy, it would have the undesirable effect of ***incentivizing insurance companies***

***to bring rescission suits as late as possible as they continue to collect premiums at no actual***

***risk***."  *National Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 565 (D. Del. 2010) (emphasis

added); *Sun Life Assur. Co. of Canada v. Berck*, 719 F. Supp. 2d 410, 418-19 (D. Del. 2010).

Worse yet, allowing an insurance company to keep the premiums when rescinding a policy

would only encourage insurers to issue policies even though they knew of some problem with the application (such as false information).  Insurers would simply issue the policy, take the premiums, and later rescind the policy and keep the premiums.[5]

148.    Despite this basic principle, Defendant Phoenix has engaged in a rampant bad faith practice of trying to rescind policies and keep the premiums.  Indeed, in March 2012, Phoenix filed seven lawsuits in Delaware on one day seeking to rescind policies that Phoenix issued as many as seven years ago.  Phoenix asked the courts in those lawsuits to allow it to keep the several millions of dollars in premiums that it happily collected from its policyholders over the years.[6]  Defendant Phoenix's improper motives are clear:  the mere threat that an investor would have to litigate to obtain the return of the premiums on a rescinded policy would cause secondary market purchasers to pay much less for a Phoenix policy because of the risk of incurring litigation costs and delays simply to recover their investments.

149.    In one case, *PHL Variable Insurance Co. v. The Faye Keith Jolly Irrevocable Life Insurance Trust*, 2012 WL 850916 (11th Cir. Mar. 14, 2012), PHL filed an action against the insured and the policy owner for negligent misrepresentation in connection with a $10 million policy.  PHL alleged that the insured and the policy owner misrepresented the insured's assets on the policy application and sought damages, rescission of the policy, and the right to keep the premiums previously paid by the Trust owner, which was a secondary market purchaser of the policy.

---

[5]    Phoenix's policies expressly provide that when Phoenix rescinds a policy, it must return the premiums.  Section 21 of one policy form states:  "If we contest the validity of all or a portion of the face amount provided under this policy, the amount we pay with respect to the contested amount will be limited to the higher of a return of any paid premium required by us for the contested face amount or the sum of any Monthly Deductions made under this policy for the contested face amount."

[6]    One of these courts has already rejected Phoenix's unlawful attempt to void a policy and, at the same time, keep the premiums.  In striking Phoenix's request to keep the premiums, the court observed that Phoenix's request was "exactly" what Delaware law prohibited.

150.    The insured defaulted on the claims against him, and the district court rescinded the policy.  However, as part of its improper tactics, PHL also asserted baseless claims for damages against the secondary market purchaser in an effort to keep the investor's premiums when rescinding the policy.  The court rejected PHL's claims, denied PHL's motion for summary judgment, and granted summary judgment in the trust's favor.

151.    Unabashed by its loss in the lower court, Defendant Phoenix appealed the ruling.  On appeal, the Eleventh Circuit reached the same conclusion as the trial court.  The Eleventh Circuit rejected PHL's arguments that the trust had made false statements in connection with the insurance application, and as a result, held that PHL had no right to retain any premiums.

152.    The facts of *Jolly* have merited significant attention from the press.  According to a June 11, 2011 article in *The Hartford Courant* entitled "Emeralds Add Glitter to Insurance Battle," Jolly was employed by a cemetery and had few, if any, assets.  In his Phoenix application, he claimed to have owned nearly a billion dollars in emeralds that he salvaged from a sunken Spanish vessel in the Gulf of Mexico.  *The Hartford Courant* noted that "at the heart of the story, as pieced through court records, is the question of how Phoenix could have approved the policy in the first place.  Jolly's application contained wild discrepancies and claims that could easily have been debunked."  PHL, however, refused to comment as to "why the company accepted Jolly's application despite such glaring discrepancies."  The real story is clear.  To get its hands on more and more premiums, Defendant Phoenix turned a blind eye to obvious application inaccuracies, but now, to avoid paying out on such policies, Phoenix has seized on such errors feigning false surprise about them.

153.    As the insurer and reviewer of policy applications, Defendant Phoenix was uniquely situated to examine policy applications for discrepancies and misrepresentations.  This

is precisely what other, responsible insurers do, and they routinely request documents to support statements made in applications.  Because purchasers of policies in the secondary market do not have access to the same information Phoenix does when it underwrites a policy, in determining whether a policy has been validly issued, secondary market purchasers rely heavily on Defendant Phoenix's underwriting, the fact that Phoenix issued the policy, and the fact that Phoenix did not contest the policy during the two-year contestability period.

154.    Once Defendant Phoenix found itself in dire financial straits and unable to earn enough revenue by selling life insurance, Phoenix stepped up its efforts to try to rescind policies that it underwrote, issued, and did not contest when it could have, and at the same time keep all the premiums it collected over the years.  This bad faith tactic is designed to deter investors from buying Phoenix policies and destroy competition in the secondary market for Phoenix policies so that existing policyholders will have no one other than Defendant Phoenix to sell their policies to.

155.    Defendant Phoenix has thus, in effect, reversed its position regarding the secondary market, which it previously embraced and in which it intended to participate.  Instead, Defendant Phoenix now routinely denies death benefits and seeks to rescind policies that its customers purchased from Phoenix and sold to investors long ago.  Defendant Phoenix now takes the position that these policies were void from the very beginning due to application errors, for lack of "insurable interest," or other pretexts, and argues this somehow permits Phoenix to keep all of the premiums it has collected over the years while never actually providing any insurance.  Defendant Phoenix has engaged in this practice not because of any legitimate concern about the policies—which it happily sold and collected premiums on for years—but because it has found itself in severe financial distress as a result of the mismanagement of its business.

156.    In short, Defendants made a calculated decision to use Defendant Phoenix's existing policyholders as their primary source of revenue.  By engaging in the anticompetitive and exclusionary conduct described herein, Defendants have created so much uncertainty about whether Defendant Phoenix will perform under its own policies that virtually no one will buy a Phoenix policy in the secondary market.  Because policyholders cannot sell their policies to anyone other than Defendant Phoenix, Phoenix's pernicious conduct has left policyholders with only two economically inefficient options:  (i) sell their policies back to Phoenix for nothing or next to nothing; or (ii) continue to pay premiums to Phoenix with no assurance that Phoenix will ever pay the death benefits under these policies.

## X.

## THE SUCCESS OF PHOENIX'S ANTICOMPETITIVE CAMPAIGN

157.    From its perspective, Defendant Phoenix's unlawful scheme has been largely successful.  As a result of Defendant Phoenix's conduct, there are now significantly fewer buyers of Phoenix policies in the secondary market.  For example, immediately after Defendant Phoenix initiated its broad-based insurance rate increases in 2011, Plaintiff received an email indicating that one of its buyers was "***putting on hold all purchases of PHX policies***."  In another example, one potential buyer of Plaintiff's policies sent an email identifying among its purchase criteria, "***No Phoenix paper***."

158.    Any buyers that still exist are only willing to purchase Phoenix policies at severely reduced prices, because they have no idea whether Defendant Phoenix will ultimately honor the terms of its own policies.  There are several indications that the steep discounts offered on Phoenix policies are the result of Defendant Phoenix's wrongful conduct.

159.    First, the value of a life insurance policy should increase over time naturally, but the value of Phoenix policies in the secondary market has actually decreased.  A policy's value should increase naturally because premiums have been paid to cover the risk of death in the earlier years, when a policy's insurance rates exceed the relatively low risk of death.  The insurance company uses these premium payments to build a surplus that is then used to pay the death benefits in the later years when more insureds are expected to die.  In the later years of a policy, the insurance rate is lower than the actual risk of death, but the insurance company has already built up a surplus from the earlier years to compensate for this.  Thus, an investor that wants to purchase a policy that has been in force for several years will pay more for the policy because the future insurance rate, relative to the risk of death, will be less than the insurance rate in the earlier years.  This temporal relationship between the insurance rates and the risk of death is illustrated in the diagram below:



160.    Second, the prices offered for policies issued by other insurers have remained relatively flat since early 2009.  On the other hand, the prices offered for Phoenix policies have plummeted from the prices offered in early 2009.  Many policyholders have, in fact, been unable

to find any buyers at all and have been forced to lapse or surrender their policies to Defendant

Phoenix, as reflected by Phoenix's relatively high lapse rates.  In 2009, 2010, and 2011, the lapse

rates for all PHL policies were 8.0%, 9.3%, and 7.3%, respectively.  These rates are shockingly

higher than PHL's lapse rates for the two years preceding the implementation of Defendants'

anticompetitive scheme, which were just 4.3% and 5.4%, and, upon information and belief,

Phoenix expects even higher lapse rates on investor-owned policies in the future.  Defendant

PHL's lapse rate for 2012 cannot be accurately calculated due to the fact that (as discussed

further below) Phoenix to date has failed to file its 2012 financial statements and disclosed that

its prior GAAP and statutory financials may not be relied on.  However, based on information

and belief, the lapse rate of PHL policies for 2012 is estimated to exceed 11.5%.

161.    Third, according to Defendant Phoenix's public filings, Phoenix has increased its

risk-based capital ratio since 2010.  Risk-based capital represents an amount of capital based on

an assessment of risks that a company should hold to protect customers against adverse

developments.  The risk-based capital ratio represents the total capital of the company (as

determined by formula) divided by the company's risk-based capital (as determined by formula)

and measures the amount of capital that an insurance company has to support its overall business

operations.  The increase in Phoenix's risk-based capital ratio should make Phoenix's policies

less risky (*i.e.*, there is less risk that Phoenix will not have sufficient capital to meet its policy

obligations) and thus more valuable.  Yet, while Phoenix claims to be financially stronger, prices

offered for Phoenix's policies have fallen dramatically.

## XI.

## PHOENIX'S ANTICOMPETITIVE PURPOSE AND INTENT

162.   Defendants' anticompetitive and exclusionary conduct has no valid or legitimate business justification.  Rather, Defendants made a calculated decision to change course and engage in illegal conduct because their reckless decisions caused the Company to sustain massive losses, jeopardizing their shareholders and policyholders while they continued to line their own pockets.  Defendants, therefore, needed to find a way to recoup those losses.  The purpose and effect of their illicit scheme is to destroy competition in the secondary market by ensuring that buyers and potential buyers for Phoenix policies cannot successfully invade or erode Defendant Phoenix's dominant and entrenched market position, so that Phoenix can force its policyholders to surrender their policies back to Phoenix.

163.   Indeed, Defendants have undertaken their anticompetitive and exclusionary actions with the specific intent to monopsonize the secondary market for Phoenix life insurance policies by eliminating, destroying, or foreclosing any meaningful competition.  Defendants' scheme is designed to thwart competition while allowing Defendant Phoenix to pay anticompetitive, below-market prices (*i.e.*, zero dollars in the case of lapses) for Phoenix life insurance policies in the secondary market while avoiding the payment of death benefits.  Indeed, Defendants' scheme has injured every single participant in the secondary market for its policies, including:

(a)      the existing policyholders who are unable to sell their policies now and who are being forced to continue paying premiums to Defendant Phoenix or else sell their policies back to Phoenix for nothing or virtually nothing;

(b)      the former policyholders who were forced to lapse or surrender their policies back

to Defendant Phoenix (upon information and belief, many investors who

purchased Phoenix policies in the secondary market sustained hundreds of

millions of dollars in losses by being forced to surrender their policies to Phoenix

as a result of Phoenix's anticompetitive campaign); and

(c)      the former policyholders who were forced to sell their policies to secondary

market purchasers at substantial losses.

164.    Defendants' intentional, sweeping, and disruptive conduct—organized,

orchestrated, and implemented by Defendants—is willful, malicious, and oppressive.

Consequently, an award of exemplary or punitive damages in an amount sufficient to punish and

deter Defendants is also justified.

## XII.

## <u>THE RELEVANT MARKETS</u>

**A.      <u>Relevant Product Market</u>**

165.    The relevant product market for purposes of Plaintiff's claims is the secondary

market for life insurance policies issued by Defendant Phoenix.

166.    Although the primary and secondary markets both involve life insurance, the

markets are separate and distinct, and there is no competition between the two markets.

167.    In the primary market, insurance companies and their agents and brokers market

and sell insurance products to prospective insureds, and prospective insureds seek insurance

policies from insurance companies.  Prospective insureds fill out applications, undergo medical

tests, and are otherwise investigated (or underwritten) by the insurance companies.  In contrast,

in the secondary market, potential insureds do not seek policies from insurance companies;

instead, actual insureds (or investors who purchased policies in the secondary market) seek to sell policies they own.

