## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LIMA LS PLC**, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 3:12-CV-01122 (WWE) |
| | § | |
| **PHL VARIABLE INSURANCE** | § | |
| **COMPANY, a Connecticut corporation;** | § | |
| **PHOENIX LIFE INSURANCE COMPANY,** | § | |
| **a New York corporation; THE PHOENIX** | § | |
| **COMPANIES, INC., a Connecticut** | § | |
| **corporation; JAMES D. WEHR, an** | § | |
| **individual; PHILIP K. POLKINGHORN, an** | § | August 30, 2013 |
| **individual; DONA D. YOUNG, an** | § | |
| **individual,** | § | |
| | § | |
| | § | |
| *Defendants.* | § | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

**<u>TABLE OF CONTENTS</u>**

I.     NATURE AND STAGE OF PROCEEDINGS ................................................................. 1

II.    SUMMARY OF ARGUMENT ..................................................................................... 1

III.   RELEVANT BACKGROUND ...................................................................................... 4

      A.    Lima Does Not Own the Policies.......................................................................... 4

          1)  Lima Created a Contractual Structure That Distances it From Policy Ownership . 4

          2)  U.S. Bank and Lima Seek Identical Recovery and Multiple Bites at the Apple Through Duplicative Litigation and Claims Splitting ............................................. 6

      B.    Lima's Alleged RICO Scheme is Nothing More than Pure Speculation................ 9

IV.    ARGUMENT................................................................................................................ 12

      A.    The RICO and Fraud Claims Fail ........................................................................ 12

          1)  Lima Fails to Allege Individual Defendant's Control of RICO Enterprise ........................................................................................................... 13

          2)  Lima Fails to Allege With Specificity Any the Individual Defendant's Actual Acts Constituting Mail or Wire Fraud ................................................................. 17

          3)  Lima Improperly Bases Allegations On Information and Belief.......................... 19

          4)  Lima Fails to Allege Facts Supporting an Inference that a Fraud Occurred ........ 21

              a.   The Litigation and Claim Denial Façade ...................................................... 21

              b.   Phoenix's Litigation is Legitimate and Protected ......................................... 23

              c.   The LPT Spreadsheet is a Complete Red Herring ........................................ 25

              d.   Lima Misrepresents the October 2008 Department of Insurance Response . 26

          5)  No Pattern of Racketeering Activity.................................................................... 27

          6)  Lima Fails to Allege a RICO Conspiracy ........................................................... 28

          7)  Lima Has No Proximately Caused Damages........................................................ 28

          8)  Phoenix Owes No Duty to Lima.......................................................................... 31

          9)  Individual Defendants Cannot be Held Liable for Fraud...................................... 32

10) Lima's RICO and Fraud Claims Should Be Dismissed With Prejudice ............... 33

B.    CUTPA Claims Fail ............................................................................... 33

1)    Lima Fails to State a CUIPA Misrepresentation Claim ........................................ 33

No Allegations Support Unfair Claims Settlement Practices Claim .......................... 35

3)    CUTPA Claims Based on Actions or Misrepresentations Made More than Three Years Prior to Filing of the FAC Must Be Dismissed .......................................... 35

4)    Lima Has Suffered No Damages Recoverable Under CUTPA ............................ 36

5)    CUTPA Claims Must Be Dismissed Due to Improper Claims Splitting ............. 37

C.    Lima is Not The Policy Owner, Lacks Damages, and Lacks Standing to Bring Antitrust Claims ..................................................................................... 39

D.    Dismissal with Prejudice Warranted ...................................................................... 39

V.    CONCLUSION .................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Active Ventilation Products, Inc. v. Prop. & Cas. Ins. Co. of Hartford*, X09CV085023757, 2009 WL 2506360, \*1 (Conn. Super. Ct. July 15, 2009) ................................................... 34

*Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 660 F. Supp. 1362 (D. Conn. 1987) ................................................................................................................ 18

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ................................................. 31

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................ 31

*Avon Meadow Condo. Ass'n, Inc. v. Bank of Bost. Conn.*, 719 A.2d 66 (Conn. App. Ct. 1998) . 35

*Bath Petrol. Storage, Inc. v. Market Hub Partners, L.P.*, 229 F.3d 1135, \*1 (2d Cir. 2000)....... 25

*Bellemare v. Wachovia Mortg. Corp.*, 894 A.2d 335 (Conn. App. Ct. 2006) ............................ 36

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ........................................... 30

*Carford v. Empire Fire & Mar. Ins. Co.*, 891 A.2d 55 (Conn. App. Ct. 2006)........................... 37

*Carpenter v. United States*, 484 U.S. 19 (1987) .......................................................... 18

*Carton et al. v. B&B Equities, LLC, et al.*, No. 2-11-cv-746, 2011 WL 6096496, \*1 (D. Nev. Dec. 7, 2011)........................................................................................................ 24

*Celpaco, Inc. v. MD Papierfabriken*, 686 F. Supp. 983 (D. Conn. 1988) .................................. 28

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) .................................... 6, 26

*Chiarella v. U.S.*, 445 U.S. 222 (1980)........................................................................ 31

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229 (2d Cir. 1999).................. 27, 28

*Commercial Cleaning Servs., LLC v. Colin Serv. Sys., Inc.*, 271 F.3d 374 (2d Cir. 2001) .......... 17

*Curtis v. Citibank, N.A.*, 226 F.3d 133 (2d Cir. 2000).......................................... 37, 38

*DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) ...................................................... 13

*DiGennaro v. Whitehair*, 467 F. App'x 42 (2d Cir. 2012). ................................................ 37

*Duksa v. City of Middletown*, 376 A.2d 1099 (Conn. 1977) ............................................ 32

*Efron v. Embassy Suites, Inc.*, 223 F.3d 12 (1st Cir. 2000) ........................................... 18

*Egan v. Hudson Nut Prods., Inc.*, 114 A.2d 213 (Conn. 1955) ...................................... 31, 32, 39

*Equitable Life Assur. Soc. of U.S. v. Alexander Grant & Co.*, 627 F. Supp. 1023 (S.D.N.Y. 1985) ........................................................................................................ 20

*Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)............................................................ 6, 22

*Fed. Paper Bd. Co., Inc. v. Amata*, 693 F. Supp. 1376 (D. Conn. 1988) ..................................... 32

*Fichera v. Mine Hill Corp.*, 541 A.2d 472 (Conn. 1988) ........................................................... 36

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) ................. 18, 20

*Friedman v. Arizona World Nurseries Ltd.,* 730 F.Supp. 521 (S.D.N.Y.1990) .......................... 28

*Goins v. JBC & Assocs., P.C.*, 352 F. Supp. 2d 262 (D. Conn. 2005)......................................... 38

*Gross v. Waywell*, 628 F. Supp. 2d 475 (S.D.N.Y. 2009) ............................................................ 18

*H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989) ...................................................... 27

*Harris v. Mills*, 572 F.3d 66 (2d Cir. 2009)................................................................................ 23

*Hemi Group, LLC v. City of N.Y.*, 130 S. Ct. 983 (2010) ...................................................... 28, 39

*Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258 (1992).................................................. 29

*In re Integrated Resources Real Estate*, 850 F. Supp. 1105 (S.D.N.Y. 1993) ............................ 12

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*, 209 F.R.D. 323 (S.D.N.Y. 2002).............................................................................................................................................. 38

*In re SmithKline Beecham Clinical Labs., Inc. Lab. Test Billing Practices Litig.*, 108 F. Supp. 2d 84 (D. Conn. 1999). ...................................................................................................................... 13

*Kalimantano GmbH v. Motion in Time, Inc.*, Civ. No. 12-6969 (PAE), 2013 WL 1499408, *1 (S.D.N.Y. Apr. 12, 2013)............................................................................................................... 12

*Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649 (S.D.N.Y. 1996) ................................ 12

*Kearney v. City of Bridgeport Police Dept.*, 573 F. Supp. 2d 562 (D. Conn. 2008) ...................... 6

*Landy v. Heller, White & Co.*, 783 F. Supp. 125 (S.D.N.Y. 1991) ............................................... 39

*Lerwick v. Kelsey*, 150 F. App'x 62 (2d Cir. 2005) ...................................................................... 20

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986) ............................................................................. 20

*Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106 (2d Cir. 2013) ................. 18, 34

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992).................................................................. 17

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993) ............................................... 18, 19

*Miranda v. Ponce Fed. Bank*, 948 F.2d 41 (1st Cir. 1991)........................................................... 12

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268 (2d Cir. 2011)................................ 15

*Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany*, 615 F.3d 97 (2d Cir. 2010)........ 23

*Musco Propane, LLP v. Town of Wolcott*, 3:10-CV-1400 JCH, 2011 WL 3267756, *1 (D. Conn. July 28, 2011)......................................................................................................................... 23

*N. Assur. Co. of Am. v. Square D Co.*, 201 F.3d 84 (2d Cir. 2000) ................................................ 38

*Nazami v. Patrons Mut. Ins. Co.*, 910 A.2d 209 (Conn. 2006)....................................................... 33

*New Phone Co. v. City of New York*, 498 F.3d 127 (2d Cir. 2007) ............................................... 37

*O'Ferral v. Trebol Motors Corp.*, 45 F.3d 561 (1st Cir. 1995)..................................................... 31

*Oy v. HR Textron, Inc.*, No. 3:08-cv-1216, 2008 WL 5214268, *1 (D. Conn. Dec. 11, 2008).... 36

*Penn Mut. Life Ins. Co. v. Greatbanc Trust Co.*, 887 F. Supp. 2d 822 (N.D. Ill. 2012)............... 24

*Petrosurance, Inc. v. Nat'l Ass'n of Ins. Comm'rs*, 514 F. App'x 51 (2d Cir. 2013) .................. 20

*PHL Variable Ins. Co. v. The Lucille E. Morello 2007 Irrevocable Trust*, 645 F.3d 965 (8th Cir. 2011) .......................................................................................................................................... 24

*Plainville Elec. Prod. Co. v. Vulcan Advanced Mobile Power Sys., LLC*, 638 F. Supp. 2d 245 (D. Conn. 2009)................................................................................................................................. 27

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) ........... 25

*Pruco Life Ins. Co. v. Brasner*, 2011 WL 134056, *1 (S.D. Fla. Jan. 7, 2011) ............................ 25

*Rand v. Anaconda–Ericsson, Inc.*, 794 F.2d 843 (2d Cir. 1986) .................................................. 29

*Reves v. Ernst & Young*, 507 U.S. 170 (1993)...................................................................... 13, 21

*Schultz v. Hartford Fire Ins. Co.*, 569 A.2d 1131 (Conn. 1990) ................................................... 6

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) .................................................................... 13

*Segal v. Gordon*, 467 F.2d 602 (2d Cir. 1972) ............................................................................ 20

*Standardbred Owners Ass'n*, 985 F.2d 102 (2d Cir. 1993) .................................................... 28, 39

*State of Connecticut v. Acordia, Inc.* 18756, 2013 WL 4419116, *1 (Conn. Aug. 27, 2013)...... 34

*TTSI Irrevocable Trust v. ReliaStar Life Ins.*, 60 So.3d 1148 (Fla. Dist. Ct. App. 2011) ........... 24

*UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010) ........................................... 28

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) ................................................................ 31

*Ventres v. Goodspeed Airport, LLC*, 881 A.2d 937 (Conn. 2005) ............................................... 32

*Waddell & Reed Fin., Inc. v. Torchmark Corp.*, 223 F.R.D. 566 (D. Kan. 2004)....................... 31