168.    Furthermore, in the primary market, buyers generally seek to obtain life insurance for the purpose of obtaining insurance protection, although some consumers have purchased life insurance in the primary market not for insurance protection but largely as an investment.  In the secondary market, however, buyers always purchase policies exclusively as investments and never for insurance protection.  And in the case of insurance companies, they purchase policies back from policyholders in the secondary market in order to release the death benefit liabilities associated with them or to hedge against their own mortality risks.  Professional or institutional buyers are the main participants in the secondary market, but they generally do not participate in the primary market.

169.    Additionally, in the primary market, the products are ***potential*** life insurance policies, because insureds must apply and qualify for policies.  In the secondary market, the products are ***actual*** life insurance policies that have already been issued.

170.    Thus, while life insurance policies are involved in both the primary and secondary markets, the secondary market is separate and distinct.  In the secondary market, investors seek a critical bundle of rights that include the right to receive the policy death benefits coupled with the right to sell or resell interests in the policies.  Indeed, the right to sell or resell the interest in a policy is a critical right that gave rise to the secondary market and allows it to continue to exist. In the primary market, insureds generally seek life insurance for different reasons, including income protection, tax-deferred growth, and the avoidance of potential estate tax liability.  The primary market involves individuals' applications for life insurance policies for personal

financial planning purposes; the secondary market involves investments in alienable interests in in-force life insurance policies strictly for investment purposes.

171.    In other words, insurers' issuance of policies, combined with their willingness and agreement to respect the right to transfer policies, effectively converts potential life insurance policies into a new product—the resalable interest in in-force policies.  This is somewhat similar to the manner in which individual mortgages have been bundled together and sold as separate products known as collateralized debt obligation ("CDO") securities.  Although the primary market for mortgages and the secondary CDO market both in some sense involve mortgages, the markets and the relevant products are separate and distinct.  Investors in the CDO market seek to purchase a distinct bundle of rights that define the nature of that market; individual mortgagors or mortgage seekers do not participate in the CDO market at all.

172.    The relevant product market includes all types of life insurance policies, although as a practical matter term life insurance is rarely sold in the secondary market (its limited term makes it too risky for most investors), and whole life insurance policies are only infrequently transferred (its fixed premium rates render it too expensive).  The majority of life insurance in the secondary market is universal life insurance because of the flexibility it offers policyholders with respect to the timing and amount of premium payments.

173.    Other financial instruments are not substitutes for life insurance policies and cannot be included in the same relevant market.  Investors in the secondary market for life insurance buy the economic interests in life insurance policies because they are seeking a particular risk/reward profile that differs substantially from the risk/reward profiles of other financial products.  In other words, investors purchase interests in life insurance policies because the price movements in those interests are largely uncorrelated with those of other financial

products.  Most, if not all, secondary market investors do not view other financial products as viable substitutes for life insurance product investments.

**B.**     **Relevant Geographic Markets**

174.    The relevant geographic markets for purposes of Plaintiff's claims consist of (i) the nationwide domestic primary market for the issuance of life insurance policies and (ii) the worldwide secondary market, including the United States, for the purchase and sale of Phoenix life insurance policies.

175.    The primary life insurance market is nationwide.  Although some insurance companies do business in only certain states, there are a number of insurance companies that compete with each other in many geographic areas, and U.S. consumers have a choice of insurance companies when they are shopping for potential policies.

176.    The secondary market for Phoenix life insurance policies is worldwide.  Investors from all over the United States, Europe, and elsewhere can and do (or, more accurately, used to) compete with each other to purchase Phoenix policies from insureds or from other investors.  Most of these transactions have involved U.S. parties and intermediaries and took place in, and directly affected, U.S. commerce.

**XIII.**

**THE SECONDARY MARKET FOR PHOENIX POLICIES**

177.    There is a separate secondary market or aftermarket for Phoenix life insurance policies.  On this secondary market, insureds can (or, more accurately, used to be able to) sell their Phoenix policies.  An insured may sell a Phoenix policy to a life settlement company, which in turn may resell it to others (*e.g.*, banks, investment funds, or other financial institutions).  In most states, the initial sale must be made to a licensed life settlement provider.

178.    As already noted, prospective purchasers of life insurance policies can choose from different life insurance companies in the primary market for life insurance.  Once an individual initially purchases a life insurance policy from Phoenix, however, she or he becomes locked into a Phoenix-specific secondary market, because, among other things:

a.    The life insurance policy application process is lengthy and complex, and often includes a mandatory physical exam and other medical tests.  Insureds do not wish to incur the substantial inconvenience and transaction costs associated with switching companies (each insurance company uses different forms; each typically requires a new medical exam; and each typically charges an application fee).  As insureds age, they generally become less likely to pass new or additional medical exams to qualify for other insurance, and if they are still insurable, they will in some circumstances pay rates on a new policy higher than those on a policy they purchased years earlier for the reasons discussed above.  As one life insurance commentator observed, many insureds "can't shop for new coverage because they are no longer insurable."  As a result, once an insured obtains a Phoenix life insurance policy, the insured is unlikely to switch to another insurer.  To the extent the insured participates in a secondary life insurance market, the insured is limited to the secondary market for Phoenix life insurance policies.

b.    Once an insured has a policy in place, other life insurance companies are less likely to offer additional policies on the same insured, because they do not want to over-insure individuals.

c.    Additionally, once an insured acquires a policy, the insured often has less need for additional insurance.

179.    The above factors, as well as Defendants' anticompetitive and exclusionary conduct, deter or prevent Phoenix policyholders from readily or easily switching to other insurers once they have acquired Phoenix policies.  Phoenix policyholders are, accordingly, substantially "locked in" to Phoenix policies.  The costs of switching insurance brands are simply too high to allow for meaningful inter-brand competition in the secondary market.  Policyholders will therefore tolerate a substantial level of decreased prices in the secondary market before even considering the possibility of switching insurance brands.  And, in many cases, they simply will have no other economically viable alternative because advanced age or changes in their health have made them uninsurable under a new policy with another carrier.

180.    Similarly, owners of Phoenix policies who purchased their policies in the secondary market are also locked in to the secondary market for Phoenix policies.  They cannot substitute policies issued by other insurance companies for the Phoenix policies they own.  They cannot compel insureds to take out other insurance, nor can they compel insureds to transfer other insurance policies to them.  Once an investor in the secondary market purchases a Phoenix policy, it is locked into that policy unless and until it can sell or transfer it or chooses to lapse it.

181.    In addition, competition in the primary market for life insurance cannot discipline or prevent anticompetitive or exclusionary activity in the secondary market for Phoenix life insurance policies.  The lifecycle cost of universal life insurance policies generally, and of Phoenix policies in particular, is not transparent to prospective insureds in the primary market; it is instead difficult to understand and opaque.  For example, the insurance rate is based on a number of assumptions by insurance companies, including assumptions about mortality, persistency (lapse rates), interest rates, expenses, taxes, and statutorily-required reserves.  Consumers who are the primary market purchasers of life insurance have little or no access to

this information, which is essential to a full understanding of the true lifecycle cost of a life insurance policy.  As a result, when prospective insureds are considering the purchase of Phoenix policies, they cannot and do not evaluate the true lifecycle costs of those policies.  This is especially true because insurers do not disclose precisely how they have priced their policies, and they write their contracts in a manner that makes them virtually incomprehensible to policyholders.

182.     In recent years, Defendant Phoenix has altered its practices, engaged in the exclusionary conduct described above, and thereby created enormous uncertainty about the value of the billions of dollars in Phoenix policies purchased by investors in the secondary market, including uncertainty about the cost to keep Phoenix's policies in force.  These changed practices or pricing structures were not known to Phoenix's policyholders at the time they purchased their Phoenix policies and were not reasonably foreseeable to them.

183.     As a result of the above lock-in factors, lifecycle pricing opacity, and Defendant Phoenix's unpredictable and altered practices, there is a separate, relevant secondary market for Phoenix-branded life insurance policies.  People who purchase Phoenix policies do not have realistic alternatives on the primary insurance market once they are locked in to Phoenix policies. Nor can they anticipate and foresee the extent of the lock-in prior to the purchase of Phoenix policies because of the lifecycle pricing opacity of life insurance.

184.     Cross-elasticities also demonstrate that the secondary market for Phoenix life insurance policies is a separate market.  In a typical monopoly case, cross-elasticity of demand is an economic variable that measures the change in the quantity of a product demanded by consumers relative to the change in price of another (the monopolized) product.  In the monopsony context, the elasticity of demand measures the relative demand of new, potential, or

fringe buyers.  Typically, cross-elasticity of supply measures the relative responsiveness of the

quantity supplied to changes in price.  In a monopsony case, cross-elasticity of supply measures

the ability of sellers to switch to other buyers of the product and avoid the low-paying buyer (the

monopsonist).

185.    Upon information and belief, in the secondary market, there is no (or no

significant) cross-elasticity of demand or supply.  If Defendant Phoenix lowers the prices it will

pay for Phoenix policies in the secondary market to below-competitive levels, policyholders will

not and cannot substitute away from Phoenix and towards other buyers because of (i) the lock-in

factors described above, (ii) Defendant Phoenix's anticompetitive and exclusionary practices

(which are strategic barriers to entry and expansion), and (iii) other barriers to buyer entry and

expansion described below.

**XIV.**

**PHOENIX'S MARKET POWER IN THE SECONDARY MARKET**

186.    Defendant Phoenix has market (or monopsony) power in the secondary market.

Circumstantial and direct evidence supports the conclusion that Defendant Phoenix has

substantial market power.

187.    As to circumstantial evidence, upon information and belief, Defendant Phoenix

now buys, through lapses and surrenders, over 75% of the Phoenix policies being bought and

sold in the secondary market.  This high market share, combined with the entry and expansion

barriers described below, establishes Phoenix's market power in the secondary market.

188.    As to direct evidence, because Defendant Phoenix dominates its secondary

market, and because Phoenix has the sole ability to refuse to pay death benefits, refuse to

approve policy transfers, and raise insurance rate charges, Phoenix now does not need to (and

does not) offer fair or market value for such policies.  Instead, having eliminated potential alternative buyers, Defendant Phoenix can, and does, force policyholders who want to sell their policies to lapse or surrender their policies, in effect, selling their policies back to Phoenix for prices drastically below those that would be offered in a competitive secondary market.

189.    Lapses or surrenders of policies are the economic equivalent of Phoenix purchases of those policies, but also allow Defendant Phoenix to avoid paying the death benefits. Phoenix's lapse rates are direct evidence of Phoenix's market (monopsony) power.  When Phoenix buys back a policy through a lapse or surrender, Phoenix pays nothing or almost nothing.  In a truly competitive market, Phoenix would have to buy the policies for fair value, at prices well above the cash surrender value.

190.    There are substantial entry and expansion barriers surrounding the secondary market for Phoenix life insurance policies.  The entry barriers include:

a.    Control of an essential resource.  Defendant Phoenix controls the supply of the policies that it issues, and it also controls the policy transfer process by approving or disapproving transfers and/or commencing litigation to challenge transfers or rescind or void policies that have been sold or transferred.  It also has the power to approve or deny claims made on the policies.  As described above, in recent years, Defendant Phoenix has undertaken a campaign of anticompetitive and exclusionary behavior designed to maintain or acquire monopsony power in the secondary market for Phoenix policies.  Phoenix's power and practices enable it to control the essential resource in the secondary market—the Phoenix insurance policies (or the transferrable interest in such policies).

b.    <u>Issuer advantages</u>.  Sellers of policies have limited information about the availability of buyers other than the company that issued the policy because most policy forms only describe the surrender option and not the settlement option.  (Only a few states require insurers to disclose a life settlement as an option for insureds.)  Additionally, insurers typically require a simple one-page form to effect the surrender of a policy.  On the other hand, when a policyholder wants to settle her or his policy to a party other than the insurer, the insurer usually requires the execution of multiple forms containing extensive disclosures and disclaimers intended to deter the life settlement transaction.

c.    <u>Higher capital costs for new entrants</u>.  New buyer-entrants in the secondary market have higher capital costs than existing participants, and these capital costs are not applicable to Defendant Phoenix.

d.    <u>Technical know-how</u>.  Investors in the secondary market need substantial and sophisticated know-how and custom computer software to accurately price Phoenix life insurance policies and portfolio risks.  They also need to be able to track policies and premium payments to ensure that policies do not lapse.  Assembling this know-how requires substantial time, effort, and capital.