*Wexner v. First Manhattan Co.*, 902 F.2d 169 (2d Cir. 1990).................................................... 20

*Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 797 (6th Cir. 2009) .............................................. 24

**Statutes**

18 U.S.C. § 1961 ........................................................................................................ 15. 29

18 U.S.C. § 1962 ........................................................................................................ 13

Conn. Gen. Stat. § 35-28 ............................................................................................ 1

Conn. Gen. Stat. § 38a-816 ........................................................................................ 33

Conn. Gen. Stat. § 42-110g ........................................................................................ 35

U.C.C. § 8–102 .......................................................................................................... 5

U.C.C. § 8–501 .......................................................................................................... 5

U.C.C. § 8–503 cmt. 2 ............................................................................................... 5

**Other Authorities**

Restatement (Second) of Contracts § 170 cmt. b........................................................ 34

## I.     NATURE AND STAGE OF PROCEEDINGS

Lima LS plc ("Lima") brought this action alleging that Phoenix,[1] a 160-year-old insurance company, was converted to a criminal enterprise by certain executives engaged in rampant fraud.  Upon considering Defendants' motion to dismiss Lima's Original Complaint, the Court let stand one of Lima's antitrust claims and its Connecticut Unfair Trade Practices Act ("CUTPA") claim, but dismissed the remaining claims.[2]  *See* Mem. of Decision on Defs.' Mot. to Dismiss [Doc. 76] [hereinafter the "Order"].  The Court granted Lima an opportunity to replead its common-law fraud and Racketeer Influenced and Corrupt Organization Act ("RICO") claims, instructing Lima that to survive a second motion to dismiss, it must allege fraudulent conduct with particularity and that it must allege with specificity each defendant's "intent, participation, and management of the alleged RICO Phoenix Enterprise."  *Id.* at p. 22, 27, 27.  Lima's First Amended Complaint (the "FAC") does nothing to cure the deficiencies in its Original Complaint.

## II.     SUMMARY OF ARGUMENT

Lima's amended RICO claim, directed against Phoenix's current Chief Executive Officer ("CEO") Jim Wehr, and former Phoenix executives Dona Young and Philip Polkinghorn (the "Individual Defendants"), is premised entirely upon the speculative allegation that in early 2009, in response to financial distress, the Individual Defendants, "secretly resolved not to permit Defendant Phoenix to honor [investor owned life insurance policies] when they come due"  *See* FAC ¶ 12.  Lima alleges that despite forming this secret intent, the Individual Defendants

---

[1] "Phoenix" collectively refers to Defendants The Phoenix Companies, Inc., Phoenix Life Insurance Company, and PHL Variable Insurance Company.

[2] The Court dismissed Lima's conspiracy and Conn. Gen. Stat. § 35-28 claims with prejudice.  *See* Order, p. 28.  The Court also held that Phoenix's litigation practices did not qualify as anti-competitive or exclusionary conduct, and that, as a matter of law, Phoenix's correspondence to its policyholders did not fraudulently misrepresent the policies' validity or status. *Id.* pp. 13, 23.  Despite this, the FAC prominently features identical allegations.

"caused Defendant Phoenix to issue notices and other materials that falsely and misleadingly represented that the investors' policies were valid and in force," constituting mail fraud. *Id.* ¶ 109. Lima rests these conclusory allegations entirely upon "information and belief."

Moreover, Lima repeatedly attempts to obfuscate a critical temporal aspect. The alleged secret decision to deny claims on investor owned policies was supposedly made after Phoenix was unable to sell new policies due to the ratings downgrades and loss of distribution partners in March 2009—immediately preceding Ms. Young's resignation as CEO and her replacement by Mr. Wehr. In addition to offering no details surrounding either this alleged secret decision or the corollary mail fraud, Lima offers no explanation for how both Ms. Young and her replacement, Mr. Wehr, could be responsible for carrying out this RICO fraud. Lima also offers no explanation as to why Mr. Polkinghorn, formerly head of Phoenix's Life and Annuity Division, is responsible for the RICO fraud after dropping claims against another executive, Ed Cassidy,[3] and drawing no connection between Mr. Polkinghorn and the alleged fraud. This is nothing more than Lima picking the names of current or former executives out of a hat, alleging on information and belief that they are responsible for developing a "secret intent," and providing nothing but conclusory allegations that they directed Phoenix to commit mail fraud.

Indeed, the only allegation Lima offers in support of an inference that such a scheme exists is an assertion that Phoenix's regulatory filings show "a massive and steady increase in the amount of death benefits refused since" the scheme's inception.[4] *Id.* ¶ 145. However, these filings show just the opposite: in the last four calendar years, Phoenix accepted 66,527 out of

---

[3] The Order dismissed all claims against Mr. Cassidy who was named as a defendant in the Original Complaint. *See* Order, p. 28; Compl. [Doc. 1], ¶ 33. Lima chose not to replead any claims against Mr. Cassidy in its FAC.

[4] There is no allegation of any of the Individual Defendants involvement with the denial of any claims.

66,535 submitted claims—an acceptance rate of 99.988%—and paid out $2.88 billion in benefits. Moreover, in addition to acknowledging that Phoenix paid $30 million in death benefits on policies subject to separate litigation, comparing the list of policies subject to the Original Complaint with the list subject to the FAC shows that Lima dropped two policies where Phoenix paid death benefits in the interim.

Otherwise, the FAC offers nothing but speculative and conclusory allegations regarding the existence of this fraudulent scheme, the Individual Defendants' participation in the scheme, or the Individual Defendants' knowledge of or involvement with the alleged mail fraud. Instead, Lima offers deceptively detailed allegations wholly disconnected from this theory. Lima focuses on Phoenix's alleged sales practices, Phoenix's investment strategies and financial position, and the Individual Defendants' involvement in those areas in the mid-2000s. These allegations are mere smokescreen, and fail to provide the specificity required by this Court to support the alleged RICO scheme, which allegedly arose in early 2009. The FAC simply does not come close to providing the "specific allegations as to actual acts specific to each of the Individual Defendants," to either control the RICO enterprise or effectuate the predicate mail fraud, as required by this Court's Order. *See* Order, p. 11.

In addition to its deficient RICO and fraud claims, the FAC asserts a CUTPA claim based upon entirely different factual theories and Connecticut Unfair Insurance Practices Act ("CUIPA") provisions than the CUTPA claim asserted in the Original Complaint. Instead of attempting to double down on its antitrust claim, as it did in its Original Complaint, Lima attempts to repackage its flawed RICO and fraud claims as a CUTPA violation. The new "misrepresentation" portion of the CUTPA claim fails for the same reasons as the RICO and fraud claims. Lima's new unfair claims handling CUTPA theory fails for the simple reason that

Lima has never submitted a claim to Phoenix, and no deaths have occurred under any of the Policies made subject to the FAC. Additionally, Lima's CUTPA claims must be dismissed for lack of standing, lack of damages, and claims splitting due to U.S. Bank, the actual owner of the Policies, having already asserted these same claims against Phoenix in other lawsuits.

Indeed, U.S. Bank—not Lima—is the owner and beneficiary of the Policies.[5] Lima is not a party to the Policies, has no ownership or beneficial interest in the Policies, and has no relationship with and is owed no duty by Phoenix. Lima's only alleged connection to the Policies is through a contractual relationship with U.S. Bank. This attenuated relationship is too remote for any action taken by Phoenix or the Individual Defendants to have proximately caused Lima injury. Similarly, as Lima does not own the policies, it cannot sell them into the secondary market, and thus lacks standing to assert antitrust claims based on Phoenix's alleged monopsonistic conduct. As such, all of Lima's claims must be dismissed.

### III.   RELEVANT BACKGROUND

**A.   Lima Does Not Own the Policies**

1)   <u>Lima Created a Contractual Structure that Distances it from Policy Ownership</u>

Lima alleges that in December 2010, it acquired its derivative interest in the Policies through its acquisition of five limited liability companies, which were then merged together and

---

[5] Phoenix acknowledges that while it challenged Lima's standing to assert RICO claims in its prior motion to dismiss, Phoenix did not specifically articulate lack of policy ownership as a ground for lack of standing. Since its prior motion to dismiss was filed, information disclosed by U.S. Bank in other cases made Lima's lack of standing clear. Specifically, in March 2013, U.S. Bank filed a brief and supporting declaration that outlined the complex contractual relationship between U.S. Bank and various Lima entities. *See* Pl.'s Supp. Brief Re: Damages [Doc. 309], at 3–4, *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, Case No. 12-3046 (C.D. Cal. Mar. 26, 2013 & Ex. 1 Declaration of Ola Eriksson ("Eriksson Decl."), ¶¶ 3, 10–13 (explaining that U.S. Bank is the record owner and beneficiary of the policies and that Lima's rights, if any, stem from its partnership and/or contractual relationships with third parties) ), attached as Ex. A to the Declaration of Jarrett Ganer (Ganer decl.). (Hereinafter, all references to exhibits refer to Ganer Decl.).

converted into Lima Acquisition LP ("Lima LP").[6]  *See* FAC ¶ 37.  Lima is allegedly Lima LP's

general partner, and their relationship is presumably subject to a partnership agreement.  *Id.*

Neither Lima nor Lima LP owns the Policies; rather, U.S. Bank owns them, as securities

intermediary[7] for Lima LP.  *Id.* ¶¶ 36–37.[8]  As explained in a declaration filed by U.S. Bank,

> The ownership and management of these policies are allocated among several
> different legal entities.   The policies are owned by U.S. Bank National
> Association, as securities intermediary for Lima Acquisition LP . . . This means
> that U.S. Bank National Association owns the policies, but Lima Acquisition LP
> holds the interests in them through a securities account with U.S. Bank National
> Association. Lima Acquisition LP, through its general partner, Lima LS plc,
> manages the policies.

*See* Eriksson Decl. ¶ 3.[9]  The relationship between U.S. Bank and Lima LP is governed by a

contract, the "Second Amended and Restated Policy Securities Account Control Agreement," to

which Phoenix is not a party.  *Id.* at ¶ 13.  In other words, the contractual relationship at issue is

as follows:

---

[6] Lima notes that a small number of the Policies were acquired after the initial December 2010 acquisition.  *See* FAC ¶ 37.  These policies are also owned by U.S. Bank as securities intermediary.  *Id.*

[7] Under the U.C.C., a "securities intermediary" is an entity that maintains a "securities account."  U.C.C. § 8–102(a)(14) (1994).  The securities intermediary "undertakes to treat the person for whom the account is maintained as entitled to exercise the rights that comprise the financial asset."  U.C.C. § 8–501(a) (1994).  As such, the entitlement holder—the person identified in the records of securities intermediary—acquires a securities entitlement <u>against the securities intermediary</u>—U.S. Bank, not against Phoenix as the issuer of the Policies.  *See* U.C.C. § 8–102(a)(8) (1994); U.C.C. § 8–503 cmt. 2 (1994) (explaining that the security entitlement is the bundle of economic and corporate rights comprising the asset).

[8] Notably, for all of its bluster concerning the "several" ownership changes Phoenix refused to process back in 2009, FAC ¶ 116–117, Lima implicitly acknowledges that Phoenix did process ownership changes for each and every policy that is subject to this litigation, designating U.S. Bank as the new policy owner.  *See* FAC ¶ 37.

[9] Phoenix requests that the Court take judicial notice of Mr. Eriksson's affidavit, filed by U.S. Bank in *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, [Doc. 309], Case No. 12-3046 (C.D. Cal. Mar. 26, 2013).  Phoenix attaches Mr. Eriksson's declaration not to refute or contradict any allegation in Lima's FAC, but simply to provide color (in the words of Lima's own manager) to Lima's allegation that U.S. Bank holds the policies as securities intermediary for Lima LP.  Phoenix does not intend to convert its motion to dismiss into a motion for summary judgment.