191.    Defendant Phoenix's anticompetitive and exclusionary conduct, described further above, also constitutes a strategic entry barrier.  Through its anticompetitive and exclusionary conduct, Phoenix has substantially eliminated other buyers from the secondary market and prevented the participation of potential buyers in that market.

192.    Additionally, the secondary market for Phoenix life insurance policies exhibits substantial expansion barriers.  Firms currently participating in this market as buyers (other than

Defendant Phoenix itself) confront the first entry barrier described above—Phoenix's near exclusive control of its own life insurance policies.  This entry barrier concurrently functions as an expansion barrier, especially through the operation of Phoenix's anticompetitive and exclusionary practices described above.  Firms that currently participate in the secondary market cannot meaningfully expand their purchases of Phoenix policies in the secondary market in light of Defendant Phoenix's anticompetitive and exclusionary conduct.

## XV.

## THE EFFECT OF PHOENIX'S CONDUCT ON TRADE OR COMMERCE

193.    Defendant Phoenix's anticompetitive and exclusionary conduct described herein has affected and restrained, and continues to affect and restrain, both commerce within the State of Connecticut (intrastate commerce) as well as interstate trade or commerce.  At least part of Defendant Phoenix's monopsonization and attempted monopsonization occurred within the State of Connecticut.

## XVI.

## INJURY-IN-FACT AND DAMAGES

194.    By reason of, and as a direct and proximate result of, Defendants' anticompetitive and exclusionary practices and conduct, Lima has suffered, and will continue to suffer, financial injury to its business and property.

195.    As a result, Lima has been deprived of revenue and profits it would have otherwise made, has suffered diminished market growth, has sustained a loss of goodwill, and has suffered an impairment of the value of the Phoenix life insurance policies it owns.

196.    Lima has not yet calculated the precise amount of its damages with respect to the approximately $1.4 billion in Phoenix policies that Lima owns or has owned, but it will do so at

an appropriate time during this case.  However, Lima estimates that the damages are in the hundreds of millions of dollars.

## XVII.

## ANTITRUST INJURY AND STANDING

197.    Defendant Phoenix's anticompetitive and exclusionary practices have directly injured owners of Phoenix policies.  Phoenix policy owners have largely been foreclosed from selling their policies in the secondary market (except to Defendant Phoenix itself, which buys them through lapses or surrenders).  Lima, as an owner of the financial interest in several Phoenix policies, has been injured substantially and directly by Defendant Phoenix's anticompetitive and exclusionary practices, including by its inability to sell its Phoenix policies to buyers other than Defendant Phoenix, forcing Lima in some cases to lapse or surrender its policies back to Phoenix.  This injury—as a seller in a market Defendant Phoenix has monopsonized or attempted to monopsonize—is antitrust injury for which Lima has standing to challenge.

198.    Additionally, as a buyer or potential buyer of Phoenix policies, Lima is a competitor or potential competitor of Defendant Phoenix in the secondary market and has also suffered direct antitrust injury in this respect.

199.    Defendant Phoenix's practices have harmed competition in the secondary market for Phoenix life insurance policies.  Phoenix's practices have all but foreclosed competition in the purchase or repurchase of interests in Phoenix policies, and have driven down prices in the secondary market well below competitive levels.

200.    Defendant Phoenix's conduct has produced antitrust injury in the form of at least the following anticompetitive, exclusionary and injurious effects upon competition in the secondary market for Phoenix life insurance policies:

a.      Competition in the purchase of Phoenix life insurance policies has been substantially and unreasonably restricted, lessened, foreclosed and eliminated;

b.      The secondary market for Phoenix life insurance policies will continue to be artificially restrained or monopsonized;

c.      Barriers to entry into the market have been raised;

d.      Barriers to expansion of buyers in the market have been raised;

e.      Consumer and investor choice has been, and will continue to be, significantly limited and constrained as to the buyers of Phoenix life insurance policies;

f.      Competitors of Phoenix in the secondary market for the purchase of Phoenix life insurance policies have been injured and excluded from the market; and

g.      Defendant Phoenix will continue to pay anticompetitive, below-market prices to the detriment of consumers and other owners of Phoenix insurance policies.

## XVIII.

### THE DEFENDANTS' FRAUDULENT SCHEME AND THE INDIVIDUAL DEFENDANTS' PATTERN OF RACKETEERING

201.    Upon information and belief, in or about 2008, Defendants devised a fraudulent scheme pursuant to which Defendant Phoenix represented to policyholders that their policies were valid and in force, and valuable, while concealing the fact that Phoenix intended to refuse to honor the policies when they came due.  The purpose of the fraudulent scheme was to continue to extract premium payments on false pretenses, and thereby, along with Defendant Phoenix's anticompetitive activities designed to purge Phoenix of its liabilities, maintain Phoenix

as an ongoing concern while allowing the Individual Defendants to continue to receive their excessive compensation packages and reap profits on their purchases of Phoenix stock.

202.    Defendants have attempted to conceal their fraudulent scheme, and the Individual Defendants' racketeering activity, from the public.  Among other things, Defendant Phoenix has included strict confidentiality provisions in its severance agreements with former executives. Phoenix has also attempted to minimize the scope of the public record related to its improper conduct by, among other things, attempting to "seal" deposition transcripts with damaging testimony from former employees.

203.    Upon information and belief, Defendants Wehr, Polkinghorn and Young were involved in the improper scheme to defraud policyholders.  Defendants Wehr, Polkinghorn and Young, among other Phoenix executives, attended numerous internal meetings and strategy sessions in which they discussed and personally approved the fraudulent scheme.

204.    Defendant Wehr acknowledged his awareness of, and involvement in, the fraudulent scheme when he stated during an investor call for the third quarter of 2011 (held on November 2, 2011): "In terms of our more recent vintage [universal life] blocks, *we've managed these blocks through a combination of [insurance rate changes] and legal remedies. . . .* [W]e are confident we know what the risks are and can manage those risks."

205.    The Individual Defendants were all involved in designing Defendant Phoenix's life insurance products to be more appealing to secondary market purchasers.  As Defendant Young explained in a January 2007 news article: "Look at who sits on our product strategy sessions at [Phoenix].  I sit on it.  Our CFO, CIO, the head of our annuity business—they sit on it.  Together we are reshaping the product calendar and the product agenda of this company and collaborating around the same table."  At the time, Defendant Wehr was Phoenix's Chief

Investment Officer, and in February 2007, Defendant Polkinghorn became the head of Phoenix's life and annuity business.

206.    From approximately 2003 through 2007, Defendants Young, Polkinghorn and Wehr directed and approved changes to its universal life insurance policies to improve the product's attractiveness to premium finance companies and to secondary market investors.

207.    Upon information and belief, having developed Defendant Phoenix's policies in a manner specifically designed to take advantage of premium financing and an active secondary market, the Individual Defendants and Defendant Phoenix itself, following upon Phoenix's dramatic losses in 2008, determined that Phoenix would in fact refuse to honor such policies— while concealing that intention from policyholders.  Thus, Defendants determined that Defendant Phoenix would issue and send, through the mails and wires, false premium billing notices, policy statements and other materials indicating the policies were valid, in effect and had value, and required further premium payments, when in fact Defendants knew Phoenix would not honor those policies when they came due.

208.    In addition, on information and belief, Defendants Young, Polkinghorn and Wehr also directed Phoenix's Title Department, in or around 2008, to create a Phoenix document known as the "LPT Spreadsheet" specifically to identify investor-owned policies that Defendant Phoenix would challenge in litigation if the Company was unable to force the policyholders to lapse or surrender their policies.  The LPT Spreadsheet listed policies featuring certain characteristics that Phoenix believed were more likely to be owned by investors in the secondary market and more susceptible to a (meritless) STOLI challenge.  The characteristics included:  (i) insured ages of 65 years old or older at the time of policy issuance; (ii) policy face amounts equal or greater than $1 million; and (iii) transfers of policy interests to a potential investor.  Defendant

Phoenix updated the LPT Spreadsheet whenever there was a change in ownership for a policy with any of those characteristics.

209.     Although Phoenix's Title Department ordinarily records any work performed on the policies for which it is responsible for in its internal computer systems, the LPT Spreadsheet was treated differently, and upon information and belief, Phoenix's management specifically instructed the Title Department *not* to keep track of updates to the LPT Spreadsheet.

210.     The LPT Spreadsheet was created by Neal Regels, the director of Phoenix's Title and Claims Departments, regularly updated by his team, and distributed monthly to Phoenix executives.

211.     As part of Defendants' fraudulent scheme, Defendant Phoenix has indeed refused to honor its policy obligations and has instead actively sought to void policies held by investors. Phoenix has both initiated suits to void policies on the ground that the policies lack an "insurable interest" and also raised "insurable interest" issues as a counterclaim in cases in which a policy owner sued Phoenix seeking payment of an insurance claim.

212.     Indeed, Defendant Phoenix recently disclosed in a court filing that, as of July 2013, Phoenix was a party in ***thirty-one*** cases in which there was a dispute about whether a life insurance policy issued by Phoenix lacked an insurable interest, despite the fact that Phoenix's underwriting department determined there ***was*** an insurable interest for each and every one of the policies at issue at the time of issuance.  In many of these lawsuits, Phoenix is actively seeking a windfall by simultaneously seeking to void policies while asking the courts to permit it to retain premiums paid by the holders of the policies it is seeking to void.

213.     Defendant Phoenix is litigating these lawsuits even though it previously disclaimed any suggestion that the same policies at issue were STOLI policies.  For example,

Defendant Polkinghorn was aware of, and involved in, Phoenix's efforts to institute purported safeguards against STOLI policies in 2008, *i.e.*, at the same time that Phoenix was issuing the policies it now challenges in court as STOLI. Defendant Polkinghorn is therefore fully aware that the policies now being challenged were not considered or determined to be STOLI at the time that Phoenix reviewed the policies during the underwriting process for STOLI characteristics. Similarly, other Phoenix executives such as Edward Cassidy, the head of distribution, actively encouraged the issuance of the very policies Defendant Phoenix now challenges as STOLI. Cassidy is also aware that the currently challenged policies were not considered STOLI at the time that Phoenix reviewed those policies during the underwriting process for STOLI characteristics.

214.    Moreover, in response to a 2008 consumer complaint to the Connecticut Department of Insurance (the "Connecticut Department") which alleged that Defendant Phoenix was knowingly issuing STOLI policies that were being funded by premium finance companies, Phoenix falsely represented, upon information and belief, with the knowledge and approval of Defendants Wehr, Polkinghorn and Young, that it was not engaged in any such practices. In "researching the allegations raised," Defendant Phoenix conducted an internal review of certain premium finance programs by visiting premium financing companies who had financed the Company's policies, reviewing data and other files from those companies, and interviewing the companies' management. At the conclusion of its review, Defendant Phoenix represented to the Connecticut Department that its "investigatory visits ha[d] not resulted in any findings that the submitted business was inconsistent with the original guidelines established for these premium financing companies," that is, with the guidelines Phoenix had established to "minimize the potential of STOLI business being submitted to Phoenix." Defendant Phoenix further

represented that it "intend[ed] to continue to do on-site visits with other premium finance firms as part of its regular quality of business review" and "intend[ed] to remain vigilant to avoid the unintentional acceptance of STOLI cases."

215.    As of August 2012, Defendant Phoenix was a party to approximately 86 lawsuits involving around ***$3.6 billion*** in Phoenix policies owned by investors that purchased their policies in the secondary market.  This amounts to approximately 17% of the $21.6 billion total in outstanding death benefits for all PHL policies and, upon information and belief, over 33% of the total face amount of PHL policies currently owned by investors (including foreign and national banks, pension funds, endowments, investment funds, other insurance companies, and various other public and private entities).

216.    Among the many lawsuits filed against Defendant Phoenix since it began to execute the fraudulent scheme are: (i) a federal RICO mail and wire fraud action filed against Phoenix by an investment fund that owns over $450 million in Phoenix policies and whose investors include the California Public Employees' Retirement System (CalPERS), (ii) the *Fenton* Action, involving approximately $300 million in investor-owned policies, alleging fraud and related claims against Phoenix, (iii) the six insurance rate lawsuits described in paragraph 137 above, and (iv) over 60 lawsuits in which Defendant Phoenix is seeking to void or rescind over $360 million in investor-owned policies while keeping the premiums.

217.    Upon information and belief, the number of lawsuits involving Defendant Phoenix as of August 2012 is dozens more than any other insurer is involved in, is increasing at

an alarming rate, and already represents more than 50% of all similar lawsuits involving *seven*

other like insurers *combined*,[7] including many significantly larger insurance companies.