Phoenix and Lima are not in contractual privity, and Lima has no rights in the Policy contracts.  *See Schultz v. Hartford Fire Ins. Co.*, 569 A.2d 1131, 1134–35 (Conn. 1990) (explaining that insurance policies are governed by "the same general rules that govern the construction of any written contract").[10]  The Policies vest all rights and incidents of ownership in the named policy owner—U.S. Bank.  *See* Ex. C: Policy Exemplar.[11]  It is U.S. Bank—not Lima—that is entitled to death benefits and to which death benefits are paid.  *Id.* at 17–18.  Communications regarding the Policies, including the notices upon which Lima relies in support of its fraud allegations, were sent to U.S. Bank, not Lima.  *See* Ex. B: Premium Notice.  For whatever reason, Lima chose to set up this complex structure rather than having direct ownership of the Policies.  Having created this structure, it must live with it, including the fact that Lima does not own the Policies.

2) <u>U.S. Bank and Lima Seek Identical Recovery and Multiple Bites at the Apple Through Duplicative Litigation and Claims Splitting</u>

Over the past two years, U.S. Bank has filed 6 lawsuits against Phoenix related to the policies it owns as securities intermediary for Lima LP and asserting the same allegations as

---

[10] *See* Ex. B: Premium Notice.

[11] When deciding a motion to dismiss, a court may consider documents relied on and integral to the plaintiff's complaint, provided their authenticity and relevancy are not in dispute. *See Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).  If the Court declines to take judicial notice of any of the exhibits attached hereto, Defendants request such documents simply be disregarded.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153–54 (2d Cir. 2002) (court may exclude documents it determines to be extrinsic to the pleadings); *Kearney v. City of Bridgeport Police Dept.*, 573 F. Supp. 2d 562, 567 n.1 (D. Conn. 2008) (disregarding documents the court considered to be extrinsic).

Lima does here.[12]  Through these other lawsuits, U.S. Bank and Lima have obtained extensive discovery from Phoenix.  Indeed, U.S. Bank has deposed Mr. Polkinghorn, deposed Phoenix's Director of Claims twice and cross-examined him at trial, and has deposed numerous other current and former Phoenix executives and employees.  If there were any facts supporting its ludicrous secret intent to deny claims theory, Lima would have discovered and alleged them by now.

Three of the lawsuits—*Doe I*, *Doe II*, and *Doe III*—relate directly to death claims U.S. Bank submitted as the designated beneficiary under the relevant policies, and constitute a primary basis for Lima's claimed damages here.  *See* FAC ¶¶ 143, 258 (alleging damages stemming from $30 million in death benefits Phoenix allegedly wrongfully withheld).  In *Doe I* and *Doe II*, U.S. Bank asserted bad faith and CUTPA claims, despite acknowledging that the combined $30 million in death benefits had been paid in full, based on its insistence that Phoenix wrongfully delayed payment due to "resurrected" policy liens.  *See Doe I*, 2d Am. Compl. ¶¶ 4–5, 31–34 (acknowledging that Phoenix paid $20 million to U.S. Bank); *Doe II*, 2d Am. Compl. ¶¶ 3–4, 26–28, 37 (acknowledging that Phoenix paid $10 million to U.S. Bank).  The CUTPA claims U.S. Bank made in *Doe I* and *Doe II* are virtually identical to the claim Lima asserts here.  *Compare Doe I*, 2d Am. Compl. ¶¶ 13–16, 106–113 (claiming that Phoenix has tried to make up for financial losses by delaying or refusing to pay death benefits); *Doe II*, 2d Am. Compl. ¶¶ 12–

---

[12] *See* Ex. D:  *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, Case No. 12-3046 (C.D. Cal. Apr. 6, 2012) [hereinafter "*Doe I*"]; *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, Case No. 12-3047 (C.D. Cal. Apr. 6, 2012) [hereinafter "*Doe II*"]; *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, Case No. 12-877 (D. Minn. Apr. 6, 2012) [hereinafter "*Doe III*"]; *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, Case No. 12-06811 (S.D.N.Y. Sept. 10, 2012) [hereinafter "*COI I*"] (case originally filed on November 16, 2011 in the Central District of California and subsequently transferred to the Southern District of New York); *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, Case No. 13-01580 (S.D.N.Y. Mar. 8, 2013) [hereinafter "*COI II*"]; *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, Case No. 13-00368 (D. Del. Mar. 8, 2013) [hereinafter "*COI III*"].

15, 107–114 (same), *with* FAC ¶¶ 293–304 (alleging that Phoenix has engaged in unfair claims settlement practices).

Phoenix was granted summary judgment on U.S. Bank's CUTPA claim in *Doe I*.  *See* Ex. E:  Order re: Defs.' Mot. for Summ. J. [Doc. 247], *Doe I* (C.D. Cal. Mar. 11, 2013) ("Plaintiff's CUTPA claim fails because it provides insufficient facts to establish that Defendant engaged in unfair settlement practices with such sufficiency as to indicate a general business practice."). The remaining bad faith claim in *Doe I* was tried to a federal jury in Los Angeles, which unanimously found that Phoenix had not acted in bad faith.  *See* Ex. F:  J. on the Verdict for Defs. [Doc. 346], *Doe I*, (C.D. Cal. Apr. 5, 2013).  U.S. Bank's appeal is pending in the Ninth Circuit Court of Appeals, and U.S. Bank stipulated to dismissal of the *Doe II* case following the *Doe I* verdict.  *See* Ex. G:  Order Approving & Granting Joint Stip. to Vol. Dismiss without Prejudice [Doc. 166], *Doe II* (C.D. Cal. May 6, 2013).

The other claims handling case (the "*Doe III*" case), referenced in FAC paragraphs 237– 243, is being actively litigated and involves CUTPA claims by U.S. Bank for CUIPA unfair claims handling violations (identical to the claim Lima asserts) and a counter-claim by Phoenix that the $3 million policy lacks insurable interest based, in part, on the assertion by the insured's widow that she and her husband were unaware the policy was ever even issued.  *See* Ex. H: Answer & Countercl., *Doe III* [Doc. 174], ¶¶ 26–30, 33–36 (insured never consented to issuance of the Policy and could not afford the premium payments).

The other three lawsuits relate to cost of insurance ("COI") charge increases for certain policies (all of which are included within the Policies made subject to this case), and include CUTPA claims identical to those asserted by Lima (i.e., that Phoenix is improperly discriminating between similarly situated insureds and has issued false illustrations to induce

policyholders to lapse policies). *See* Ex. D:  *COI I*, 2d Am. Compl. [Doc. 203], ¶¶ 34–42, 51–62 (alleging violations of CUTPA/CUIPA and breach of contract relating to COI charges); *COI II*, 2d Am. Compl. [Doc. 22], ¶¶ 42–51, 63–73 (same); *COI III*, 1st Am. Compl. [Doc. 9], ¶¶ 42–51, 63–73 (same).  In other words, non-contracting party Lima seeks to recover damages (including loss of policies' market value) related to COI increases on the same Policies and same legal theories as contracting party U.S. Bank does in the COI cases.

Lima is attempting to assert claims and recover damages already sought through the *Doe I*, *II* and *III* and *COI I, II* and *III* cases by U.S. Bank.  *See* FAC ¶¶ 258, 296, 298, 301. Preventing multiple and duplicative recovery through coordinated gamesmanship is precisely why parties must have standing to bring claims.  Lima is not a party to the Policies and lacks standing to bring claims arising from the Policies.  Even if Lima had standing, this is a textbook example of patently impermissible claims splitting.

**B.      Lima's Alleged RICO Scheme is Nothing More than Pure Speculation**

Lima's FAC spans a verbose 120 pages plus attachments, much of which is occupied with completely irrelevant, unsubstantiated, speculative, and contrived allegations that have been the subject of extensive discovery in other litigation.  Notably, the bulk of the factual allegations chronicling Phoenix's alleged encouragement and acquiescence to the sale of life insurance policies that were eventually resold into the secondary market during the 2003 to 2008 time period.  Despite spending page after page detailing this time period, Lima never alleges that any of Phoenix's or the Individual Defendant's actions were unlawful.  Rather, Lima's contention is that the RICO scheme and fraud began in early 2009.

Stripping away the bulk of Lima's irrelevant allegations, the only salient factual assertions in the FAC bearing on the RICO scheme and its predicate acts are the same as in the Original Complaint:

- Between February 19, 2009 and March 4, 2009 Phoenix's financial strength ratings were downgraded.  *See* FAC ¶ 98.

- On March 3 and March 4, 2009, Phoenix's two largest distributors announced they would no longer sell Phoenix products.  *See id.* ¶ 99.

- Beginning on March 10, 2009, Phoenix's ratings were further downgraded.  *See id.* ¶¶ 100–101.

- Having suffered losses in the financial crisis, having its credit ratings downgraded and unable to sell new policies, it is at this point Lima alleges that, "upon information and belief," the Individual Defendants, seeking to "keep Defendant Phoenix afloat", "determined that Defendant Phoenix would contest investor-owned policies once they came due, but that this intent would be kept secret, while Defendant Phoenix fraudulently induced policyholders to continue to pay their often substantial premiums."  *See id.* ¶¶ 7, 20–21, 106, 109–110.

- Lima then alleges, again solely upon "information and belief," that the Individual Defendants "caused Defendant Phoenix to issue notices and other materials that falsely and misleadingly represented that the investors' policies were valid and in force, and had value, without ever disclosing that, in fact, when these policies came due, Phoenix would contest and refuse to pay the death benefit and challenge these policies as void, while seeking to retain the premiums paid prior to that time."  *See id.* ¶ 109.

- On April 15, 2009, Ms. Young resigned as CEO, and was replaced by Mr. Wehr, previously the company's Chief Investment Officer ("CIO").  *See id.* ¶¶ 103, 105.[13]

In other words, Lima speculates that in March 2009, with Phoenix in dire financial straits, three executives—one of whom had announced her retirement—came up with a secret plan to deny death benefits on every investor owned policy that came due in the future.  Despite having formed this alleged intent, Lima contends that the Individual Defendants, by virtue only of their positions (or, in the case of Ms. Young, former position) within Phoenix, permitted the company to continue issuing policy correspondence indicating the policies were in force.  *See id.* ¶¶ 12, 13, 24, 109, 140, 207, 219, 222, 226, 230, 233, 236, 245.  In other words, Lima claims that the

---

[13] Ms. Young's retirement and replacement by Mr. Wehr was around March 23, 2009. *See Dona D. Young to Retire as Chairman, President and CEO of Phoenix*, Bloomberg Business Wire (March 23, 2009), *available at*: http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a3_LIs7VcisA.

Individual Defendants decided not to allow Phoenix to pay claims for death benefits on investor owned policies, but otherwise did nothing different from what they had done before.

In the face of the Court's instruction that these "conclusory or even speculative allegations" regarding the Individual Defendants were insufficient and that it must offer "specific allegations as to actual acts specific to each of the Individual Defendants" to survive a motion to dismiss, the FAC offers nothing new.  *See* Order, pp. 22.  Instead, the FAC's additional allegations are more of the same, including vague and conclusory allegations that the Individual Defendants:

- designed and implemented a secret scheme to keep Phoenix in business through a pattern of anticompetitive and fraudulent conduct.  *See* FAC ¶ 1.