218.    In addition, based upon information provided by Defendant Phoenix's own

former employees, Phoenix has, in furtherance of its illicit scheme, concealed relevant

information in discovery in litigation and/or destroyed documents that were relevant to actual or

potential litigation.  For example, despite the obvious relevance of the user guide that Phoenix

prepared in connection with its efforts to market and sell policies using non-recourse premium

financing and the script that Defendant Polkinghorn read encouraging Phoenix's sales force to

sell policies using non-recourse premium financing (*see* ¶¶ 70-72 above), Phoenix has never,

upon information and belief, produced these documents in discovery despite numerous requests

seeking them.

219.    Accordingly, all of the Defendants, including Defendant Phoenix itself, have

perpetrated a fraud on Phoenix's policyholders, including Plaintiff.  Further, the Individual

Defendants have thereby conducted the affairs of Defendant Phoenix through a pattern of

racketeering activity that includes fraudulently inducing Plaintiff and other policyholders to

continue paying premiums to Phoenix while the Individual Defendants have no intention of

allowing Phoenix to honor the terms of its own policies.  Specifically:

A.    **Premium Notices**

220.    Defendants have induced Plaintiff to continue to pay premiums to Defendant

Phoenix by sending, or causing Phoenix to send, premium notices to Plaintiff in interstate

commerce, through the United States Postal Service and/or interstate wires (by email or

---

[7]    Those other insurers are American General, AXA, John Hancock, Lincoln National, New York Life, Northwestern, and TransAmerica.

facsimile), advising Plaintiff that Plaintiff must continue to pay premiums to keep its policies in force.  These notices state:[8]

    a.     "The cash value of your policy has been depleted, and is no longer sufficient to support the monthly charges and consequently entered its 61 day grace period at the time."

    b.     "At a minimum, $4,432.72 must be received by us on or before 01/31/2012, in order to prevent a lapse."

    c.     "We urge you to prevent the loss of ***this valuable coverage*** by sending your payment today."  (Emphasis added).

221.    Each time Defendant Phoenix mailed a premium notice to Plaintiff, Phoenix affirmatively represented that, to its knowledge and belief, the subject policy was valid and enforceable and that Phoenix did not intend to challenge the policy or refuse to pay the death benefit, and that if premiums are paid, Phoenix will honor the policy.  For example, by telling Plaintiff that a policy's cash value has been depleted and that Plaintiff must pay a certain amount of money "in order to prevent a lapse," Defendant Phoenix represented to Plaintiff that it considered Plaintiff's policy to be a valid policy, that the policy had a cash value that had accumulated from Plaintiff's premium payments, and that Plaintiff's valid policy could lapse (since an invalid policy cannot lapse).  Upon information and belief, these statements were false because Defendant Phoenix intended to claim in each instance that the policy is not valid, but instead is void for lack of insurable interest or some other reason.  Likewise, by urging Plaintiff to pay money to prevent the loss of "valuable coverage," Defendant Phoenix represented to Plaintiff that Phoenix intends to provide coverage under the policy and that such coverage had

---

[8]    Specific language is taken from exemplar policies.  The stated dates, amounts, and other policy-specific information are different for each document.

value.  Upon information and belief, these statements were and are false because Defendant Phoenix had and has no intent to provide "valuable coverage," but instead plans to try to force Plaintiff to lapse or surrender the policy or else deny coverage on the ground that the policy is void for lack of insurable interest or some other reason.

222.    Upon information and belief, Defendant Phoenix mailed, and the Individual Defendants caused Defendant Phoenix to mail, these premium notices to Plaintiff, and collect the premiums billed, without disclosing to Plaintiff that Phoenix secretly intended to, and the Individual Defendants secretly intended to have Phoenix, deny the death benefits and/or the validity of the Policies or, through other actions, force Plaintiff to lapse or surrender its policies. Thus, each time Defendant Phoenix used the United States Postal Service and/or interstate wires to send premium notices to Plaintiff, Phoenix fraudulently concealed its intention to deny the death benefits and/or the validity of the Policies or, through other improper actions, to force Plaintiff to lapse or surrender its policies.

223.    Defendant Phoenix has sent these premium notices to Plaintiff at least once a year since Plaintiff purchased the Policies.  Attached hereto as Appendix C is a Schedule identifying the dates Phoenix sent such notices.  Defendant Phoenix has also provided Plaintiff with wiring instructions for the payment of premiums and accepted premium payments by interstate wire transfer.  Defendant Phoenix mailed these notices as part of Defendants' plan to defraud Plaintiff into paying premiums to Phoenix, which Plaintiff did.

**B.**      **Annual Statements**

224.    Defendants have also induced Plaintiff to continue to pay premiums to Defendant Phoenix by sending, or causing Phoenix to send, annual statements to Plaintiff in interstate commerce, through the United States Postal Service and/or interstate wires (by email or facsimile), advising Plaintiff that Plaintiff's policies were valid.  Specifically, these notices state:

a.  "Date of Issue:  February 10, 2006."

b.  "Policy Specifications as of February 09, 2012."

c.  "Policy Status:  **In Force**."  (Emphasis added).

d.  "Base Policy Face Amount:  $10,000,000.00"

e.  "Beginning Value as of 02/10/2011:  $77,636.82."

f.  "Surrender Value"

g.  "Net Surrender Value"

h.  "Net Death Benefit:  $10,000,000."

225.  Each time Defendant Phoenix mailed an annual statement to Plaintiff, Phoenix affirmatively represented that, to its knowledge and belief, the subject policy was valid and enforceable and that Phoenix did not intend to challenge the policy or refuse to pay the death benefit, and that if premiums are paid, Phoenix will honor the policy.  For example, by telling Plaintiff that a policy was "In Force" and had a certain "Date of Issue," Phoenix represented to Plaintiff that it considered Plaintiff's policy to be a valid policy that was "in force," and that the policy had been validly issued as of the issue date.  Upon information and belief, these statements were false because Defendant Phoenix intended to claim in each instance that the policy is not valid, but instead is void *ab initio* (*i.e.*, never issued) for lack of insurable interest or some other reason.  Likewise, by advising Plaintiff that the policy had a Base Policy Face Amount, Beginning Value, Surrender Value, Net Surrender Value, and Net Death Benefit, Defendant Phoenix represented to Plaintiff that Phoenix considered Plaintiff's policy to be valid, because only a valid policy has such values.  Upon information and belief, these statements were false because Defendant Phoenix intended to claim in each instance that the policy is not valid, but instead is void for lack of insurable interest or some other reason.

226.     Upon information and belief, Defendant Phoenix mailed, and the Individual Defendants caused Defendant Phoenix to mail, these annual statements to Plaintiff without disclosing to Plaintiff that Phoenix secretly intended to, and the Individual Defendants secretly intended to have Phoenix, deny the death benefits and/or the validity of the Policies or, through other actions, force Plaintiff to lapse or surrender its policies.  Thus, each time Defendant Phoenix used the United States Postal Service and/or interstate wires to send annual statements to Plaintiff, Phoenix fraudulently concealed its intention to deny the death benefits and/or the validity of the Policies or, through other improper actions, to force Plaintiff to lapse or surrender its policies.

227.     Defendant Phoenix has sent these annual statements to Plaintiff at least once a year since Plaintiff purchased the Policies.  Attached hereto as Appendix C is a Schedule identifying the dates Phoenix sent such annual statements.  Defendant Phoenix mailed these annual statements as part of the Individual Defendants' plan to defraud Plaintiff into paying premiums to Phoenix, which Plaintiff did.

## C.    Verifications of Coverage

228.     Defendants have also induced Plaintiff to continue to pay premiums to Defendant Phoenix by sending, or causing Phoenix to send, verifications of coverage to Plaintiff in interstate commerce, through the United States Postal Service and/or interstate wires (by email or facsimile), advising Plaintiff that Plaintiff's policies were valid.  Specifically, these notices state:

a.       "Policy Issue Date:  May 29, 2008."

b.       "Payment Information Status:  **_Active_**."  (Emphasis added).

c.       "Total Account Value:  $32,130.55."

d.       "Gross Death Benefit:  $10,000,000.00."

e.       "Net Death Benefit:  $10,000,000.00."

     f.       "Surrender Charge:  -$513,738.30."

     g.      "This statement indicates ***the value of this contract as of the date specified***." (Emphasis added).

     h.      "Should anyone suggest that you ***cancel or replace this policy***, we recommend that you contact your advisor or Phoenix's Client Service."  (Emphasis added).

    229.    Some verifications of coverage also state that a policy is "in force."  Each time Defendant Phoenix mailed a verification of coverage to Plaintiff, Phoenix affirmatively represented that, to its knowledge and belief, the subject policy was valid and enforceable and that Phoenix did not intend to challenge the policy or refuse to pay the death benefit, and that if premiums are paid, Phoenix will honor the policy.  For example, by telling Plaintiff that a policy was "Active," "in force" and had a certain "Policy Issue Date," Defendant Phoenix represented to Plaintiff that it considered Plaintiff's policy to be a valid policy that was "active" and "in force," and that the policy had been validly issued as of the Policy Issue Date.  Upon information and belief, these statements were false because Defendant Phoenix intended to claim in each instance that the policy is not valid, but instead is void *ab initio* (*i.e.*, never issued) for lack of insurable interest or some other reason.  Likewise, by advising Plaintiff that the policy had a Total Account Value, Gross Death Benefit, Net Death Benefit, and Surrender Charge, Defendant Phoenix represented to Plaintiff that Phoenix considered Plaintiff's policy to be valid, because only a valid policy has such values.  In addition, by telling Plaintiff that "[t]his statement indicates ***the value of this contract as of the date specified***" and that Plaintiff could "cancel or replace this policy," Defendant Phoenix represented to Plaintiff that the policy was a valid contract that had a certain value as of the date specified and that the policy was a valid policy that could be canceled or replaced (an invalid policy cannot be canceled or replaced).  Upon

information and belief, these statements were false because Defendant Phoenix intended to claim

that the policy is not valid, but instead is void for lack of insurable interest or some other reason.

230.     Upon information and belief, Defendant Phoenix mailed, and the Individual

Defendants caused Defendant Phoenix to mail, these verifications of coverage to Plaintiff

without disclosing to Plaintiff that Phoenix secretly intended to, and the Individual Defendants

secretly intended to have Phoenix, deny the death benefits and/or the validity of the Policies or,

through other actions, force Plaintiff to lapse or surrender its policies.  Thus, each time

Defendant Phoenix used the United States Postal Service and/or interstate wires to send

verifications of coverage to Plaintiff, Phoenix fraudulently concealed its intention to deny the

death benefits and/or the validity of the Policies or, through other improper actions, to force

Plaintiff to lapse or surrender its policies.

**D.      Policy Illustrations**

231.     Defendants have also induced Plaintiff to continue to pay premiums to Defendant

Phoenix by sending, or causing Phoenix to send, policy illustrations to Plaintiff in interstate

commerce, through the United States Postal Service and/or interstate wires (by email or

facsimile), advising Plaintiff that Plaintiff's policies were valid.  Specifically, these notices state:

    a.      "Issue Date:  02/10/2006."

    b.      "Years Inforce:  6."

    c.      "Months Inforce:  2."

    d.      "Net Death Proceeds:  $10000000.00"

    e.      "Gross Account Value:  $14389.87."

    f.      "If premiums are received late or paid in a more frequent pay mode, values will

        be less than illustrated, and in fact, the policy may terminate earlier than shown."

232.    Each time Defendant Phoenix mailed an illustration to Plaintiff, Phoenix affirmatively represented that, to its knowledge and belief, the subject policy was valid and enforceable and that Phoenix did not intend to challenge the policy or refuse to pay the death benefit, and that if premiums are paid, Phoenix will honor the policy.  For example, by telling Plaintiff that a policy was "Inforce" for a certain number of years and months and that the policy had a certain "Policy Issue Date," Defendant Phoenix represented to Plaintiff that it considered Plaintiff's policy to be a valid policy that was "in force," and that the policy had been validly issued as of the Policy Issue Date.  Upon information and belief, these statements were false because Defendant Phoenix intended to claim in each instance that the policy is not valid, but instead is void *ab initio* (*i.e.*, never issued) for lack of insurable interest or some other reason. Likewise, by advising Plaintiff that the policy had a Base Face Amount, Total Death Benefit, and Account Value, Defendant Phoenix represented to Plaintiff that Phoenix considered Plaintiff's policy to be valid, because only a valid policy has such values.  In addition, by telling Plaintiff that if premiums are received late or paid in a more frequent pay mode, "the policy may terminate earlier than shown," Defendant Phoenix represented to Plaintiff that the policy is a valid contract that could terminate earlier than shown (an invalid policy cannot terminate).  Upon information and belief, these statements were false because Defendant Phoenix intended to claim in each instance that the policy is not valid, but instead is void for lack of insurable interest or some other reason.