- were "involved in the improper scheme to defraud policyholders" and "attended numerous internal meetings and strategy sessions in which they discussed and personally approved the fraudulent scheme".  *See id.* ¶ 203.

- expressly authorized all of the "improper activities" Phoenix engages in.  *See id.* ¶ 107.

- were involved with the design of Phoenix's insurance products.  *See id.* ¶¶ 2, 205, 206.

- approved certain premium finance programs and pursued premium-finance business.  *See id.* ¶¶ 68, 75.

- were "involved in the decisions and events leading up to the" COI rate increases.  *See id.* ¶ 137.

- directed Phoenix's title department to track ownership changes in a spreadsheet.  *See id.* ¶¶ 208–210.

These allegations are the same speculative, conclusory and irrelevant allegations already rejected by the Court.  *See* Order, pp. 21–22.  What is missing from the FAC, and what was missing from Lima's Original Complaint, are <u>any</u> non-conclusory, non-speculative allegations regarding the alleged RICO and mail fraud scheme and the Individual Defendants' specific actions in carrying out or objectively manifesting an agreement to the scheme.

# IV.   ARGUMENT

## A.   The RICO and Fraud Claims Fail

"Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)). "Because the 'mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" *Id.* (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir.1990)); *Kalimantano GmbH v. Motion in Time, Inc.*, Civ. No. 12-6969 (PAE), 2013 WL 1499408, at *9 (S.D.N.Y. Apr. 12, 2013) (explaining the court's "duty to critically assess RICO claims at the threshold, to assure that a plaintiff's claim of a RICO violation is not used improperly as a club to bludgeon settlement or surrender without reciting legally sufficient allegations"). Thus, courts must always be on the lookout for the putative RICO case that is really "nothing more than an ordinary fraud case clothed in the Emperor's trendy garb." *In re Integrated Res. Real Estate*, 850 F. Supp. 1105, 1148 (S.D.N.Y. 1993).

Lima's FAC asserts claims against the Individual Defendants for RICO violations (Count Six) and fraud (Count Seven) and against Phoenix for fraud (Count Five). These interrelated claims fail for a number of reasons. First, Lima fails to provide specific allegations as to the Individual Defendants' activities that could substantiate a finding that any of them controlled a RICO enterprise, were guilty of at least two acts of mail fraud, or are involved in an ongoing pattern of racketeering activity.

More fundamentally, with respect to both the RICO claim and the stand-alone fraud claims, Lima fails to allege facts sufficient to establish that a fraud even occurred. Specifically, Lima repeatedly makes the conclusory allegation that Phoenix committed fraud by failing to

disclose its intent to deny death benefits on investor-owned policies (including the Policies), but never provides any specific, non-conclusory allegations to support an inference that Phoenix had such a secret intent.  Indeed, the very public filings Lima contends support the existence of the scheme show that Phoenix actually paid 99.9% of claims since allegedly forming the intent to deny investor-owned claims.  Lima has also acknowledged that Phoenix has paid claims under several policies that U.S. Bank held as securities intermediary for Lima LP.

Additionally, Lima fails to assert facts sufficient to establish a RICO conspiracy, or the proximately caused damages necessary to establish standing under RICO.  Finally, Lima cannot establish that it was owed a duty by either Phoenix or the Individual Defendants, and cannot establish that the Individual Defendants can be held liable for fraud in their individual capacities.

1)      Lima Fails to Allege Individual Defendant's Control of RICO Enterprise

Central to any RICO claim is the requirement that the defendant exercise control over a RICO enterprise.  *See* 18 U.S.C. § 1962(c) (2012); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  As set forth by the "operation and management" test outlined by the Supreme Court in *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993), a defendant must "participate in the operation or management of the enterprise itself."  Order, p 21.  Facts must be alleged as to each RICO defendant's control over the unlawful activity.  *Id.*, p. 21–22 (citing *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001)).  This requirement is "stringent" and requires more than mere association with or participation in the activities of an enterprise.  *In re SmithKline Beecham Clinical Labs.*, 108 F. Supp. 2d 84, 99–100 & n.29 (D. Conn. 1999).  In its FAC, Lima once again impermissibly rests on allegations of the Individual Defendants' corporate positions within Phoenix the life insurance company, rather than providing any particularized allegations as to how the Individual Defendants directed Phoenix the alleged RICO enterprise.  *See* Order, p. 22.

Instead of offering the details, Lima composed a narrative spanning dozens of pages in which it alleges that from 2003 to 2008, Phoenix did everything it could to design and market insurance products to consumers who would potentially resell those policies to investors, invested profits from these sales in Alt-A mortgage backed securities, and attempted to operate a life settlement company.  Lima purports to detail the Individual Defendants' involvement in these activities.  *See* FAC ¶ 68 (Ms. Young traveled the country marketing premium finance programs); ¶ 72 (Mr. Polkinghorn held a conference call in 2005 regarding acceptance of non-recourse premium financing); ¶¶ 2, 17, 75, 205, 320 (Ms. Young and Mr. Polkinghorn participated in a product strategy group committee); ¶ 88 (Ms. Young reporting on an investor call); ¶ 89 (same); ¶ 90 (Mr. Wehr invested in Alt-A mortgage backed securities); ¶ 93 (Ms. Young and Mr. Polkinghorn involved with starting Phoenix Life Solutions); ¶ 99 (Mr. Wehr acknowledged that distributors stopped selling Phoenix products); ¶ 246 (Mr. Wehr signed allegedly false financial statements); ¶ 320 (Individual Defendants all members of product strategy group).  Despite spending the bulk of its factual background dissecting Phoenix's sale of universal life insurance policies from 2003 to 2008, Lima never asserts that there was anything criminal about the Individual Defendants' activities during this time period, or that there was anything wrong with the insurance policies Phoenix issued, which includes the Policies.

Lima's story experiences a stark temporal shift at the beginning of 2009.  Lima describes the economic downturn and a series of rating downgrades and distribution channel closures in February through March 2009 that allegedly left Phoenix unable to sell new life insurance and unwilling or unable to pay the death benefits on policies sold over the previous five years.  *See id.* ¶¶ 97–102.  It is at this point that two things happen: (1) the Individual Defendants and others allegedly form a secret intent to deny future claims, causing previously innocuous and routine

14

policy correspondence to transform into mail fraud; and (2) Lima stops providing specificity in its allegations regarding the Individual Defendants.  Indeed, despite spending page after page detailing five years' worth of business activities, Lima simply glosses over the specifics of the actual scheme that it contends transformed Phoenix into a RICO enterprise.  Instead of providing these specifics, the FAC offers more smokescreen, in the form of allegations detailing the Individual Defendants compensation across several years, their stock ownership,[14] and Phoenix's financial statements.[15]  *See. e.g,.* FAC ¶ 256 (Mr. Wehr purchases stock); ¶ 261 (compensation); ¶ 262 (same).

What Lima does not and cannot offer, are particularized allegations as to any of the Individual Defendants' actions taken in furtherance of the alleged RICO scheme.  Among other things, there are no particularized allegations of when the intent to deny claims was formed, who was involved in forming the intent, what plan was formed to carry out the intent's concealment, or what actions the Individual Defendants (or anyone else) took to carry out the plan.  Having

---

[14] The FAC retains Lima's recitation of the Individual Defendants stock ownership (with a notable absence of allegations that any Individual Defendant ever sold a single share of Phoenix stock in furtherance of the alleged scheme) found irrelevant to establishing RICO liability in the Original Complaint.  *See* Order, p. 22.  The FAC supplements these irrelevant allegations with a convoluted theory of how Mr. Wehr's compensation, which is largely comprised of long-term stock options, somehow incentivizes him to drag Phoenix into short-term liquidation as opposed to long-term viability.  *See* FAC ¶¶ 256, 260–262.  These allegations do not support any inference that Mr. Wehr or any Individual Defendant was (or continues to be) engaged in fraud or a RICO scheme.

[15] Although this does not appear to be the case, to the extent Lima is attempting to characterize Phoenix's SEC and other regulatory security filings as a RICO predicate act, such an attempt fails.  First, these allegations are insufficient to establish a violation of any of the laundry list of criminal actions that constitute a RICO predicate act.  *See* 18 U.S.C. § 1961(1) (West 2013) (specifying the racketeering activity on which a RICO claim may rely).  Second, to the extent Lima could actually show that these actions constituted securities fraud, such claims are exempt from RICO tie-in by the RICO Amendment to the Private Securities Litigation Reform Act.  *See MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 269 (2d Cir. 2011).

conjured this theory out of thin air, Lima decides to further speculate and assert that a scheme of this magnitude must have originated from the top of the company.

Indeed, the failing of Lima's theory is illustrated by its allegations concerning Ms. Young and Mr. Wehr.  Lima acknowledges that Mr. Wehr replaced Ms. Young as CEO in early 2009 but contends both are somehow responsible for the RICO scheme allegedly implemented contemporaneous with this leadership change and carried out over the next five years.  *See* FAC ¶ 103 (alleging Ms. Young "abruptly resigned").  While Lima offers a smattering of specific allegations related to Ms. Young's tenure as CEO, none relate to an intent to deny claims. Rather, they relate solely to her supposed approval of Phoenix's general business practices, such as product development, marketing and underwriting—perfectly normal activities for a life insurance company's CEO.  *Id.* ¶¶ 18, 68, 77, 85, 94.  More importantly, Lima has absolutely no explanation for how Ms. Young could direct Phoenix to fraudulently conceal anything after she resigned as CEO.  Similarly, Lima cannot reconcile its contention that Ms. Young personally participated in and approved of Phoenix's COI increases with its admission that she had resigned as CEO a year earlier.  *Compare id.* ¶ 103, 107, *with* ¶ 127

The flip side of this former and current CEO equation is equally damning.  The only allegations surrounding Mr. Wehr that predate his transition to CEO are that (1) as Phoenix's CIO, he was allegedly responsible for Phoenix's investment losses; (2) he was on a product development committee; and (3) he somehow shared responsibility with Ms. Young and Mr. Polkinghorn for Phoenix's Director of Policy Title creating a spreadsheet to track ownership changes.  *Id.* ¶¶ 17, 20, 42.  None of these allegations are salient to the alleged fraud—that Phoenix concealed its intent to deny claims on investor owned policies.  Instead of offering specific, non-conclusory allegations of how Mr. Wehr directed the fraudulent concealment once

he became CEO, Lima repeatedly alleges that Mr. Wehr somehow let slip his participation in the "fraudulent scheme" by stating to Phoenix's shareholders that the company was working to manage liabilities through contractual and legal remedies.  *Id.* ¶¶ 107, 204, 323.  Companies have assets and liabilities, and how they manage risks associated with those assets and liabilities dictates their success—there is nothing improper about a CEO telling shareholders that he is taking appropriate steps to manage risks, and nothing within Mr. Wehr's alleged statements that would allow the Court to draw any inference that fraud was afoot.  Further, the Court has already acknowledged that Phoenix's litigation activity is protected.   That this statement is Lima's supposed smoking gun is illustrative of how weak their allegations truly are.  Lima offers even less of an explanation of how Mr. Polkinghorn—President of Phoenix's Life and Annuity Division—was involved in the alleged scheme, offering nothing but conclusory allegations.

The RICO allegations are merely a last ditch attempt by Lima to save its RICO and fraud claims by smearing the reputations of Phoenix executives without substantiation.  If permitted, this would turn RICO on its head and permit any claimant to assert RICO violations by simply alleging, upon information and belief, that all corporate officers are responsible under RICO whenever a plaintiff contends a corporation commits fraud.