233.    Upon information and belief, Defendant Phoenix mailed, and the Individual Defendants caused Defendant Phoenix to mail, these illustrations to Plaintiff without disclosing to Plaintiff that Phoenix secretly intended to, and the Individual Defendants secretly intended to have Phoenix, deny the death benefits and/or the validity of the Policies or, through other

actions, force Plaintiff to lapse or surrender its policies.  Thus, each time Defendant Phoenix

used the United States Postal Service and/or interstate wires to send illustrations to Plaintiff,

Phoenix fraudulently concealed its intention to deny the death benefits and/or the validity of the

Policies or, through other improper actions, to force Plaintiff to lapse or surrender its policies.

**E.**     **Insurance Rate Letters**

234.     Defendants have also induced Plaintiff to continue to pay premiums to Defendant

Phoenix by sending, or causing Phoenix to send, notices regarding insurance rates to Plaintiff in

interstate commerce, through the United States Postal Service, advising Plaintiff that Plaintiff's

policies were valid.  Specifically, these notices state:

a.     "Your policy referenced above will be subject to this rate increase on your next

policy anniversary beginning 2/7/2011 unless your accumulated policy value is

maintained at a sufficient level."

b.     "This increase is ***in accordance with the terms of your policy*** and the adjusted

rates for the [insurance charge] will remain below the maximum guaranteed . . .

insurance rates we are permitted to charge your policy."  (Emphasis added).

235.     Each time Defendant Phoenix mailed an insurance rate letter to Plaintiff, Phoenix

affirmatively represented that, to its knowledge and belief, the subject policy was valid and

enforceable and that Phoenix did not intend to challenge the policy or refuse to pay the death

benefit, and that if premiums are paid, Phoenix will honor the policy.  For example, by telling

Plaintiff that a policy was "subject to this rate increase" and that the policy had an "anniversary"

and "accumulated policy value," Defendant Phoenix represented to Plaintiff that it considered

Plaintiff's policy to be a valid policy that was subject to a rate increase, that the policy had been

validly issued on the anniversary date, and that the policy had a certain accumulated value.

Upon information and belief, these statements were false because Defendant Phoenix intended to

claim in each instance that the policy is not valid, but instead is void *ab initio* (*i.e.*, never issued) for lack of insurable interest or some other reason and thus there was, according to Phoenix, no accumulated policy value.  Likewise, by advising Plaintiff that an insurance rate change was "in accordance with the terms of your policy," Defendant Phoenix represented to Plaintiff that Phoenix considered Plaintiff's policy to be valid, because Phoenix could only be basing the rate increases on the "terms" of a valid policy.  This statement was false because Defendant Phoenix intended to claim in each instance that the policy is not valid, but instead is void for lack of insurable interest or some other reason.

236.    Upon information and belief, Defendant Phoenix mailed, and the Individual Defendants caused Defendant Phoenix to mail, these insurance rate letters to Plaintiff without disclosing to Plaintiff that Phoenix secretly intended to, and the Individual Defendants secretly intended to have Phoenix, deny the death benefits and/or the validity of the Policies or, through the insurance rate increases and other actions, force Plaintiff to lapse or surrender its policies. Thus, each time Defendant Phoenix used the United States Postal Service to send insurance rate letters to Plaintiff, Phoenix fraudulently concealed its intention to deny the death benefits and/or the validity of the Policies or, through the insurance rate increases and other improper actions, to force Plaintiff to lapse or surrender its policies.

237.    In a recent example, Defendant Phoenix made several representations to Plaintiff that a policy was validly issued, in force, and had a positive account value.  However, when the insured died and Plaintiff submitted a claim for the death benefit, Defendant Phoenix refused to pay.  Just ***two weeks*** after Defendant Phoenix affirmatively represented to Plaintiff that the policy was validly issued, in force, and had a positive account value, Phoenix claimed that the policy was invalid and that Phoenix was entitled to keep all of the premiums it had collected on

the policy, including premiums that Plaintiff paid in reliance on Phoenix's representations that the policy was valid, in force, and had a positive account value.  The circumstances of this fraud are outlined below:

238.    On January 20, 2011, Defendant Phoenix issued an annual statement for the policy.  The annual statement represented, among many other things:

**Policy Status:  In Force**

**Policy Value as of 1/21/2010:  $51,900.76**

**Policy Value as of 1/20/2011:  $26,497.67**

239.    In reliance on these representations, Plaintiff continued paying premiums to Defendant Phoenix to keep the policy in force, reasonably believing that Phoenix intended to honor the terms of the policy.

240.    Several months later, on October 21, 2011, just two weeks before the insured died, Defendant Phoenix issued a policy illustration to Plaintiff.  The illustration represented, among many other things:

**Issue Date: 01/21/2008**

**Years Inforce:  3**

**Months Inforce:  10**

**Gross Account Value: $26,243.14**

241.    Two weeks after Defendant Phoenix made these representations, on November 4, 2011, the insured passed away, and Plaintiff, through its securities intermediary, made a claim for the death benefit shortly thereafter.  Phoenix, however, refused to pay.

242.    In the lawsuit that Plaintiff filed seeking payment of the death benefit, Defendant Phoenix has claimed that the policy "is null and void *ab initio* and is of no force and effect from

its inception."  Defendant Phoenix has also sought an order from the court "that it may retain all premiums paid" on this allegedly invalid policy.

243.    Thus, just two weeks before the insured died, Defendant Phoenix said that the policy was "issued" on January 21, 2008.  But after the insured died and Phoenix received a claim for the death benefit, Phoenix said the policy was "void *ab initio*" – *i.e.*, it was never issued to begin with.  Before the insured died, Defendant Phoenix said that the policy was "in force" and had been "in force" for three years and ten months.  But after the insured died and Phoenix received a claim for the death benefit, Phoenix said that the policy "is of no force and effect."  Before the insured died, Defendant Phoenix said that the policy had an account value on January 21, 2010 of $51,900.76 and an account value on January 20, 2011 of $26,243.14, which values were built up from premium payments.  But after the insured died and Phoenix received a claim for the death benefit, Phoenix said that the policy is invalid and has sought "an order that it may retain all premiums paid."

244.    Defendant Phoenix still has not paid the death benefit on the policy.

245.    In sum, upon information and belief, in late 2008 or early 2009, Defendants made a conscious decision that Defendant Phoenix would not honor policies that were owned by investors that purchased their policies in the secondary market, including the Lima Policies.  Instead, Defendants would mislead holders of Defendant Phoenix's policies to continue making premium payments while intending to raise insurance rates, seek to rescind or void policies (and keep the premiums), and refuse to pay the death benefits on policies when they matured.  Upon information and belief, Defendant Phoenix made, and the Individual Defendants directed and caused Defendant Phoenix to make, the above misrepresentations to Plaintiff, and conceal the facts described above from Plaintiff, to induce Plaintiff to continue to pay premiums to Phoenix.

Defendant Phoenix would then book the revenue from Plaintiff's premiums payments, and the Individual Defendants would personally profit from those payments through personal compensation and their ownership interests in Phoenix, as described below.

246.   Moreover, upon information and belief, as part of their scheme, Defendant Wehr also caused Defendant PNX to issue false and misleading financial statements for 2009, 2010, 2011, and the first two quarters of 2012 in order to conceal the company's true financial condition and induce policyholders into continuing to make their premium payments.  Each of Defendant PNX's public filings were signed by Defendant Wehr as well as other Phoenix executives certifying that the representations contained therein were *not* materially false or misleading, and that any significant deficiencies or material weaknesses in internal controls had been reported to PNX's auditors.

247.   On October 31, 2008, faced with widespread concerns regarding Phoenix's financial condition, Defendant Young sent policyholders, shareholders, and "all interested parties" a "simple message" in which she indicated that Defendant Phoenix has "a strong balance sheet with adequate capital and liquidity to meet [its] obligations."  Defendant Young affirmed that the Company was "financially strong" and "able to pay its claims."

248.   After disclosing year-end net losses of $726 million in 2008, Defendant Wehr, as the new Chief Executive Officer, reiterated the same type of message made by Defendant Young.  On April 24, 2009, Defendant Wehr represented that Defendant Phoenix is "adequately capitalized," maintains a healthy balance sheet, and has "meaningfully increased" its liquidity over the past year—to assure policyholders about the Company's financial strength.

249.   The truth about the false assurances made by Defendants Young and Wehr did not surface until more than three years later when, on September 18, 2012, Defendant PHL reported

to the SEC in its Form 8-K that it had incorrectly accounted for a reinsurance treaty with its

parent company, PLIC, and misallocated the treatment of ceded premiums and adjustments

relating to receivables, deferred acquisition costs, and policyholder liabilities.  Defendant PHL

disclosed, "As a result of these errors, the Company believes that its net loss was understated and

stockholder's [sic] equity was overstated at December 31, 2011, 2010, 2009 and 2008."

Defendant PHL anticipates that the impact of these "errors" will be approximately 15% of

stockholders' equity, or approximately $94,000,000.  As shown in Appendix A, almost all of

Plaintiff's In Force Policies are with Defendant PHL, and Plaintiff is relying on PHL's ability to

pay claims on those In Force Policies when they mature.

250.    Less than two months later, on November 8, 2012, Defendant PHL amended and

supplemented its earlier Form 8-K in order to disclose additional material errors in its previously

issued financial statements.  These errors included: (i) the incorrect classification of deposits and

withdrawals in Phoenix's universal life and variable universal life business as cash flows used in

continuing operations, and (ii) the incorrect reporting of certain fees and interest charges as cash

flows provided by financing activities.  Defendant PHL further disclosed that that its

management was "likely" to conclude that the company had "one or more material weaknesses"

in its internal controls.

251.    That same day, PHL's parent company, Defendant PNX, reported that it was

postponing the announcement of its earnings report for the third quarter of 2012 and disclosed its

own need for restatements.  In its Form 8-K, Defendant PNX disclosed that its Form 10-Ks and

Form 10-Qs for 2011, 2010 and 2009 "should no longer be relied upon" because of the same

material errors PHL had identified.  Defendant PNX also disclosed the likelihood of "one or more material weaknesses" in its internal controls.[9]

252.    Since its initial announcement, Defendant PNX has repeatedly avoided committing to a specific date for concluding its restatement process.  For instance, on March 15, 2013, Defendant PNX reported to the SEC that it was not only further delaying the filing of its Form 10-Q for the third quarter of 2012 and the three prior years of financial statements, but also that it would not timely file its Form 10-K for 2012.  Defendant PNX represented that it was "continu[ing] to reassess its disclosure controls and procedures and internal control over financial reporting" and that "[m]anagement believes that it has currently identified multiple material weaknesses that will be reported in the 2012 Form 10-K."  Unable to provide a date by which its restatements would be complete, Defendant PNX indicated only that it would give an "update" on the restatement process on or before April 30, 2013.

253.    On April 24, 2013, Defendant PNX again announced that it "may not be able to timely file its Quarterly Reports on Form 10-Q for the first, second and third quarters of 2013" and "there can be no assurances that the Company will make its filings with the [SEC]" by December 31, 2013.  Defendant PNX advised only that it would provide "further updates on timing and estimated financial impact."  Since then, each of the subsequent updates on May 22, 2013 and June 28, 2013 have only indicated that "the previously announced restatement process continues."

---

[9]     A putative securities class action has been filed in this District based on the November 8, 2012 announcement and the corresponding drop in PNX's share price.  *Strougo* v. *The Phoenix Companies, Inc.*, 3:13-cv-00547 (D. Conn.).

254.    As of the date of this Amended Complaint, Defendant PNX has failed to issue a single restatement, provide an anticipated date for completion, or file its latest financial statements.

255.    As a result of Defendant Phoenix's inability to timely restate its financials, on July 25, 2013, Fitch Ratings withdrew its "B" holding company Issuer Default Rating on Defendant PNX and the "BB+" Insurer Financial Strength ratings on Defendants PLIC and PHL. Fitch's press release explained that the ratings withdrawal was prompted by its view that it "lack[ed] sufficient information to maintain" the existing ratings or to resolve the negative rating watch status.  Fitch's press release further noted that Defendant PNX's "most recent announcement" of further delays "raises the potential for material restatements of statutory financials as well as GAAP financials."