    2)    <u>Lima Fails to Allege With Specificity Any Of the Individual Defendant's Actual Acts Constituting Mail or Wire Fraud</u>

"The bare minimum of a RICO charge is that a defendant <u>personally</u> committed or aided and abetted the commission of two predicate acts."  *McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992) (affirming dismissal of RICO claim for failure to plead pattern of racketeering activity) (emphasis added).   The plaintiff must allege that each defendant committed the predicate acts willfully or with actual knowledge of the illegal activities.  *See Commercial Cleaning Servs., LLC v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 387 (2d Cir. 2001).

17

Courts are particularly vigilant to enforce heightened pleading standards in the context of civil RICO claims predicated on mail or wire fraud.  *See Gross v. Waywell*, 628 F. Supp. 2d 475, 493 (S.D.N.Y. 2009) (noting that RICO claims based on mail or wire fraud must be heavily scrutinized (citing *Efron v. Embassy Suites, Inc.*, 223 F.3d 12, 20 (1st Cir. 2000))).  Additionally, claims based on mail fraud must satisfy Rule 9(b), and "must plead facts that give rise to a strong inference that the defendant possessed fraudulent intent."  *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993).  Violation of the mail fraud statute requires "the existence of a fraudulent scheme and a mailing in furtherance of the scheme."  *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 119 (2d Cir. 2013).  The words "to defraud" in the mail fraud statute have "the common understanding of wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching."  *Carpenter v. United States*, 484 U.S. 19, 27, (1987) (citations omitted).

Here, Lima alleges conclusory allegations that the Individual Defendants caused Phoenix to issue fraudulent mailings.  Lima offers no allegations providing any specificity regarding how each specific Individual Defendants caused Phoenix to commit mail fraud.  *See Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 660 F. Supp. 1362, 1369 (D. Conn. 1987) (dismissing RICO allegations where plaintiff did not "specify which defendants used mail or wire services, what was transmitted, when it was transmitted, or to whom it was sent.").  Lima certainly does not allege facts giving rise to a strong inference that any Individual Defendant was acting with a criminal intent to defraud.  *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178–179 (2d Cir. 2004) (concluding that an amended complaint which alleged

temporally inconsistent facts failed to alleged a strong inference of fraudulent intent to support a RICO claim).

Indeed, *Mills v. Polar Molecular Corp.* is directly on point. *See Mills*, 12 F.3d at 1175 (dismissing a RICO claim for failure to plead a predicate act of mail or wire fraud). In *Mills*, the plaintiff brought suit against a corporation and its officers and directors, alleging the officers and directors used the corporation as a RICO enterprise. *Id.* at 1174. The plaintiff alleged mail and wire fraud as the predicate acts. *Id.* at 1176 (acknowledging that failure to satisfy Rule 9(b) as to the fraud claims "demands as a corollary that these allegations cannot serve as predicate acts"). The court dismissed the allegations because, among other reasons, plaintiff had "not linked the alleged fraudulent statements to a particular Director" and because the "mere fact that the Directors were controlling persons at [the company] does not link them to the statements; the plaintiffs also had to allege that the Directors *personally* knew of, or participated in, the fraud." *Id.* (noting that allegations regarding "broken promises to third parties were equally vague, and cannot serve as predicate acts"). Lima's conclusory allegations here are no different.

### 3) Lima Improperly Bases Allegations On Information and Belief

Unwilling to admit it is simply speculating that there is a secret intent to deny claims under the Policies, Lima asserts that it bases its allegation on "information and belief." *See* FAC n. 1. Almost every allegation Lima offers in the FAC (conclusory or otherwise) is based entirely on information and belief. *See id.*, ¶¶ 12, 17–18, 21, 24, 27, 39–44, 62, 68, 75, 86, 105–107, 109, 116, 138, 140, 143, 146, 160, 163, 185, 187, 201, 203, 207– 209, 214–215, 217–218, 221–222, 225–226, 229–230, 232–233, 235–236, 245–246, 259 & n.11, 265, 306, 308, 320–321, 323–325, 332, 335.[16]

---

[16] Indeed, Lima states at the outset of its FAC that, other than the allegations specifically related to Lima, every allegation is based solely on information and belief. *See* FAC n.1. In its

Although matters peculiarly within a defendant's knowledge may be pled "on information and belief," this does not mean that those matters may be pled lacking any detail at all, as Lima does here.  *See First Capital Asset Mgmt., Inc.*, 385 F.3d at 179; *Lerwick v. Kelsey*, 150 F. App'x 62, 64–65 (2d Cir. 2005) (affirming RICO dismissal where plaintiff failed "to provide any evidence (besides allegations based on information and belief) of any false or fraudulent pretenses or representations required for establishing a 'scheme or artifice to defraud' under the mail and wire fraud statutes"); *Equitable Life Assur. Soc. of U.S. v. Alexander Grant & Co.*, 627 F. Supp. 1023, 1029 (S.D.N.Y. 1985) (pleading RICO allegations "upon information and belief…is entirely inappropriate under Civil Procedure Rule 9(b)").[17]

Lima offers no specific, non-conclusory allegations based on actual facts regarding how each Individual Defendant was involved in the alleged decision to deny claims, how each was involved in the alleged mail fraud, or what actions each took in furtherance of either in furtherance of the RICO scheme or the mail fraud.  Lima simply ignores the Court's Order, and its allegations are insufficient to survive a motion to dismiss.  *See Petrosurance, Inc. v. Nat'l Ass'n of Ins. Comm'rs*, 514 F. App'x 51, 52–53 (2d Cir. 2013) (affirming dismissal of RICO

---

RICO Case Statement, however, Lima contends that its allegations are actually "based upon a substantial amount of evidence already in Plaintiff's possession."  RICO Case Statement [Doc. 88], at 1.  Whatever its reasons for failing to include in its FAC allegations reflecting this supposedly "substantial evidence", Lima has not complied with the Court's admonition that it must set forth facts supporting the specific acts taken by the Individual Defendants.  *See* Order, pp. 21–22.

[17] *See also Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990) (affirming dismissal of amended complaint that was plead "largely on information and belief" and disagreeing with plaintiff's contention that the facts could be "inferred from the supporting statement of facts"); *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986) (plaintiff's allegations "upon information and belief" that that defendants made oral and written representations to plaintiffs failed to provide facts upon which the beliefs were founded and were therefore insufficient to allege fraud claims with particularity); *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972) (plaintiff's conspiracy claims were unfounded when  the complaint was "entirely conclusory in  nature" and failed to specify particularized allegations).

action after concluding that plaintiff had gone "to extraordinary lengths to construct [a] fantastical scheme, a scheme that is ripe for dismissal simply 'because it defies logic'"); s*ee also Reves*, 507 U.S. at 179 (requiring operation or management of a RICO enterprise to incur liability under RICO).

> 4)     Lima Fails to Allege Facts Supporting an Inference that a Fraud Occurred

In supporting its RICO and fraud claims, Lima offers only the conclusory and speculative allegation that the Individual Defendants agreed not to permit Phoenix to pay claims on investor-owned policies. *See* FAC ¶¶ 8, 12–13, 24, 28, 207–208, 245. In its fraud claims, Lima attempts to infer the existence of this secret intent by pointing to (a) Phoenix's litigation activities and its resisted claim rate since 2009, *id.* ¶¶ 145–146, 211–213; (b) an alleged secret list of investor owned policies, *id.* ¶¶ 208–210; and (c) Phoenix's October 2008 correspondence with the Connecticut Insurance Department, *id.* ¶ 214. None of these allegations are sufficient to support the inference of a secret intent.

> a.     The Litigation and Claim Denial Façade

Stunningly, Lima alleges that from 2003 to 2008 Phoenix issued $10 billion of policies that are now investor-owned, and that, in early 2009, the Individual Defendants resolved that Phoenix would never voluntarily pay a single penny for any of these policies. *See* FAC ¶ 2 ("Phoenix made hundreds of millions of dollars selling billions of dollars in life insurance policies that were later resold to investors…."); ¶ 19 (alleging that Phoenix increased sales from $125 million per year to $445 million per year through investor-owned sales); ¶ 86 (same); ¶¶ 87, 104 (noting that Phoenix's policies were now largely investor-owned); ¶ 106 (same); ¶¶ 109, 182, 215 (noting $21.6 billion outstanding PHL policies); ¶ 259 (alleging Phoenix issued $10 billion of investor-owned policies which Phoenix has no intent to pay). If such a resolution

had taken place four years ago, there should be ample evidence by now of Phoenix denying claims on investor-owned policies.  There is not.

Lima cites to the resisted claims disclosed in Phoenix's regulatory filings, asserting that Phoenix went from denying 1% of claims in 2008 to now denying an astronomical level of claims.  *See id.* ¶ 145.[18]  Basic math, however, shows that Lima is misleading the Court by double and triple counting resisted claims.  *See* Ex. I:  Regulatory Filings.  The regulatory filings upon which Lima relies identify resisted claims by policy number, amount, and the year <u>initially</u> resisted.  *See, e.g.*, *id.* at 36 (Schedule F).  Once a claim is resisted, it remains identified in regulatory filings every year until resolved.  In other words, if a resisted claim is in litigation for several years, it will appear as a resisted claim in multiple years' filings—but is still only one policy.  *Id.* at 24.GT, 36.  To fabricate the rapidly increasing claims denial rates asserted within its FAC, Lima counts claims as resisted in each and every year they appear on a filing, rather than in the year in which the claim was actually denied.  The end result is that Lima counts paid claims only once, while counting resisted claims multiple times, resulting in a fictional figure bearing no relation to the number or percentage of claims Phoenix actually resisted.

In reality, the filings show that Phoenix "denied or resisted" 7 of 6,640 claims submitted in 2008; 1 of 18,675 claim submitted in 2009;[19] 3 of 18,517 claims submitted in 2010; 2 of 18,879 claims submitted in 2011; and 2 of 10,464 claims submitted in 2012.  *Id.* at 24.GT, 36; *see also* Ex. J: Summary of Claims Statistics.  These filings show Phoenix actually resisted seven

---

[18] These regulatory filings are specifically identified and relied upon by Lima to support an integral allegation in its FAC.  As the authenticity of the filings are not subject to dispute, the Court can consider them on a motion to dismiss.  *See Faulkner*, 463 F.3d at 134.

[19] Although the relevance of this metric is unclear, Phoenix "denied or resisted" a single, $5,000,000 claim in 2009 (see Column 5 on Schedule F of Exhibit I), which represents approximately 0.75% of the $666,518,911 in death benefit claims made that calendar year—<u>not</u> 12.37%, as Lima alleges.

(7) claims in 2008—the year before the alleged secret intent was formed—but has resisted only eight (8) claims combined from 2009 through 2012.  Moreover, U.S. Bank and Lima have both acknowledged that Phoenix paid the $30 million death benefits under the policies at issue in *Doe I* and *Doe II*, and between the filing of Lima's Original Complaint and its FAC, Phoenix paid claims under two policies, which Lima has dropped from the listing of Policies in its FAC.