256.    Defendants have never disclosed their illicit strategy to Phoenix's shareholders and policyholders, but the Individual Defendants and others in senior management have invested heavily in it.  During a four-month period in 2009, Defendant Wehr bought over 110,000 shares of PNX stock; Defendant Polkinghorn purchased over 48,000 shares of his own; and Chief Financial Officer Peter Hofmann purchased over 41,000 shares.  Since recently stepping up their efforts to deny death benefits and force lapses and surrenders, the Individual Defendants have also doubled-down on the success of their unlawful scheme.  In addition to the tens of thousands of shares they purchased in 2009, several senior executives purchased thousands of additional shares.  On May 10, 2012, Defendant Wehr purchased another 100,000 shares.  On May 4, 2012, Defendant Polkinghorn purchased 10,000 shares.  On May 15, 2012, the Executive Vice President and Chief Investment Officer of PNX, Christopher Wilkos, purchased 25,000 shares. And on May 17, 2012, the General Counsel, John Mulrain, purchased 10,000 shares.

257.    These share purchases are evidence of the Individual Defendants' scheme since Defendant Phoenix today writes only a tiny fraction of the volume of life insurance it issued before 2009.  In 2011, PHL, as a company, received just a little more than a paltry ***$1.5 million*** in premiums from sales of new life insurance, or approximately 0.5% of new premiums received in 2008.[10]  The Individual Defendants know these minimal life insurance sales are incapable of sustaining Phoenix as a going concern.

258.    However, the Individual Defendants also know that Defendant Phoenix continues to collect substantial premium payments on policies that Defendants have no intent of honoring.  As of July 25, 2013, Defendant Phoenix has received a total of $169 million in premiums on Plaintiff's In Force Policies and continues to receive approximately $2.6 million ***each month*** in premiums on these policies.  Meanwhile, Defendants have, among other things, (i) successfully forced Plaintiff to lapse a portion of the $229 million in policies on which Defendant Phoenix received $24.1 million in premiums, (ii) refused to pay Plaintiff at least $3 million in death benefits while attempting to keep all of the premiums, and (iii) resisted and delayed for six months the payment of $30 million in death benefits, forcing Plaintiff to incur costs and other burdens of litigation to receive payment.

259.    The Individual Defendants also know that there is, upon information and belief, around $10 billion in Defendant Phoenix policies in force and owned by investors at this time, which Defendant Phoenix has no intent to pay.[11]  By engaging in the fraudulent scheme and

---

[10]   This was less than what Ed Humphrey made in 2006 and less than 10% of Humphrey's 2007 premium quota. *See* paragraphs 77-78 above.

[11]   According to Phoenix's public filings, Phoenix also has the option to recapture the risk on policies ceded to its reinsurers.  Phoenix exercises this valuable right when it finds it "financially advantageous" to "reassume the risk rather than continue paying reinsurance premiums."  Upon information and belief, Defendants have exercised, or intend to exercise, this option with Phoenix's reinsurers with respect to at least a portion of the

pattern of racketeering described herein, Defendants plan to continue collecting hundreds of millions of dollars in premium payments while secretly intending not to honor these policies so as to avoid payment of the significant death benefits that would be due.  Thus, Defendants will make a windfall profit on every policy where they retain the premiums but refuse to pay the death benefit.

260.    The Individual Defendants also stand to profit from their fraudulent scheme and pattern of racketeering through their holdings of PNX stock.  At $42.72 per share (the closing price on July 30, 2013), Phoenix has a market capitalization of approximately $247.8 million.  As of September 30, 2012 (when it was reported to shareholders in publicly disclosed slides), Phoenix's statutory surplus was approximately $944.4 million.  Thus, based on the most recent information available, Phoenix has a market capitalization equal to 26.2% of its statutory surplus.  In a liquidation scenario (which is the clear end game for Phoenix now that it writes very little life insurance), shareholders, including the Individual Defendants, would realize the full liquidation or cash value of Phoenix's statutory surplus—not just 26.2%.  Defendant Wehr, for example, would almost quadruple the value of his holdings.  As indicated in Phoenix's 2012 proxy, Defendant Wehr's compensation has been heavily geared toward restricted stock units and long-term performance units, all of which would significantly benefit from a runoff strategy because such awards were granted at pricing well below book value.

261.    In short, Defendant Phoenix is now in the "business" of denying death benefits and "managing [its] liabilities," and of lying to its policyholders to extract premium payments.  The Individual Defendants have never disclosed this to the public because Defendant Wehr continues to receive millions of dollars every year as though Phoenix were like any other

---

billions of dollars in investor-owned policies, so that they can capture the benefits of their plan never to pay the death benefits on these policies.

insurance company, and Defendants Polkinghorn and Young collected millions of dollars during

their careers at Phoenix.  Indeed, during 2009-2011, while PNX stock dropped almost 50% in

value, Phoenix's senior executives collectively made more money than Phoenix itself.  In 2009,

they earned nearly $8 million in total compensation, while the Company lost $319 million.  In

2010, they earned over $9 million, while the Company lost $12.6 million.  And in 2011,

Phoenix's senior executives earned close to $9 million (also excluding Cassidy's compensation,

which is not publicly available), while the Company made just $8.1 million.  These figures are

illustrated below (although they may change if and when Defendant Phoenix restates its

financials):[12]

|  | 2009 | 2010 | 2011 |
|---|---|---|---|
| **Jim Wehr** | $3,439,396 | $3,509,365 | $3,766,804 |
| **Philip Polkinghorn** | $1,239,199 | $1,465,951 | $1,748,831 |
| **Edward Cassidy** | $1,156,405 | $1,656,101 | Not available |
| **Dona Young** | Not available | Not available | Not available |
| **Peter Hofmann** | $1,017,833 | $1,255,717 | $1,806,679 |
| **Christopher Wilkos** | $980,920 | $1,294,594 | $1,423,124 |
| **Total** | **$7,833,753** | **$9,181,728** | **$8,745,438** |
| **PNX Change in Share Price (From Prior Year)** | $3.17 1/2/09<br><br>$2.78 12/31/09<br><br>-$0.39<br><br>-12.3% | $2.78 12/31/09<br><br>$2.54 12/31/10<br><br>-$0.24<br><br>-8.6% | $2.54 12/31/10<br><br>$1.68 12/30/11<br><br>-$0.86<br><br>-33.9% |

---

[12]   Individual compensation includes stock options and pension value.

| **PNX Net Income/(Loss)** | ($319 million) | ($12.6 million) | $8.1 million |
|---|---|---|---|

262.     Phoenix's senior executives also received substantial compensation in 2012. Although Defendant Phoenix has not filed its 2012 financial statements with the SEC—and has not scheduled its annual shareholder meeting for 2013, and thus has not made current proxy materials available—a July 2013 *Insurance Forum* article reported, based on state insurance filings, that Defendant Polkinghorn received more than $5 million in 2012, the same year he resigned from the Company; that Defendant Wehr received more than $3.2 million in 2012; that Peter Hofmann received more than $1.7 million in 2012; and that Christopher Wilkos received more than $1 million in 2012.

263.     Defendants' unlawful scheme described above is ongoing.

## XIX.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**(Actual Monopolization in Violation of Conn. Gen. Stat. Section 35-27)**
**Against PNX, PLIC, and PHL**

264.     Plaintiff hereby realleges and incorporates by reference herein each allegation set forth in paragraphs 1 through 263 above.

265.     Defendant Phoenix has monopoly (monopsony) power in the secondary market for Phoenix life insurance policies, with, upon information and belief, over a 75% market share on the buy side of the market.

266.     Defendant Phoenix has acquired monopsony power, not as the result of a superior product, business acumen, or a historic accident, but as a result of the intentional anticompetitive and exclusionary conduct alleged above.  That conduct includes the use and manipulation of

Phoenix life insurance policies, and the transfer rights associated with those policies, to prevent competition for the purchase of those policies.

267.    Significant barriers to entry and expansion – some strategically created by Defendant Phoenix itself – prevent other buyers or potential buyers from competing in the secondary market for the purchase of Phoenix life insurance policies, and serve to reinforce Phoenix's monopsony power.

268.    Defendant Phoenix's anticompetitive and exclusionary conduct has caused antitrust injury to Plaintiff and other Phoenix policyholders, potential buyers of Phoenix policies, consumers, and competition.

269.    By reason of, and as a direct and proximate result of, Defendant Phoenix's anticompetitive and exclusionary conduct, Plaintiff has suffered, and will continue to suffer, financial injury to its business and property.

270.    Defendant Phoenix's acquisition and abuse of its monopsony power violates Conn. Gen. Stat. section 35-27.

## SECOND CAUSE OF ACTION

**(Attempted Monopolization in Violation of Conn. Gen. Stat. Section 35-27)**
**Against PNX, PLIC, and PHL**

271.    Plaintiff hereby realleges and incorporates by reference herein each allegation set forth in paragraphs 1 through 270 above.

272.    Defendant Phoenix has engaged in the anticompetitive and exclusionary conduct described above, including the use and manipulation of Phoenix life insurance policies, and the transfer rights associated with those policies, to prevent competition for the purchase of those policies.

273.     Defendant Phoenix has a dangerous probability of obtaining a monopsony in the secondary market for Phoenix life insurance policies.

274.     Defendant Phoenix has a specific intent to monopsonize the secondary market for Phoenix life insurance policies.

275.     Significant barriers to entry and expansion – some strategically created by Defendant Phoenix itself – prevent other buyers or potential buyers from competing in the secondary market for the purchase Phoenix life insurance policies, and serve to reinforce Phoenix's attempt to acquire monopsony power.

276.     Defendant Phoenix's anticompetitive and exclusionary conduct has caused antitrust injury to Plaintiff and other Phoenix policyholders, potential buyers of Phoenix policies, consumers, and competition.

277.     By reason of, and as a direct and proximate result of, Phoenix's anticompetitive and exclusionary conduct, Plaintiff has suffered, and will continue to suffer, financial injury to its business and property.

278.     Defendant Phoenix's attempt to acquire monopsony power violates Conn. Gen. Stat. section 35-27.

## **THIRD CAUSE OF ACTION**

**(Unfair Trade Practices in Violation of Conn. Gen. Stat. Sections 42-110a, Et Seq.)**
**Against PNX, PLIC, and PHL**

279.     Plaintiff hereby realleges and incorporates by reference herein each allegation set forth in paragraphs 1 through 278 above.

280.     The Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b(a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

281.    The Connecticut Unfair Insurance Practices Act ("CUIPA") prohibits unfair methods of competition and unfair and deceptive acts and practices in the insurance industry. See Conn. Gen. Stat. §§ 38a-815, et seq.

282.    Among other things, CUIPA prohibits:

a.    "Making, issuing or circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement, sales presentation, omission or comparison" which contains false or misleading statements, including misrepresentations as to the "benefits, advantages, conditions or terms of any insurance policy." Conn. Gen. Stat. §§ 38a-816(1);

b.    "Making, publishing, disseminating, circulating or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated or placed before the public," any "untrue, deceptive or misleading" statement "with respect to the business of insurance." *Id.* §§ 38a-816(2); and

c.    Any violation of various specified provisions, Conn. Gen. Stat. §§ 38a-816(9), including Conn. Gen. Stat. § 38a-446, which prohibits life insurance companies from "mak[ing] or permit[ting] any distinction or discrimination in favor of individuals between insurants of the same class and expectation of life in the amount or payment of premiums or rates charged" for life insurance.

283.    Defendant Phoenix's anticompetitive, exclusionary, unfair and deceptive conduct (described above) violates CUIPA, including without limitation the CUIPA provisions described above, and thus violates CUTPA (among other applicable Connecticut law).

284.    In particular, Defendant Phoenix's anticompetitive and exclusionary conduct violates CUIPA's prohibitions of false or misleading illustrations, advertising materials, statements and omissions, and discrimination in premiums and rates charged.

285.    In addition, because Defendant Phoenix's anticompetitive and exclusionary conduct violates the Connecticut Antitrust Act, it is an unfair method of competition and/or an unfair or deceptive act or practice.

286.    Further, Defendant Phoenix's practice of issuing false and misleading premium notices, policy statements, verifications of coverage, policy illustrations and insurance rate letters violates CUIPA's and, therefore, CUTPA's prohibitions against false or misleading illustrations, statements and omissions, and discrimination in premiums and rates charged.