In the end, Lima's RICO claim is predicated on the speculative assertion that four years ago the Individual Defendants resolved that Phoenix would not pay claims on investor-owned policies, but offers no explanation as to why Phoenix has contested only a handful of claims while paying out billions of dollars to beneficiaries.  A RICO and fraud action should not be permitted to stand supported by such implausible and speculative assertions, and a theory starkly undermined by undisputable facts.  *See Musco Propane, LLP v. Town of Wolcott*, 3:10-CV-1400 JCH, 2011 WL 3267756, at *5–6 (D. Conn. July 28, 2011) (dismissing plaintiff's claim because it depended on an "unsupported and highly implausible premise"); *Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany*, 615 F.3d 97, 114 (2d Cir. 2010) ("To survive a motion to dismiss, a complaint must meet a plausibility standard . . . [t]his analysis is a 'context-specific task that requires [us] to draw on [our] judicial experience and common sense." (quoting *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009)).

b.    <u>Phoenix's Litigation is Legitimate and Protected</u>

As this Court has already held, Lima's allegations show only that Phoenix has "legitimately pursued litigation to challenge insurance policies that appear to lack insurance interests."  *See* Order, p. 13 & n.2.  Nonetheless, a key thesis of Lima's FAC remains the supposed wrongfulness of Phoenix seeking to void a STOLI policy or a fraudulently procured

policy while at the same time seeking to retain premiums.[20]   Contrary to Lima's repeated assertions, Phoenix may seek such relief in connection with lawsuits[21] seeking to void or rescind policies.  *See PHL Variable Ins. Co. v. The P. Bowie 2008 Irrevocable Trust*, 718 F.3d 1, 12 (1st Cir. 2013) (finding that Phoenix, as a clear victim of a STOLI scheme, may retain premiums paid); *PHL Variable Ins. Co. v. The Lucille E. Morello 2007 Irrevocable Trust*, 645 F.3d 965, 969 (8th Cir. 2011) (affirming denial of return of premium given fraudulent STOLI activities, including the falsification of the insured's finances "to dupe Phoenix into issuing an insurance policy" for which the insured was not financially qualified); *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 797 (6th Cir. 2009) (refusing to allow a party with unclean hands to recover premiums); *see also Penn Mut. Life Ins. Co. v. Greatbanc Trust Co.*, 887 F. Supp. 2d 822, 829–31 (N.D. Ill. 2012) (holding that a life insurance policy without an insurable interest is an illegal and void wagering contract that must be treated as though it never existed and declining to order a return of premiums); *TTSI Irrevocable Trust v. ReliaStar Life Ins.*, 60 So.3d 1148, 1150 (Fla. Dist. Ct. App. 2011) (leaving the parties as the court found them by declining to enforce a STOLI policy that was void as contrary to public policy); *Carton et al. v. B&B Equities, LLC, et al.*, No. 2-11-cv-746, 2011 WL 6096496, at *9–10 (D. Nev. Dec. 7, 2011) (ruling that an insurer was not unjustly enriched in retaining premiums paid for a STOLI policy, which was void as a

---

[20] Additionally, the litigation shows that Phoenix is not sitting back, collecting premiums and waiting for death claims to occur, only to blind-side an investor with a denied claim. Instead, Phoenix has proactively sought judicial declarations regarding policy validity while the insureds are still living.  Even if Phoenix policies are devalued on the secondary market due to the market's awareness of Phoenix's willingness to contest fraudulent policies, Phoenix litigation is protected conduct that cannot form the basis of a claim, whether sounding in contract, tort, or under RICO or antitrust statutes.

[21] Notably, Lima does not allege that Phoenix has sought to rescind a policy or deny a claim while retaining premiums outside of the context of litigation between Phoenix and a policyholder or beneficiary.  In other words, Lima's only complaint is with how Phoenix has asserted its legal rights in litigation, which is protected conduct.

matter of public policy); *Pruco Life Ins. Co. v. Brasner*, 2011 WL 134056, *7–8 (S.D. Fla. Jan. 7, 2011) (denying a motion to dismiss the insurer's equitable argument to retain the premiums if the policy is declared void for lack of an insurable interest).

To the extent Lima seeks to predicate liability on Phoenix's litigation activities, it is well-established that "Noerr Pennington immunity is applicable to RICO actions and to state-law claims such as fraud." *Bath Petrol. Storage, Inc. v. Market Hub Partners, L.P.*, 229 F.3d 1135, at*1 (2d Cir. 2000) (summary order) (unpublished table opinion). The Noerr Pennington doctrine protects First Amendment efforts, including petition of the government for redress. *Id.*; *see also Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993). Lima can only get around the Doctrine by alleging that Phoenix's lawsuits were a sham, or so "objectively baseless . . . that no reasonable [person] could realistically expect success on the merits." *Bath*, 229 F.3d at *1 (quoting *Prof'l Real Estate Investors, Inc.*, 508 U.S. at 51). As this Court has found, Phoenix has successfully challenged fraudulent policies and no court has ever found that Phoenix's suits were objectively baseless. *See* Order, p. 13. Despite this holding, Lima continues to include this specious allegation in its FAC.

### c. The LPT Spreadsheet is a Complete Red Herring

Lima contends that the "LPT" spreadsheet is a "secret" list of investor owned policies Phoenix intends to challenge, but fails to explain how this spreadsheet plausibly corroborates its theory that the Individual Defendants formed a secret intent to deny claims in 2009. Given that the spreadsheet was allegedly created a year earlier by the Director of Phoenix's Policy Title Department, it is implausible that the spreadsheet was created in connection with the alleged RICO scheme. *Compare* FAC ¶ 208 (alleging that Phoenix's title department created the spreadsheet in 2008), *with id.* ¶¶ 97–102, 106, 245 (claiming that the Individual Defendants formed the alleged "secret intent" after the ratings downgrades and stock market crash in the

spring of 2009).  Additionally, there is simply nothing expressly or implicitly nefarious about Phoenix's Director of Policy Title tracking ownership changes, and Lima's group-pled, conclusory assertion that Phoenix's CEO, CIO and President of Life & Distribution all directed the Title Department's creation of this spreadsheet does not advance the ball for Lima.  *Id.* ¶¶ 208, 210.

>            d.      <u>Lima Misrepresents the October 2008 Department of Insurance Response</u>

Despite having a copy of Phoenix's October 2008 response to the Connecticut Department of Insurance regarding an anonymous letter from a life insurance producer, Lima chooses to brazenly misconstrue the letter as a representation to the Connecticut Department of Insurance that, as of October 2008, Phoenix had audited its policies and concluded that it had not issued any STOLI policies.  *See* FAC ¶ 214.  In reality, the letter simply says that Phoenix had established guidelines "to minimize the potential of STOLI business being submitted to Phoenix" and that it undertook "investigatory visits" to premium finance companies, where it selected for review "a number of cases submitted by" the firm "to see if any irregularities or inconsistencies appear."  *See* Ex. K:  Letter to Conn. Dep't of Ins, at 14.[22]  Phoenix also noted that these visits had "not resulted in any findings that the submitted business was inconsistent with the original guidelines" but that "Phoenix intends to remain vigilant to avoid the unintentional acceptance of STOLI cases.  Further, apart from the dealings with premium finance companies, when we become aware of inappropriate STOLI business, we will file individual rescission cases when it is merited by the circumstances."  *Id.*  Phoenix's statement that it would file "rescission cases when . . . merited" apparently did not drive the Department into a regulatory frenzy, as Lima

---

[22] The Court can consider documents Lima possessed and relied upon in drafting its complaint.  *See Chambers*, 282 F.3d at 154–55  (allowing consideration of documents plaintiffs had in their possession and relied on in drafting its complaint).

believes it should have.  The letter has nothing to do with an alleged scheme to defraud through a pattern of mail fraud.

     5)    <u>No Pattern of Racketeering Activity</u>

To sustain its RICO claim, Lima must plead a pattern of racketeering activity, where the racketeering acts are related and either amount to or pose a threat of continuing criminal activity. *See Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (citing *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).  Lima states conclusorily that the Individual Defendants are engaged in an ongoing pattern of actionable conduct, but pleads no facts suggesting any threat of continuing criminal activity.  *See* FAC ¶¶ 263, 318; *Plainville Elec. Prod. Co. v. Vulcan Advanced Mobile Power Sys., LLC*, 638 F. Supp. 2d 245, 254 (D. Conn. 2009) (confirming that the plaintiff "must plead facts that would suggest a threat of continuing criminal activity beyond . . . when the last predicate act may have occurred"). Moreover, when the alleged enterprise conducts a legitimate business, "there must be some evidence from which it may be inferred that the *predicate acts* were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued *criminal activity*." *Cofacredit*, 187 F.3d at 243 (emphasis added). So Lima offers no evidence that the Individual Defendants are engaged in an ongoing pattern of criminal activity and, in fact, Lima acknowledges that neither Ms. Young nor Mr. Polkinghorn are even still employed by Phoenix.  *See* FAC ¶¶ 43–44.  Indeed Ms. Young stepped down as CEO before Lima allegedly acquired its interest in the Policies.  *Compare id.* ¶ 37 (alleging that Lima acquired interests in the Policies in December 2010 and April 2011), *with* ¶ 44 (stating that Ms. Young resigned in April 2009).   As such, the Individual Defendants do not pose a threat of continued criminal activity.

6)      Lima Fails to Allege a RICO Conspiracy

To allege a conspiracy under Section 1962(d), Lima "must assert that each defendant implicated in the conspiracy objectively manifested an agreement to participate in the affairs of an enterprise through the commission of two or more predicate crimes." *Celpaco, Inc. v. MD Papierfabriken*, 686 F. Supp. 983, 992 (D. Conn. 1988); *see Friedman v. Arizona World Nurseries Ltd.,* 730 F. Supp. 521, 548 (S.D.N.Y.1990), *aff'd without opinion*, 927 F.2d 594 (2d Cir. 1991) (complaint did not adequately allege conspiracy because it did not "allege that each defendant *personally* agreed to commit two or more of the predicate acts" [emphasis in original]).  As Lima failed to allege any facts demonstrating an objective manifestation of an agreement to participate in two or more predicate crimes by any of the Individual Defendants, Lima's RICO conspiracy claim must be dismissed.[23]

7)      Lima Has No Proximately Caused Damages

To have standing to assert a RICO claim, the alleged predicate acts must be both the proximate and "but for" cause of Lima's injury.  *See* Order, p. 20; *Hemi Group, LLC v. City of N.Y.*, 130 S. Ct. 983, 991 (2010) (plaintiff's injury is the harm caused by the predicate acts); *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 136 (2d Cir. 2010) (dismissing claims that failed to "meet RICO's requirement of a direct causal connection between the predicate offense and the alleged harm").  This rule is designed "to preclude recovery by plaintiffs who 'complain of harm flowing merely from the misfortunes visited upon a third person.'" *Standardbred Owners Ass'n*, 985 F.2d 102, 104 (2d Cir. 1993) (quoting *Holmes v. Securities Investor Prot.*

---

[23] The RICO conspiracy claim also fails because Lima does not plead a substantive RICO violation.  *See Cofacredit*, 187 F.3d at 244–45 (requiring that a RICO plaintiff alleging conspiracy plead facts establishing that the RICO defendants "agreed to form and associate themselves with a RICO enterprise and that they agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with enterprise" and show "that if the agreed-upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity").

*Corp.*, 503 U.S. 258, 268 (1992), and citing *Rand v. Anaconda–Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir. 1986)) (corporate shareholders or creditors suing for injuries to the corporation).  As such, to have standing to assert a RICO claim, Lima must show that the mail fraud was both the proximate cause and "but for" cause of a ripe, defined and recoverable injury.

As this Court clearly explained, "injury [] premised upon the contingency that plaintiff will not recover the benefits of the Policies" fails to meet RICO's standing requirements.  *See* Order, p. 25.  In other words, while Lima's entire fraud theory is premised on its speculation that Phoenix will never pay a claim under the Policies, Lima cannot premise its injury either on unpaid death benefits or on premiums paid for which the benefit of the bargain was not received, as both of these injuries are premised upon a contingent event—Phoenix's receipt of and wrongful denial of a claim—which may never occur.