287.    Defendant Phoenix's conduct is also fraudulent, immoral, unethical, oppressive, and unscrupulous, and for that reason as well constitutes an unfair method of competition and/or an unfair or and deceptive act or practice.

288.    Defendant Phoenix's conduct also causes substantial injury to consumers, competitors, and other business persons or entities, including Plaintiff, and for that reason as well constitutes an unfair method of competition and/or an unfair or deceptive act or practice.  The substantial injury inflicted by Defendant Phoenix's conduct was and is not outweighed by any countervailing benefits to consumers or competition, and reasonably could not have been and cannot be avoided by consumers, including Plaintiff.

289.     Defendant Phoenix's anticompetitive, exclusionary, unfair and deceptive conduct is not merely incidental to its primary business; rather, it directly concerns its primary business.

290.     By reason of, and as a direct and proximate result of, Defendant Phoenix's anticompetitive, exclusionary, unfair and deceptive conduct, Plaintiff has suffered, and will continue to suffer, an ascertainable loss of money and property (including, without limitation, financial injury).

291.     Because Defendant Phoenix acted with a willful, reckless and/or wanton indifference to Plaintiff's rights, Phoenix also is liable for punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).  Plaintiff also is entitled to recover its costs and reasonable attorneys' fees incurred in prosecuting this action pursuant to Conn. Gen. Stat. § 42-110g(d).

292.     In compliance with Connecticut General Statutes § 42-110g(c), a copy of this Amended Complaint is being mailed to the Attorney General of the State of Connecticut and the Connecticut Commissioner of Consumer Protection on this date.

## FOURTH CAUSE OF ACTION

**(Unfair Trade Practices in Violation of Conn. Gen. Stat. Sections 42-110a, Et Seq.)
Against PNX, PLIC, and PHL**

293.     Plaintiff hereby realleges and incorporates by reference herein each allegation set forth in paragraphs 1 through 292 above.

294.     The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

295.     The Connecticut Unfair Insurance Practices Act ("CUIPA") prohibits unfair methods of competition and unfair and deceptive acts and practices in the insurance industry. See Conn. Gen. Stat. §§ 38a-815, et seq.

296.     Among other things, CUIPA prohibits unfair claim settlement practices, which include various actions (such as misrepresenting pertinent facts or policy provisions relating to coverage, failing to act promptly with respect to claims under policies, and not acting in good faith to reach fair and equitable settlements of claims where liability has become reasonably clear) performed "with such frequency as to indicate a general business practice." *Id.* §§ 38a-816(6).

297.     Defendant Phoenix's conduct (described above) violates CUIPA, including without limitation CUIPA's prohibitions against unfair claim settlement practices.

298.     Indeed, Defendant Phoenix has engaged in unfair claim settlement practices with such frequency as to indicate a general business practice.  Among other unlawful conduct, Defendant Phoenix has:  (i) made misrepresentations regarding the facts relating to coverage under its policies, including claiming that there were "issues" regarding consent to insurance and the existence of an insurable interest, where Defendant Phoenix in fact knew there were no such issues; (ii) failed to act with reasonable promptness upon communications regarding its policies; (iii) failed to adopt and implement reasonable standards for the prompt investigation of claims brought under its policies; (iv) refused to pay unquestionably valid claims without conducting reasonable investigation and despite available information establishing the validity of such claims; (v) failed to affirm or deny coverage within a reasonable time; and (vi) failed to promptly provide a reasonable explanation of the basis for its denial of a claim.

299.     Defendant Phoenix's conduct is also fraudulent, immoral, unethical, oppressive, and unscrupulous, and for that reason as well constitutes an unfair or deceptive act or practice.

300.     Defendant Phoenix's conduct also causes substantial injury to consumers, competitors, and other business persons or entities, including Plaintiff, and for that reason as well

constitutes an unfair method of competition and/or unfair acts or practices.  The substantial injury inflicted by Defendant Phoenix's conduct was and is not outweighed by any countervailing benefits to consumers or competition, and reasonably could not have been and cannot be avoided by consumers, including Plaintiff.

301.    Defendant Phoenix's unfair claim settlement practices are not merely incidental to its primary business; rather, they directly concern its primary business.

302.    By reason of, and as a direct and proximate result of, Defendant Phoenix's unfair claim settlement practices, Plaintiff has suffered, and will continue to suffer, an ascertainable loss of money and property (including, without limitation, financial injury).

303.    Because Defendant Phoenix acted with a willful, reckless and/or wanton indifference to Plaintiff's rights, Phoenix also is liable for punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).  Plaintiff also is entitled to recover its costs and reasonable attorneys' fees incurred in prosecuting this action pursuant to Conn. Gen. Stat. § 42-110g(d).

304.    In compliance with Connecticut General Statutes § 42-110g(c), a copy of this Amended Complaint is being mailed to the Attorney General of the State of Connecticut and the Connecticut Commissioner of Consumer Protection on this date.

## FIFTH CAUSE OF ACTION

### (Fraud)
### Against PNX, PLIC, and PHL

305.    Plaintiff hereby realleges and incorporates by reference herein each allegation set forth in paragraphs 1 through 304 above.

306.    As set forth in paragraphs 219 through 243, Defendant Phoenix has made numerous material misrepresentations to, and omitted material information from, Plaintiff in premium notices, annual policy statements, policy illustrations, verifications of coverage and

letters demanding the payment of increased insurance rates.  These misrepresentations included false representations that Defendant Phoenix considered Plaintiff's policies as valid and in force, and that Phoenix did not intend to contest the Policies but intended to honor them.  Upon information and belief, these representations were false because, at the time the representations were made, Defendant Phoenix had no intention of honoring the terms of the Policies, as it intended either to take actions to force Plaintiff to lapse or surrender its policies, or would contest the Policies or refuse to pay the death benefits when they came due.  Defendant Phoenix also had a duty to disclose these facts to Plaintiff but instead concealed them from Plaintiff. Defendant Phoenix had unique knowledge of or access to these facts, and knew that Plaintiff did not know them and could not have discovered them through reasonable diligence.  Plaintiff did not discover, and could not have discovered with reasonable diligence, the true facts until 2012.

307.    Defendant Phoenix knowingly and intentionally made these misrepresentations, acts of concealment, and failures to disclose to deceive and defraud Plaintiff (and others). Defendant Phoenix either knew or recklessly disregarded these material misrepresentations and omissions, and Plaintiff reasonably relied on the misrepresentations and omissions as described above, including by purchasing the Policies and continuing to pay premiums on them.

308.    Defendant Phoenix's fraudulent intent to mislead Plaintiff (and other policyholders) into thinking that Phoenix would honor its policies is evidenced by, among other things:  (1) Defendant Phoenix is currently challenging in litigation a number of policies as having a lack of insurable interest although it collected premiums on each of those policies for years before bringing such challenges; (2) Defendant Phoenix has resisted or denied an increasing number of claims each year since 2008, and has resisted claims at a rate far above the national average for the life insurance industry; (3) upon information and belief, Defendant

Phoenix keeps a secret list of investor-owned policies to challenge in litigation; and (4) Defendant Phoenix has challenged policies issued before October 2008 as being STOLI although it appears to have audited its policies for STOLI concerns in October 2008, and reported to its regulator in Connecticut that it had found no STOLI policies and would continue to investigate and remain vigilant for such concerns.

309.    As a direct and proximate result of Defendant Phoenix's fraudulent misrepresentations and omissions, Plaintiff has been damaged in an amount to be proven at trial.

310.    Defendant Phoenix's conduct was intentional, fraudulent, malicious, oppressive, despicable and in conscious disregard of Plaintiff's rights so as to justify an award of exemplary and punitive damages in an amount appropriate to punish Phoenix and deter future wrongful conduct.

## SIXTH CAUSE OF ACTION

### (Violation of RICO, 18 U.S.C. §§ 1962(c) and (d))
### Against the Individual Defendants

311.    Plaintiff hereby realleges and incorporates by reference herein each allegation set forth in paragraphs 1 through 310 above.

312.    The Individual Defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of Defendant Phoenix (the "Phoenix Enterprise") through a pattern of racketeering.

313.    At all relevant times, the Individual Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3) because they are individuals and are capable of holding a legal or beneficial interest in property.

314.    The Phoenix Enterprise constitutes a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4) because it consists of a corporation and its subsidiaries.

315.    The Individual Defendants are employed by or associated with the Phoenix Enterprise within the meaning of 18 U.S.C. § 1962(c).

316.    The Individual Defendants used the Phoenix Enterprise as an instrument to carry out the elements of their fraudulent scheme and pattern of racketeering activity.  The Phoenix Enterprise has an ascertainable structure and purpose beyond the scope and commission of the Individual Defendants' predicate acts and conspiracy to commit such acts, and the Phoenix Enterprise is separate and distinct from the Individual Defendants.

317.    The Phoenix Enterprise has engaged in, and its activities have affected, interstate and foreign commerce by inducing policyholders within and without the United States to continue paying premiums to Phoenix.

318.    Each of the Individual Defendants has exerted substantial control over the Phoenix Enterprise and participated in the operation, and managed the affairs of, the Phoenix Enterprise.  The Individual Defendants have committed or aided and abetted the commission of at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that the Individual Defendants committed and/or conspired to commit or aided or abetted the commission of were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."  The pattern is ongoing, and there is a continuing threat that the Individual Defendants will engage in future similar predicate acts of racketeering activity in

furtherance of their fraudulent scheme and in the conduct and/or participation in the conduct, directly or indirectly, of the Phoenix Enterprise's affairs.

319.   The Individual Defendants' predicate acts of "racketeering" within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to:

      a.   <u>Mail Fraud</u>:  The Individual Defendants have violated, and caused the Phoenix Enterprise to violate, 18 U.S.C. § 1341 by sending or receiving materials via the U.S. mail or commercial interstate carriers for the purpose of executing their fraudulent scheme to obtain money by means of false or fraudulent pretenses, misrepresentations, promises, and/or omissions.  The materials sent via U.S. mail or commercial interstate carriers include, but are not limited to, premium notices, annual policy statements, verifications of coverage, policy illustrations, and insurance rate letters.

      b.   <u>Wire Fraud</u>:  The Individual Defendants have violated, and caused the Phoenix Enterprise to violate, 18 U.S.C. § 1343 by transmitting and receiving materials by wire for the purpose of executing their fraudulent scheme to obtain money by false or fraudulent pretenses, misrepresentations, promises, and/or omissions.  The materials sent via wire include, but are not limited to, premium notices, annual policy statements, verifications of coverage, policy illustrations, and insurance rate letters.

320.   The Individual Defendants conducted the affairs of the Phoenix Enterprise through this pattern of racketeering.  As described above, upon information and belief,

Defendants Wehr, Polkinghorn and Young were members of Defendant Phoenix's product strategy group, which made executive decisions about the design of every Phoenix life insurance product, approved and directed improper insurance rate increases, and approved and directed the dissemination of misleading financial information.  From approximately 2003 to 2007, the product strategy group directed and approved products that were designed and intended to be attractive to premium finance companies and secondary market investors.

321.    Upon information and belief, Defendants Young and Polkinghorn also directed Defendant Phoenix's sales force to sell policies using non-recourse premium financing.  In late 2005, Defendant Polkinghorn read from a script advising Phoenix's sales force that Phoenix would accept sales of policies using non-recourse premium financing.  Later, Defendants Young, Wehr and Polkinghorn directed Phoenix to create a list of approved premium finance programs. Their efforts caused Defendant Phoenix to be known internally as the "King of STOLI." Relatedly, upon information and belief, Defendants Young and Polkinghorn caused Defendant Phoenix to consciously relax and disregard its underwriting standards in order to increase or maintain the volume of its business (and thus increase the Individual Defendants' compensation).

322.    In 2007, as described above, Defendant Young commissioned a team to form a life settlement division by which Defendant Phoenix would buy its own policies in the secondary market.  Defendants Young and Polkinghorn touted the benefits of this new venture in public statements.

323.    In or about 2008, as described above, however, despite initially managing Defendant Phoenix so as to encourage premium-financed policies and other policies that could be sold in the secondary market, upon information and belief, the Individual Defendants determined to direct Phoenix not to honor policies that it knew or believed to be investor-owned,

110

and to attempt to induce the lapse of such policies.  Upon information and belief, Defendants Young, Wehr, and Polkinghorn, among other Phoenix executives, attended numerous internal meetings and strategy sessions in which they discussed and personally approved each aspect of the fraudulent scheme.  As Defendant Wehr stated, Phoenix is "managing" its liabilities "through a combination of [insurance rate changes] and legal remedies."