The Court identified three possible avenues in which Lima could potentially allege a viable damage claim: (a) money lost on lapsed or surrendered policies; (b) failure or delay in making $33 million of death claims; or (c) devaluation of the policies.  Lima's FAC does not allege facts sufficient to establish that the Individual Defendants' alleged acts of mail fraud were the proximate or "but for" cause of any of these alleged injuries, which is what is necessary to establish RICO standing.

As to the first potential damage, Lima does not allege that Phoenix's failure to disclose its intent to challenge a policy caused Lima to lapse a policy.  Indeed, this is exactly the opposite of Lima's claim, which is that the notices fraudulently induced it to continue paying premiums.  *See* FAC ¶¶ 220, 224, 228, 231, 234, 245.  While Lima claims that it was forced to lapse policies, it was supposedly due to the alleged anti-competitive and exclusionary conduct, which does not qualify as a RICO predicate act.  *Id.* ¶¶ 9, 21–23; *see* 18 U.S.C. § 1961(1) (2013) (listing the

indictable predicate acts on which a RICO claim may be premised).  While this could support a claim for antitrust damages (though in this case, it does not), it cannot sustain a RICO claim.

The second potential damage, the $33 million in denied or delayed claims, relate to policies that are specifically <u>not included</u> within the Policies identified by Lima as subject to this suit.  This dooms Lima's claim for at least two reasons.  First, Lima makes no allegations of predicate acts with respect to these policies, therefore failing to connect its RICO claim with RICO damages.  *See* FAC ¶ 36 & App. A (listing the in force Policies made subject of the FAC, which do not include the *Doe I*, *Doe II*, or *Doe III* Policies); App. B (listing the lapsed Policies, which do not include the *Doe I*, *Doe II*, or *Doe III* Policies); App. C (listing the alleged predicate act mailings, which do not include notices related to the *Doe I*, *Doe II*, or *Doe III* Policies); *see also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) (requiring a direct relation between the asserted injury and the alleged conduct under RICO to "obviate the risk of multiple recoveries").  Second, to the extent Lima seeks damages related to delayed or denied claims, it cannot (and does not) allege such damages with respect to the Policies in the FAC as no claims have been made under any of the Policies (by contrast, two polices included in the Original Complaint but left out of the FAC have resulted in fully and promptly paid claims).

Finally, Lima offers no allegations supporting a finding that a failure to disclose an intent to deny claims was the proximate or "but for" cause of the Policies losing value.  Indeed, under Lima's own theory it is not the predicate act of mail fraud that has caused the Policies to lose value—it is Phoenix's secret intent to deny coverage.  Phoenix's intent to deny claims, if such existed, is neither criminal nor a RICO predicate act.  Lima simply cannot show that the Policies were devalued by Phoenix's fraudulent concealment of its intent to deny claims separate and apart from the fraudulent intent itself.  As such, the alleged predicate acts could not be the "but

for" cause of any policy devaluation.[24]  *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457–58 (2006) (affirming dismissal of a RICO claim where the cause of the harm was distinct from the alleged predicate act).

Moreover, given the other actions that Lima alleges caused the Policies to be devalued—i.e., the market's reaction to a belief that Phoenix will not be financially capable of making death payments due to financial losses and ratings downgrades, COI increases, Phoenix's involvement with litigation, etc., it is implausible to conclude that the predicate acts were the "but for" or proximate cause of any devaluation.  *Id.* (explaining that other factors could have resulted in the asserted injury, and thus, the alleged fraud could not have proximately caused the loss); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (requiring a complaint to "state a claim to relief that is plausible on its face"); FAC ¶¶ 22, 97–101, 134, 211–213.  As such, Lima has not alleged damages sufficient to establish RICO standing, and its RICO claims must be dismissed.

    8)    Phoenix Owes No Duty to Lima

Nondisclosure by itself is insufficient to establish fraudulent concealment.  *See Egan v. Hudson Nut Prods., Inc.*, 114 A.2d 213, 214 (Conn. 1955); *see also Waddell & Reed Fin., Inc. v. Torchmark Corp.*, 223 F.R.D. 566, 605 (D. Kan. 2004) (citing *O'Ferral v. Trebol Motors Corp.*, 45 F.3d 561, 564 (1st Cir. 1995)) (nondisclosure by itself ordinarily insufficient to show RICO fraud or fraudulent intent).  A defendant may only incur liability for fraud by omission when he has a duty to disclose material information.  *See Chiarella v. United States*, 445 U.S. 222, 227–28 (1980) ("There must be a duty to disclose, however, for there to be a claim of fraud for failure to disclose."); *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000).  A plaintiff asserting fraud based on nondisclosure must also plead facts supporting the defendant's duty to disclose.

---

[24] Indeed, Lima's antitrust theory is that the Policy devaluation was caused by a variety of anti-competitive actions.

*See Fed. Paper Bd. Co., Inc. v. Amata*, 693 F. Supp. 1376, 1391 (D. Conn. 1988).  To the extent Phoenix owes a duty of disclosure, it is to the policy owner to whom the notices were mailed— U.S. Bank.  *See Duksa v. City of Middletown*, 376 A.2d 1099, 1101 (Conn. 1977) ("Such a duty [to disclose] is imposed on a party insofar as he voluntarily makes disclosure."); *Egan*, 114 A.2d at 214 (requiring that a person intend or expect to cause a mistake or induce the other into entering or refraining from entering into a transaction to be liable for fraudulent nondisclosure). As a non-party to the Policies, Phoenix could not possibly owe Lima a duty of disclosure.  *See* Ex. C:  Policy Exemplars; Ex. A:  Pl.'s Supp. Brief Re: Damages [Doc. 309], at 3–4, *Doe I*, Case No. 12-3046 (C.D. Cal. Mar. 26, 2013) & Eriksson Decl., ¶¶ 10, 13 (describing the contractual relationship between U.S. Bank and Lima, pursuant to a contractual relationship).  As such, Lima's RICO and fraud claims, Causes Five, Six and Seven must be dismissed.

9)     Individual Defendants Cannot be Held Liable for Fraud

With very limited exceptions not relevant here, corporate officers cannot be held personally liable for actions taken by their employer.  *See Ventres v. Goodspeed Airport, LLC*, 881 A.2d 937, 962 (Conn. 2005) (explaining that an officer is not liable for the corporation's torts "merely because of his official position").  Lima does not allege that the Individual Defendants personally or in their individual capacities made misrepresentations to Lima, fraudulently concealed information from Lima, or owed any duty to Lima.  Rather, the Individual Defendants supposedly caused Phoenix to commit fraud when Phoenix mailed notices related to Phoenix-issued policies where Phoenix did not intend to honor its obligations under the Policies.  As Lima fails to allege any facts that would allow for the Individual Defendants to be held liable for common law fraud in their individual capacities, Cause Seven must be dismissed.

10)     Lima's RICO and Fraud Claims Should Be Dismissed With Prejudice

As Lima failed in two opportunities to state its RICO and fraud claims, Cause Five, Six and Seven should all be dismissed with prejudice.

**B.     CUTPA Claims Fail**

While its Original Complaint grounded its CUTPA claim on CUIPA's "boycott, coercion, and intimidation" provision (Conn. Gen. Stat. § 38a-816(4)), Lima's FAC asserts two separate CUTPA counts based on three CUIPA provisions, as well as a variety of non-actionable claims.  Count Three deals with CUIPA misrepresentations (Conn. Gen. Stat. §§38a-816(1)–(2)), which fail for much the same reasons the fraud and RICO claims fail.  Count Four deals with CUIPA unfair claims handling (Gen. Stat. § 38a-816(6)), which fails for the simple reason that there are no death claims at issue in this case.  Lima also attempts to assert claims for actions taking place more than three years ago, which are barred by the statute of limitations.  Additionally, Lima's CUTPA claims fail due to lack of damages, standing and claims splitting.

1)     Lima Fails to State a CUIPA Misrepresentation Claim

Lima seeks to ground its CUTPA/CUIPA claim by incorporating the previous 100 pages by reference.  Lima's unwillingness to define which conduct in the 120-page FAC it bases its CUTPA claims on is reason enough to dismiss it.  Regardless, a plaintiff asserting CUTPA claims based on alleged violations of Section 38a-816(1) or (2) must plead the traditional common law elements of the associated tort—typically negligent misrepresentation.  *Nazami v. Patrons Mut. Ins. Co.*, 910 A.2d 209, 213–14 (Conn. 2006).  As the Court has already rejected Lima's affirmative misrepresentation theory, it is limited to a claim for fraudulent concealment.[25]

---

[25] In its FAC, Lima discusses illustrations that allegedly provide misleading COI rates, but does not identify any such misleading illustrations being issued to or relied upon by Lima with respect to the Policies at issue in this case—a flaw that is fatal to its claim.  *See* FAC ¶¶ 139; *Lundy*, 711 F.3d at 119 (to satisfy the particularity requirement a complaint must

To the extent Lima's § 38a-816(1) or (2) claim is based on the alleged fraudulent nondisclosure addressed above, the CUTPA claim fails along with those claims.

To the extent Lima is attempting to resurrect its assertion that statements allegedly made by Phoenix that the Policies were in force or that COI rates were adjusted "in accordance with the terms" of the Policies, constitute affirmative misrepresentations, these claims fail as a matter of law.  Putting aside that none of these statements were made to Lima, they reflect, at best, an opinion.  For purposes of CUIPA, an insurer's opinion of the terms of its policies, and its legal interpretations are non-actionable, particularly where the opinion is made to a sophisticated entity capable of assessing the policy and law on its own.  *See Active Ventilation Products, Inc. v. Prop. & Cas. Ins. Co. of Hartford*, X09CV085023757, 2009 WL 2506360, at *2 (Conn. Super. Ct. July 15, 2009); Restatement (Second) of Contracts § 170 cmt. b ("[A]s between the two parties to a contract, the recipient is ordinarily expected to draw his own conclusions or to seek his own independent legal advice.").

Equally flawed is Lima's conclusory assertion that because Phoenix has violated the Connecticut Antitrust Act, or because its alleged conduct is "fraudulent, immoral, unethical, oppressive, and unscrupulous" and has "injur[ed] . . . consumers" it has violated CUTPA.  *See* FAC ¶¶ 285, 287, 288.  In the context of insurance, only conduct that violates CUIPA constitutes a violation of CUTPA.  *See State of Connecticut v. Acordia, Inc.* 18756, 2013 WL 4419116, at **8, 12 (Conn. Aug. 27, 2013) (holding that the laundry list of CUIPA violations is exhaustive

---

"adequately specify the statements it claims were false or misleading" and "give particulars as to the respect in which plaintiff contends the statements were fraudulent").   Lima similarly asserts that unidentified marketing materials violate CUTPA/CUIPA, but offers no facts in support of this claim.  *See* FAC ¶ 284.

and cannot be judicially expanded).  As these allegations are disconnected from CUIPA, they fail as a matter of law.[26]

 As such, Cause Three CUTPA claims under §§ 38a-816(1)–(2) should be dismissed.