324.    Upon information and belief, Defendants Young, Wehr and Polkinghorn directed Defendant Phoenix to (i) issue fraudulent and materially misleading premium notices, policy statements, verifications of coverage, policy illustrations and insurance rate increase letters indicating Phoenix believed the policies described in those communications to be valid and in force, when in fact the Individual Defendants had no intention of permitting Phoenix to honor those policies; and (ii) refuse or unjustifiably delay the payment of death benefits on the baseless ground that the policies were so-called "STOLI policies," while seeking to retain all of the premiums already paid.

325.    Upon information and belief, the Individual Defendants knowingly and intentionally caused Phoenix to make these misrepresentations, acts of concealment, and failures to disclose to deceive Plaintiff (and others).  The Individual Defendants either knew or recklessly disregarded that these were material misrepresentations and omissions, and Plaintiff relied on the misrepresentations and omissions as described herein.

326.    The Individual Defendants also conspired to violate 18 U.S.C. § 1962(c) as described herein.  The Individual Defendants have participated as co-conspirators with each other in these offenses and have performed overt acts in furtherance of the conspiracy, as described herein.

327.     By authorizing, orchestrating, directing, supervising, and participating in the conduct described herein, including the predicate acts of mail and wire fraud, the Individual Defendants committed, and caused Defendant Phoenix to commit, willful misconduct and knowing violations of criminal laws, including RICO, 18 U.S.C. § 1962(c) and (d), and the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.  In implementing their unlawful scheme, the Individual Defendants were not acting in good faith and in or not opposed to the best interest of Phoenix.  Instead, they were acting to further their own independent economic interests by using Phoenix as an unlawful enterprise to enrich themselves at the expense of policyholders, other shareholders, and Phoenix itself.

328.     The Individual Defendants have obtained money and property belonging to Plaintiff as a result of these statutory violations.  Plaintiff has been injured in its business and property by the Individual Defendants' overt acts of mail and wire fraud and by their aiding and abetting each other's acts of mail and wire fraud, and by the Individual Defendants' conduct of the Phoenix Enterprise's affairs through a pattern of racketeering activity.

329.     Plaintiff reasonably relied on the misrepresentations and omissions as described herein, including by purchasing the Policies and continuing to pay premiums on them.  As a direct and proximate cause of the Individual Defendants' conduct and/or participation, directly or indirectly, in the conduct of the affairs of the Phoenix Enterprise through a pattern of racketeering activity, Plaintiff has been injured in its business and property in an amount to be proven at trial, which consists of unpaid death benefits and approximately $169 million in premiums that have been paid to Phoenix.

330.     Plaintiff also is entitled to recover reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

## SEVENTH CAUSE OF ACTION

### (Fraud)
### Against the Individual Defendants

331.    Plaintiff hereby realleges and incorporates by reference herein each allegation set forth in paragraphs 1 through 330 above.

332.    The Individual Defendants' conduct described above also constitutes a fraud on Plaintiff.  As set forth above, the Individual Defendants knowingly and intentionally caused Defendant Phoenix to make numerous false and misleading statements of fact to Plaintiff in premium notices, annual policy statements, policy illustrations, verifications of coverage, and letters demanding that Plaintiff pay increased insurance rates.  These misrepresentations included representations that Plaintiff's policies were valid,  in force and valuable, and that Phoenix did not intend to contest the Policies but intended to honor them.  Upon information and belief, these representations were false because at the time the representations were made, the Individual Defendants were aware that Phoenix had no intention of honoring, and the Individual Defendants had no intention of allowing Phoenix to honor, the terms of the Policies.  The Individual Defendants had a duty to disclose their and Defendant Phoenix's true intent and the relevant facts to Plaintiff, but instead concealed them from Plaintiff.  The Individual Defendants had unique knowledge of or access to these facts, and knew that Plaintiff did not know them and could not have discovered them through reasonable diligence.  Plaintiff did not discover, and could not have discovered with reasonable diligence, the true facts until 2012.

333.    The Individual Defendants knowingly and intentionally caused these misrepresentations, acts of concealment, and failures to disclose to deceive and defraud Plaintiff (and others).  The Individual Defendants knew that these were material misrepresentations and

omissions, and Plaintiff reasonably relied on the misrepresentations and omissions as described herein, including by purchasing the Policies and continuing to pay premiums on them.

334.    The Individual Defendants have participated as co-conspirators with each other in the fraud against Plaintiff.  Each Individual Defendant knowingly and willfully participated in the conspiracy and knowingly and willfully committed wrongful acts pursuant to, and in furtherance of, the conspiracy, as alleged herein.  Each Individual Defendant knew that his or her conduct, and that of the conspiracy, was wrongful and had an unlawful purpose.

335.    The Individual Defendants' fraudulent intent to mislead Plaintiff (and other policyholders) into thinking that Defendant Phoenix would honor its policies is evidenced by, among other things, the following:  (1) Phoenix is currently challenging in litigation a number of policies as having a lack of insurable interest although it collected premiums on each of those policies for years before bringing such challenges; (2) Phoenix has resisted or denied an increasing number of claims each year since 2008, and has resisted claims at a rate far above the national average for the life insurance industry; (3) upon information and belief, Phoenix keeps a secret list of investor-owned policies to challenge in litigation; and (4) Phoenix has challenged policies issued before October 2008 as being STOLI although it appears to have audited its policies for STOLI concerns in October 2008, and reported to its regulator in Connecticut that it had found no STOLI policies and would continue to investigate and remain vigilant for such concerns.  Upon information and belief, the Individual Defendants have personally directed and authorized all of this conduct.

336.    In the alternative, the Individual Defendants were willfully blind to Defendant Phoenix's misrepresentations, acts of concealment, and fraudulent nondisclosures or omissions. Given the pervasive nature of the fraud within Defendant Phoenix, the Individual Defendants

deliberately acted to avoid confirming the high probability that Defendant Phoenix was issuing false and misleading statements and omitting material information as described herein.

337.    As a direct and proximate result of these fraudulent misrepresentations and omissions, Plaintiff has been damaged in an amount to be proven at trial.

338.    The Individual Defendants' conduct was intentional, fraudulent, malicious, oppressive, and despicable conduct in conscious disregard for Plaintiff's rights so as to justify an award of exemplary and punitive damages in an amount appropriate to punish the Individual Defendants and deter future wrongful conduct.

## XX.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court adjudge and decree as follows:

**A.    On the First Cause of Action**

1.    That the conduct alleged in the First Cause of Action herein be adjudged to be unlawful monopolization (monopsonization) in violation of Connecticut General Statutes section 35-27;

2.    That Plaintiff recover actual damages, including pre-judgment and post-judgment interest, and trebling the amount of Plaintiff's damages sustained by reason of Defendants' violations of law;

3.    That Plaintiff be awarded reasonable attorneys' fees and costs of litigation;

4.    That Defendants' anticompetitive and exclusionary conduct be preliminarily and permanently enjoined;

5.    For a preliminary declaration that Plaintiff is not required to continue paying premiums to Phoenix and that Plaintiff be permitted to pay premiums into an interest-bearing escrow account until a final judgment is rendered in this action; and

      6.      For such other and further relief as the Court deems just and proper.

**B.**      <u>**On the Second Cause of Action**</u>

      1.      That the conduct alleged in the Second Cause of Action herein be adjudged to be an unlawful attempt to monopolize (monopsonize) in violation of Connecticut General Statutes section 35-27;

      2.      That Plaintiff recover actual damages, including pre-judgment and post-judgment interest, and trebling the amount of its damages sustained by reason of Defendants' violations of law;

      3.      That Plaintiff be awarded reasonable attorneys' fees and costs of litigation;

      4.      That Defendants' anticompetitive and exclusionary conduct be preliminarily and permanently enjoined;

      5.      For a preliminary declaration that Plaintiff is not required to continue paying premiums to Phoenix and that Plaintiff be permitted to pay premiums into an interest-bearing escrow account until a final judgment is rendered in this action; and

      6.      For such other and further relief as the Court deems just and proper.

**C.**      <u>**On the Third Cause of Action**</u>

      1.      That the conduct alleged in the Third Cause of Action herein be adjudged to be an unfair or deceptive act or practice in violation of Connecticut General Statutes section 42-110b(a);

      2.      That Plaintiff recover actual damages, including pre-judgment and post-judgment interest;

      3.      That Plaintiff be awarded punitive damages;

      4.      That Plaintiff be awarded reasonable attorneys' fees and costs of litigation;

5.       That Defendants' unfair and deceptive conduct be preliminarily and permanently enjoined;

6.       For a preliminary declaration that Plaintiff is not required to continue paying premiums to Phoenix and that Plaintiff be permitted to pay premiums into an interest-bearing escrow account until a final judgment is rendered in this action; and

7.       For such other and further relief as the Court deems just and proper.

**D.       On the Fourth Cause of Action**

1.       That the conduct alleged in the Fourth Cause of Action herein be adjudged to be an unfair or deceptive act or practice in violation of Connecticut General Statutes section 42-110b(a);

2.       That Plaintiff recover actual damages, including pre-judgment and post-judgment interest;

3.       That Plaintiff be awarded punitive damages;

4.       That Plaintiff be awarded reasonable attorneys' fees and costs of litigation;

5.       That Defendants' unfair and deceptive conduct be preliminarily and permanently enjoined;

6.       For a preliminary declaration that Plaintiff is not required to continue paying premiums to Phoenix and that Plaintiff be permitted to pay premiums into an interest-bearing escrow account until a final judgment is rendered in this action; and

7.       For such other and further relief as the Court deems just and proper.

**E.       On the Fifth Cause of Action**

1.       That Plaintiff recover actual damages, including pre-judgment and post-judgment interest;

2.       That Plaintiff be awarded punitive damages;

3.      That Plaintiff be awarded reasonable attorneys' fees and costs of litigation;

4.      That Defendant Phoenix's fraudulent and unlawful conduct be preliminarily and permanently enjoined;

5.      For a preliminary declaration that Plaintiff is not required to continue paying premiums to Phoenix and that Plaintiff be permitted to pay premiums into an interest-bearing escrow account until a final judgment is rendered in this action; and

6.      For such other and further relief as the Court deems just and proper.

**F.      On the Sixth Cause of Action**

1.      That Plaintiff recover actual damages, including pre-judgment and post-judgment interest, and treble the amount of its damages sustained by reason of Defendants' violations of law;

2.      That Plaintiff be awarded reasonable attorneys' fees and costs of litigation;

3.      That Defendants' fraudulent and unlawful conduct be preliminarily and permanently enjoined;

4.      For a preliminary declaration that Plaintiff is not required to continue paying premiums to Phoenix and that Plaintiff be permitted to pay premiums into an interest-bearing escrow account until a final judgment is rendered in this action; and

5.      For such other and further relief as the Court deems just and proper.

**G.      On the Seventh Cause of Action**

1.      That Plaintiff recover actual damages, including pre-judgment and post-judgment interest;

2.      That Plaintiff be awarded punitive damages;

3.      That Plaintiff be awarded reasonable attorneys' fees and costs of litigation;

4.      That the Individual Defendants' fraudulent and unlawful conduct be preliminarily and permanently enjoined;

5.      For a preliminary declaration that Plaintiff is not required to continue paying premiums to Phoenix and that Plaintiff be permitted to pay premiums into an interest-bearing escrow account until a final judgment is rendered in this action; and

6.      For such other and further relief as the Court deems just and proper.

## XXI.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Lima hereby demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Respectfully submitted,

PLAINTIFF
LIMA LS PLC

/s/ James I. Glasser
James I. Glasser (ct07221)
**Wiggin and Dana LLP**
One Century Tower
265 Church Street, P.O. Box 1832
New Haven, CT  06508-1832
Tel: (203) 498-4313
Fax: (203) 782-2889
E-mail:  jglasser@wiggin.com

Of Counsel:

Martin Flumenbaum
Allan J. Arffa
Jessica S. Carey
**Paul, Weiss, Rifkind,**
**Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York  10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990
E-mail:  mflumenbaum@paulweiss.com
          aarffa@paulweiss.com
          jcarey@paulweiss.com

120

## **CERTIFICATION**

I hereby certify that on July 31, 2013, a copy of the foregoing Amended Complaint was

filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of

this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system

or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic

Filing.  Parties may access this filing through the Court's CM/ECF System.

 /s/ *James I. Glasser*_____
James I. Glasser, Esq.