2)      No Allegations Support Unfair Claims Settlement Practices Claim

The allegation that Phoenix violated subsection § 38a-816 (6) is not ripe for adjudication. Subsection (6) prohibits an insurer from engaging in a "general business practice" of "unfair claim settlement practices," which, by definition, can only take place <u>after</u> the insured has died and a claim to the death benefit has been submitted.  *See* Conn. Gen. Stat. Ann. §§ 38a-816(6) (West 2012) (detailing the specific claims handling practices prohibited under CUIPA).  Lima does not —and cannot— allege <u>any</u> specific violations of those subparts with respect to a Policy at issue in this litigation.  Moreover, even if Lima had raised factual allegations bearing on Phoenix's claims handling, its sporadic and isolated claims denials—if wrongful—would be legally insufficient to constitute a "general business practice."  *See supra* [page 22–23]; *Craig*, 335 F. Supp. 2d at 308 ("Under … CUIPA, isolated instances of unfair insurance settlement practices are not cognizable." (citations omitted)). As such, Cause Four CUTPA claims under § 38a-816(6) must be dismissed.

3)      CUTPA Claims Based on Actions or Misrepresentations Made More than Three Years Prior to Filing of the FAC Must Be Dismissed

A CUTPA action "may not be brought more than three years after the occurrence of a violation" of the Act. *See* Conn. Gen. Stat. § 42-110g(f) (West 2004).  This limitations period is both "substantive and jurisdictional." *Avon Meadow Condo. Ass'n, Inc. v. Bank of Bost. Conn.*, 719 A.2d 66, 73 (Conn. App. Ct. 1998).  The three-year period begins running from the date of the violation, not from the date of its discovery or the date an injury occurred.  *See Fichera v.*

---

[26] To the extent Lima asserts any other CUTPA violations that are not prohibited under CUIPA, they must be dismissed as well.  *See, e.g.*, FAC ¶¶ 299–300.

*Mine Hill Corp.*, 541 A.2d 472, 475–76 (Conn. 1988).  "Section 42-110g(f) applies to all claims brought under CUTPA without regard to the nature of the underlying unfair trade practice that has been alleged."  *Bellemare v. Wachovia Mortg. Corp.*, 894 A.2d 335, 344 (Conn. App. Ct. 2006).

Phoenix's alleged scheme to fraudulently conceal its intent to deny claims was supposedly enacted in early 2009, and Lima identifies communications starting in 2009 as being allegedly fraudulent.  *See* FAC ¶¶ 12, 222, 226, 230, 233, 245; *see also* App. C.  As such, CUTPA claims related to these early communications are time-barred.  Because Lima did not acquire its derivative interest in the Policies until December 2010, it cannot assert claims for any alleged misrepresentations that fall outside of the statute of limitations.  However, because it is not entirely clear to what conduct Lima's Third and Fourth Causes of Action is intended to apply, Phoenix requests that the Court dismiss Causes Three and Four as to any conduct or actions made more than three years before the FAC was filed.  *See Oy v. HR Textron, Inc.*, No. 3:08-cv-1216 (WWE), 2008 WL 5214268, at *5 (D. Conn. Dec. 11, 2008) (dismissing untimely CUTPA claim).

### 4)   Lima Has Suffered No Damages Recoverable Under CUTPA

The injury for which Lima seeks redress under CUTPA—premiums paid under policies and death benefits payable under policies—are damages exclusively derived from policy ownership.  As U.S. Bank, and not Lima, is the sole owner and beneficiary of the Policies, Lima had neither the obligation to make premium payments on the Policies, nor the right to surrender or lapse the Policies, nor the right to receive any death benefits.  *See* Ex. C: Policy Exemplar, pp. 9 ("You" refers only to the owner of the policy), 13–14 (the policy owner pays the premiums on the policy), 17 (the policy owner has the right to surrender the policy), 17–18 (explaining that while the insured is living, the owner of the policy is the appropriate party to exercise all rights

provided by the policy). As such, any damages Lima has allegedly suffered are entirely derivative of Lima LP's contract with U.S. Bank, which is insufficient to give Lima standing here. *See Carford v. Empire Fire & Mar. Ins. Co.*, 891 A.2d 55, 62 (Conn. App. Ct. 2006) (CUTPA claims premised on a violation of CUIPA may not be brought by a non-insured third party). As such, Causes Three and Four must be dismissed.

    5)    <u>CUTPA Claims Must Be Dismissed Due to Improper Claims Splitting.</u>

The actual owner of the Policies, U.S. Bank, allegedly acting as Lima LP's "securities intermediary," has already asserted CUTPA claims against Phoenix for violations of the same CUIPA provisions Lima alleges herein. *See* Ex. D: *Doe I*, 2d Am. Compl. [Doc. 73], ¶¶ 106–113 (alleging violations of CUTPA/CUIPA); *Doe II*, 2d Am. Compl. [Doc. 56], ¶¶ 107–114 (same); *Doe III*, 2d Am. Compl. [Doc. 39], ¶¶ 151–159 (same); *COI I*, 2d Am. Compl. [Doc. 203], ¶¶ 34–42, 51–62 (alleging violations of CUTPA/CUIPA and breach of contract relating to COI charges); *COI II*, 2d Am. Compl. [Doc. 22], ¶¶ 42–51, 63–73 (same); *COI III*, 1st Am. Compl. [Doc. 9], ¶¶ 42–51, 63–73 (same).

It is well established that "[a]s part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit." *New Phone Co. v. City of New York*, 498 F.3d 127, 129 (2d Cir. 2007). As the Second Circuit has explained:

> [t]he rule against duplicative litigation is distinct from but related to the doctrine of claim preclusion or *res judicata*. . . . The two doctrines serve some of the same policies. The power to dismiss a duplicative lawsuit is meant to foster judicial economy and the comprehensive disposition of litigation. The doctrine is also meant to protect parties from the vexation of concurrent litigation over the same subject matter.

*Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000) (citations and quotation marks omitted); *see also DiGennaro v. Whitehair*, 467 F. App'x 42, 43 (2d Cir. 2012).

"The determination of whether a suit is duplicative is informed by the doctrine of claim preclusion." *Goins v. JBC & Assocs., P.C.*, 352 F. Supp. 2d 262, 266 (D. Conn. 2005). A case is thus duplicative if both the parties and the facts from which the claims arise are the same as those in another case. *See N. Assur. Co. of Am. v. Square D Co.*, 201 F.3d 84, 87 (2d Cir. 2000); *see also Curtis*, 226 F.3d at 139 ("[P]laintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time."). Additionally, the court must "consider the equities of the situation." *Id.* at 138.

Although the parties are different, U.S. Bank purports to bring the other lawsuits as securities intermediary for Lima LP, for which Lima acts as general partner. This relationship is sufficient for claims splitting purposes. *See In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*, 209 F.R.D. 323, 339 (S.D.N.Y. 2002) ("Claim-splitting is generally prohibited by the doctrine of res judicata . . . which bars parties to a prior action or *those in privity with them* from raising in a subsequent proceeding any claim they could  have raised in the prior one, where all of the claims arise from the same set of operative facts.") (emphasis added). Here, Lima asserts claims for CUIPA violations based on misrepresentations related to the Policies and based on Phoenix's claims practices, both theories that have previously been asserted by U.S. Bank, the actual owner of the Policies. *See Doe I*; *Doe II*; *Doe III*; *COI I*; *COI II*; *COI III.* Additionally, where U.S. Bank and Lima have demonstrated a pattern of intentionally filing multiple litigation and engaging in claims splitting (such as by filing three separate lawsuits against Phoenix alleging the exact same breach of contract and CUTPA violations related to the same exact COI adjustment), the only equitable solution is to dismiss Causes Three and Four in light of the ongoing (or, in the case of the *Doe I* and *Doe II* cases, completed) litigation.

**C.**     **Lima is Not The Policy Owner, Lacks Damages, and Lacks Standing to Bring Antitrust Claims**

The Policies are owned by U.S. Bank, not Lima.  As discussed, U.S. Bank is the party responsible for paying premiums and the party to whom Phoenix would pay any death benefits. As such, Lima lacks standing to assert claims for damages flowing from the Policies, regardless of the theory, and could not suffer damages by anything Phoenix did with respect to the Policies. *See Egan*, 114 A.2d at 214–15 (fraud); *Standardbred*, 985 F.2d at 105 (CUTPA); *Hemi Group, LLC*, 130 S. Ct. at 989 (RICO).

Indeed, with respect to its Connecticut Antitrust Act claims, Lima contends that it has standing to bring claims by way of its status as a seller and potential buyer of Phoenix policies. *See* FAC ¶¶ 197–198.  As it is axiomatic that someone cannot sell something it does not own, Lima lacks standing as a seller of Phoenix policies because it does not actually own the Policies. While Lima may sell whatever interest it has in its contract with U.S. Bank, only U.S. Bank has the ability to actually sell the Policies.  On the flip side, Lima's theory is that Phoenix's anti-competitive and exclusionary conduct has severely depressed sales prices of Phoenix policies. *See id.* ¶¶ 23, 158, 161, 199.  As a "potential buyer" of Phoenix policies, Lima could not have suffered any damages, as it would have only benefited from an artificially depressed market. As such, Lima lacks standing to bring Antitrust claims, which must be dismissed.

**D.**     **Dismissal with Prejudice Warranted**

Because Lima has already been given a chance to replead once, and was given express directions by the Court on what Lima must allege to survive a motion to dismiss, Lima's claims should be dismissed with prejudice.  *See Landy v. Heller, White & Co.*, 783 F. Supp. 125, 133 (S.D.N.Y. 1991) ("[D]ismissal of a complaint with prejudice is proper when the complaint has been amended previously.").

## V.      CONCLUSION

Lima has had two opportunities in this Court to state a claim against PHL, in addition to the half dozen opportunities U.S. Bank has utilized as Lima LP's securities intermediary.  Lima was given express instructions on what it would need to allege in order to satisfy Rules 8 and 9(b) in order to state plausible RICO and fraud claims, yet failed entirely in its effort to do so. Lima was also given a second opportunity to assert CUTPA claims and likewise failed to do so. More fundamentally, Lima's entire Amended Complaint is flawed due to its lack of policy ownership, standing to bring claims, and lack of discernible damages.  As such, Phoenix's Motion to Dismiss Lima's Amended Complaint under Federal Rules of Civil Procedure 8, 9(b) and 12(b)(6) should be granted and Lima's claims should be dismissed with prejudice.

Respectfully submitted,

/s/ *Thomas F.A. Hetherington*
Thomas F.A. Hetherington*
tom.hetherington@emhllp.com
David T. McDowell*
david.mcdowell@emhllp.com
Jarrett E. Ganer*
jarrett.ganer@emhllp.com
Shannon A. Lang*
shannon.lang@emhllp.com
EDISON, MCDOWELL & HETHERINGTON LLP
3200 Southwest Freeway, Suite 2100
Houston, Texas  77027
Telephone:     (713) 337-5580
Facsimile:      (713) 337-8850
*admitted *pro hac vice*

Kathleen D. Monnes (ct13433)
kdmonnes@daypitney.com
Thomas O. Farrish (ct19598)
tofarrish@daypitney.com
DAY PITNEY LLP
242 Trumbull Street
Hartford, Connecticut 06103-3499
Telephone:  (860) 275-0100
Facsimile: (860) 285-0343

*Attorneys for Defendants*

***The Phoenix Companies, Inc., Phoenix Life Insurance Company, PHL Variable Insurance Company, James D. Wehr, Philip K. Polkinghorn, and Dona D. Young***

## CERTIFICATE OF SERVICE

 I hereby certify that a true and correct copy of the foregoing document was filed with the Court's CM/ECF system on August 30, 2013, which should have generated and delivered electronic notice of filing to all counsel of record.

/s/ *Thomas F.A. Hetherington*
Thomas F.A. Hetherington